IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

RODNEY REED,

        Plaintiff,

v.

BRYAN GOERTZ, Bastrop County District
Attorney;

STEVE MCCRAW, Director, Texas
Department of Public Safety;

SARAH LOUCKS, Bastrop County District
Clerk; and

MAURICE COOK, Bastrop County Sheriff;

Defendants (sued only in their official
capacity).

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

**CIVIL CASE NO.1:19-cv-794**

**CAPITAL CASE**

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Bryce Benjet
**THE INNOCENCE PROJECT**
40 Worth Street, Suite 701
New York, NY 10013
(212) 364-5980
bbenjet@innocenceproject.org

Andrew F. MacRae
**LEVATINO|PACE PLLC**
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, TX 78746
(512) 637-8565
amacrae@levatinopace.com
*Attorneys for the Plaintiff*

**INTRODUCTION**

*"DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty."*

*Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55, 129 S. Ct. 2308, 2312, 174 L. Ed. 2d 38 (2009) (Roberts, C.J.)

1.      The State of Texas used DNA evidence to convict Mr. Reed, but since that conviction has been called into question in post-conviction proceedings, the State has consistently opposed DNA testing which is capable of proving Mr. Reed's innocence and identifying another man as the murderer.  Mr. Reed properly filed a motion for DNA testing under the existing Texas law approximately five years ago, but his request was denied after lengthy proceedings—including two appeals to the Texas Court of Criminal Appeals (the "CCA").  This constitutional challenge to the Texas postconviction DNA testing statute, Article 64 of the Code of Criminal Procedure ("Article 64"), is now brought after efforts to remedy the deficiencies in the statute in the 86th Texas Legislature were unsuccessful.

2.      This action under 42 U.S.C. § 1983 ("Section 1983") challenges the constitutionality of Article 64 both on its face and as interpreted and applied by the CCA in Mr. Reed's case.  Specifically, this action raises the constitutional violations that flow from the extra-statutory conditions that the CCA imposed on Article 64, conditions which effectively preclude most postconviction DNA testing absent State consent and eviscerate the relief that Article 64 provides.   Given the unique ability of DNA evidence to identify the perpetrator of a crime, the CCA's adoption of non-statutory criteria to preclude Mr. Reed from testing key trial evidence in its possession to prove his innocence violates fundamental notions of fairness and denies him due process of law and access to the courts.

3.     Accordingly, Mr. Reed seeks a declaration that the denial of DNA testing to Mr. Reed under Article 64, as interpreted and applied by the Texas courts, violates his rights under the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.  Mr. Reed also seeks injunctive relief compelling defendants, who are sued in their official capacities only as the custodians of the evidence at issue, to release such evidence for forensic DNA testing. Relief under Section 1983 is warranted when a state's post-conviction DNA testing scheme is applied in a manner that violates constitutional principles of fundamental fairness or due process. *See Osborne*, 557 U.S. at 69.  Relief is necessary here to preserve Mr. Reed's liberty interest in accessing the Texas statutory procedure to conduct forensic DNA testing and to use that DNA evidence to prove his innocence.

## JURISDICTION

4.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201 and 2202, and under 42 U.S.C. § 1983.

## VENUE

5.     Venue lies in this Court under 28 U.S.C. § 1391 because the events or omissions that gave rise to this action took place in the Western District of Texas and each of the defendants maintains an office in this district.  *See* 28 U.S.C. § 1391(b) (2016).

## PARTIES

6.     Plaintiff Rodney Reed is a resident of Bastrop County Texas and is incarcerated at the Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas.  Mr. Reed is sentenced to death by the 21st Judicial District Court of Texas (the "District Court").

7.    Defendant Bryan Goertz is the Bastrop County District Attorney.[1]   Defendant Goertz has opposed Mr. Reed's request to conduct DNA testing on the items of evidence at issue in this case.  A district attorney who opposes DNA testing is a proper defendant in a section 1983 action seeking DNA testing.  *See, e.g., Skinner v. Switzer*, 562 U.S. 521 (2011) (suit against District Attorney); *Elam v. Lykos*, 470 Fed. Appx. 275 (5th Cir. 2012) (same).  Defendant Goertz is sued in his official capacity only and for declaratory relief.

8.    Defendant Sarah Loucks is the Bastrop County District Clerk.  She maintains an office in Bastrop, Texas.  Defendant Loucks has custody of certain evidence specified in Exhibit A.  Defendant Loucks is sued in her official capacity only and only for injunctive relief.

9.    Defendant Maurice Cook is the Bastrop County Sheriff.  He maintains an office in Bastrop, Texas.  Defendant Cook is the ultimate supervisor of the Bastrop County Sheriff's Office, which has custody of certain evidence specified in Exhibit A.  Defendant Cook is sued in his official capacity only and only for injunctive relief.

10.    Defendant Steve McCraw is the Director of the Texas Department of Public Safety.  He maintains an office in Austin, Texas.  Defendant McCraw is the ultimate supervisor of the Department of Public Safety Crime Lab which has custody of certain evidence specified in Exhibit A.  Defendant McCraw is sued in his official capacity only and only for injunctive relief.

## FACTUAL BACKGROUND

### A.    The Murder of Stacey Stites, Investigation, and Collection of Evidence

11.    Stacey Stites was reported missing after she failed to arrive for her early morning shift at the Bastrop H.E.B. on the morning of April 23, 1996.  She was alleged to have been traveling in her fiancé Jimmy Fennell's red pickup truck, which was found that morning in the

---

[1]    The Defendants are sued only in their official capacities. The suit is brought reluctantly against the Defendants individually in an abundance of caution because sovereign immunity and other jurisdictional issues may impede bringing a cause of action against the State of Texas and/or the county agencies the Defendants serve.

