# Exhibit A

EVIDENCE SOUGHT TO BE SUBJECTED TO DNA TESTING

| Location found | Evidence item |
| --- | --- |
| Ms. Stites's body and/or clothing | Section of belt (no buckle), Section of belt (with buckle), H.E.B. name tag, H.E.B. employee shirt (underarms, collar), White t-shirt, Right shoe (particularly laces, heel, and tongue (if applicable)), Left shoe (particularly laces, heel, and tongue (if applicable)), Socks, Strands of hair from Stites's body, Extracted DNA from hair #20, Pants (zipper, buttons, belt loops, cuffs, waistband), Underwear, Bra (clasp, straps). |
| Location on Bluebonnet Road where Ms. Stites's body was found | Swabs/samples taken from mouths of two Busch beer cans, Two Busch beer cans, Items from plastic bags placed over Mr. Stites's hands during investigation, Knee brace. |

# Exhibit B

342

Cause No. 8701

| STATE OF TEXAS | § | IN THE 21ST DISTRICT COURT |
| | § | |
| v. | § | OF |
| | § | |
| RODNEY REED | § | BASTROP COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After considering the record in this case, and after making credibility determinations following a live hearing in this Chapter 64 proceeding, the Court enters the following findings of fact and conclusions of law:

Relevant Procedural History

1.  The State, on April 8, 2014, filed a motion to set an execution date for Movant, Rodney Reed. The State requested a date of November 19, 2014.

2.  Movant, on April 8, 2014, filed a motion to recuse the elected judge overseeing his case, Judge Towslee-Corbett.

3.  Movant, on April 14, 2014, opposed setting of an execution date. Movant requested indefinite delay of his execution to conduct DNA testing, to file a subsequent state habeas application, and to file a scientific-evidence application.

4.  On May 23, 2014, Judge Towslee-Corbett issued an order of voluntary recusal.

5.  On May 28, 2014, Judge Underwood, the presiding judge of the Second Administrative Judicial Region, assigned the undersigned judge to preside over the case.

6.  On June 18, 2014, the Court set a hearing on the State's motion to set an execution date.

7.  On June 17, 2014, the Court re-set the hearing on the State's motion to set an execution date at the request of the parties.

8.  On July 14, 2014, the Court held a hearing on the State's motion to set an execution date. The Court entered an order setting Movant's execution for January 14, 2015.

FILED 8:40 M
DATE 7 16 2014
Sarah Loucks
District Clerk, Bastrop County

1

347



9.    On July 14, 2014, immediately before the hearing on the State's motion to set an execution date, Movant filed the instant Chapter 64 motion. The motion contained no affidavit from Movant and no affidavit from a DNA expert. Movant, however, attached several affidavits purporting to undermine the State's forensic case at trial.

10.   At the July 14, 2014, hearing, the Court signed an order permitting agreed-to DNA testing. The items to be tested included four specified hairs and various swabs taken from the victim's body.

11.   At July 14, 2014, hearing, Movant requested indefinite delay of his execution to conduct DNA testing.

12.   The State timely responded on September 12, 2014. The State attached several exhibits regarding the existence, custody, and present condition of evidence collected in connection with the investigation of Movant's offense.

13.   Movant filed a letter requesting a hearing on the Chapter 64 motion on October 14, 2014.

14.   The State filed a letter opposing a hearing on the Chapter 64 motion on October 22, 2014. The State attached an exhibit reflecting an amended inventory regarding fingerprint evidence.

15.   Movant filed a letter again requesting a hearing on the Chapter 64 motion on October 23, 2014. Movant attached, for the first time ever, an affidavit from a DNA expert.

16.   On October 27, 2014, the Court set a hearing on Movant's Chapter 64 motion.

17.   On November 18, 2014, the State moved to modify Movant's execution date. The State requested an amended date of March 5, 2015.

18.   Movant filed a reply to the State's Chapter 64 response on November 24, 2014. Movant attached, for the first time ever, a personal affidavit.

19.   Movant filed a motion to withdraw his execution date on November 25, 2014, immediately before the hearing on his Chapter 64 motion. Movant requested indefinite delay of his execution to conduct DNA testing or to appeal the denial of DNA testing.

20.   The Court held a live hearing on the Chapter 64 motion on November 25, 2014. Movant called crime-scene and forensics expert, John Paolucci, and DNA expert, Deanna Lankford. The State called Gerald Clough, an investigator with the Office of the Attorney General of Texas, Lisa Tanner, the special prosecutor on Movant's case, and Etta Wiley, a deputy district clerk for Bastrop

2

344

County.   Movant and the State also introduced various exhibits.   After considering the record in this case, and after making credibility determinations from the hearing, the Court denied Movant's Chapter 64 motion.

21.   At the November 25, 2014, hearing, the Court granted the State's motion to modify Movant's execution date.   The Court entered an amended execution order setting Movant's execution for March 5, 2015.

22.   On December 2, 2014, Movant requested a subpoena to obtain a personal reference sample for purposes of the agreed-to DNA testing ordered on July 14, 2014.   A subpoena issued on December 3, 2014.

<u>Findings of Fact and Conclusions of Law</u>

23.   Reed has failed to prove by a preponderance of the evidence that his Chapter 64 motion is not made to unreasonably delay the execution of sentence of administration of justice.   This is explained below:

23a.   Movant, to date, has not provided the Court with any information regarding time estimates for the extensive DNA testing he seeks.   This alone, the Court believes, is sufficient to show that Movant has failed in his burden to show that his request is not made to unreasonably delay his execution.

23b.   Movant filed his Chapter 64 motion on the day this Court initially set Movant's execution date.   This timing, the Court believes, was not coincidental, but a designed tactic to delay the setting of Movant's execution date.   Movant's repeated desire to indefinitely delay his execution, instead of proposing concrete timelines, further supports the Court's belief that his Chapter 64 motion was filed for purposes of unreasonable delay.

23c.   The Court notes that Movant's Chapter 64 motion was filed thirteen years after Chapter 64's enactment and approximately three years after Chapter 64's most recent amendment.   The Court finds that there was no legal impediment to filing a Chapter 64 motion during this entire period.   The Court also notes that Movant has been continuously represented by counsel during his postconviction proceedings, as indicated by the multiple state and federal opinions generated during these proceedings. The lack of filing during this period, which was without factual or legal impediment, leads the Court to believe that the present Chapter 64 motion is filed for purposes of delay.

23d.   As pled in Movant's Chapter 64 motion, Movant's first informal request for DNA testing occurred three days after the United States Court of Appeals affirmed the denial of his federal petition for writ of habeas

3

344



corpus. This timing is important because, as demonstrated in the State's response, there is little chance for relief following affirmation of the denial of a federal habeas petition. Thus, the Court finds that Movant only sought DNA testing after his other efforts at relief proved unsuccessful. This diminishes Movant's case that his present Chapter 64 motion was not filed for purposes of unreasonable delay.

23e. As demonstrated by the State's exhibits, Movant's attorney—Bryce Benjet—is counsel of record for Larry Swearingen, another Texas death row inmate. Mr. Benjet filed a Chapter 64 motion for Swearingen approximately a year and a half before Movant's Chapter 64 motion. Mr. Benjet filed another Chapter 64 motion for Swearingen approximately two months before Movant's Chapter 64 motion. Movant's motion is substantially similar to Swearingen's initial Chapter 64 motion and attached to Swearingen's initial Chapter 64 motion is a personal affidavit from Swearingen and an affidavit from a DNA expert. Swearingen's second Chapter 64 motion has attached to it another affidavit from a DNA expert. Thus, the Court concludes that Movant, through his counsel, Mr. Benjet, had the legal and factual knowledge to file Movant's present Chapter 64 motion more than a year before it was filed. Movant's delayed presentation of a personal affidavit and an expert affidavit, the Court finds, is a purposeful attempt at delay.

