IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RODNEY REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BRYAN GOERTZ, Bastrop County District Attorney, in his official capacity only, | § | **CIVIL CASE NO. 1:19-cv-794** |
| | § | |
| | § | |
| Defendant. | § | **CAPITAL CASE** |
| | § | |
| | § | |

**AMENDED COMPLAINT PURSUANT TO 42 U.S.C. § 1983**

*Of Counsel*

Cliff C. Gardner (*pro hac vice* filed)
Robert A. Weber (*pro hac vice* filed)
Nicole A. DiSalvo (*pro hac vice* filed)
Shaivlini Khemka (*pro hac vice* filed)
**SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP**
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Bryce Benjet
**THE INNOCENCE PROJECT**
40 Worth Street, Suite 701
New York, New York  10013
(212) 364-5980
bbenjet@innocenceproject.org

Andrew F. MacRae
**LEVATINO|PACE PLLC**
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas  78746
(512) 637-8565
amacrae@levatinopace.com

*Attorneys for Plaintiff, Rodney Reed*

# INTRODUCTION

*"DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty."*

*Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55, 129 S. Ct. 2308, 2312, 174 L. Ed. 2d 38 (2009) (Roberts, C.J.)

1.      The State of Texas used DNA evidence to convict Mr. Reed, but since that conviction has been called into question in post-conviction proceedings, the State has consistently opposed DNA, testing which is capable of proving Mr. Reed's innocence and identifying another man as the murderer.  Mr. Reed properly filed a motion for DNA testing under the existing Texas law approximately five years ago, but his request was denied after lengthy proceedings—including two appeals to the Texas Court of Criminal Appeals (the "CCA") and one to the United States Supreme Court.  This constitutional challenge to the Texas post-conviction DNA testing statute, Article 64 of the Texas Code of Criminal Procedure ("Article 64"), is brought after the Supreme Court's denial of certiorari and subsequent unsuccessful efforts to remedy the deficiencies in the statute in the 86th Texas Legislature.

2.      This action under 42 U.S.C. § 1983 ("Section 1983") challenges the constitutionality of Article 64 both on its face and as interpreted, construed and applied by the CCA.  Specifically, this action raises the constitutional violations that flow from the extra-statutory conditions that the CCA imposed on Article 64, conditions which effectively preclude most post-conviction DNA testing absent State consent and eviscerate the relief that Article 64 was designed to provide.  Given the unique ability of DNA evidence to identify the perpetrator of a crime, the CCA's adoption of non-statutory criteria to preclude Mr. Reed from testing key trial evidence to prove his innocence violates fundamental notions of fairness and denies him due process of law and access to the courts.

3.      Accordingly, Mr. Reed seeks a declaration that Article 64, as interpreted, construed and applied by the Texas courts to deny his motion for DNA testing, violates his rights under the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution and under Article 1 of the Texas Constitution.  Relief under Section 1983 is warranted when a state's post-conviction DNA testing scheme is applied in a manner that violates constitutional principles of fundamental fairness or due process.  *See Osborne*, 557 U.S. at 69.  The declaratory relief sought in this action is necessary to preserve Mr. Reed's liberty interest, recognized by the Supreme Court in *Osborne*, and to access the Texas statutory procedure to conduct forensic DNA testing and to use that DNA evidence to prove his innocence.  *Id.* at 68.

## JURISDICTION

4.      This Court has jurisdiction over Mr. Reed's federal constitutional claims under 28 U.S.C. §§ 1331, 1343, 1651, 2201, 2202 and Section 1983, and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

5.      Defendant Goertz has opposed, and continues to oppose, Mr. Reed's requests – both formal and informal—to conduct DNA testing on the items of evidence at issue in this case. In addition, Defendant Goertz has directed or otherwise caused each of the non-party custodians of the evidence identified below to refuse to allow Mr. Reed to conduct DNA testing on the evidence in their custody.  Accordingly, there is a present, actual and continuing case and controversy between the parties.

## VENUE

6.      Venue lies in this Court under 28 U.S.C. § 1391 because the events or omissions that gave rise to this action took place in the Western District of Texas, and Defendant maintains an office in this district.  *See* 28 U.S.C. § 1391(b) (2016).

## PARTIES

7.     Plaintiff Rodney Reed is a resident of Bastrop County, Texas and is incarcerated at the Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas.   Mr. Reed is sentenced to death by the 21st Judicial District Court of Texas (the "District Court").

8.     Defendant Goertz is the Bastrop County District Attorney.[1] A district attorney who opposes DNA testing is a proper defendant in a Section 1983 action seeking DNA testing. *See, e.g.*, *Osborne, supra* (suit against district attorney's office); *Skinner v. Switzer*, 562 U.S. 521 (2011) (suit against District Attorney); *Elam v. Lykos*, 470 F. App'x 275 (5th Cir. 2012) (same). Just like in *Osborne* and *Skinner*, Defendant Goertz has the power to control access to the evidence that Mr. Reed seeks to test.   Defendant Goertz is sued in his official capacity for declaratory relief and is a proper Defendant in an action under Section 1983.

## NON-PARTY CUSTODIANS OF EVIDENCE

9.     Non-party Sarah Loucks is the Bastrop County District Clerk.  She maintains an office in Bastrop, Texas.  Loucks has custody of certain evidence specified in Exhibit A and is identified for informational purposes only.

10.     Non-party Maurice Cook is the Bastrop County Sheriff.  He maintains an office in Bastrop, Texas.  Cook is the ultimate supervisor of the Bastrop County Sheriff's Office, which has custody of certain evidence specified in Exhibit A, and is identified for informational purposes only.

11.     Non-party Steve McCraw is the Director of the Texas Department of Public Safety.  He maintains an office in Austin, Texas.  McCraw is the ultimate supervisor of the

---

[1]    Defendant is sued only in his official capacity.

Department of Public Safety Crime Lab, which has custody of certain evidence specified in Exhibit A, and is identified for informational purposes only.

**FACTUAL BACKGROUND**

**A.      The Murder of Stacey Stites, Investigation, and Collection of Evidence**

12.      Stacey Stites was reported missing after she failed to arrive for her early morning shift at the Bastrop H.E.B. on the morning of April 23, 1996.  She was alleged to have been traveling in her fiancé Jimmy Fennell's red pickup truck, which was found that morning in the Bastrop High School parking lot.  Immediately outside of the locked driver side door were some papers and a broken portion of Ms. Stites's leather woven belt, as pictured below:



13.      Later in the day, a passerby discovered Ms. Stites's body in the brush along an unpaved road in rural Bastrop County, Texas.  As pictured below, the murderer left the other half of Ms. Stites's belt at the side of the road in a position that pointed directly toward her body:

5



14.     An autopsy confirmed that the murderer used the leather woven belt to strangle Ms. Stites.  Accordingly, the killer forcefully gripped the belt with both hands for a substantial period of time.

