IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| RODNEY REED, § | |
| § | **Civil Case No. 1:19-cv-794** |
| Plaintiff, § | |
| § | **CAPITAL CASE** |
| v. § | |
| § | **ORAL ARGUMENT** |
| BRYAN GOERTZ, Bastrop County District Attorney, § | **REQUESTED** |
| in his official capacity only, § | |
| § | |
| Defendant. § | |

## PLAINTIFF'S MOTION TO STAY EXECUTION

Plaintiff Rodney Reed respectfully moves for a stay of his scheduled November 20, 2019 execution for a murder he did not commit. Reed seeks a stay so that this Court can consider whether the Texas courts' construction of Chapter 64 of the Texas Code of Criminal Procedure ("Chapter 64") denies Reed the ability to conduct forensic DNA testing of key evidence in violation of the United States and Texas Constitutions. Temporary relief is necessary here because Defendant, Bastrop County District Attorney Bryan Goertz, opposes any stay even though powerful evidence casts extreme doubt upon Reed's conviction and points to someone else as the murderer, and the murder weapon—a woven belt—has *never* been DNA tested.

### FACTUAL BACKGROUND

**A.    The Murder Of Stacey Stites, Investigation, And Collection of Evidence.**

Stacey Stites was reported missing after she failed to arrive for her early morning shift at a Bastrop grocery store on April 23, 1996. (¶ 11)[1] Stites's fiancé, Jimmy Fennell, claimed that

---

[1]    The Amended Complaint Pursuant to 42 U.S.C. § 1983 and the Exhibits thereto are cited as "¶ _" and "Compl. Ex. _", respectively, herein.  Exhibits to this Motion are cited as "Ex. _."

she left the couple's apartment in Giddings, Texas shortly before 3:00 a.m. in his truck. (¶ 12) The truck was later found in the Bastrop High School parking lot. (*Id.*) Investigators discovered a broken portion of Stites's leather woven belt outside of the truck. (*Id.*) Stites's body was found that afternoon in the brush along an unpaved road in Bastrop County. (¶ 13) The other half of the belt was on the roadside pointing toward Stites's body, and her employee name tag was positioned in the crook of her knee. (¶¶ 12, 55) The medical examiner concluded that Stites had been strangled with the belt. (¶ 14) Although the killer gripped the belt forcefully while strangling Stites, thus transferring his DNA to it, ***this murder weapon has never been tested for DNA***. (¶¶ 14-15) Other crucial items, like clothing and Stites's name tag, were also never tested, even though all of this evidence is securely maintained by the State. (¶ 17)

**B.     Powerful Evidence Points To Stites's Fiancé As The Killer**.

Evidence pointing to Fennell, then a local patrol officer, as the killer is powerful. (¶¶ 18-26) Fennell closed his bank account while Stites was missing and he has made numerous inconsistent statements about his activities the night she was murdered. (¶¶ 19-21) Before Stites was killed, Fennell was overheard saying that if he discovered Stites cheating on him, he would kill her by ***strangling her with a belt***. (¶ 25) There is also credible evidence that Fennell discovered that Reed and Stites were having an affair. (¶ 28) After Fennell was found to have been untruthful on two polygraph tests, he asserted his Fifth Amendment privilege. (¶ 26) After Reed was arrested, Fennell waived his Fifth Amendment privilege and testified for the prosecution at Reed's trial; however, he invoked the privilege again at a 2017 habeas hearing and refused to testify about Stites's murder or his activities on the night she died. (*Id.*)