Bastrop High School parking lot.  Immediately outside of the locked driver side door were some papers and a broken portion of Ms. Stites's leather woven belt, as pictured below:



12.     Later in the day, a passerby discovered Ms. Stites's body in the brush along an unpaved road in rural Bastrop County, Texas.  As pictured below, the murderer left the other half of Ms. Stites's belt at the side of the road in a position that pointed directly towards her body:



13.     An autopsy confirmed that the murderer used the woven leather belt to strangle Ms. Stites.  Accordingly, the killer forcefully gripped the belt with both hands for a substantial period of time.

14.     Neither portion of the belt has ever been tested for DNA even though the evidence remains in the custody of the Bastrop District Clerk under lock and key.

15.     The Bastrop Clerk's office representative testified that the belt sections and other relevant evidence in that office's custody listed on Exhibit A, has always been securely maintained, and has never been tampered with or replaced.  Both portions of the belt, along with

other evidence identified in Exhibit A, are in a condition in which today's sophisticated DNA tests can extract valuable identifying biological information.

16.     Multiple additional items of evidence collected during the investigation of Ms. Stites's murder have also been kept secure by the various defendants and have never been subjected to DNA testing despite the possibility that they may contain DNA from the murderer. These untested items are detailed in Exhibit A.  Like the belt sections, these items of evidence remain secure under lock and key, have never been tampered with or replaced, likely contain biological material that can yield probative results if subjected to DNA testing, and are in a condition suitable for DNA testing.

17.     In 1996, Fennell was a police officer in Giddings, Texas.  For months after the body was found, Fennell was a suspect in his fiancé's murder.  When initially interviewed by police during the investigation, Fennell claimed that he and Ms. Stites spent the evening of April 22, 1996 at home together.  After Fennell was found deceptive on a second polygraph test, he refused to cooperate further with the investigation and asserted his Fifth Amendment Rights against self-incrimination.  However, the investigation of Fennell was superficial.  Inexplicably, investigators *never* searched the apartment that Fennell shared with Ms. Stites for signs of foul play or other probative evidence.

18.     Fennell's behavior before and after Ms. Stites's murder was unusual.  Although it did not contain much money, Fennell closed his bank account the morning of April 23, 1996 while Ms. Stites was still missing.  Fennell told police and later testified that he had not had sex with Ms. Stites for several days because she was on the "green pill" on her birth control medication and that he had been told that there was a higher risk of pregnancy during that time. Merrill Lewen, M.D., a Houston area Board Certified OB/GYN has reviewed this statement and

concluded that it is false.  Fennell gave another false statement on the morning of Ms. Stites's disappearance when he told police he had filled his truck with gas the night before.  He changed his story a few days later when police discovered the truck's gas tank was less than ¼ full. Fennell also testified to agreeing with Ms. Stites that she would drive his truck to work the next morning. However, Carol Stites, Ms. Stites's mother, remembered Fennell insisting on the evening of April 22 that he drive Ms. Stites to work the next morning.   Fennell disposed of the truck shortly after Ms. Stites's body was recovered.

19.     In 2016, it came to light that Fennell made other inconsistent statements which suggest his culpability in the murder.  In an interview with CNN, Curtis Davis, Fennell's best friend at the time, recounted a private conversation he had with Fennell on the morning Ms. Stites was reported missing, but before her body was found.  Contrary to what Fennell told police and later testified to at Mr. Reed's trial, Fennell told Davis that, on the night of April 22, 1996, he came home late because he had been out drinking beer with other officers after his youth baseball team's evening practice and did not come home until late at night.  Davis was not interviewed about Fennell during the investigation, and Fennell's statements to Davis (a career Bastrop Sheriff's Officer) were not disclosed until the 2016 interview, after which Davis was officially reprimanded by the Bastrop County Sheriff for speaking publicly about the case.

20.     Fennell's inconsistent statements regarding his whereabouts and activities on the night of April 22, 1996 are particularly significant because the condition of Ms. Stites's body indicates that she was murdered several hours before her body was transported in Fennell's truck and left in the remote location where she was found.  Prominent forensic pathologists have reached the unrebutted conclusion that Fennell's testimony that Ms. Stites was abducted and

murdered while on her way to work at around 3:30 a.m. is medically and scientifically impossible.

21.     Rodney Reed later became a suspect when investigating officers identified him as the source of a small amount of semen collected from Ms. Stites's vaginal cavity and underwear. After Mr. Reed was indicted for the murder, Fennell waived his Fifth Amendment rights as previously asserted and testified for the State at Mr. Reed's trial as to his activities that evening. Fennell's trial testimony generally conformed with his prior statements to the police and again contradicted what he told his best friend, Bastrop Sheriff's Officer Curtis Davis, on the morning of April 23, 1996, before Ms. Stites's body was found. Fennell's trial testimony omitted entirely his conversation with Davis.

22.     Fennell was a principal suspect in the killing of Ms. Stites for more than a year after her death—long after it was determined that he was not the source of the semen collected from Ms. Stites.  Investigators eventually claimed to have dismissed Fennell as a suspect when they could not account for his presence at the couple's apartment on the morning of April 23, 1996 without his truck, but they did not thoroughly investigate whether Fennell may have had an accomplice.

23.     Around the time of the murder, Fennell was the subject of several complaints alleging racial bias and use of excessive force at the Giddings Police Department where he worked.    After Ms. Stites's death, Fennell was described by a subsequent girlfriend as emotionally abusive, controlling, and virulently racist.  She described him stalking her home and harassing her friends after she ended the relationship with Fennell.  Fennell later abused his position as a police officer while working for the Georgetown Texas Police Department.  Fennell was recently released from prison, after serving a ten-year prison sentence stemming from

9

charges that he abducted and raped a young woman that he was called out to protect while on duty. When confronted with this allegation, Fennell falsely denied responsibility. A subsequent Texas DPS investigation of Fennell revealed that the assault for which he was convicted was part of a pattern of sexual violence by Fennell against women.