23f. Movant has been cited for abuse of the writ on five separate occasions by the Court of Criminal Appeals. As demonstrated by the State's evidence, the United States District Court for the Western District of Texas ruled that Movant had untimely sought forensic testing and was dilatory in submitting an affidavit. The United States Court of Appeals for the Fifth Circuit also found that Movant submitted evidence in an untimely fashion. Accordingly, the Court finds that Movant has engaged in a dilatory and piecemeal litigation strategy throughout his postconviction proceedings and the Court believes this Chapter 64 motion is a continuation of such behavior.

23g. Movant has thrice asked the Court to indefinitely postpone his execution date—once in opposing the State's motion to set an execution date, once at the hearing to set an execution date, and once at the hearing on this Chapter 64 motion via a motion to withdraw the date. The Court finds that Movant's request for, essentially, indefinite stays works against him in proving that he is not attempting to unreasonably delay his execution.

23h. Movant, at the live evidentiary hearing on the Chapter 64 motion, asked for DNA testing on a substantial amount of evidence that he had not mentioned in his Chapter 64 motion. Consequently, Movant has not

4

individually briefed or explained the type of testing that he would like performed on these items. The Court finds this dilatory request to be another example of Movant's last-minute amendments to his Chapter 64 pleadings, which this Court considers to be an attempt to unreasonably delay his execution.

23i.   The Court rejects Movant's rationale for failing to request and brief those items of evidence raised for the first time at the hearing on the Chapter 64 motion; specifically, that Movant did not know of the evidence's existence until the State attached inventories to its Chapter 64 response. Movant has failed to demonstrate that he requested such inventories from the State prior to the State's Chapter 64 response or that the State refused him such inventories upon request. Further, one of the items of evidence that Movant requested to be tested for the first time at the Chapter 64 hearing—beer cans—has been heavily litigated during the course of Movant's postconviction proceedings. It is inconceivable to the Court that Movant did not know that such item existed. Moreover, Movant requested DNA testing of items of evidence in his Chapter 64 motion—a condom, a knife, and a shirt piece—that were not introduced at trial and were, therefore, "unknown" to Movant until the State attached an inventory to its response. Stated another way, Movant requested testing of some items he did not "know" were in the possession of the State or District Clerk. The Court finds Movant's unsupported excuse to be further evidence of his attempts to unreasonably delay his execution.

23j.   As demonstrated by the State's evidence, Movant is in possession of extracts from multiple pieces of evidence he seeks testing on and which he could test independently of a Chapter 64 motion. This includes the beer cans, various swabs from the victim's body, stains from the victim's pants and back brace, and a condom. Movant's request to test these items via Chapter 64 when he could conduct the testing himself, especially given his offer to pay for DNA testing, leads the Court to believe that his request for DNA testing is for the purpose of unreasonable delay.

23k.   The Court finds that Movant has requested DNA testing of items of evidence that the State has already agreed to test. This includes various hairs and swabs from the victim's body. The Court finds that this request for redundant testing is, again, an attempt to unreasonably delay the execution of sentence.

23l.   Movant has repeatedly stated, in pleadings and in court, that he plans to soon file postconviction motions for relief pursuant to Articles 11.071 and 11.073 of the Texas Code of Criminal Procedure. To date, despite

5

*347*

Movant's promise of diligence, he has not filed either pleading. The Court views this procrastination as another example of an attempt to unreasonably delay his execution.

23m.   Movant waited more than four months to obtain a subpoena for a reference sample from himself for purposes of the agreed-to DNA testing that this Court ordered in July.  This delay in requesting a reference sample demonstrates, the Court believes, unreasonable delay and Movant's tardy actions in his agreed-to DNA testing makes this Court believe he could not complete his requested DNA testing before the present execution date.

24.   The Court finds that Movant has failed to prove by a preponderance of the evidence that he would not have been convicted but for exculpatory results from DNA testing.  This is explained below:

24a.   The State's case on guilt-innocence was strong—Movant's DNA was found both on and inside the victim, which demonstrated presence; the intactness of Movant's sperm inside the victim's vaginal cavity, the peri-mortem injuries to the victim's anus, Movant's saliva on the victim's breasts after she took a shower the evening before her murder, and the small amount of semen in the victim's panties demonstrated sexual assault contemporaneous with murder; the peri-mortem injury to the victim's anus and the obvious signs of sexual assault—the victim's bunched up panties, a broken pants zipper, partially unclothed, bruises to the arms, torso, and head of the victim—demonstrated lack of consent; and additional evidence indicated that Movant frequented the area of the victim's disappearance at the time the victim disappeared and the Movant matched the height of someone who would have fit the adjusted seat in the victim's truck.

24b.   Many of the items of evidence Movant seeks to test were already before the jury and the jury knew they did not match Movant—their exculpatory nature was already before the jury.  For example, Movant's DNA and forensics expert testified that one of the hairs Movant seeks to test did not match Movant's genetic profile.  As another example, a DPS forensic scientist testified that none of the hairs collected from the victim's body microscopically matched Movant's hair.  And, as another example, Movant did not match any of the fingerprints collected during the course of the investigation.  Thus, the jury knew that many of the items Movant seeks to test were not from him.

24c.   Further, the Court finds that none of the evidence Movant seeks to test was so integral to the State's case that the jury would have acquitted despite knowing that Movant's DNA was not on the item.  Many of items

6

*342*

were in a truck shared with the victim's fiancé and evidence at trial demonstrated that other people had ridden in the truck. Thus, the jury would not be surprised to know that foreign DNA was found on items originating from the truck. Further, many of the items of evidence have been handled by ungloved individuals, which further undermines the value of such "exculpatory" results before a jury. Ultimately, at best, exculpatory results from the items Movant seeks to test would muddy the waters, not prove by a preponderance that he would have been acquitted.

Accordingly, Movant's Chapter 64 motion is DENIED.

It is so ORDERED.

DONE AND ENTERED this ___/2___ day of ___December___, 2014.

_____

Doug Shaver
Presiding Judge
21st District Court
Bastrop County, Texas

Sitting by Assignment

7

# Exhibit C

CAUSE NO. 8701

| STATE OF TEXAS | § | IN THE 21ST DISTRICT COURT |
|---|---|---|
| | § | |
| vs. | § | OF |
| | § | |
| RODNEY REED | § | BASTROP COUNTY, TEXAS |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### RELEVANT PROCEDURAL HISTORY

1. Reed filed a Chapter 64 motion on July 14, 2014, seeking to conduct DNA testing (the "Motion" or "Chapter 64 Motion").

2. On November 25, 2014, the Court held an evidentiary hearing on the Motion.

3. Crime-scene and forensics expert, John Paolucci, and DNA expert, Deanna Lankford, testified on behalf of Reed at the hearing. The State's witnesses were: Gerald Clough, an investigator with the Office of the Attorney General of Texas; Lisa Tanner, the special prosecutor in Reed's case; and Etta Wiley, a deputy district clerk for Bastrop County.

4. At the conclusion of the hearing, the Court denied the Motion and set Reed's execution date for March 5, 2015. R.R. Vol. IV 47:4-11.

5. The State proposed Findings of Facts and Conclusions of Law addressing only that: (1) the Motion was filed untimely and calls for unreasonable delay, and (2) that there is no reasonable probability Reed would not have been convicted had the results been available at the trial of the case. The Court adopted the State's proposed findings and conclusions and entered them in an order dated December 16, 2014.