15.     Neither portion of the belt has ever been tested for DNA, even though the evidence remains in the custody of the Bastrop County District Clerk under lock and key.

16.     The Bastrop County District Clerk's office representative testified that the belt sections and other relevant evidence in that office's custody, listed on Exhibit A, have always been securely maintained, and have never been tampered with or replaced.  Both portions of the

belt, along with other evidence identified in Exhibit A, are in a condition in which today's sophisticated DNA tests can extract valuable identifying biological information.

17.     Multiple additional items of evidence collected during the investigation of Ms. Stites's murder have also been kept secure by the various custodians and have never been subjected to DNA testing despite the possibility that they may contain DNA from the murderer. These untested items are detailed in Exhibit A.  Like the belt sections, these other items of evidence, including hairs collected from Ms. Stites's body, remain secure under lock and key, have never been tampered with or replaced, likely contain biological material that can yield probative results if subjected to DNA testing, and are in a condition suitable for DNA testing.

18.     In 1996, Fennell was a police officer in Giddings, Texas.  For months after the body was found, Fennell was a suspect in his fiancé's murder.  When initially interviewed by police during the investigation, Fennell claimed that he and Ms. Stites spent the evening of April 22, 1996 at home together.  After Fennell was found deceptive on a second polygraph test, he refused to cooperate further with the investigation and asserted his Fifth Amendment Rights against self-incrimination.  However, the investigation of Fennell was superficial.  Inexplicably, investigators *never* searched the apartment that Fennell shared with Ms. Stites for signs of foul play or other probative evidence.

19.     Fennell's behavior before and after Ms. Stites's murder was unusual.  Although it did not contain much money, Fennell closed his bank account the morning of April 23, 1996, while Ms. Stites was still missing.  Fennell told police and later testified that he had not had sex with Ms. Stites for several days because she was on the "green pill" on her birth control medication and that he had been told that there was a higher risk of pregnancy during that time. Merrill Lewen, M.D., a Houston-area Board Certified OB/GYN, has reviewed this statement and

concluded that it is false.  Fennell gave another false statement on the morning of Ms. Stites's disappearance, when he told police he had filled his truck with gas the night before.  He changed his story a few days later when police discovered the truck's gas tank was less than ¼ full. Fennell also testified to agreeing with Ms. Stites that she would drive his truck to work the next morning.  However, Carol Stites, Ms. Stites's mother, remembered Fennell insisting on the evening of April 22 that he drive Ms. Stites to work the next morning.   Fennell disposed of the truck shortly after Ms. Stites's body was recovered.

20.     In 2016, it came to light that Fennell made other inconsistent statements, which suggest his culpability in the murder.  In an interview with CNN, Curtis Davis, Fennell's best friend at the time, recounted a private conversation he had with Fennell on the morning Ms. Stites was reported missing, but before her body was found.  Contrary to what Fennell told police and later testified to at Mr. Reed's trial, Fennell told Davis that, on the night of April 22, 1996, he came home late that night because he had been out drinking beer with other officers after his youth baseball team's evening practice.  Davis was not interviewed about Fennell during the investigation, and Fennell's statements to Davis (a career Bastrop Sheriff's Officer) were not disclosed until the 2016 interview, after which Davis was officially reprimanded by the Bastrop County Sheriff for speaking publicly about the case.

21.     Fennell's inconsistent statements regarding his whereabouts and activities on the night of April 22, 1996 are particularly significant because the condition of Ms. Stites's body indicates that she was murdered several hours before her body was transported in Fennell's truck and left in the remote location where she was found.  Prominent forensic pathologists have reached the unrebutted conclusion that Fennell's testimony that Ms. Stites was abducted and

murdered while on her way to work at around 3:30 a.m. is medically and scientifically impossible.

22.     Mr. Reed later became a suspect when investigating officers identified him as the source of a small amount of semen collected from Ms. Stites's vaginal cavity and underwear. After Mr. Reed was indicted for the murder, Fennell waived his Fifth Amendment privilege, as previously asserted, and testified for the State at Mr. Reed's trial as to his activities that evening. Fennell's trial testimony generally conformed with his prior statements to the police and again contradicted what he told his best friend, Bastrop Sheriff's Officer Curtis Davis, on the morning of April 23, 1996, before Ms. Stites's body was found. Fennell's trial testimony omitted entirely his conversation with Davis.

23.     Fennell was a principal suspect in the killing of Ms. Stites for more than a year after her death—long after it was determined that he was not the source of the semen collected from Ms. Stites.  Investigators eventually claimed to have dismissed Fennell as a suspect when they could not account for his presence at the couple's apartment on the morning of April 23, 1996 without his truck; but they did not thoroughly investigate whether Fennell may have had an accomplice.

24.     Around the time of the murder, Fennell was the subject of several complaints alleging racial bias and use of excessive force at the Giddings Police Department, where he worked.    After Ms. Stites's death, Fennell was described by a subsequent girlfriend as emotionally abusive, controlling, and virulently racist.  She described him stalking her home and harassing her friends after she ended their relationship.  Fennell later abused his position as a police officer while working for the Georgetown, Texas Police Department.  Fennell was recently released from prison, after serving a ten-year prison sentence after being convicted of

the abduction and rape of a young woman who he was called out to protect while on duty.  When confronted with this allegation, Fennell falsely denied responsibility.  A subsequent Texas DPS investigation of Fennell revealed that the assault for which he was convicted was part of a pattern of sexual violence by Fennell against women.

25.     Before Ms. Stites was killed, Fennell was overheard on multiple occasions saying that if Ms. Stites were to cheat on him, he would kill her. At least once, he specifically stated that he would strangle her with a belt.