C.      **Reed's Conviction Was Predicated On Expert Opinions That Have Been Recanted.**

No similar evidence connects Reed to the crime. He became a suspect when he was identified as the source of a small amount of semen collected from Stites's body. (¶ 29) The State's three purported experts testified that, as a matter of scientific fact, intact spermatozoa cannot be found in the vaginal cavity more than 24-26 hours after intercourse. (¶ 30) Based on these opinions, the State argued that the intact sperm proved that Reed had intercourse with Stites at the time of death and, therefore, must have killed her. (*Id.*)[2] This testimony, which the State described as its "smoking gun" and upon which the all-white jury sentenced Reed, an African American, to death ***has since been recanted by these experts or their employers, and proven false by three of the nation's most respected forensic pathologists***—Drs. Werner Spitz, Michael Baden and LeRoy Riddick.[3] (¶¶ 30, 59-63; Compl. Exs. E, G)

D.      **The CCA's Arbitrary And Fundamentally Unfair Interpretation Of Chapter 64.**

The Bastrop County District Court denied Reed's initial request to test the murder weapon and other trial evidence for DNA in a summary order on May 27, 1999. (¶ 32) On July 14, 2014, Reed sought forensic DNA testing pursuant to Chapter 64 of certain evidence items, including items recovered from the truck and the location where Stites's body was found, such as the belt. (¶ 33) At a one-day evidentiary hearing, Reed's experts demonstrated that the evidence contained potentially exculpatory DNA and was in a suitable condition for modern testing using

---

[2]     The State's theory of Reed's guilt at trial was contradicted by its actions during the investigation. Even though Fennell was excluded as the source of the few spermatozoa seen on the vaginal swabs, he remained a suspect for months and was subjected to aggressive interrogations and polygraph examinations.

[3]     The medical examiner, Dr. Roberto Bayardo, has recanted his trial testimony in a sworn declaration. (¶ 61, Compl. Ex. F) The Texas Department of Public Safety and the Bode Cellmark Forensics Laboratory have also acknowledged that the scientific opinions used to convict Reed were in error. (¶ 67)

"touch DNA" technology. (¶¶ 36-37) The State did not dispute these claims or offer any rebuttal; rather, it asserted that the evidence in the custody of the Bastrop County District Clerk was "contaminated" because it had been handled with ungloved hands and then stored together in a box. (¶ 38) The Bastrop County District Court Clerk employee Etta Wiley, however, testified that the evidence was secured "under lock and key" and had "not been substituted, replaced, tampered with, or materially altered." (¶ 39)

Retired Harris County District Judge Shaver denied the motion from the bench in a brief verbal ruling and thereafter signed verbatim the findings of fact and conclusions of law that were submitted by the State *ex parte*. (¶ 40, Compl. Ex. B) Reed appealed to the Texas Court of Criminal Appeals (the "CCA"), which then remanded the matter to the District Court to make findings on the Chapter 64 elements not addressed in the State-authored findings. (¶ 41) The remand proceedings were marred by remarkable procedural irregularities. Despite the passage of nineteen months between the evidentiary hearing and the CCA's remand, Judge Shaver declined to permit oral argument and, instead, ordered the parties to submit proposed findings of facts and conclusions of law. (*Id.*) On September 15, 2016, Judge Shaver **signed both parties' proposed findings.** (¶ 44) After this was raised in the CCA, Judge Shaver sent a short note to the CCA stating that he had meant to sign only the State's proposed findings. (¶ 47)

On April 12, 2017, the CCA affirmed the District Court's denial of Reed's DNA motion (the "Opinion"). (Ex. 1; ¶ 53) The Opinion made no mention of Judge Shaver's diametrically opposed sets of findings of fact and conclusions of law, nor did it identify which findings discussed in the Opinion originated from those proposed by the State or by Reed. (¶ 46)

In denying relief, the CCA used a novel construction of the traditional chain of custody requirement to conclude that the State's handling of the evidence broke chain of custody. (¶ 48)

4

Chapter 64 requires merely that the evidence is what it purports to be and that it "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." (¶ 49) As Wiley testified, that standard was satisfied. (¶ 39)  By judicially grafting a non-statutory "no contamination" barrier onto Chapter 64's chain of custody element—one that differs substantially from how the CCA has interpreted chain of custody in other contexts—the CCA rendered the statute illusory. As interpreted, Chapter 64 precludes post-conviction access to evidence any time the DNA profile may have changed since the commission of the crime.