24.     Before Ms. Stites was killed, Fennell was overheard on multiple occasions saying that if Ms. Stites were to cheat on him, he would kill her. At least once, he specifically stated that he would strangle her with a belt.

25.     Notwithstanding investigators' initial suspicions of Fennell, his inconsistent statements to investigators, and his having been found to have answered deceptively in two polygraph examinations, the prosecution embraced Fennell's version of the murder timeline and presented it as their own at trial. Fennell testified at Mr. Reed's trial in 1998 that on the evening of April 22, 1996, he returned home from baseball practice around 7:30 to 8 p.m., and he and Ms. Stites spent a quiet evening at home. He testified that the two showered together, that she went to sleep around 9 p.m., and that he stayed up watching TV. Fennell testified that Ms. Stites had likely taken his truck and left for her early-morning shift at the Bastrop H.E.B. grocery store at her usual time of 2:30 to 3 a.m., although he was asleep when she left. Fennell, who gave an entirely different account of his activities and whereabouts around the time of the murder to his best friend and Bastrop County Sheriff's Officer Curtis Davis, was the last person to see Ms. Stites alive. At a 2017 habeas hearing regarding Fennell's statements to Officer Davis, Fennell refused to testify and improperly invoked the Fifth Amendment rights that he had previously waived.

B.      The Trial of Rodney Reed

26.     The State's theory of the crime was entirely speculative.  At Mr. Reed's 1998 trial, relying largely on Fennell's testimony to establish a timeline, the State contended that Ms. Stites left their apartment alone in Fennell's truck between 2:30 and 3:30 a.m. on the morning of April 23, 1996.  The State further claimed that Mr. Reed must have stopped Ms. Stites as she drove past his neighborhood in central Bastrop and then abducted, raped and murdered her—leaving her body off an unpaved road out of town and then abandoning the truck in the Bastrop High School parking lot.  The State did not present a single eyewitness to *any* of these events.

27.     Mr. Reed argued in defense that his semen was found because he and Ms. Stites were having an affair, which they kept secret because Ms. Stites was engaged.  At a bond hearing after Mr. Reed's arrest and later at trial, witnesses testified to seeing Ms. Stites and Mr. Reed together at various times prior to her murder.

28.     There was no evidence connecting Mr. Reed to the scenes where Ms. Stites's body was found or where the truck was abandoned.  The only suggestion that Mr. Reed may have driven Fennell's truck was based on racially charged observations that the driver's seat was reclined and a smudge on the rear window could have been made by the kind of hair products black people use.

29.     In most murder cases, the time of death is typically established through a number of customary forensic markers, such as core body temperature, lividity, and bodily discharge. Not so here.  Instead, the evidence the State used to infer Ms. Stites's time of death, and Mr. Reed's alleged role in her murder rested almost entirely on the timeline provided by Fennell and three intact spermatozoa[2] found in samples taken from Ms. Stites's body.  DNA testing of those

---

[2]   There are over 150 million spermatozoa in the average ejaculation by a fertile male. *See* https://www.who.int/reproductivehealth/topics/infertility/cooper_et_al_hru.pdf

samples associated them with Mr. Reed. The State then presented uncontradicted testimony from three experts that, as a matter of scientific fact, intact spermatozoa cannot be found in the vaginal cavity more than approximately 24-26 hours after intercourse.  Based on this asserted scientific fact, the State argued that the intact condition of three sperm proved that Mr. Reed had intercourse with Ms. Stites at or near the time of her death and, therefore, must have killed her. This central expert testimony relied on by the State to convict Mr. Reed has since been recanted, retracted and proven false.  See *infra* at ¶¶ 56-59.

30.     Mr. Reed was convicted of capital murder and subsequently sentenced to death based largely on this faulty scientific evidence.

### C.     Reed's First DNA Testing Motion

31.     As part of his initial state habeas proceedings, Mr. Reed filed a motion for DNA testing of various items of evidence, including Ms. Stites's belt and clothing.  That motion was denied in a summary order on May 27, 1999.

### D.     Mr. Reed's Second DNA Motion

32.     On July 14, 2014, Mr. Reed filed a motion in the District Court seeking forensic DNA testing pursuant to Article 64 (the "Article 64 Motion") of certain evidence items, including items recovered from the location where Ms. Stites's body was found and from the location of the truck.

33.     Despite the apparent availability of the elected 21st District Court Judge in whose court the case was filed,[3] the Article 64 Motion was assigned to Retired Judge Doug Shaver.

---

[3]   Other matters relating to the case had initially been assigned to 335th District Court Judge Reva Townslee Corbett, who  recused herself because her father had presided over Mr. Reed's trial.

34.     On November 25, 2014, the District Court held a one-day evidentiary hearing on Mr. Reed's Article 64 Motion.  Reed presented the testimony of John Paolucci, an expert in crime scene investigation, and Deanna D. Lankford, M.T., an expert in DNA testing.

35.     Reed's experts testified that many evidence items recovered by the State from both scenes would contain potentially exculpatory DNA evidence if subjected to DNA testing. They further testified that this evidence was in a suitable condition for testing using modern "touch DNA" technology to identify cells left by other individuals present at the crime scenes.

36.     The State did not rebut the testimony of Mr. Reed's DNA expert and relied instead on an employee of the Attorney General's Office[4] who claimed that the evidence in the possession of the Bastrop County District Clerk was contaminated because of the manner in which the evidence was stored.  This testimony was presented by the State as evidence supporting its contention that a proper chain of custody could not be established as required under Chapter 64.