6. On January 12, 2015, Reed filed a notice of appeal of the Court's denial of the Chapter 64 Motion.

7. On June 29, 2016, the Court of Criminal Appeals entered an order remanding Reed's Chapter 64 case to the Court for additional findings of fact and conclusions of law. *Reed v. Texas*, No. Ap-77,054 (Tex. Crim. App. June 29, 2016) (Order).

8. The Court of Criminal Appeals directed the Court to make the following findings regarding each item Reed seeks to test:

(a) whether the item still exists and is in a condition making DNA testing possible;

1

(b) whether the item has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(c) whether there is a reasonable likelihood that the item contains biological material suitable for DNA testing; and

(d) whether identity was or is an issue in this case.

*Id.*, slip op. at 2.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Whether Evidence Still Exists And Is In A Condition Making DNA Testing Possible. Tex. Code Crim. Proc. Art. 64.03(a)(1).

9.  Reed seeks to test three categories of evidence: (1) the victim's clothing, (2) evidence recovered in or near the truck the State claims the victim was driving when she was purportedly abducted, and (3) evidence recovered from the area where the victim's body was discovered. Each of the items Reed seeks to test is listed in the attached Addendum A.

10.  The Court finds that based on the State's evidence, including the evidence inventories and hearing testimony of Gerald Clough and Etta Wiley, each item Reed seeks to test still exists and is within the possession, custody and control of the Attorney General's Office, the Texas Department of Public Safety Crime Lab, or the Bastrop District Court Clerk.

11.  Crime-scene and forensics expert, John Paolucci, and DNA expert, Deanna Lankford, testified that each item Reed seeks to test is in a condition making DNA testing possible. The State offered no rebuttal evidence on this element. Although the State attempted to elicit the opinion of its investigator, Gerald Clough, about whether the evidence is suitable for DNA testing, the Court sustained objections to this testimony based on Mr. Clough's lack of qualifications as a DNA expert.

12.  The Court finds that each item listed in Addendum A exists and is in a condition making DNA testing possible pursuant to Tex. Code Crim. Proc. art. 64.03(a)(1).

### B.  Whether The Evidence Has Been Subject To A Chain Of Custody Sufficient To Establish That It Has Not Been Substituted, Tampered With, Replaced, Or Altered In Any Material Respect. Tex. Code Crim. Proc. Art. 64.03(a)(1)(A)(ii).

13.  Each of the items Reed seeks to test has been within the custody and control of the State since the item was collected. The State did not contest the chain of custody as to those items of evidence within the custody of the Department of Public Safety Crime Lab or the Office of the Attorney General. The Court finds that all items of evidence in the possession of the Office of the Attorney General and the Department of Public Safety Crime Lab have been subjected to a chain of custody sufficient to establish that they have

2

not been substituted, tampered with, replaced, or altered in any material respect pursuant to Article 64.03(a)(1)(A)(ii) of the Texas Code of Criminal Procedure.

14. The State argued that chain of custody was not established with respect to evidence that was introduced at Reed's trial in 1998 and has remained in the custody of the Bastrop District Court ever since.

15. At the hearing, the Bastrop District Court Criminal Deputy Clerk, Etta Wiley, testified that each of the items Reed seeks to test remained within the custody of the Bastrop District Court "under lock and key." R.R. Vol. IV 195-196. Wiley also testified that to her knowledge, no item has been "been substituted, replaced, tampered with, or materially altered." R.R. Vol. IV 195-197.

16. Trial prosecutor Lisa Tanner testified regarding the handling of evidence before and during the 1998 trial. Tanner testified that the evidence was handled with gloves prior to trial, but that the evidence was handled during the trial by her, the defense attorneys, and court personnel without gloves. R.R. Vol. IV 199. Tanner also testified that she presumed the evidence had been handled by the district clerk and had also been sent back to the jury room. *Id.*

17. The State's investigator, Mr. Clough, testified in response regarding the following hypothetical proposed by the State: "if you had collected evidence and sealed it and put it in custody and somebody came in and opened that seal and touched it and then passed it around to other individuals". Clough gave a conclusory opinion over objection that, under these circumstances, he would consider the evidence to be "contaminated", "materially altered," and "tampered with." R.R. Vol. IV 185-186.

18. Crime-scene and forensics expert John Paolucci and DNA expert Deanna Lankford offered unrebutted expert testimony explaining how items that may have been handled without gloves or comingled can provide probative DNA evidence through either identifying and comparing the DNA of those persons known to have handled the evidence as well as by comparing DNA profiles from the potentially contaminated items to those detected on items from the Attorney General's evidence locker or the Department of Public Safety Crime Lab which were not handled at trial. *See*, e.g., R.R. Vol. II 26-29, 76-78; R.R. Vol. III 94-101, 104-105, 111; R.R. Vol. IV 76. Reviewing a photograph of the trial exhibits as they were stored together in a box by the Bastrop District Clerk's Office, Lankford also testified that it was common for evidence in old cases to be submitted to her lab for DNA testing under similar conditions. She further testified that the manner of storage under these circumstances did not prevent the lab from obtaining probative results from the items in the box. R.R. Vol. III 96.

19. The Court finds that a proper chain of custody has been established as to the evidence kept as trial exhibits by the Bastrop District Court Criminal Deputy Clerk. By admitting the items into evidence at Reed's 1998 trial, the Court has already determined that the items were subjected to a proper chain of custody prior to trial. There is also no dispute that the evidence was subsequently maintained by the Bastrop District Clerk under secure

3

conditions. As discussed by Lankford, the fact that the items were handled by participants in the trial is certainly relevant to the Court's consideration of any DNA results from the testing of these items. However, such routine handling necessary for the evidence to be considered at trial does not destroy the chain of custody as to that evidence.

20. The Court finds that each item Reed seeks to test has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect within the meaning of Article 64.03(a)(1)(A)(ii) and therefore meets the requirements of that article.

## C.  Whether There Is A Reasonable Likelihood That The Items Contain Biological Material Suitable For DNA Testing.

21. Crime-scene and forensics expert John Paolucci and forensic DNA expert Deanna Lankford testified why each item Reed seeks to test contains biological evidence.

22. Lankford opined that, to a reasonable degree of scientific certainty, each item Reed seeks to test contains biological material suitable for DNA testing. *See* R.R. Vol. II 17-18; R.R. Vol. III 114, 117-118, 135, 142; Defendant's Hearing Ex. 11, ¶ 15.

23. Paolucci explained how the items would have been handled during the commission of the crime and that DNA evidence obtained from those items could reveal the killer's identity. R.R. Vol. II 17-18.

24. The State offered no rebuttal witnesses, and sponsored no documentary evidence contradicting Paolucci's or Lankford's testimony. In fact, the State's contamination arguments made in the context of chain of custody presume that biological material is present on each of the items of evidence kept in the custody of the Bastrop District Clerk's Office.

25. The Court finds that there is a reasonable likelihood that each item Reed seeks to test contains biological material and therefore meets the requirements of Tex. Code Crim. Proc. art. 64.01(a).

26. The Court further finds that each item Reed seeks to test was gathered in relation to the offense that is the basis of Reed's conviction and was in the possession of the State during Reed's trial.

27. The Court accepts the unrebutted testimony of Deanna Lankford that the evidence was either not previously subjected to DNA testing, or can be tested using newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of any previous testing.

4

*43*

28. Based on the documentary and testimonial evidence introduced at the hearing, the Court finds that the requirements of Tex. Code Crim. Proc. art. 64.01(b) are satisfied for each item Reed seeks to test.