26.     Notwithstanding investigators' initial suspicions of Fennell, his inconsistent statements to investigators, his deceptive answers in two polygraph examinations to questions about harming Stites, and his subsequent invocation of his Fifth Amendment right not to testify, the prosecution embraced Fennell's version of the murder timeline and presented it as their own at trial.  Fennell testified at Mr. Reed's trial in 1998 that on the evening of April 22, 1996, he returned home from baseball practice around 7:30 to 8 p.m., and he and Ms. Stites spent a quiet evening at home.  He testified that the two showered together, that she went to sleep around 9 p.m., and that he stayed up watching TV.  Fennell testified that Ms. Stites had likely taken his truck and left for her early-morning shift at the Bastrop H.E.B. grocery store at her usual time of 2:30 to 3 a.m., although he was asleep when she left.  Fennell, who gave an entirely different account of his activities and whereabouts around the time of the murder to his best friend and Bastrop County Sheriff's Officer, Curtis Davis, was the last person to see Ms. Stites alive.  At a 2017 habeas hearing regarding Fennell's statements to Officer Davis, Fennell refused to testify and improperly invoked the Fifth Amendment rights that he had previously waived.

**B.    The Trial of Rodney Reed**

27.    The State's theory of the crime was entirely speculative.  At Mr. Reed's 1998 trial, relying largely on Fennell's testimony to establish a timeline, the State contended that Ms. Stites left their apartment alone in Fennell's truck between 2:30 and 3:30 a.m. on the morning of April 23, 1996.  The State further claimed that Mr. Reed must have stopped Ms. Stites as she drove past his neighborhood in central Bastrop and then abducted, raped and murdered her—leaving her body off an unpaved road out of town and then abandoning the truck in the Bastrop High School parking lot.  The State did not present a single eyewitness to *any* of these events.

28.    Mr. Reed argued in his defense that his semen was found because he and Ms. Stites were having an affair, which they kept secret because Ms. Stites was engaged.  At a bond hearing after Mr. Reed's arrest and later at trial, witnesses testified to seeing Ms. Stites and Mr. Reed together at various times prior to her murder.

29.    There was no evidence connecting Mr. Reed to the scenes where Ms. Stites's body was found or where the truck was abandoned.  The only suggestion that Mr. Reed may have driven Fennell's truck was based on racially charged observation that a smudge on the rear window could have been made by the kind of hair products black people use.

30.    In most murder cases, the time of death is typically established through a number of customary forensic markers, such as core body temperature, lividity, and bodily discharge. Not so here.  Instead, the evidence the State used to infer Ms. Stites's time of death, and Mr. Reed's alleged role in her murder, rested almost entirely on the shaky timeline provided by Fennell and three intact spermatozoa[2] found in samples taken from Ms. Stites's body.  DNA testing of those samples associated them with Mr. Reed. The State then presented uncontradicted

---

[2]   There are over 150 million spermatozoa in the average ejaculation by a fertile male.  *See* https://www.who.int/reproductivehealth/topics/infertility/cooper_et_al_hru.pdf

testimony from three purported experts that, as a matter of scientific fact, intact spermatozoa cannot be found in the vaginal cavity more than approximately 24-26 hours after intercourse. Based on this asserted scientific fact, the State argued that the intact condition of three sperm proved that Mr. Reed had intercourse with Ms. Stites at or near the time of her death and, therefore, must have killed her.  This central expert testimony relied on by the State to convict Mr. Reed has since been recanted, retracted and proven false.  See *infra* at ¶¶ 56-59.

31.     Mr. Reed was convicted of capital murder and subsequently sentenced to death based largely on this faulty scientific evidence.

### C.     Mr. Reed's First DNA Testing Motion

32.     As part of his initial state habeas proceedings, Mr. Reed filed a motion for DNA testing of various items of evidence, including Ms. Stites's belt and clothing.  That motion was denied in a summary order on May 27, 1999.

### D.     Mr. Reed's Second DNA Motion

33.     On July 14, 2014, Mr. Reed filed a motion in the District Court seeking forensic DNA testing pursuant to Article 64 (the "Article 64 Motion") of certain evidence items, including items recovered from the location where Ms. Stites's body was found and from the location of the truck.

34.     Despite the apparent availability of the elected 21st District Court Judge in whose court the case was filed,[3] the Article 64 Motion was assigned to Retired Judge Doug Shaver. The Article 64 Motion sought DNA testing of all of the evidence identified in Exhibit A.

35.     Also on July 14, 2014, the State and Mr. Reed stipulated to the agreed DNA testing of several items of evidence.  The stipulation referenced above, which was so-ordered by

---

[3]   Other matters relating to the case had initially been assigned to 335th District Court Judge Reva Townslee Corbett, who recused herself because her father had presided over Mr. Reed's trial.

Judge Shaver, expressly provided that it was not a waiver of any of Mr. Reed's rights "to seek additional forensic DNA testing on evidence related to the case[.]"

36.     On November 25, 2014, the District Court held a one-day evidentiary hearing on Mr. Reed's Article 64 Motion.  Mr. Reed presented the testimony of John Paolucci, an expert in crime scene investigation, and Deanna D. Lankford, M.T., an expert in DNA testing.

37.     Mr. Reed's experts testified that many evidence items recovered by the State from both scenes would contain potentially exculpatory DNA evidence if subjected to DNA testing. They further testified that this evidence was in a suitable condition for testing using modern "touch DNA" technology to identify cells left by other individuals present at the crime scenes.

38.     The State did not even attempt to rebut the testimony of Mr. Reed's experts, and relied instead on an employee of the Attorney General's Office,[4] who claimed that the evidence in the possession of the Bastrop County District Clerk was contaminated because of the manner in which the evidence was stored.  This testimony was presented by the State as evidence supporting its contention that a proper chain of custody could not be established as required under Article 64.

39.     However, Bastrop District Court Clerk employee Etta Wiley, the custodian of the evidence, testified that she was responsible for the evidence at the clerk's office, and that the evidence was secured "under lock and key" and that she was confident that it had "not been substituted, replaced, tampered with, or materially altered."

40.     At the conclusion of the hearing, Retired Judge Shaver rendered a brief verbal ruling expressing his intent to deny Mr. Reed's Article 64 Motion and requested that the State draft proposed findings on the matter.  On December 16, 2014, he affixed his signature to the

---

[4]     Counsel for the State in these proceedings included attorneys from the Office of the Attorney General of Texas who were deputized as special assistant Bastrop District Attorneys.

State's proposed findings of fact and conclusions of law (the "Initial Findings"), adopting them verbatim as his own.  A copy of these findings is attached as Exhibit B.