The CCA also unconstitutionally construed the element of "unreasonable delay," even though the method for "touch DNA" testing Reed sought was not previously available as a technical matter or legally available under prior versions of the post-conviction law. (¶ 57)

**E. Defendant's Pattern Of Inappropriate Execution Dates.**

Defendant and the State's counsel recently explained in state court proceedings that the decision to set Reed's execution for November 20, 2019 was made immediately after the CCA denied Reed's state habeas application and without consultation with opposing counsel. (¶ 65; Ex. 2; Compl. Exs. J, K)[4] By obtaining an execution date before Reed could seek United States Supreme Court review, the State has sought to create an inappropriate structural advantage. Moreover, the setting of an execution date upon such notice is unnecessarily burdensome to Reed's counsel, who must rush to prepare and file multiple federal proceedings and a clemency petition with enough time so that these important claims can receive meaningful consideration by

---

[4]   The State immediately sought an execution date knowing that it would interfere with review of the CCA's June 26, 2019 decision on the merits of Reed's constitutional claims both by the United States Supreme Court and through subsequent federal habeas proceedings. The outdated practice of using execution dates to truncate federal review runs counter to the norms of civility expected of Texas lawyers. *See* Texas Lawyer's Creed at III. ¶¶ 6-7.

the federal courts, the Board of Pardons and Paroles, and Governor Abbott. Defendant's schedule will likely be equally disruptive to the orderly consideration by each of these deliberative bodies.

The setting of a November execution date should also be viewed in light of the State's prior conduct. The CCA has shown no interest in expediting Reed's execution. In 2015, the CCA stayed a prior execution date and then waited two years before issuing a brief order remanding some of Reed's claims for a *Brady* hearing. When the case returned to the CCA after the evidentiary hearing, it again held the case for eighteen months before issuing a cursory order that contained no legal analysis. That the Texas courts believed Reed's claims warranted four years of deliberation should inform this Court's consideration of his request for a stay.

Finally, Defendant and the State's counsel have only sought to expedite this case when it serves them strategically. Throughout Reed's post-conviction proceedings, counsel obtained several extensions, each presumably delaying the final resolution of the case.

## ARGUMENT

When evaluating a motion for stay, courts consider "the circumstances of the particular case" along with four factors: (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (citation omitted); *see also In re Campbell,* 750 F.3d 523, 535 (5th Cir. 2014). In a capital case, courts "must be particularly certain that the legal issues have been sufficiently litigated, and the criminal defendant accorded all the protections guaranteed him by the Constitution of the United States." *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (citation omitted).

I.  **REED HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.**

Constitutional claims involving the construction of Texas's post-conviction DNA statute may be brought under 42 U.S.C. § 1983. *Skinner v. Switzer*, 562 U.S. 521, 525 (2011).[5] Reed can demonstrate a likelihood of success on his claim that the CCA's construction of Chapter 64 arbitrarily denies applicants access to evidence to conduct forensic DNA testing that can prove their innocence and provide access to post-conviction remedies. *First*, the CCA's interpretation of Chapter 64's chain of custody as including a "no contamination" requirement is inconsistent with the plain language of the statute, how chain of custody is established for inculpatory purposes, and the evidentiary record. *See, e.g.*, *Druery v. State*, 225 S.W.3d 491, 503-04 (Tex. Crim. App. 2007) ("Absent evidence of tampering or other fraud[,] . . . problems in the chain of custody do not affect the admissibility of evidence."); *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997) (same). The United States Supreme Court rejected a similar practice in *Moore v. Texas*, when the CCA applied a different standard (an outdated test to assess intellectual disability) in post-conviction proceedings. 137 S. Ct. 1039, 1042, 1052 (2017).