37.     However, Bastrop District Court Clerk Etta Wiley, the custodian of the evidence, testified that she was responsible for the evidence at the clerk's office and that the evidence was secured "under lock and key" and that she was confident that it had "not been substituted, replaced, tampered with, or materially altered."

38.     At the conclusion of the hearing, Retired Judge Shaver rendered a brief verbal ruling expressing his intent to deny Mr. Reed's Article 64 Motion and requested that the State draft proposed findings on the matter.  On December 16, 2014, he affixed his signature to the State's proposed findings of fact and conclusions of law (the "Initial Findings"), adopting them verbatim as his own.  A copy of these findings is attached as Exhibit B.

---

[4]     Counsel for the State in these proceedings included attorneys from the Office of the Attorney  General of Texas who were deputized as special assistant Bastrop District Attorneys.

39.     Mr. Reed timely appealed the Initial Findings to the CCA, and on June 29, 2016, the CCA entered an order finding that the District Court failed to make certain requisite findings regarding the elements of Article 64 for the items which Reed sought to test, including: (1) whether the item still exists and is in a condition making DNA testing possible; (2) whether the item has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; (3) whether there is a reasonable likelihood that the item contains biological material suitable for DNA testing; and (4) whether identity was or is an issue in this case.  The CCA's June 29, 2016 Order remanded the proceeding to the District Court and directed it to make findings on the elements which had been omitted from the Initial Findings.  *Reed v. State*, No. AP-77,054, 2016 WL 3626329 (Tex. Crim. App. 2016).

40.     The proceedings on remand were marred by procedural irregularity.  Given the passage of approximately nineteen months between the evidentiary hearing (November 2014) and the CCA's remand order (June 2016), Mr. Reed proposed an in-person court appearance at which the parties could present argument in favor of their proposed findings.  The State opposed Mr. Reed's request and moved for entry of a scheduling order requiring the parties to submit proposed findings of facts and conclusions of law.  Retired Judge Shaver granted the State's motion, and the parties thereafter filed their proposed findings.

41.     The parties' proposed findings were in direct conflict as to two disputed Article 64 elements: (1) chain of custody as to the items maintained by the Bastrop County District Clerk's Office, and (2) whether there was a reasonable likelihood that certain items contain biological material suitable for DNA testing.

42.    On September 15, 2016, Retired Judge Shaver signed and submitted **both** parties' proposed findings to the CCA without explanation for his two wildly inconsistent rulings in the same matter.  True and correct copies of each of the District Court's September 15, 2016 sets of findings and conclusions are attached to this complaint as Exhibits C (drafted by Mr. Reed) and D (drafted by the State).

43.    The State promptly sought to remand the competing signed findings back to Retired Judge Shaver for clarification.   The State's remand motion stated that "For some findings, this [the two sets of findings and conclusions] does not pose a problem, but for others, it does.  For example, the State proposed that chain of custody had not been shown for certain items, but Appellant asserted to the contrary that it had….*Both cannot be right* and resolution of the convicting court's intent is therefore necessary."  (emphasis added).

44.    On September 23, 2016, Retired Judge Shaver then sent an unsolicited letter to the CCA stating only that he had meant to rule in favor of the State:

To:  The Texas Court of Criminal Appeals

Re:  No. AP-77,054   Rodney Reed, Appellant vs. The State of Texas

Dear Justices:

On September 9, 2016, I signed, adopted and submitted both Findings of Fact and

Conclusions of Law, by State of Texas and Rodney Reed.

Signing of both was an inadvertent mistake,  It was and is my intent to sign and

adopt only the Findings of Fact and Conclusions of Law as proposed by The State

of Texas.

I apologize to this Court and all parties for my mistake.

Sincerely,

*Doug Shaver*

Doug Shaver,  Senior Judge

FILED IN
COURT OF CRIMINAL APPEALS

SEP 23 2016

On October 3, 2016, the CCA denied the State's motion to remand and a motion by Mr. Reed to strike Retired Judge Shaver's unsolicited letter.

45.    On April 12, 2017, the CCA affirmed the District Court's denial of Mr. Reed's Article 64 motion.

46.    The CCA opinion discusses some of Retired Judge Shaver's findings, but does not disclose the fact that Retired Judge Shaver actually adopted two diametrically-opposed sets of findings of fact and conclusions of law in ruling on the Article 64 Motion, nor does it identify whether the findings discussed came from those proposed by the State or by Reed.  Mr. Reed's motion for reconsideration was denied by the CCA on October 4, 2017. *Reed v. State*, 541 S.W.3d 759, 762 (Tex. Crim. App. 2017), *reh'g denied* (Oct. 4, 2017), *cert. denied*, 138 S. Ct. 2675, 201 L. Ed. 2d 1071 (2018).

### E.     The CCA's Arbitrary Interpretation of Article 64 in Mr. Reed's Case Prevents Access to Potential Evidence of Innocence

47.     In seeking DNA testing in state court, Mr. Reed proved each of the statutory requirements of Article 64 through expert testimony that the crime scene evidence he seeks to test (1) exists in the State's custody; (2) is in a condition suitable for DNA testing; (3) has not been substituted, tampered with or materially altered; and (4) potentially contains probative forensic DNA results that could both exculpate Mr. Reed and identify another person as responsible for the murder.

#### *Novel and Arbitrary Chain of Custody Requirement*

48.     Despite Mr. Reed's proof of his entitlement to relief under the plain language of Article 64, the CCA  applied a novel construction of the traditional chain of custody requirement such that the then customary storage of evidence together in a box by state officials, and the routine handling of such evidence by trial officials, negated the chain of custody.