## D.   Whether Identity Was Or Is An Issue In This Case.

29. The identity of Ms. Stites's killer was the primary contested issue at trial, and has been a contested issue through appeal and petitions for a writ of habeas corpus. The Court of Criminal Appeals has noted that the facts give rise to "a healthy suspicion that Fennell [the victim's fiancé] had some involvement in Stacey's death." *Ex parte Reed*, 271 S.W.3d 698, 747 (Tex. Crim. App. 2008). This Court finds that identity is at issue as required by Article 64.03(a)(1)(C).

ENTERED this _____ day of _____, 2016.

_____
Hon. Doug Shaver
Presiding Judge
21st District Court
*Bastrop County, Texas*

Sitting by Assignment

FILED
DATE
Sarah Loucks
District Clerk, Bastrop County

**44**

## ADDENDUM A

### ITEMS REED SEEKS TO TEST

| Victim's Clothing | In or Near Truck | Victim Recovery Scene |
|---|---|---|
| Pants | HEB pen | Plastic bags placed over victim's hands during investigation |
| Underwear | Knife and metal cover | Used condom |
| Bra | Green lighter | Two Busch beer cans |
| Employee name tag | Metal box cutter | Swabs/samples taken from mouths of two Busch beer cans |
| White t-shirt | Pack of Big Red gum | Extract samples from blue condom stored in coin envelope |
| Section of belt (no buckle) | Pieces of plastic cup | piece of shirt |
| Section of belt with buckle | Brown planner/organizer | piece of knife |
| Earring | Single hair from organizer/planner | |
| Right shoe | White paper napkin | |
| Left shoe | Carbon copies of checks | |
| HEB employee shirt | Gas emergency book | |
| Strands of hair from left sock, back of left leg, back | Latent fingerprint | |
| Tape lifts from pubic area | Automatic teller receipt | |
| vaginal and rectal swabs | bridal shop receipt | |
| | Wal-Mart receipt | |
| | business card | |
| | plastic bag | |
| | blue nylon rope | |
| | brown rope | |

# Exhibit D

Cause No. 8701

| STATE OF TEXAS | § | IN THE 21ST DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | OF |
| | § | |
| RODNEY REED | § | BASTROP COUNTY, TEXAS |

**SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After considering the record in this case, and after making credibility determinations following a live hearing in this Chapter 64 proceeding, the Court enters the following supplemental findings of fact and conclusions of law:

Relevant Procedural History

1. On July 14, 2014, Movant filed a Chapter 64 motion.

2. The State responded on September 12, 2014, and attached several exhibits regarding the existence, custody, and present condition of evidence collected in connection with the investigation of Movant's offense.

3. On October 22, 2014, the State filed an amended inventory regarding fingerprint evidence.

4. Movant filed an affidavit from a DNA expert on October 23, 2014.

5. On October 27, 2014, the Court set a hearing on Movant's Chapter 64 motion.

6. Movant filed a reply on November 24, 2014, and attached a personal affidavit.

7. The Court held a live hearing on the Chapter 64 motion on November 25, 2014. Movant called crime-scene and forensics expert, John Paolucci, and DNA expert, Deanna Lankford. The State called Gerald Clough, an investigator with the Office of the Attorney General of Texas, Lisa Tanner, the special prosecutor on Movant's case, and Etta Wiley, a deputy district clerk for Bastrop County. Movant and the State also introduced various exhibits. After considering the record in this case, and after making credibility determinations from the hearing, the Court denied Movant's Chapter 64 motion.

8. On December 12, 2014, the Court issued findings of fact and conclusions of law explaining the denial of Movant's Chapter 64 motion.

9.  Movant filed a notice of appeal on January 12, 2015.

10. On June 29, 2016, the Court of Criminal Appeals remanded this case for the limited purpose of making additional findings "regarding each item [Movant] seeks to have tested:
    (1) whether the item still exists and is in a condition making DNA testing possible;
    (2) whether the item has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;
    (3) whether there is a reasonable likelihood that the item contains biological material suitable for DNA testing; and
    (4) whether identity was or is an issue in this case."

11. On July 5, 2016, the Court entered a scheduling order requiring the parties to file proposed findings.

Supplemental Findings of Fact and Conclusions of Law

*Items Requested for DNA Testing*

12. The Court finds that Movant initially requested DNA testing on the following items:
    - White paper napkin
    - Belt (in two parts)
    - HEB pen
    - Carbon copies of checks
    - Gas emergency book
    - Latent fingerprint
    - Automated teller receipt
    - Bridal shop receipt
    - Green cigarette lighter
    - Metal box cutter
    - Package of Big Red gum
    - Walmart receipt
    - Business card
    - Plastic bag
    - Earring
    - Knife with metal cover
    - Blue rope
    - Brown rope
    - White t-shirt
    - Hair from Stites's left sock
    - Hair from Stites's left leg
    - Hair from Stites's back

- Hair from pubic tape lift
- Pubic tape lift
- Blue pants
- Black bra
- Green panties
- HEB nametag
- Vaginal swabs taken by medical examiner
- Rectal swabs taken by medical examiner
- Piece of a shirt
- Condom
- Piece of a knife

13. At the hearing, Movant expanded his initial DNA testing request to include these items and parts of items as well:
    - Blue pants—the crotch, zipper, cuffs, waistband, button opening, and button
    - Green panties—the crotch and waistband
    - Black bra—the clasp
    - White t-shirt—the collar
    - Socks—the heels and cuffs
    - Left shoe—the heel and laces
    - Right shoe—the heel and laces
    - HEB shirt—the collar, cuffs, and armpits
    - Pieces of a green cup
    - Portrait receipt
    - Brown planner
    - Beer cans—the lip and crush ridges
    - Hair from brown planner
    - Bags around Stites's hands
    - Extracts from condom
    - Extracts from beer cans
    - White flakes
    - Two tape lifts from Stites's body
    - Green blanket
    - Driver's seat tape lift
    - White paper sheet
    - Back brace
    - Knee brace

14. At the hearing, Movant withdrew his request to test items that were part of a previous DNA testing agreement with the State:
    - Hair from Stites's left sock
    - Hair from Stites's left leg
    - Hair from Stites's back

- Hair from pubic tape lift
- Vaginal swabs taken by medical examiner
- Rectal swabs taken by medical examiner

15.   The Court notes that the State timely objected to Movant's expanded DNA testing request.

*Existence of Items and Their Condition*

16.   The Court finds that all of the items listed in findings 12 and 13 still exist and are in a condition making DNA testing possible.

*Chain of Custody*

17.   The Court finds that the following items have NOT been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect:
- Blue pants
- Green panties
- Socks
- Left shoe
- Right shoe
- Black bra
- HEB nametag
- White t-shirt
- Belt (in two parts)
- Earring
- HEB shirt
- Knife with metal cover
- Pieces of a green cup
- Brown planner
- Back brace
- Bridal shop receipt
- Portrait receipt
- Knee brace
- Carbon copies of checks
- Walmart receipt

18.   In making finding 17, the Court considers the following evidence:

18a.   Tanner credibly testified that, following forensic analysis of the items in finding 17, the items were handled ungloved by the trial participants, court personnel, and possibly jurors as they were exhibits in Movant's trial.   Tanner's testimony on this point was not contradicted by Movant.

4

18b.   Clough credibly testified that some of the items in finding 17 have been stored without packaging, comingled in unsealed boxes.   Clough's testimony on this point was not contradicted by Movant.

18c.   Wiley credibly testified that some of the items in finding 17 have been stored without packaging, comingled in a manila envelope.   Wiley's testimony on this point was not contradicted by Movant.

18d.   Paolucci testified that evidence should remain sealed, or handled with gloves if unsealed, "[t]o prevent contamination."   Paolucci admitted that there is "a good chance that [the items in finding 17 are] contaminated evidence."