41.     Mr. Reed timely appealed the Initial Findings to the CCA, and on June 29, 2016, the CCA entered an order finding that the District Court failed to make certain requisite findings regarding the elements of Article 64 for the items which Mr. Reed sought to test, including: (1) whether the item still exists and is in a condition making DNA testing possible; (2) whether the item has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; (3) whether there is a reasonable likelihood that the item contains biological material suitable for DNA testing; and (4) whether identity was or is an issue in this case.  The CCA's June 29, 2016 Order remanded the proceeding to the District Court and directed it to make findings on the elements that had been omitted from the Initial Findings.  *Reed v. State*, No. AP-77,054, 2016 WL 3626329 (Tex. Crim. App. 2016).

42.     The proceedings on remand were marred by procedural irregularity.  Given the passage of approximately nineteen months between the evidentiary hearing (November 2014) and the CCA's remand order (June 2016), Mr. Reed proposed an in-person court appearance at which the parties could present argument in favor of their proposed findings.  The State opposed Mr. Reed's request and moved for entry of a scheduling order requiring the parties to submit proposed findings of facts and conclusions of law.  Retired Judge Shaver granted the State's motion, and the parties thereafter filed their proposed findings.

43.     The parties' proposed findings were in direct conflict as to two disputed Article 64 elements: (1) chain of custody as to the items maintained by the Bastrop County District Clerk's

Office, and (2) whether there was a reasonable likelihood that certain items contain biological material suitable for DNA testing.

44.     On September 15, 2016, Retired Judge Shaver signed and submitted **both** parties' proposed findings to the CCA without explanation for his two wildly inconsistent rulings in the same matter.   True and correct copies of each of the District Court's September 15, 2016 sets of findings and conclusions are attached to as Exhibits C (drafted by Mr. Reed) and D (drafted by the State).

45.     Mr. Reed's proposed findings provided that he met each of the requirements for DNA testing under Article 64.   *See* Ex. C.   By signing those findings, Retired Judge Shaver was statutorily required to order the DNA testing.   Texas Code of Crim. Proc. Art. 64.03(c) ("If the convicting court finds in the affirmative the issues listed in Subsection (a)(1) and the convicted person meets the requirements of Subsection (a)(2), the court **shall** order that the requested forensic DNA testing be conducted.") (Emphasis added.)

46.     The State promptly sought to remand the competing signed findings back to Retired Judge Shaver for clarification.   The State's remand motion stated that "[f]or some findings, this [the two sets of findings and conclusions] does not pose a problem, but for others, it does.   For example, the State proposed that chain of custody had not been shown for certain items, but Appellant asserted to the contrary that it had....*Both cannot be right* and resolution of the convicting court's intent is therefore necessary."   (emphasis added).

47.     On September 23, 2016, Retired Judge Shaver then sent an unsolicited letter to the CCA, stating only that he had meant to rule in favor of the State:

**To:  The Texas Court of Criminal Appeals**

**Re:  No. AP-77,054   Rodney Reed, Appellant vs. The State of Texas**

**Dear Justices:**

On September 9, 2016, I signed, adopted and submitted both Findings of Fact and

Conclusions of Law, by State of Texas and Rodney Reed.

Signing of both was an inadvertent mistake,  It was and is my intent to sign and

adopt only the Findings of Fact and Conclusions of Law as proposed by The State

of Texas.

I apologize to this Court and all parties for my mistake.

Sincerely,

*Doug Shaver*

Doug Shaver,  Senior Judge

FILED IN
COURT OF CRIMINAL APPEALS

SEP 2 3 2016

48.     On October 3, 2016, the CCA denied the State's motion to remand and a motion

by Mr. Reed to strike Retired Judge Shaver's unsolicited letter.

49.     On April 12, 2017, the CCA affirmed the District Court's denial of Mr. Reed's

Article 64 Motion.

50.     The CCA opinion discusses some of Retired Judge Shaver's findings, but does not

disclose the fact that Retired Judge Shaver actually adopted two diametrically-opposed sets of

findings of fact and conclusions of law in ruling on the Article 64 Motion, nor does it identify

whether the findings discussed came from those proposed by the State or by Mr. Reed.  Mr.

Reed's motion for reconsideration was denied by the CCA on October 4, 2017. *Reed v. State*, 541

S.W.3d 759, 762 (Tex. Crim. App. 2017), *reh'g denied* (Oct. 4, 2017).

51.     Mr. Reed petitioned the United States Supreme Court for review of the CCA

opinion on February 1, 2018, supported by several *amici*.  After seeking multiple extensions of

16

time to respond, the State, represented by Defendant Goertz, opposed Mr. Reed's petition.  The

Supreme Court declined to review the CCA opinion on June 25, 2018.  *See* 138 S. Ct. 2675, 201

L. Ed. 2d 1071 (2018).

      **E.**      **The CCA's Arbitrary Interpretation of Article 64 Prevents Access to Potential Evidence of Innocence**

     52.     In seeking DNA testing in state court, Mr. Reed proved each of the statutory

requirements of Article 64 through expert testimony that the crime scene evidence he seeks to

test (1) exists in the State's custody; (2) is in a condition suitable for DNA testing; (3) has not

been substituted, tampered with or materially altered; and (4) potentially contains probative

forensic DNA results that could both exculpate Mr. Reed and identify another person as

responsible for the murder.

*Novel and Arbitrary Chain of Custody Requirement*

     53.     Despite Mr. Reed's proof of his entitlement to relief under the plain language of

Article 64, the CCA construed and applied the statute to include a novel construction of the

traditional chain of custody requirement such that the then-customary storage of evidence

together in a box by state officials, and the routine handling of such evidence by trial officials,

negated the chain of custody.

     54.     On its face, Article 64's chain of custody requirement merely requires the District

Court to make a finding (without assigning a burden of proof) that the evidence is what it

purports to be – that it "has been subjected to a chain of custody sufficient to establish that it has

not been substituted, tampered with, replaced, or altered in any material respect."   Chain of

custody is a well-established concept under Texas law.   Mr. Reed had no notice that the CCA would read an entirely different definition into the text of Article 64.[5]

55.    It is undisputed that none of the evidence that Mr. Reed seeks to test is a substitute or replacement for the actual crime scene evidence, and that no person has altered or tampered with any of the items.  It is also undisputed that each item of evidence Mr. Reed seeks to test is what it purports to be, *i.e.*, the broken sections of the belt comprise the murder weapon, the employee name tag is the one investigators found placed in the crook of Ms. Stites's knee, and the clothing is the clothing removed from Ms. Stites's body.  Thus, the CCA has arbitrarily grafted non-statutory barriers onto Article 64 that have deprived Mr. Reed of his liberty interest in proving his innocence with new evidence under state law.