The CCA's novel interpretation of Chapter 64's "chain of custody" element also places an impossible burden on applicants with respect to evidence ***over which they have no control***. This is acutely problematic for those who, like Reed, were convicted years ago and are being denied the ability to use sophisticated new DNA testing techniques solely because of how the State handled and stored evidence. *See Nebraska v. Pratt*, 842 N.W.2d 800, 811 (Neb. 2014) ("[i]f we were to interpret the physical integrity prong as demanding that the biological evidence

---

[5]  The State moved to dismiss Reed's original complaint on the grounds that it sought mandamus. While Reed submits that the State is wrong, he filed an Amended Complaint to clarify that he is not seeking mandamus, but is rather asking this Court to issue declaratory relief to address the constitutional issues presented in this action.

was secured in a way likely to avoid accidental contamination with extraneous DNA from epithelial cells, then the express purposes of the Act would be undermined"); *Newton v. City of New York*, 681 F. Supp. 2d 473, 491 (S.D.N.Y. 2010) ("Due Process rights have been violated if attempts to locate the evidence are frustrated due to a poor or non-existent evidence management system"). Additionally, while the CCA accepted the State's position that the "manner in which the evidence was handled and stored [by the State] casts doubt on the evidence's integrity" such that the chain of custody provision of Article 64.03(a)(1)(ii) was not met (*Reed v. State*, No. AP-77,054, at 18 (Tex. Crim. App., Apr. 12, 2017)), the CCA also acknowledged that "[m]any of the [district] judge's findings improperly tie together the separate inquiries of whether the items are reasonably likely to contain biological material suitable for DNA testing with whether testing would produce a DNA profile" and that "***Reed proved that either biological material exists or there is a reasonable likelihood that it exists*** on [certain] items." *Id.* at 20, 23 (emphasis added). The two conclusions are mutually exclusive.

The CCA also disregarded the plain language of Chapter 64 in favor of an improper laches analysis to conclude that Reed sought DNA testing for the purpose of unreasonable delay. The CCA improperly relied on Chapter 64 cases brought on the eve of pending executions, when Reed first sought DNA testing in 1999 just months after his conviction. Reed sought testing in 2014 only after the Texas legislature enacted statutory amendments to Chapter 64 to correct an earlier CCA decision prohibiting the requested type of DNA testing for microscopic amounts of skin cells. *See* Acts 2011, 82nd Leg., R.S., Ch. 366 (S.B. 122), Sec. 1, eff. September 1, 2011 (defining "biological material" to include skin cells). The CCA's interpretation is inconsistent with the Texas legislature's stated intent that Chapter 64 impose a *lower* burden than other post-conviction procedures. *See Skinner v. Switzer*, C.A. No. 2:09-cv-281, slip op. at 2-3 (N.D. Tex.,

Oct. 27, 2011), *report and recommendation adopted* (N.D. Tex., Nov. 4, 2011). It also ignores substantial evidence of innocence Reed has developed, including through post-conviction litigation efforts. As such, Chapter 64, as construed by the CCA, deprived Reed of procedural Due Process. *See Foucha v. Louisiana*, 504 U.S. 71, 79-80 (1992) (failure to provide relief for a possibly innocent prisoner amounts to an "arbitrary" abridgement of the "[f]reedom from bodily restraint [that] has always been at the core of the liberty protected by the Due Process Clause").

Chapter 64, as construed by the CCA, violates Reed's right to Due Process and to access the courts under the United States and Texas Constitutions. When a state creates a judicial remedy, access to that remedy must be fairly afforded. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). Where, as here, the state fails to provide access to evidence needed to litigate claims of innocence, it imposes an intolerable barrier to the right of access to courts. *See Wade v. Brady*, 460 F. Supp. 2d 226, 250 (D. Mass. 2006) ("Denying prisoners access to potentially exculpatory DNA evidence limits meaningful access to the courts in even more profound terms than denying access to a law library or attorney."). The Fifth Circuit has found an access-to-courts violation when state actors impeded a potential litigant's access to evidence. *See Ryland v. Shapiro*, 708 F.2d 967, 971-76 (5th Cir. 1983). And "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009). Here, Reed has been denied access to critical evidence—such as DNA present on the belt used to commit the murder—under extraordinary circumstances that demand access to that evidence, including because all of the expert scientific testimony used to convict him has been recanted and proven false.