49.     On its face, Article 64's chain of custody requirement merely requires the district court to make a finding (without assigning a burden of proof) that the evidence is what it purports to be – that it "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect."   Chain of custody is a well-established concept under Texas law.   Mr. Reed had no notice that the Court would read an entirely different definition into the text of Article 64.[5]

50.     It is undisputed that none of the evidence Mr. Reed seeks to test is a substitute or replacement for the actual crime scene evidence, and that no person has altered or tampered with any of the items.  It is also undisputed that each item of evidence Mr. Reed seeks to test is what it purports to be, *i.e.*, the broken sections of the belt comprise the murder weapon, the employee

---

[5]     *Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989) *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990); *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

name tag is the one investigators found placed in the crook of Ms. Stites's knee, and the clothing

is the clothing removed from Ms. Stites's body.   Thus, the CCA has arbitrarily grafted non-

statutory barriers onto Article 64 that have deprived Mr. Reed of his liberty interest in proving

his innocence with new evidence under state law.

51.    The CCA's arbitrarily imposed and novel chain of custody requirement also stems

from its arbitrary limitation on the potential "exculpatory results" from DNA testing that the

CCA is willing to consider when deciding whether to grant DNA testing under under Article 64.

DNA expert Lankford testified that issues of contamination could be resolved if DNA testing

identified a known offender through the CODIS DNA database or produced a consistent DNA

profile on both items that were comingled and those stored separately.

### *Arbitrary Finding of Unreasonable Delay*

52.    The CCA also unconstitutionally applied the element of unreasonable delay.

Contrary to the findings of state courts, Mr. Reed has for years been persistent in his pursuit of

post-conviction relief and DNA testing.   He utilized the rudimentary DNA technology that was

available at the time of trial.   He again sought DNA testing as part of his initial postconviction

proceedings in 2001.   This request was summarily denied by the trial court, and Mr. Reed

continued to litigate his innocence based on other evidence until his Motion for DNA testing was

brought in 2014 under the recently amended Article 64.   This statutory amendment was enacted

to allow for DNA testing of touched items for skin cells, which is precisely the type of DNA

testing sought in Mr. Reed's motion.   By finding that Mr. Reed's request for DNA testing was

brought for an improper purpose, the Texas courts' have arbitrary applied the unreasonable delay

prong of the statute to deny Mr. Reed DNA testing in violation of Mr. Reed's constitutional

rights, especially when the CCA acknowledged that Mr. Reed's "Chapter 64 motion largely

hinges on the newly available analysis of touch DNA" and such testing was unavailable under the Statute prior to its amendment.  *See* CCA Op. at 9; *see also Swearingen v. State*, No. 99-11-06435-CR (9th Dist., Montgomery County, Tex. June 10, 2013).

### *Arbitrary Prohibition on Consideration of Additional Exculpatory Evidence*

53.     The CCA, and the District Court, denied DNA testing based, in part, on factual assertions from trial that have since been disproven.

54.     At the 2017 evidentiary hearing in Mr. Reed's state habeas proceedings,  world-renowned forensic pathologist, Dr. Michael Baden testified as an expert witness. His testimony was consistent with his report that is attached as Exhibit E. Dr. Baden's testimony proved that the State's theory of Mr. Reed's guilt was false for at least three reasons:

55.     *First*, the State claimed that Ms. Stites had been sexually assaulted at the time of her murder.  Dr. Baden examined the evidence and explained in his report and  in his testimony at the hearing that Ms. Stites had ***not*** been sexually assaulted.  He found absolutely "no forensic evidence that Ms. Stites was sexually assaulted in any manner."

56.     *Second*, although no physical evidence placed Mr. Reed in Fennell's truck, the State repeatedly claimed that the minimal amount of semen taken from Ms. Stites's body was the "smoking gun" that tied him to her murder at the 2017 hearing.  But the medical examiner who testified in support of the State's argument at trial, Dr. Robert Bayardo, has since recanted his trial testimony in a sworn affidavit. This affidavit is attached as Exhibit F.   Dr. Bayardo's affidavit states that sexual contact between Ms. Stites and Mr. Reed occurred more than twenty-four hours prior to her death, corroborating Mr. Reed's assertion that he and Ms. Stites had consensual relations at least a day before her murder.   At the evidentiary hearing, Dr. Baden testified that Mr. Reed's semen was deposited at least a full day before Ms. Stites was killed, thus

confirming Dr. Bayardo's sworn affidavit. These opinions are also confirmed by Dr. Werner Spitz, author of the seminal textbook on forensic pathology, *Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation*. Dr. Spitz's report is attached as Exhibit G.

57.     In addition to Dr. Baden, Dr. Bayardo, and Dr. Spitz, additional forensic experts—including Dr. LeRoy Riddick, M.D., Joseph Warren, Ph. D., and Ronald Singer, M.S.— have confirmed Dr. Bayardo's account that the State's timeline based on the presence of sperm in Ms. Stites's body was not reliable.  These experts also demonstrated that the State's assertion that sperm can only last within the human body for no more than 24 to 26 hours is scientifically false.

58.     *Third*, Dr. Baden's testimony flatly rebutted the flimsy timeline the State presented at trial through Fennell.   The State argued that Ms. Stites was killed after leaving for work on the morning of April 23, 1996.  In his report and testimony at the evidentiary hearing, Dr. Baden explained why the State's timeline was "not possible."   Dr. Baden examined the evidence and demonstrated that Ms. Stites was murdered before midnight on April 22, 1996, the very time when, according to Fennell's testimony, the two were home in bed together. Specifically, Dr. Baden examined the lividity present in Ms. Stites's body and concluded, among other things, that "[w]hen [Ms. Stites] was killed…she lay face down in one spot for at least four or five hours before she was moved…by the car where she had some evidence of decomposition, until she was placed in this…roadside area, on her back."   Dr. Spitz similarly noted that his review of the case lead him to conclude that, "Stacy Stites was murdered prior to midnight on April 22, 1996" and "[t]he lividity…on Stites's face, shoulder, and arm, scientifically proves that she was dead in a position different from that which she was found for a period of at least 4-5

hours." He went on to say that, "The presence of lividity in these non-dependent areas makes it medically and scientifically impossible that Stites was killed between 3-5am on the date in question…It is impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial."