18e.   Lankford testified that, if evidence in her laboratory was unsealed and touched with an ungloved hand, "you've tampered with our evidence."

19.   The Court finds that all items listed in findings 12 and 13, except those in finding 17, have been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect.

*Reasonable Likelihood of Biological Material Suitable for DNA Testing*

20.   The Court finds that there is NOT a reasonable likelihood that the following items contain biological material suitable for DNA testing:
- White paper napkin
- Belt (in two parts)
- HEB pen
- Carbon copies of checks
- Gas emergency book
- Latent fingerprint
- Automated teller receipt
- Bridal shop receipt
- Green cigarette lighter
- Metal box cutter
- Package of Big Red gum
- Walmart receipt
- Business card
- Plastic bag
- Earring
- Knife with metal cover
- Blue rope
- Brown rope
- White t-shirt—the collar
- Pubic tape lift

- Blue pants—the crotch, zipper, cuffs, waistband, button opening, and button
- Black bra—the clasp
- Green panties—the crotch and waistband
- HEB nametag
- Piece of a shirt
- Condom
- Piece of a knife
- Socks—the heels and cuffs
- Left shoe— the heel and laces
- Right shoe— the heel and laces
- HEB shirt—the collar, cuffs, and armpits
- Pieces of a green cup
- Portrait receipt
- Brown planner
- Beer cans—the lip and crush ridges
- Hair from brown planner
- Bags around Stites's hands
- Extracts from condom
- Extracts from beer cans
- White flakes
- Two tape lifts from Stites's body
- Green blanket
- Driver's seat tape lift
- White paper sheet
- Back brace
- Knee brace

21.   In making finding 20, the Court considers the following evidence:

    21a.   For purposes of establishing biological material on most items, Movant relied on skin cell transfer—Locard's exchange principle.

    21b.   Paolucci testified that, for paper items, he would prefer latent print examination over DNA testing because "we didn't have much success testing paper as a substrate."

    21c.   The following items are paper goods:
- White paper napkin
- Carbon copies of checks
- Automated teller receipt
- Bridal shop receipt
- Walmart receipt
- Business card
- Portrait receipt

*23*

- White paper sheet

21d. Paolucci testified that he would want additional examination to determine if biological material existed on the following items:
  - White paper napkin
  - White flakes
  - Two tape lifts from Stites's body
  - Green blanket
  - Driver's seat tape lift
  - White paper sheet

21e. Paolucci's request for additional examination to determine if biological material exists on the items in finding 21d necessarily means that he does not know if biological material exists on such items.

21f. Paolucci admitted that the only way to determine if there is biological material on a certain item is if it is tested for DNA and he could not "promise anybody that there's going to be DNA" on any particular item.

21g. Paolucci admitted that he could not "say for sure where—where these items were touched."

21h. Paolucci specifically admitted that he could not say that the perpetrator touched any of the following items:
  - White paper napkin
  - HEB pen
  - Knife with metal cover
  - Brown planner

21i. Paolucci did not discuss whether biological material might be found on the following items:
  - White paper napkin
  - Carbon copies of checks
  - Gas emergency book
  - Latent fingerprint
  - Automated teller receipt
  - Bridal shop receipt
  - Walmart receipt
  - Business card
  - Plastic bag
  - Blue rope
  - Brown rope
  - Pubic tape lift
  - Piece of a shirt

7

- Piece of a knife
- Portrait receipt
- Extracts from condom
- Extracts from beer cans
- White flakes
- Two tape lifts from Stites's body
- Green blanket
- Driver's seat tape lift
- White paper sheet

21j. Lankford testified that "the only way to know for sure" if biological material is present "is to test the[ items] and obtain a DNA profile" and that she "couldn't testify to there being a biological stain, for instance, on an item of clothing without testing it."

21k. Lankford admitted that she has no personal knowledge that any particular item of evidence was manipulated with bare hands.

21l. Lankford admitted that she did not know whether any particular item was handled or that there is biological material in the supposedly handled spot on the item.

21m. Lankford admitted that she had no personal knowledge that Stites was dragged by her clothing and that it was equally likely that she was moved via her unclothed body parts.

21n. Lankford admitted that she could not say whether any particular stain on the white t-shirt contained biological material.

21o. Lankford admitted that she could not say that the following items were handled during the commission of Stites's murder:
- White paper napkin
- HEB pen
- Carbon copies of checks

21p. Lankford testified that for the items in finding 17, there is the possibility that so much biological material has been contributed it will be impossible to deconstruct the mixture.

21q. Lankford stated she "couldn't say for sure" that DNA will be detected on the items for which Movant requests testing.

21r. Lankford testified that, as far as fingerprints go, "sometimes we obtain a DNA profile and sometimes we don't."

8

21s.   Lankford testified that she would want additional examination to determine if biological material existed on the following items:
- Green blanket
- White paper sheet
- Driver's seat tape lift

21t.   Lankford's request for additional examination to determine if biological material exists on the items in finding 21s necessarily means that she does not know if biological material exists on such items.

21u.   Lankford did not discuss whether biological material might be found on the following items:
- Gas emergency book
- Automated teller receipt
- Bridal shop receipt
- Walmart receipt
- Business card
- Plastic bag
- Earring
- Blue rope
- Brown rope
- Piece of a shirt
- Piece of a knife
- Portrait receipt
- Hair from brown planner
- Extracts from condom
- Extracts from beer cans
- Green blanket
- Driver's seat tape lift
- White paper sheet
- Back brace
- Knee brace

21v.   The items listed in finding 17 have been contaminated, tampered, and/or altered, as explained in finding 18.

21w.   There was testimony at trial that Stites was not dragged to her resting place.

21x.   There was testimony at trial that Stites's fingernails were too short to obtain scrapings from underneath.

21y.   There was no testimony at trial that Stites hit or scraped her attacker with her hands.

21z.   There was testimony at trial that the following items contained no stains of evidentiary value on them:
- White t-shirt
- White flakes
- Black bra
- Paper napkin
- White paper sheet
- Knee brace
- HEB shirt

22.   The Court finds that there is a reasonable likelihood that all items listed in findings 12 and 13, except those in finding 20, contain biological material suitable for DNA testing.  Namely, the hair from the brown planner.

23.   The Court notes that the reasonable likelihood standard utilized in finding 20 comes from an amendment of Chapter 64 that occurred after Movant filed his Chapter 64 motion.

24.   The Court would enter finding 20 whether applying the 2013 version of Chapter 64 or the 2015 amendments to Chapter 64.

*Identity Was or Is an Issue*

25.   The Court finds that identity was an issue in this case.

*Supplementation*

26.   The above findings are supplemental to those issued by the Court on December 12, 2014.

DONE AND ENTERED this ___7___ day of ___Sept_____, 2016.

Doug Shaver
Presiding Judge
21st District Court
Bastrop County, Texas

Sitting by Assignment

10

# Exhibit E

# Michael M. Baden, M.D.

15 West 53rd Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732

Facsimile: (212) 397-2754
E-mail: MBaden@mac.com

10 February 2015

*Via e-mail to bbenjet@innocenceproject.com*

Bryce Benjet
Staff Attorney, Innocence Project
40 Worth Street, Suite 701
New York, New York 10013

Re:     *Stacey Stites, deceased*

Dear Mr. Benjet:

1.      I am a physician, licensed to practice medicine in the State of New York and Board-Certified in Anatomic, Clinical and Forensic Pathology.  I am a former Chief Medical Examiner of New York City and the former Chief Forensic Pathologist for the New York State Police.  I have held professorial appointments at Albert Einstein Medical School, Albany Medical College, New York Law School and John Jay College of Criminal Justice.  I served as Chairman of the Forensic Pathology Panels of the United States Congress Select Committee on Assassinations that reinvestigated the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr. (1970s).  I have been a forensic pathology consultant to the Federal Bureau of Investigation,

the Veterans Administration, the U.S. Department of Justice and the U.S. Drug Enforcement Agency.  Attached hereto is a copy of my *curriculum vitae.*

2.     I have reviewed the autopsy report and other medical examiner office documents, scene and autopsy and clothing photographs, a scene videotape, police reports, laboratory reports and a statement by Mrs. Carol Stites relative to the death of Stacey Stites, 19 years old.