56.    The CCA's arbitrarily imposed and novel chain of custody requirement also stems from its arbitrary limitation on the potential "exculpatory results" from DNA testing that the CCA is willing to consider when deciding whether to grant DNA testing under Article 64. DNA expert Lankford testified that issues of contamination could be resolved if DNA testing identified a known offender through the CODIS DNA database or produced a consistent DNA profile on both items that were comingled and those stored separately.

### *Arbitrary Finding of Unreasonable Delay*

57.    The CCA also unconstitutionally construed and applied the Article 64 element of unreasonable delay.   Contrary to the findings of state courts, Mr. Reed has for years been persistent in his pursuit of post-conviction relief and DNA testing.  He utilized the rudimentary DNA technology that was available at the time of trial.  He again sought DNA testing as part of his initial post-conviction proceedings in 2001.  This request was summarily denied by the trial

---

[5]    *Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989) *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990); *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

court, and Mr. Reed continued to litigate his innocence based on other evidence until his motion

for DNA testing was brought in 2014 under the recently amended Article 64.  This statutory

amendment was enacted to allow for DNA testing of touched items for skin cells, which is

precisely the type of DNA testing sought in Mr. Reed's motion.  By finding that Mr. Reed's

request for DNA testing was brought for an improper purpose, the Texas courts have arbitrarily

construed and applied the unreasonable delay prong of the statute to deny Mr. Reed DNA testing

in violation of Mr. Reed's constitutional rights, especially when the CCA acknowledged that Mr.

Reed's "Article 64 motion largely hinges on the newly available analysis of touch DNA" and

such testing was unavailable under the statute prior to its amendment.  *See* CCA Op. at 9; *see*

*also Swearingen v. State*, No. 99-11-06435-CR (9th Dist., Montgomery County, Tex. June 10,

2013).

### *Arbitrary Prohibition on Consideration of Additional Exculpatory Evidence*

58.    The CCA, and the District Court, denied DNA testing based, in part, on factual

assertions from trial that have since been disproven.

59.    At the 2017 evidentiary hearing in Mr. Reed's state habeas proceedings, world-

renowned forensic pathologist, Dr. Michael Baden testified as an expert witness. His testimony

was consistent with his report which is attached as Exhibit E. Dr. Baden's testimony proved that

the State's theory of Mr. Reed's guilt was false for at least three reasons:

60.    *First*, the State claimed that Ms. Stites had been sexually assaulted at the time of

her murder.  Dr. Baden examined the evidence and explained in his report and in his testimony at

the hearing that Ms. Stites had ***not*** been sexually assaulted.  He found absolutely "no forensic

evidence that Ms. Stites was sexually assaulted in any manner."

61.     *Second*, although no physical evidence placed Mr. Reed in Fennell's truck, the State repeatedly claimed that the minimal amount of semen taken from Ms. Stites's body was the "smoking gun" that tied Mr. Reed to her murder.   But the medical examiner who testified in support of the State's argument at trial, Dr. Roberto Bayardo, has since recanted his trial testimony in a sworn affidavit. This affidavit is attached as Exhibit F.  Dr. Bayardo's affidavit states that sexual contact between Ms. Stites and Mr. Reed occurred more than twenty-four hours prior to her death, corroborating Mr. Reed's assertion that he and Ms. Stites had consensual relations at least a day before her murder.   At the 2017 evidentiary hearing, Dr. Baden testified that Mr. Reed's semen was deposited at least a full day before Ms. Stites was killed, thus confirming Dr. Bayardo's sworn affidavit. These opinions are also confirmed by Dr. Werner Spitz, author of the seminal textbook on forensic pathology, *Spitz and Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation*. Dr. Spitz's report is attached as Exhibit G.

62.     In addition to Dr. Baden, Dr. Bayardo, and Dr. Spitz, additional forensic experts—including Dr. LeRoy Riddick, M.D., Joseph Warren, Ph.D., and Ronald Singer, M.S.— have confirmed that the State's timeline based on the presence of sperm in Ms. Stites's body was not reliable.  These experts also demonstrated that the State's assertion that sperm can only last within the human body for no more than 24 to 26 hours is scientifically false.

63.     *Third*, Dr. Baden's testimony flatly rebutted the flimsy timeline the State presented at trial through Fennell.   The State argued that Ms. Stites was killed after leaving for work on the morning of April 23, 1996.  In his report and testimony at the evidentiary hearing, Dr. Baden explained why the State's timeline was "not possible."  Dr. Baden examined the evidence and demonstrated that Ms. Stites was murdered before midnight on April 22, 1996, the

very time when, according to Fennell's testimony, the two were home in bed together. Specifically, Dr. Baden examined the lividity present in Ms. Stites's body and concluded, among other things, that "[w]hen [Ms. Stites] was killed … she lay face down in one spot for at least four or five hours before she was moved … by the car where she had some evidence of decomposition, until she was placed in this … roadside area, on her back."   Dr. Spitz similarly noted that his review of the case lead him to conclude that, "Stacy Stites was murdered prior to midnight on April 22, 1996" and "[t]he lividity … on Stites's face, shoulder, and arm, scientifically proves that she was dead in a position different from that which she was found for a period of at least 4-5 hours." He went on to say that, "[t]he presence of lividity in these non-dependent areas makes it medically and scientifically impossible that Stites was killed between 3-5am on the date in question … It is impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial."

64.     This new evidence establishes that the State's timeline and theory that Mr. Reed raped Ms. Stites and killed her immediately thereafter is false.  The assertion that Mr. Reed's semen must have been left close to the time of Ms. Stites's death has been definitively refuted, along with Fennell's unsubstantiated claim that Ms. Stites left for work around 2:30 to 3:30 a.m. on April 23, 1996.

65.     The State has not presented any expert to contradict the scientific evidence of innocence discussed above, and the State's trial experts (or their employing agents) have retracted the opinions offered at trial.  The State nonetheless insisted on moving to set Mr. Reed's execution date at the first available opportunity after the CCA's denial of Mr. Reed's habeas proceeding became final.  Notwithstanding the complete lack of remaining trial evidence that incriminates Mr. Reed, the Defendant and his lawyer decided together decided to move to set the

execution date promptly in order to "ensure state court finality of the CCA's decision." Exhibit J, Affidavit of Matthew Ottoway dated September 13, 2019, at 2; *see also* Exhibit K, Affidavit of Brian Goertz dated September 12, 2019, at ¶ 3 (acknowledging that State decided to move to fix execution date as soon as "the time for Mr. Reed to request a rehearing had expired on July 11, 2019.")