Chapter 64, as construed by the CCA, violates the Eighth Amendment and deprives Reed of the opportunity to prove actual innocence. Texas enacted Chapter 64 to provide convicted

9

persons a definitive right to access evidence to prove their innocence. Because the CCA has construed Chapter 64 in a manner that renders it illusory in order to deprive applicants of their primary means of proving their innocence, the statute is patently cruel and leads to a miscarriage of justice by allowing execution of a potentially innocent person. *See, e.g.*, *In re Davis*, 557 U.S. 952, 953-54 (2009) (Stevens, Ginsberg and Breyer, JJ., concurring) ("it 'would be an atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person") (citations omitted).

## II. THE BALANCE OF THE EQUITIES HEAVILY FAVOR A STAY.

Because no harm could be more irreparable than the loss of life, this element strongly favors granting a stay. *O'Bryan*, 691 F.2d at 708 (per curiam). Since a brief stay will harm no one, this element too weighs in favor of a stay. *See In re Campbell*, 750 F.3d at 535. Any purported State interest in an expedited resolution of Reed's case is belied by the more than four years of deliberation in the Texas courts after staying Reed's 2015 execution and Defendant's conduct in seeking to rush Reed's execution. The public interest also favors a stay of execution of a potentially innocent person. Moreover, this Court's consideration of the State's interest should also be informed by the fact that the Texas legislature has amended Chapter 64 five times and has recognized that the CCA has interpreted the statute in a way that "prevents the discovery of exonerations." *See* C.S.S.B. 487, Committee Report (Apr. 7, 2015). Finally, a stay is in the public interest because forensic DNA testing can exculpate Reed and bring Stites's real killer to justice. Indeed, even while the State opposes Reed's requests to test critical evidence, like the murder weapon, it continues to work with DNA experts at Texas DPS to obtain new results on previously tested material. (*See* ¶¶ 91-92, Compl. Ex. L)

## CONCLUSION

Reed respectfully requests that this Court stay his execution pending disposition of this action or, alternatively, expedite this action such that a decision may be rendered before his execution date, with adequate time for any necessary appeals.

Dated: October 1, 2019

| | |
|---|---|
| | /s/ Bryce Benjet |
| | Bryce Benjet |
| *Of Counsel* | **THE INNOCENCE PROJECT** |
| | 40 Worth Street, Suite 701 |
| Cliff C. Gardner (*pro hac vice filed*) | New York, NY 10013 |
| Robert A. Weber (*pro hac vice filed* ) | (212) 364-5980 |
| Nicole A. DiSalvo (*pro hac vice filed*) | bbenjet@innocenceproject.org |
| Shaivlini Khemka (*pro hac vice filed*) | |
| **SKADDEN, ARPS, SLATE,** | Andrew F. MacRae |
| **  MEAGHER & FLOM LLP** | **LEVATINO PACE PLLC** |
| One Rodney Square | 1101 S. Capital of Texas Highway |
| P.O. Box 636 | Building K, Suite 125 |
| Wilmington, Delaware 19899-0636 | Austin, TX 78746 |
| Tel.: (302) 651-3000 | (512) 637-8565 |
| | amacrae@levatinopace.com |
| | *Attorneys for Plaintiff Rodney Reed* |

## CERTIFICATE OF SERVICE

I certify that on this 1st day of October, 2019, I electronically filed the foregoing pleading with the clerk of the court for the U.S. District Court, Western District of Texas, using the CM/ECF system.  I understand the CM/ECF system will send a Notice of Electronic Filing to all counsel of record.

/s/ Andrew F. MacRae
Andrew F. MacRae