59.     This new evidence establishes that the State's timeline and theory that Mr. Reed raped Ms. Stites and killed her immediately thereafter is false.  The assertion that Mr. Reed's semen must have been left close at the time of Ms. Stites death has been definitively refuted, along with Fennell's claim that Ms. Stites left for work around 2:30 to 3:30 a.m. on April 23, 1996.

60.     The State has not presented any expert to contradict the scientific evidence of innocence discussed above, and the State's trial experts (or their employing agents) have retracted the opinions offered at trial.

61.     Mr. Reed was convicted because his DNA was linked by expert testimony to a purported sexual assault the State claimed was contemporaneous with the murder.

62.     The Texas Department of Public Safety (who employed criminalist Karen Blakely), the Bode Cellmark Forensics Laboratory (who employed the State's retained expert Meghan Clement), and former Travis County Medical Examiner Dr. Roberto Bayardo have all now acknowledged that the scientific opinions offered by the State to tie Mr. Reed to the murder were in error. *See* Exhibit H (Letter from DPS); Exhibit I (report from Bode); Exhibit F (Bayardo affidavit). This is because it is a scientific fact that sperm can survive intact longer than twenty-six hours; indeed, the actual time period is proven to be much longer.

63.     The CCA's opinion denying DNA testing arbitrarily fails to take into account any of the foregoing newly discovered evidence, which negates the State's evidence against Mr.

Reed.  Instead, the CCA cites the very same "scientific" evidence used to support the State's timeline that has since been recanted or proven false, and fails to even acknowledge that this evidence has been roundly rejected in the scientific community.  The CCA further fails to recognize the exculpatory potential of crime scene evidence by summarily dismissing the mountain of evidence of third-party guilt Mr. Reed has presented linking Fennell to the murder.

### *Denial of Article 64 Motion Deprives Access to Other Available Remedies*

64.     The Texas courts' arbitrary construction and application of Article 64's statutory requirements also unconstitutionally denied Mr. Reed his due process rights and his right to access available statutory remedies.  Further, proceeding with Mr. Reed's execution while arbitrarily denying DNA testing capable of proving his innocence would violate the Eighth Amendment's prohibition on cruel and unusual punishment.  If DNA testing reveals exculpatory results, Articles 11.071, 11.073, and 64.04 of the Texas Code of Criminal Procedure provide procedures for adjudicating Mr. Reed's innocence and overturning his conviction and death sentence.  Exculpatory DNA results can also provide the basis for a request for executive clemency under Texas law.  Moreover, exculpatory DNA results can provide the factual basis for a showing of innocence necessary for the Federal Courts to consider a successive federal habeas petition pursuant to 28 U.S.C. §2244.

65.     Article 64 tracks the traditional legal standard for proof of chain of custody, the purpose of which is to authenticate evidence by establishing that the evidence is what the proponent says it is.  The CCA has repeatedly applied this standard to uphold the admission of evidence offered by the State as evidence of guilt, including DNA results from evidence that had been handled before, during and after trial.  Evidence is routinely admitted in Texas criminal cases absent evidence of fraudulent tampering, substitution, alteration   or other fraud.

66.     The CCA interprets the same chain of custody standard in Chapter 64 cases in a contrary manner, to require additional proof that the evidence is not only what it purports to be, but also that the evidence has been stored by the State in a manner such that no additional DNA was added.   This contrary interpretation is arbitrary and deprives Mr. Reed of fundamental constitutional rights.

67.     The CCA's unprecedented interpretation and application of Article 64 will automatically deny Article 64 relief to any person convicted before rules governing the State's handling and storage of evidence were put in place, and preclude such persons from proving innocence through newly available DNA analysis.   In fact, the CCA's interpretation and application of Article 64 will preclude Article 64 relief any time that the State contends that the DNA profile of evidence, including evidence secured at the crime scene, was changed, irrespective of whether that evidence retains the ability to reliably demonstrate innocence.

68.     Despite the powerful and unrebutted evidence of Mr. Reed's innocence, he continues to be denied relief on grounds that cannot withstand constitutional scrutiny.

69.     Mr. Reed has a constitutional right to access and utilize the Texas statutory DNA testing procedure in a fair and due-process-compliant manner, to exonerate himself by identifying the person whose DNA is on the belt that was used to murder Stacey Stites, as well as the clothing, name tag and other items that her killer likely touched.   The CCA's tortured, results-driven and utterly unfair interpretation and application of Article 64 denies Mr. Reed basic constitutional protections.

CLAIMS FOR RELIEF

**First Claim for Relief: Denial of Due Process**

70.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

71.     Pursuant to Article 64, when an individual sentenced to death, such as Mr. Reed, presents a motion that requests DNA testing of biological material that both still exists in a condition that makes testing possible, and also could yield exculpatory results, he or she is entitled to have the evidence tested.  Vernon's Ann. Texas C.C.P. Art. 64.03 (2017).  If testing successfully produces an unidentified DNA profile, that profile must be compared to the FBI's CODIS database, and the database established by the Department of Public Safety.  Vernon's Ann. Texas C.C.P. Art. 64.035 (2011).  Exculpatory DNA results obtained under Article 64 are considered by the trial court, and the movant is entitled to a determination of whether those results prove innocence.  Vernon's Ann. Texas C.C.P. Art. 64.04 (2011).