3.     According to Mrs. Stites, her daughter returned from work as usual about 1:30 p.m. on April 22, 1996.  She went upstairs to the apartment she and her fiancé Jimmy Fennel, a police officer, shared, changed out of her work clothes and came back down.  She stayed with her mother until about 8:00 p.m. when Mr. Fennel returned from baseball practice and they both went upstairs.  That was the last time Mrs. Stites saw her daughter alive.

4.     Mr. Fennel told police that Ms. Stites left their apartment to drive to work in his pickup truck by herself about 3:00 a.m. on April 23, 1996.  The unoccupied truck was seen parked in the Bastrop High School parking lot by a patrol officer less than 2-1/2 hours later, at 5:23 a.m.  The officer also noticed a six to eight inch length of part of a leather belt with a square chrome buckle on the ground in front of the driver's door.

5.     Ms. Stites' partially clothed body was found lying face-up in brush a number of yards from an unpaved road about 3:00 p.m. the same day.  Prominent

lividity was noted on the front non-dependent parts of her body by responding sheriff's department officers. This inappropriate lividity is clearly documented in scene photographs. A homicidal ligature mark was present around her neck and the ligature, the remainder of the belt portion seen near the truck, was nearby.

6.     Lividity develops by the gravitational settling of red blood cells while still in blood vessels in the lower dependent portions of the body after death causing a maroon-type discoloration of the skin. The intensity and extent of the lividity present on Ms. Stites' body demonstrates that she would have lain face down after she was dead for more than four or five hours in order for this lividity to remain after she was turned over when she was placed on her back in the brush. This lividity demonstrates that Ms. Stites was dead before midnight on April 22nd when she was alone with Mr. Fennel.

7.     Examination of the truck showed that the driver's seat was reclined back and the passenger seat was in a slightly forward position. "Some type of viscous fluid" was found on the passenger-side floorboard. This is not pulmonary edema fluid from Ms. Stites as interpreted by the prosecution. Pulmonary edema fluid is thin and frothy and would also have been present in and around her mouth and nose, and was not. Pulmonary edema fluid is not viscous. This is typical post-mortem purge fluid that flowed from her nose and mouth as her body began to decompose and showed other decomposition changes, such as skin slippage and

green discoloration of skin, which were also described at the scene and autopsy. It would have taken more than four hours after her death for this purge fluid to develop. It could not have developed in less than 2-1/2 hours if she were alive at 3:00 a.m. when she got into the truck. This finding also demonstrates that she had been dead for a number of hours, before midnight, when she was placed in the passenger seat.

8.    The testimony at trial that no intact sperm remains in the vagina after 24 hours is not correct. It is my experience, and the experience of other forensic pathologists as reported in the forensic science literature, that sperm may remain intact for more than 72 hours after intercourse. The few sperm seen are entirely consistent with consensual intercourse that Mr. Reed said occurred between midnight and 3:00 a.m. on April 22, 1996.

9.    The autopsy photographs show dilatation of Ms. Stites' anus that normally occurs after death when the anal sphincter muscles relax. No lacerations, no blood, no semen were present in or around the anus in the photographs and which finding was also confirmed in Dr. Bayardo's autopsy report. There is no evidence of anal penetration. There is no forensic evidence that Ms. Stites was sexually assaulted in any manner.

10.    In my opinion removing the clothing and performing vaginal swabs at the scene where the body was found rather than at the properly equipped medical

examiner's office is contrary to proper forensic practice.  Such procedure can cause loss of trace evidence at the scene and contamination of evidence that is removed and evidence that remains, including contamination of rectal swabs with vaginal contents.

11.    It is my opinion, to a reasonable degree of medical and scientific certainty, based on my education, training and more than fifty years' experience as a forensic pathologist, that the distribution and intensity of Mrs. Stites' lividity shows that she was murdered before midnight of April 22, more than four hours before she was brought to where her body was found; that she was already dead with signs of decomposition and development of purge fluids when she was placed in the truck; that intact sperm could be present two or three days after consensual vaginal intercourse; and that there is no evidence of anal intercourse or of sexual assault.  It is further my opinion beyond a reasonable degree of medical certainty that, based on all of the forensic evidence, Mr. Reed is scheduled to be executed for a crime that he did not commit.

Very truly yours,

Michael M. Baden

Michael M. Baden, M.D.
Former Chief Medical Examiner,
  City of New York
Former Chief Forensic Pathologist,
  New York State Police

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RODNEY REED, | § | |
| Petitioner | § | |
| | § | |
| v. | § | CIVIL ACTION NO. A-02-CA-142 |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| Respondent | § | |

## DECLARATION OF ROBERTO J. BAYARDO, M.D.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

1.       My name is Roberto J. Bayardo, M.D.  I am over the age of 18 years and fully competent in all respects to make this Declaration.  All the facts recited herein are within my personal knowledge and are true and correct.  All of the opinions recited herein are expressed within a reasonable degree of medical and/or scientific probability, except where noted.

2.       I am a forensic pathologist, and the former Travis County Medical Examiner. I performed the autopsy on Stacy Stites, and testified at the trial of Rodney Reed.  I have recently reviewed the following materials:

    a.   The autopsy report on Ms. Stites;

    b.   My trial testimony;

    c.   Excerpts from the trial testimony of Karen Blakely and Meghan Clement; and

    d.   The April 14, 2006 affidavit and June 16, 2010 declaration of Leroy Riddick, M.D.

I am also personally aware that Jimmy Fennell, who was a Giddings police officer at the time of Ms. Stites's death, and was a suspect in her murder, has been convicted of sexual assault while

serving as police officer in Georgetown, Texas and is in prison. Based on the materials identified above, the information concerning Mr. Fennell, and my expertise as a forensic pathologist, I have the following opinions and clarifications.

3.     Time of Death.  At trial, I testified that I estimated the time of death as 3:00 a.m. on April 23, 1996.  Estimates regarding time of death are just that – estimates – and the accuracy of the estimate is subject to various factors, as outlined by Dr. Riddick in paragraphs 10-13 of his April 14, 2006 affidavit.  My estimate of time of death, again, was only an estimate, and should not have been used at trial as an accurate statement of when Ms. Stites died.  (As I testified, I am unaware of how long it was between the time of death and the time her body was brought to the Travis County Medical Examiner's office.)  If the prosecuting attorneys had advised me that they intended to use my time of death estimate as a scientifically reliable opinion of when Ms. Stites died, I would have advised them not to do so.  In my professional opinion, pinpointing a precise time of exactly when Ms. Stites died would have been, and remains, impossible.