66.     Mr. Reed was convicted because his DNA was linked by expert testimony to a purported sexual assault the State claimed was contemporaneous with the murder.

67.     The Texas Department of Public Safety (who employed criminalist Karen Blakely), the Bode Cellmark Forensics Laboratory (who employed the State's retained expert Meghan Clement), and former Travis County Medical Examiner Dr. Bayardo have all now acknowledged that the scientific opinions offered by the State to tie Mr. Reed to the murder were in error. *See* Exhibit H (Letter from DPS); Exhibit I (report from Bode); Exhibit F (Bayardo affidavit). This is because it is a scientific fact that sperm can survive intact longer than twenty-six hours; indeed, the actual time period has been proven to be much longer.

68.     The CCA's opinion denying DNA testing arbitrarily fails to take into account any of the foregoing newly discovered evidence, which negates the State's evidence against Mr. Reed. Instead, the CCA cites the very same "scientific" evidence used to support the State's timeline that has since been recanted or proven false, and fails to even acknowledge that this evidence has been roundly rejected in the scientific community. The CCA further fails to recognize the exculpatory potential of crime scene evidence by summarily dismissing the mountain of evidence of third-party guilt Mr. Reed has presented linking Fennell to the murder.

***Denial of Article 64 Motion Deprives Access to Other Available Remedies***

69.     The Texas courts' arbitrary construction and application of Article 64's statutory requirements also unconstitutionally denied Mr. Reed his due process rights and his right to access available statutory remedies.   Further, proceeding with Mr. Reed's execution while arbitrarily denying DNA testing capable of proving his innocence would violate the Eighth Amendment's prohibition on cruel and unusual punishment.   If DNA testing reveals exculpatory results, Articles 11.071, 11.073, and 64.04 of the Texas Code of Criminal Procedure provide procedures for adjudicating Mr. Reed's innocence and overturning his conviction and death sentence.   Exculpatory DNA results can also provide the basis for a request for executive clemency under Texas law.   Moreover, exculpatory DNA results can provide the factual basis for a showing of innocence necessary for the federal courts to consider a successive federal habeas petition pursuant to 28 U.S.C. § 2244.

70.     Article 64 tracks the traditional legal standard for proof of chain of custody, the purpose of which is to authenticate evidence by establishing that the evidence is what the proponent says it is.   The CCA has repeatedly applied this standard to uphold the admission of evidence offered by the State as evidence of guilt, including DNA results from evidence that had been handled before, during and after trial.   Evidence is routinely admitted in Texas criminal cases absent evidence of fraudulent tampering, substitution, alteration or other fraud.

71.     The CCA interprets the same chain of custody standard in Article 64 cases in a contrary manner, to require additional proof that the evidence is not only what it purports to be, but also that the evidence has been stored by the State in a manner such that no additional DNA was added.   This contrary interpretation is arbitrary and deprives Mr. Reed of fundamental constitutional rights.

23

72.     The CCA's unprecedented interpretation and application of Article 64 will automatically deny Article 64 relief to any person convicted before rules governing the State's handling and storage of evidence were put in place, and preclude such persons from proving innocence through newly available DNA analysis.  In fact, the CCA's interpretation and application of Article 64 will preclude Article 64 relief any time that the State contends that the DNA profile of evidence, including evidence secured at the crime scene, was changed, irrespective of whether that evidence retains the ability to reliably demonstrate innocence.

73.     Despite the powerful and unrebutted evidence of Mr. Reed's innocence, he continues to be denied relief on grounds that cannot withstand constitutional scrutiny.

74.     Mr. Reed has a constitutional right to access and utilize the Texas statutory DNA testing procedure in a fair and due-process-compliant manner, to exonerate himself by identifying the person whose DNA is on the belt that was used to murder Ms. Stites, as well as the clothing, name tag and other items that her killer likely touched.  The CCA's tortured, results-driven and utterly unfair interpretation and application of Article 64 deny Mr. Reed basic constitutional protections under both the United States Constitution and the Texas Constitution.

### CLAIMS FOR RELIEF

**First Claim for Relief: Denial of Due Process (Declaratory Judgment)**

75.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Amended Complaint.

76.     Pursuant to Article 64, when an individual sentenced to death, such as Mr. Reed, presents a motion that requests DNA testing of biological material that both still exists in a condition that makes testing possible and also could yield exculpatory results, he or she is entitled to have the evidence tested.  Vernon's Ann. Texas C.C.P. Art. 64.03 (2017).  If testing

successfully produces an unidentified DNA profile, that profile must be compared to the FBI's CODIS database, and the database established by the Department of Public Safety.  Vernon's Ann. Texas C.C.P. Art. 64.035 (2011).  Exculpatory DNA results obtained under Article 64 are considered by the trial court, and the movant is entitled to a determination of whether those results prove innocence.  Vernon's Ann. Texas C.C.P. Art. 64.04 (2011).

77.     Exculpatory DNA results are accepted under Texas law as evidence that can be used to prove a claim for habeas relief based on innocence, false or misleading testimony, and other constitutional violations brought under Article 11.071 of the Texas Code of Criminal Procedure.  Exculpatory DNA results can also be used as evidence to prove a claim for a new trial pursuant to Article 11.073 of the Texas Code of Criminal Procedure, and may be considered by the Board of Pardons and Paroles and the Texas Governor in a request for executive clemency.  *See State v. Holloway*, 360 S.W.3d 480, 489 n.58 (Tex. Crim. App. 2012), *abrogated on other grounds by Whitfield v. State*, 430 S.W.3d 405 (Tex. Crim. App. 2014).

78.     Because the State of Texas has created a procedure through which convicted persons can obtain DNA testing and then utilize exculpatory results from that testing to secure a declaration of innocence, habeas relief, a new trial, executive clemency and potentially other relief from their convictions, the processes employed by the State for obtaining access to DNA must not violate fundamental fairness.  *See Osborne*, 557 U.S. at 69; *Skinner v. Switzer*, 562 U.S. 521 (2011); *Elam v. Lykos*, 470 F. App'x 275, 276 (5th Cir. 2012) ("While there is no freestanding right for a convicted defendant to obtain evidence for post-conviction DNA testing, Texas has created such a right, and, as a result, the state provided procedures must be adequate to protect the substantive rights provided."); *Emerson v. Thaler*, 544 F. App'x 325, 327 (5th Cir. 2013) ("Although states are under no obligation to provide mechanisms for postconviction relief,

when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").