72.     Exculpatory DNA results are accepted under Texas law as evidence which can be used to prove a claim for habeas relief based on innocence, false or misleading testimony, and other constitutional violations brought under Article 11.071 of the Texas Code of Criminal Procedure.  Exculpatory DNA results can also be used as evidence to prove a claim for a new trial pursuant to Article 11.073 of the Texas Code of Criminal Procedure, and may be considered by the Board of Pardons and Paroles and the Texas Governor in an available request for executive clemency.  *See State v. Holloway*, 360 S.W.3d 480, 489 n.58 (Tex. Crim. App. 2012), *abrogated on other grounds by Whitfield v. State*, 430 S.W.3d 405 (Tex. Crim. App. 2014).

73.     Because the State of Texas has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure a

declaration of innocence, habeas relief, a new trial, executive clemency and potentially other relief from their convictions, the processes employed by the State for obtaining access to DNA must not violate fundamental fairness.  *See Osborne*, 557 U.S. at 69; *Skinner v. Switzer*, 562 U.S. 521 (2011); *Elam v. Lykos*, 470 F. App'x 275, 276 (5th Cir. 2012) ("While there is no freestanding right for a convicted defendant to obtain evidence for post-conviction DNA testing, Texas has created such a right, and, as a result, the state provided procedures must be adequate to protect the substantive rights provided."); *Emerson v. Thaler*, 544 F. App'x 325, 327 (5th Cir. 2013) ("Although states are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").

74.    The CCA's interpretation and application of Article 64 in Mr. Reed's case violates fundamental fairness in several ways.  First, the CCA's flawed construction of the chain of custody requirement of Article 64 resulted in the erroneous exclusion from eligibility for testing the majority of key pieces of evidence introduced at trial, including pieces of the belt used to strangle Ms. Stites, her clothing, and several other crucial pieces of evidence likely touched by the murderer.

75.    The CCA incorrectly found that these significant pieces of physical evidence were excluded by this requirement because they were potentially contaminated by poor storage procedures or the ungloved handling of evidence in court.  The CCA ignored the unrebutted testimony of Mr. Reed's DNA expert that the potential additional DNA did not preclude probative results, and such evidence could still be successfully tested.

76.     This failure to appropriately apply the chain of custody requirement imposed by Article 64 resulted in the exclusion of the majority of the key evidence in this case, testing of which could exonerate Mr. Reed.

77.     Second, the manner in which the CCA adjudicated Mr. Reed's appeal was arbitrary in its own right.   The CCA's arbitrary limitation of "exculpatory results" to be considered pursuant to article 64.003 of the Code of Criminal Procedure ignores the clear inculpatory inferences from identifying DNA of a known offender on the evidence or finding the same unidentified DNA profile on both properly stored items and those which could have been contaminated.

78.     Additionally, the CCA's failure to clarify, acknowledge, or even differentiate between the inconsistent competing findings of fact and conclusions of law signed by the District Court—on which its opinion relies—violates Mr. Reed's Due Process rights.   As explained above, on remand the District Court signed two diametrically opposing and irreconcilable sets of findings of fact and conclusions of law submitted by the State and Mr. Reed.   The CCA's subsequent opinion did not vacate either set of findings and conclusions, yet said nothing about this error, while the CCA both agreed and disagreed with various findings of the District Court without indicating which of the two sets of findings it was addressing.   The CCA simply notes that "[a]fter remand, the judge made supplemental findings of fact and conclusions of law."   This breakdown in the procedures afforded to petitioners under Article 64 also violates Mr. Reed's procedural Due Process rights.

79.     Finally, the CCA's interpretation of Article 64's requirement that the petitioner show that he or she would not have been convicted if exculpatory DNA results were produced ignores the most powerful aspects of DNA testing and excludes from consideration evidence

tending to inculpate third parties.  In conducting this analysis, the CCA expressly excludes all DNA results that inculpate a third party, instead focusing only on those results that exclude the movant as a contributor. This violates due process. *Cf Chambers v. Mississippi*, 410 U.S. 284 (1973) (trial court's exclusion of evidence that inculpated a third party resulted in denial of a trial in accord with fundamental standards of due process).

80.     The District Court and the CCA also violated Mr. Reed's due process rights by relying on trial evidence which has since been recanted, discredited and proven false to deny request for DNA testing under Article 64.  The CCA specifically relied on the District Court's "conclusion" that "[t]he State's case on guilt-innocence was strong," its finding that the evidence showed Mr. Reed's "presence" and that "sexual assault occurred contemporaneously with the murder."  *Reed v. State*, 541 S.W.3d 759, 773 (2017).  Not a single expert witness still supports this conclusion.  Additional experts, including world renowned forensic pathologists Dr. Michael Baden and Dr. Werner Spitz, have provided unrebutted forensic conclusions which completely eliminate the scientific foundation for the State's case against Mr. Reed.

81.     The CCA's unreasonable interpretations of Article 64, and the procedural faults in the handling of Mr. Reed's motion, have prevented Mr. Reed from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder.  Since the State of Texas provides a means for obtaining post-conviction forensic DNA testing, those procedures must be imbued with a fundamental fairness.  *See generally, Osborne*, 557 U.S. 52; *Skinner v. Switzer*, 562 U.S. 521 (2011).  The CCA's failures here have deprived Mr. Reed of his liberty interests in utilizing these state procedures to obtain a declaration of innocence, a new trial, executive clemency, or other avenues for relief, all in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution.