4.     Survival of Sperm.  At trial, I testified that the very few spermatozoa I found in Ms. Stites's vaginal cavity had been deposited there "quite recently."  Ms. Blakely testified that spermatozoa can remain intact in the vaginal cavity for no more than 26 hours; and Ms. Clement testified that spermatozoa can remain intact for no more than 24 hours.  I question the qualifications of these witnesses to offer this testimony, and in any event, they are incorrect. I am personally aware of medical literature finding that spermatozoa can remain intact in the vaginal cavity for days after death. Accordingly, in my professional opinion, the spermatozoa I found in Ms. Stites's vaginal cavity could have been deposited days before her death.  Further, the fact that I found "very few" (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was not deposited less than 24 hours before Ms. Stites's

2

death. If the prosecuting attorneys had advised me that they intended to present testimony that spermatozoa cannot remain intact in the vaginal cavity for more than 26 hours, and argue that Ms. Stites died within 24 hours of the spermatozoa being deposited, I would have advised them that neither the testimony nor the argument was medically or scientifically supported.

5. Sperm Not Found in Rectum. I reported in the autopsy report and testified at trial that rectal smears taken of Ms. Stites were negative for spermatozoa and seminal fluid. Upon direct examination, I did testify that under a microscope, the rectal smears showed what appeared to be the heads of spermatozoa. However, the smears were insufficient to conclude that spermatozoa were present in the rectum. Accordingly, I reported the smears as negative on the autopsy report. My trial testimony should not have been construed as suggesting that spermatozoa were indeed found in Ms. Stites's rectal cavity. Had the prosecuting attorneys advised me that they intended to present my testimony as evidence that spermatozoa was found in Ms. Stites's rectal cavity, I would have informed them that that was incorrect. An autopsy report is the result of scientifically valid, forensic pathology methods. Trial testimony is given in response to the questions asked. Had I been asked at trial if spermatozoa and/or seminal fluid had been found in Ms. Stites's rectal cavity, I would have said that it had not, consistent with the autopsy report.

6. Sexual Assault. I found on autopsy that Ms. Stites was sexually assaulted, and testified consistently at trial. However, the presence of spermatozoa in Ms. Stites's vaginal cavity was not evidence of sexual assault. There was no indication that the spermatozoa in Ms. Stites's vaginal cavity was placed there in any fashion other than consensually. Also, because there was no spermatozoa found in Ms. Stites's rectal cavity, there is no evidence that any spermatozoa was deposited in the rectal cavity as a result of the sexual assault. In my

3

professional opinion, Ms. Stites was sexually assaulted in her anal cavity, and that assault did not result in the deposit of any spermatozoa.   The injuries to Ms. Stites's anus are certainly consistent with penile penetration, as I testified, but if there was penile penetration, there was no ejaculation. I understand that the sexual assault for which Mr. Fennell was convicted did not involve ejaculation. This is consistent with the sexual assault on Ms. Stites.  Further, the injuries to Ms. Stites's anus are more consistent with penetration by a rod-like instrument, such as a police baton.

7.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13, 2012.

Roberto J. Bayardo, M.D.

4

# Exhibit G

## AFFIDAVIT OF WERNER U. SPITZ, MD

STATE OF MICHIGAN    )
                     ) ss
COUNTY OF MACOMB     )

I, Werner U. Spitz, M.D., having been duly sworn and having personal knowledge

of the matters set forth in this affidavit, hereby states:

I am a medical doctor licensed to practice medicine. I graduated from medical school in 1953 and have undertaken residency in pathology followed by fellowship in forensic pathology. I am certified by the American Board of Pathology in anatomic pathology (1961) and forensic pathology (1965). I have spent my entire professional life (62 years) in the practice of forensic pathology. My curriculum vitae is attached.

1.    My review of the autopsy report, autopsy photos, crime scene photos, crime scene video, and report of crime scene investigation leads me to conclude that Stacey Stites was murdered prior to midnight on April 22, 1996 (the night before her body was found). And further that she laid in a different position for about 4-5 hours before she was moved to the location where the body was found.

2.    The lividity (livor mortis, red purple discoloration due to pooling of blood after death) on Stites's face, shoulder, and arm, scientifically proves that she was dead in a position different from that which she was found for a period of at least 4- 5 hours. This pattern of lividity seen on the anterior arm, chest, shoulder, and face would develop if Stites was lying face down with one arm lower than the rest of the body for 4-5 hours, before she was moved to the position in which she was found. It is impossible that this lividity occurred at the scene in the position the body was found because Stites's body was found on her back. I have reviewed investigation reports indicating that mucus-like fluid was found near the passenger floor board of the truck belonging to Stites's fiancé. The presence of this fluid in combination with the lividity on the arm, shoulder and face is consistent with Stites being killed at a different location and later placed into the pick-up truck, resting with her face and arm lower than the rest of the body. This would explain both the mucus-like fluid near the passenger floor of truck and the blanching (areas where blood is pressed out of the skin) on the fingers as if pressed into something after death.

3.    The presence of lividity in these non-dependent areas makes it medically and scientifically impossible that Stites was killed between 3- 5 a.m. on the date in question. Stites could not have been both murdered and dumped between the hours of 3-5 a.m. on April 23, 1996 and remained undisturbed in that spot until her body was discovered at around 3 p.m. because the lividity observed in the non-dependent areas

1

would have taken at least 4-5 hours to develop. It is impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial. I have reviewed the trial transcripts of the pathologist Roberto Bayardo M.D. and the Crime Scene Investigator Karen Blakely. The medico-scientific analysis of the lividity I discuss was never addressed.

4.   Dr. Bayardo describes "slight residual" rigor at autopsy conducted at 1:30 p.m. on April 24, 1996, after the body was refrigerated since approximately 11 p.m. on April 23rd. Rigor is seen on the crime scene video, but the arms are easily placed down from above Stites's head as she is put into a body bag before sundown on April 23,1996. This movement of the arms shows passing rigor. Likewise, "slight residual rigor" after refrigeration at the ME's office is consistent with passing rigor, at the time the body is filmed in the video.

5.   Rigor is markedly temperature-dependent. In warm weather rigor mortis progresses faster, in cool weather it progresses more slowly. The average temperature on April 23rd was in the mid-60s. Taking this temperature into consideration, passing rigor, as depicted in the video, is consistent with death of about 20-24 hours prior to the video—a period of 15 hours as estimated by Dr. Bayardo would not allow for such movement, without having broken the rigidity.

6.   Very few sperm were found on autopsy smears, and the crime scene investigator found only 3 intact spermatozoa. If the victim was sexually assaulted between 3-5 a.m., there would be more sperm found on slides. A normal sperm count is considered to be 15 million spermatozoa per milliliter. The amount of sperm found on the slides is more consistent with a longer interval between intercourse and the time the sample was collected. As I explain in my book, intact spermatozoa can be found in the vagina up to 72 hours after coitus.

7.   My review shows evidence of decomposition that is not consistent with a time of death at 3 a.m. on April 23, 1996. The body is described as having green discoloration, which can be seen in the video. The appearance of the breasts after the bra is removed shows gas formation. The abdomen does not appear flat. There is skin slippage in several places. What is described at autopsy as post mortem burns in the face, breasts, and other areas is also likely skin slippage, in which the top layer of skin has dried. What has been described as petechiae in the scalp are none other than small torn blood vessels in the process of reflection of the scalp. Brown fluid running from the mouth and nose, across the right cheek is decomposition fluid and is not described in the autopsy report. Internal organs also show evidence of decomposition—what Dr. Bayardo describes as congestion in lungs is actually decomposition. The heart is flabby and the blood is liquid after liquefaction which is part of the decomposition process.

2

Brain swelling is also part of decomposition. This amount of decomposition supports a post-mortem interval of about 20 to 24 hours before the film and photographs.