79.     The CCA's interpretation and application of Article 64 violates fundamental fairness in several ways.    *First*, the CCA's flawed construction of the chain of custody requirement of Article 64 resulted in the erroneous exclusion from eligibility for testing the majority of key pieces of evidence introduced at trial, including pieces of the belt used to strangle Ms. Stites, her clothing, and several other crucial pieces of evidence likely touched by the murderer.

80.     The CCA incorrectly found that these significant pieces of physical evidence were excluded by this requirement because they were potentially contaminated by poor storage procedures or the ungloved handling of evidence in court.    The CCA ignored the unrebutted testimony of Mr. Reed's DNA expert that the potential additional DNA did not preclude probative results, and such evidence could still be successfully tested.

81.     This failure to appropriately apply the chain of custody requirement imposed by Article 64 resulted in the exclusion of the majority of the key evidence in this case, testing of which could exonerate Mr. Reed.

82.     *Second*, the manner in which the CCA adjudicated Mr. Reed's appeal was arbitrary in its own right.    The CCA's arbitrary limitation of "exculpatory results" to be considered pursuant to Article 64.003 of the Texas Code of Criminal Procedure ignores the clear inculpatory inferences from identifying DNA of a known offender on the evidence or finding the same unidentified DNA profile on both properly stored items and those which could have been contaminated.

83.     *Third*, the CCA's failure to clarify, acknowledge, or even differentiate between the inconsistent competing findings of fact and conclusions of law signed by the District Court—on which its opinion relies—violates Mr. Reed's Due Process rights.  As explained above, on remand, the District Court signed two diametrically opposing and irreconcilable sets of findings of fact and conclusions of law submitted by the State and Mr. Reed, a profound and inexplicable error in any case, let alone a capital case.  Instead of implementing DNA testing, as required by Article 64.03(c) in light of the findings contained in Exhibit C, the CCA accepted Retired Judge Shaver's inappropriate explanation without question, briefing or a hearing. The CCA's subsequent opinion did not vacate either set of findings and conclusions, yet said nothing about Judge Shaver's  careless and confusing adoption of conflicting sets of findings and conclusions; instead, the CCA both agreed and disagreed with various findings of the District Court without indicating which of the two sets of findings it was addressing.  The CCA simply notes that "[a]fter remand, the judge made supplemental findings of fact and conclusions of law."  This fundamental breakdown in the procedures afforded to petitioners under Article 64 violates Mr. Reed's procedural Due Process rights as well as the clear requirement of Article 64 itself.

84.     *Fourth*, the CCA's finding of unreasonable delay violated Mr. Reed's rights to procedural due process by faulting him for not bringing a Aticle 64 motion prior to 2014, when in fact the type of "touch DNA" testing that Mr. Reed sought in his motion did not become available under Article 64 until the statute was amended in 2014.  *See* ¶ 55, *infra*.  The CCA overlooked this critical fact, as well as the fact that Mr. Reed sought DNA testing in 1999, before Article 64 was even enacted.

85.     Finally, the CCA's interpretation of Article 64's requirement that the petitioner show that he or she would not have been convicted if exculpatory DNA results were produced

ignores the most powerful aspects of DNA testing and excludes from consideration evidence tending to inculpate third parties. The Supreme Court, however, holds that evidence of third-party guilt *is* exculpatory; indeed, a defendant's ability to present such exculpatory evidence lies at the heart of the Constitutional guarantee of a "meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (internal citations omitted). The CCA's analysis, which expressly excludes all DNA results that inculpate a third party and instead focuses only on results that exclude the movant as a contributor, violates due process. *Cf Chambers v. Mississippi*, 410 U.S. 284 (1973) (trial court's exclusion of evidence that inculpated a third party resulted in denial of a trial in accord with fundamental standards of due process).

86.    The District Court and the CCA also violated Mr. Reed's due process rights by relying on trial evidence that has since been recanted, discredited and proven false, to deny his request for DNA testing under Article 64. The CCA specifically relied on the District Court's "conclusion" that "[t]he State's case on guilt-innocence was strong," its finding that the evidence showed Mr. Reed's "presence" and that "sexual assault occurred contemporaneously with the murder." *Reed v. State*, 541 S.W.3d 759, 773 (Tex. Crim. App. 2017). Today, however, not one of the State's three expert witnesses from Mr. Reed's criminal trial stand by their trial testimony. Additional experts, including world renowned forensic pathologists Dr. Michael Baden and Dr. Werner Spitz, have provided unrebutted forensic conclusions, which completely eliminate the scientific foundation for the State's case against Mr. Reed. Moreover, Fennell, whose trial testimony formed the backbone of the State's chronology of Ms. Stites's death and, thus, the case against Mr. Reed, improperly invoked the Fifth Amendment in a 2017 habeas proceeding, negating both Fennell's trial testimony and any suggestion that the State's case against Mr. Reed was "strong."

87. The CCA's unreasonable construction and application of Article 64, and the procedural faults in the handling of Mr. Reed's motion, including in particular the CCA's extra-statutory construction and application of Article 64's chain of custody requirement, have prevented Mr. Reed from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder. Since the State of Texas provides a means for obtaining post-conviction forensic DNA testing, those procedures, including the construction and application of well-settled terms included in the statutory text, such as chain of custody, must be imbued with a fundamental fairness. *See generally Osborne*, 557 U.S. 52; *Skinner v. Switzer*, 562 U.S. 521 (2011). The CCA's failures in construing and applying Article 64 violate "principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Osborne*, 557 U.S. at 69. Specifically, the CCA's failures here have deprived Mr. Reed of his liberty interests in utilizing these state procedures to obtain a declaration of innocence, a new trial, executive clemency, or other avenues for relief, all in violation of his right to due process of law under the Fourteenth Amendment to the United States Constitution, and he is entitled to a declaratory judgment so stating pursuant to 28 U.S.C. §§ 2201-2202.

**Second Claim for Relief: Access to Courts (Declaratory Judgment)**

88. Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Amended Complaint.

89. Mr. Reed has a fundamental right to access to courts, rooted in the First and Fourteenth Amendments, which requires that states make available the tools necessary for prisoners to obtain meaningful access to available judicial remedies. State law must ensure that prisoners like Mr. Reed have meaningful access to post-conviction remedies in order to vindicate this right. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (holding that prison authorities are

required to provide inmates meaningful legal assistance or resources to ensure that their constitutional right of access to courts be upheld).