**Second Claim for Relief: Access to Courts**

82.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

83.     Mr. Reed has a fundamental right to access to courts, rooted in the First and Fourteenth Amendments, which requires that the states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies.  State law must ensure that prisoners like Mr. Reed have meaningful access to post-conviction remedies in order to vindicate this right.  *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are required to provide inmates meaningful legal assistance or resources to ensure their constitutional right of access to courts be upheld).

84.     As alleged above, Mr. Reed has available remedies under Texas law for access to post-conviction DNA testing, and to a declaration of innocence, to relief from his conviction and to executive clemency based on the exculpatory results of such testing.  And, as alleged above, Texas's restrictive procedure for obtaining access to DNA testing under Article 64, and the CCA's interpretation thereof, is not adequate, meaningful or effective.

85.     Mr. Reed incurred actual injury when the CCA denied his request for DNA testing that could potentially produce exculpatory evidence, and thus provide him with relief from his conviction.

86.     As stated above, the CCA's unreasonable interpretation of Article 64 has prevented Mr. Reed from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder.  These failures have deprived Mr. Reed of his fundamental right to access to courts under the First and Fourteenth Amendments.

**Third Claim for Relief: Cruel and Unusual Punishment**

87.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

88.     The Eighth Amendment's prohibition on cruel and usual punishment prevents the execution of prisoners, like Mr. Reed, who have viable claims that they are innocent of the crime for which they have been convicted without first affording them the opportunity to prove their innocence.  The CCA has interpreted Article 64 to bar DNA testing even where, as in Mr. Reed's case, realistically possible exculpatory DNA results from such testing have the capacity to prove innocence based solely on the State's handling of evidence.  Because Texas law does not allow for DNA testing under circumstances where such testing has the capacity to prove innocence, Article 64 violates the Eighth Amendment prohibition on cruel and unusual punishment.

**Fourth Claim for Relief: Denial of Opportunity to Prove Actual Innocence**

89.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

90.     By refusing to release the physical evidence for DNA analysis, and thereby preventing Mr. Reed from gaining access to evidence which can exonerate him, Mr. Reed is denied the opportunity to make a conclusive showing that he is actually innocent of the crime for which he is currently incarcerated, in violation of the Eighth Amendment, the right to access to courts, the right to a remedy, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

91.     The State will suffer no prejudice by allowing Mr. Reed to access the evidence for purposes of DNA testing.  The testing Mr. Reed seeks may be conducted at a fully accredited DNA laboratory with the expenses to be paid by his counsel at the Innocence Project, in which

case it would proceed at no cost to the State.  DNA testing is also in the State's interest.  Testing can both determine whether an innocent man is in prison and identify the real murderer.

**Request for Injunctive Relief: Release of Evidence for Testing**

92.     For the reasons stated above, the United States Constitution requires declaratory relief that the denial of DNA testing to Mr. Reed violates the United States Constitution and that Mr. Reed be afforded the opportunity to conduct DNA testing on the evidence identified in this Complaint. Further, the Mr. Reed asks for injunctive relief compelling those Defendants who are custodians of the evidence identified in this Complaint to release the evidence designated in Exhibit A for DNA testing.   Accordingly, Mr. Reed asks this Court to grant prospective injunctive relief compelling the Defendants to release the evidence identified in this Complaint so that the requested DNA testing can be accomplished.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Reed prays that the Court provide relief as follows:

1.     A declaration that the CCA's interpretation and application of Article 64 of the Texas Code of Criminal Procedure in Mr. Reed's case is unconstitutional because:

    a.     Such interpretation and application imposes a fundamentally unfair limitation, in violation of due process and the First Amendment right to access to courts, upon Mr. Reed's access to statutory remedies available under Texas law, and deprives Mr. Reed of adequate, effective and meaningful access to such remedies.  Those remedies include: (1) the statutory right to access post-conviction DNA testing pursuant to Article 64; (2) the statutory right to a declaration of innocence pursuant to Article 64.04 of the Texas Code of Criminal Procedure based on exculpatory DNA results; (3) the statutory right to habeas relief for innocence and other constitutional violations pursuant to Article 11.071 of the Texas Code of Criminal Procedure based on exculpatory DNA evidence; (4) the statutory right to a new trial pursuant to Article 11.073 of the Code of Criminal Procedure based on exculpatory DNA results; and (5) executive clemency based on exculpatory DNA results.

    b.     Such interpretation and application denies Mr. Reed the protection of the Eighth Amendment of the Unites States Constitution, which prohibits the execution of

persons who are actually innocent of the crime for which they are convicted and requires that state laws providing persons facing the death penalty with a right to seek post-conviction DNA testing be construed and applied in a manner that allows a convicted person to access and test evidence where realistically possible exculpatory results can prove innocence.

2.      A preliminary and permanent injunction requiring Defendants to produce and release for DNA testing the evidence specified in Exhibit A for DNA testing, pursuant to an appropriate protocol regarding chain of custody and preservation and return of such evidence after testing has been completed;

3.      Reasonable attorney's fees, costs of suit and such other and further relief as this Court deems just and proper.

Dated: August 8, 2019                            Respectfully submitted,

/s/Bryce Benjet
BRYCE BENJET
Texas State Bar No. 24006829
E-mail: bbenjet@innocenceproject.org
**THE INNOCENCE PROJECT**
40 Worth Street, Suite 701
New York, NY 10013
Telephone No.: (212) 364-5980
Facsimile No.: (212) 364-5341

ANDREW F. MACRAE
Texas State Bar No. 00784510
E-mail: amacrae@levatinopace.com
**LEVATINO|PACE PLLC**
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, TX 78746
Telephone No.: (512) 637-8565
Facsimile No.: (512) 637-1583

*Attorneys for Rodney Reed, Plaintiff*