8.     The distended anus seen in photos and described at autopsy is normal, in consideration of the absence of rigidity. It is a common mistake for death investigators to misinterpret natural relaxation of the sphincter, as evidence of anal penetration. There are no apparent lacerations in the photographs of the anus. If lacerations were present, they would be visible. Abrasions described at autopsy are not evidence of anal assault, and are equally consistent with hard bowel movements. I am aware that there was a weak DNA result consistent with Rodney Reed on the sperm fraction of the rectal swab taken from Stites. The presence of a small amount of sperm in the rectum is not surprising and does not contradict my conclusion that there is no evidence of anal penetration in this case. When semen is present in a body, it can drain from the vagina into the dilated anus. I have seen this happen in a number of cases. Contamination of the rectal swab by vaginal contents is also a concern, especially in cases where vaginal swabs are collected prior to the taking of the rectal specimens.

9.     The examination of the body at the scene was inappropriate. None of the investigation should have been done by the crime scene investigator. The body should have been placed in a body bag, preserving all trace evidence, and then taken to a controlled environment where it could be examined by a forensic pathologist. But despite these errors, the photographs and video provide enough evidence to estimate the post-mortem interval. These observable factors include: lividity, rigor, amount of residual sperm in the genital tract, and evidence of decomposition. When all of these factors are considered together, it becomes indisputable that the time of death was considerably earlier than 3:00 am on April 23rd as estimated by Dr. Bayardo. All findings point to a post-mortem interval of about 20-24 hours prior to the time the body was filmed.

10.    My textbook, *MEDICOLEGAL INVESTIGATION OF DEATH*, 4th edition, published by Charles C. Thomas, Springfield, Illinois, 2006 discusses many of the issues in this affidavit in greater detail.

11.   All my opinions expressed in the above paragraphs 1-10 are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.

Werner U. Spitz, M.D.

Sworn to and subscribed before me on February 4th, 2015

Diane L. Lucke, Notary Public, State of Michigan
Monroe County,  Acting in Macomb County
My commission expires:  October 20, 2017

4

# Exhibit H

# TEXAS DEPARTMENT OF PUBLIC SAFETY

**5805 N LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001**
**512/424-2000**
www.dps.texas.gov



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
SKYLOR HEARN
DEPUTY DIRECTORS

COMMISSION
STEVEN P. MACH, CHAIRMAN
MANNY FLORES
A. CYNTHIA LEON
JASON K. PULLIAM
RANDY WATSON

April 30, 2018

Bryce Benjet
Senior Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY 10013

Dear Mr. Benjet:

I have reviewed your correspondence entitled "Request for Correction, L-246937" dated July 11, 2017. I do not believe that Ms. Blakely's testimony constitutes professional negligence or professional misconduct and thus do not see a basis for the Crime Lab to report this matter to the Texas Forensic Science Commission pursuant to Article 38.01, Sec. 4, Texas Code of Criminal Procedure. The issues raised in your letter have been extensively litigated in this case. We do not see a duty to correct in this matter; however, during our review of the testimony by Ms. Blakely we noted some potential limitations in the paper she cited during testimony: Spermatozoa – Their Persistence After Sexual Intercourse, GM Willott and JE Allard, Forensic Science International, 19 (1982) pp 135-154.

The Willott paper cited by Ms. Blakely during her testimony concerned a study that was undertaken to determine the amount of time spermatozoa could remain in the body after intercourse. Data for this study was collected from living victims and relied on the victim to correctly estimate the time since the offense (intercourse) occurred. The paper acknowledged that reliance on the victim to estimate the time since the offense occurred was a potential limitation to the research. The paper also included a table comparing the results of similar studies. In this table, a study by Davies and Wilson was referenced that reported 72 hours as the longest time for intact spermatozoa to be found in the vagina. The Davies and Wilson study, in contrast to the Willott study, relied on laboratory volunteers to collect samples at pre-established time points. The difference in collection method is a possible explanation for the difference in result. As seen in the table in the Willott paper, the literature varied greatly in the time given for finding spermatozoa (intact and otherwise) in the female reproductive tract.

Your letter indicates that you have sent your Request for Correction to the Texas Forensic Science Commission. We would fully cooperate with the Commission or the Courts regarding any hearings or reviews they may choose to conduct.

Sincerely,

Brady W. Mills
Assistant Division Director
Crime Laboratory Service
Law Enforcement Service Division

cc: Lynn Garcia, Texas Forensic Science Commission

BWM:cg

*EQUAL OPPORTUNITY EMPLOYER*
COURTESY • SERVICE • PROTECTION

# Exhibit I



**Bode Cellmark**
FORENSICS
LabCorp Specialty Testing Group

10430 Furnace Road, Suite 107
Lorton, VA 22079
Phone: 703-646-9740

**Forensic DNA/Biology Analysis Testimony**
**Result of Review**
**January 11, 2018**

**To:**
Bryce Benjet
Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY 10013

**Cellmark Case #:** F9801744

**List of Documents Evaluated from Innocence Project received on July 11, 2017:**

Transcript for Case F9801744

**CONCLUSIONS:**

Bode Cellmark has completed its review of the testimony transcript [and/or stipulation] for the case referenced above and found it to contain:

\_\_ Satisfactory Statements          <u>X</u> Unsatisfactory Statements

If Unsatisfactory: Bode Cellmark has completed its review of the testimony transcript [and/or stipulation] for the case referenced above and found it to contain:

\_\_ **Error Type 1:** The DNA Analyst stated an inclusion associated with a specific individual to the exclusion of all others when 1) source attribution threshold was not met (applicable only to cases reported before September 19, 2015) or 2) after Bode Cellmark discontinued the practice of applying source attribution (September 19, 2015).
\_\_ **Error Type 2:** The DNA Analyst provided an incorrect statistical value during testimony or incorrectly explained the meaning of the statistical value(s).
<u>X</u> **Error Type 3:** The DNA/Forensic Biology Analyst cites the number of cases and/or samples worked in the lab as a predictive value to bolster the conclusion that the DNA profile belongs to a specific individual or the DNA/Forensic Biology Analyst otherwise testifies beyond the scope of his/her expertise.

See enclosed Testimony Review Evaluation Form.

Report submitted by,

Stephane Sivak, MS
Technical Leader

Correction Review Evaluation Form

| Case Information: | |
|---|---|
| Case Number: | F9801744 |
| Defendant(s): | Rodney Reed |
| Date of Review: | 11/22/2017 |

| Review of Testimony: | |
|---|---|
| Date of Testimony: | 5/11/1998 |
| Testifying Analyst: | Meghan Clement |
| Name of Prosecutor: | Mr. Charles Penick, Mr. Forrest Sanderson, & Ms. Lisa Tanner |
| Name of Defense: | Mr. Calvin Garvie & Ms. Lydia Clay-Jackson |

Testimony Results (mark as appropriate):

Unsatisfactory Statements:     Yes   [X]          No   [ ]

If testimony contained Unsatisfactory Statements, cite each by Error type, page(s), and line number(s):

| | |
|---|---|
| Page 55, lines 13-21 | With spermatozoa, the tails are very fragile and tend to break off, so after a short period of time they start losing their tails and then what you find is only the spermatozoa heads, from sexual assault cases. So that can be an indicator of how long the spermatozoa has been in a particular place before it is actually collected and detected. |
| Page 56, lines 8-16 | In serology work, typically, sexual assault kits weren't even collected more than 24 hours after an encounter because the chances of finding sperm is so rare. Generally, finding intact sperm at more than probably about 20 hours, 20 to 24 hours, I don't ever recall finding intact sperm more than that, from the time of the sexual assault and from the time the collection was made. |
| Page 56, line 18, after asked to clarify above response: "And that was in over thousands of rape kits?" | Yes. |

Approved By: _____          Date: 1/11/2018

Document:  Correction Review Evaluation Form
Revision:  1
Effective:  1/3/2018 4:22:11 PM
Issuing Authority:  Quality Assurance Manager