90.     As alleged above, Mr. Reed has available remedies under Texas law for access to post-conviction DNA testing, and to a declaration of innocence, to relief from his conviction and to executive clemency based on the exculpatory results of such testing.  And, as alleged above, Texas's restrictive procedure for obtaining access to DNA testing under Article 64, and the CCA's construction and application thereof, is not adequate, meaningful or effective.

91.     Mr. Reed incurred actual injury when the CCA denied his request for DNA testing that could potentially produce exculpatory evidence, and thus provide him with relief from his conviction.

92.     As stated above, the CCA's unreasonable interpretation of Article 64 has prevented Mr. Reed from gaining access to exculpatory evidence that could demonstrate that he is not guilty of capital murder.  These failures have deprived Mr. Reed of his fundamental right to access to courts under the First and Fourteenth Amendments, and he is entitled to a declaratory judgment so stating pursuant to 28 U.S.C. §§ 2201-02.

**Third Claim for Relief: Cruel and Unusual Punishment (Declaratory Judgment)**

93.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Amended Complaint.

94.     The Eighth Amendment's prohibition on cruel and usual punishment prevents the execution of prisoners, like Mr. Reed, who have viable claims that they are innocent of the crime for which they have been convicted without first affording them the opportunity to prove their innocence.  The CCA has interpreted Article 64 to bar DNA testing even where realistically possible exculpatory DNA results from such testing have the capacity to prove innocence based

solely on the State's handling of evidence.  Because Texas law does not allow for DNA testing under circumstances where such testing has the capacity to prove innocence, Article 64 violates the Eighth Amendment prohibition on cruel and unusual punishment, and he is entitled to a declaratory judgment so stating pursuant to 28 U.S.C. §§ 2201-02.

### Fourth Claim for Relief: Denial of Opportunity to Prove Actual Innocence
### (Declaratory Judgment)

95.    Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Amended Complaint.

96.    By refusing to release the physical evidence for DNA analysis, and thereby preventing Mr. Reed from gaining access to evidence that can exonerate him, Mr. Reed is denied the opportunity to make a conclusive showing that he is actually innocent of the crime for which he is currently incarcerated, in violation of the Eighth Amendment, the right to access to courts, the right to a remedy, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and Mr. Reed is entitled to a declaratory judgment so stating pursuant to 28 U.S.C. §§ 2201-02.

97.    The State will suffer no prejudice by allowing Mr. Reed to access the evidence for purposes of DNA testing.   The testing that Mr. Reed seeks may be conducted at a fully accredited DNA laboratory with the expenses to be paid by his counsel at the Innocence Project, in which case it would proceed at no cost to the State.  DNA testing is also in the State's interest, and indeed, the State's conduct concedes the point – while tirelessly opposing every request for testing from Mr. Reed, the State continues to this day to secretly conduct DNA tests (without any input from Mr. Reed) on evidence previously tested years ago, as shown by a September 26, 2019 supplemental DNA testing report attached hereto as Exhibit L.   In other words, while continuing to resist DNA testing on the murder weapon, the State continues to test extraneous

evidence that has no implications for guilt or innocence.  DNA testing can both determine whether an innocent man is in prison and identify the real murderer.

### Fifth Claim for Relief: Violations of Texas Constitution (Declaratory Judgment)

98.     Mr. Reed re-alleges and incorporates herein by reference the allegations contained in all of the preceding paragraphs of this Amended Complaint.

99.     The foregoing allegations constitute violations of Mr. Reed's rights under the Texas Constitution, including, without limitation, his right to receive substantive and procedural due process of law (Article 1, Section 19), his right to access to courts and to a remedy by due course of law (Article 1, Sections 13 and 27), and his right to not be subjected to cruel and unusual punishment (Article 1, Section 13).   Mr. Reed is entitled to a declaratory judgment so stating pursuant to 28 U.S.C. §§ 2201-02.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Reed prays that this Court provide relief as follows:

1.     A declaration that the CCA's interpretation and application of Article 64 of the Texas Code of Criminal Procedure is unconstitutional under both the United States Constitution and the Texas Constitution because:

a.     Such interpretation and application imposes a fundamentally unfair limitation, in violation of due process and the First Amendment right to access to courts, upon Mr. Reed's access to statutory remedies available under Texas law, and deprives Mr. Reed of adequate, effective and meaningful access to such remedies.  Those remedies include: (1) the statutory right to access post-conviction DNA testing pursuant to Article 64; (2) the statutory right to a declaration of innocence pursuant to Article 64.04 of the Texas Code of Criminal Procedure based on exculpatory DNA results; (3) the statutory right to habeas relief for innocence and other constitutional violations pursuant to Article 11.071 of the Texas Code of Criminal Procedure based on exculpatory DNA evidence; (4) the statutory right to a new trial pursuant to Article 11.073 of the Code of Criminal Procedure based on exculpatory DNA results; and (5) executive clemency based on exculpatory DNA results.

b.    Such interpretation and application denies Mr. Reed the protection of the Eighth Amendment of the United States Constitution, which prohibits the execution of persons who are actually innocent of the crime for which they are convicted and requires that state laws providing persons facing the death penalty with a right to seek post-conviction DNA testing be construed and applied in a manner that allows a convicted person to access and test evidence where realistically possible exculpatory results can prove innocence.

2.    Such other and further relief as this Court deems just and proper.

DATED:  October 1, 2019                      Respectfully submitted,


/s/Bryce Benjet
BRYCE BENJET
Texas State Bar No. 24006829
E-mail: bbenjet@innocenceproject.org
**THE INNOCENCE PROJECT**
40 Worth Street, Suite 701
New York, New York  10013
Telephone No.: (212) 364-5980
Facsimile No.: (212) 364-5341

ANDREW F. MACRAE
Texas State Bar No. 00784510
E-mail: amacrae@levatinopace.com
**LEVATINO|PACE PLLC**
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
Telephone No.: (512) 637-8565
Facsimile No.: (512) 637-1583

Cliff C. Gardner (*pro hac vice* filed)
Robert A. Weber (*pro hac vice* filed)
Nicole A. DiSalvo (*pro hac vice* filed)
Shaivlini Khemka (*pro hac vice* filed)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Tel.: (302) 651-3000

*Attorneys for Rodney Reed, Plaintiff*

33

857448-WILSR01A - MSW

<u>**CERTIFICATE OF SERVICE**</u>

  I hereby certify that this First Amended Complaint was filed through the CM/ECF system on October 1, 2019. I understand the CM/ECF system will send a Notice of Electronic Filing to all counsel of record.

/s/ Andrew F. MacRae
Andrew F. MacRae
