Case No.___

# United States Court of Appeals

*for the*

# Fifth Circuit

**In re RODNEY REED,**

Movant.

## OPPOSED MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

## CAPITAL CASE

### *Execution Date Scheduled for November 20, 2019*

### - ARGUMENT REQUESTED -

1

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this application pursuant to 28 U.S.C.

§ 2244(b).

## STATEMENT OF ISSUE PRESENTED

1.     Whether the Court should grant applicant authorization to file a

successor petition for writ of habeas corpus under 28 U.S.C. § 2244?

TO THE JUDGES OF THE FIFTH CIRCUIT COURT OF APPEALS:

Rodney Reed asks this Court to authorize his filing of a second habeas petition because there is new evidence that (1) disproves the entirety of the State's case presented at his capital murder trial, (2) supports Reed's defense that he and the murder victim Stacey Stites had consensual sex about a day before her murder, and (3) strongly implicates Stites's fiancé, Jimmy Fennell, as the actual murderer.

Reed's execution was stayed by the Texas Court of Criminal Appeals in 2015 based on only some of this new evidence.[1]  But after four years of state habeas litigation—including a multi-day hearing on one of Reed's *Brady* claims— the CCA denied his petition in a terse, six-page order that contained no legal analysis.[2]  Reed is now scheduled for execution on November 20, 2019.  In light of the new evidence of actual innocence and related constitutional violations, Reed requests authorization to file and have this Court consider a successive petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2244(b)(3)(C).

## STATEMENT REGARDING OTHER PENDING LITIGATION

Reed currently has litigation pending in both state and federal court, and has requested a stay or similar relief in each proceeding.

On September 24, 2019, Reed filed a Petition for a Writ of Certiorari in the

---

[1] *Ex parte Rodney Reed*, WR-50, 961-07 (Tex. Crim. App. Feb. 23, 2015).
[2] Exhibit 1, CCA Order (June 26, 2019).

Supreme Court of the United States, seeking review of a June 26, 2019 decision of the Texas Court of Criminal Appeals (hereafter, the "CCA") denying Reed's state habeas petition. The petition presents questions related to (1) the application of the Brady materiality standard, (2) whether a State's use of scientifically invalid expert testimony violates due process, and (3) whether the execution of a person who is actually innocent violates the United States Constitution. Petition for Certiorari at i-ii, *Reed v. Texas*, __ U.S. __ (No. 19-411). Briefing has concluded and the Court's conference is set for November 15, 2019.

On October 1, 2019, Reed filed an Amended Complaint in the Western District of Texas seeking a declaratory judgment that Article 64 of the Texas Code of Criminal Procedure, as interpreted by the CCA, violates his constitutional rights due process, access to the courts, and freedom from cruel and unusual punishment. Amended Complaint at 24-32, *Reed v. Goertz*, No. 1:19-cv-794-LY (W.D. Tex. filed Oct. 1, 2019), ECF No. 10. Reed has filed a motion for a stay of execution in this proceeding. Briefing has concluded on the defendant's motion to dismiss and on Reed's stay motion, and both motions are under consideration.

On October 4, 2019, Reed filed a Motion for Withdrawal of Execution Date in the 21st Judicial District Court of Bastrop County, Texas (the "21st District Court") seeking the withdrawal of the order scheduling his November 20, 2019 execution date based upon newly-discovered evidence that establishes Reed's

actual innocence. On November 4, 2019, Reed filed a second motion seeking a determination that the execution order is void because the issuing judge's assignment lapsed. On November 6, 2019, the 21st District Court scheduled a hearing on Reed's motions for November 13, 2019. On November 12, 2019, the CCA issued an order staying the District Court's scheduled hearing.

On November 11, 2019, Reed filed an Application for Writ of Habeas Corpus with the CCA. Reed's Application addresses much of the same evidence as presented in the instant proposed habeas petition.

## STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

The State's case against Reed was premised on the identification of Reed based upon DNA collected from Stites's body and the theory that he abducted, raped, and murdered Stites at 3:00 a.m. on April 23, 1996, while Stites drove to work. *See Reed v. Stephens*, 739 F.3d 753, 760 (5th Cir. 2014). Because her body was found beside an unpaved road in rural Bastrop County, and the truck Stites was supposed to be driving was found locked at 5:23 a.m., the State argued that Stites's abduction, rape and murder all occurred within a roughly two-hour window. *Id.* at 760-61. Reed's defense contended that he was innocent, and that his DNA was present because he was having an affair with Stites. *See id.* at 762.

In his prior federal habeas petition, Reed presented evidence that the State's experts interpreted the serology evidence incorrectly and that additional witnesses

implicated Fennell and corroborated Reed's relationship with Stites. *See id.* at 767-68. However, this Court rejected Reed's actual innocence claim, concluding that (1) Reed's critique of the State's scientific experts created only a "possibility" of his innocence, and (2) Reed's witnesses implicating Fennell and with knowledge of Reed's affair with Stites were not credible. *See id.* at 771-72.

Since Reed was last before this Court, undersigned counsel have conducted a comprehensive re-examination of the case, and the evidentiary picture has changed entirely:

- **New Forensic Evidence Exonerating Reed and Implicating Fennell**.

Three of the nation's leading forensic pathologists, **Dr. Werner Spitz, M.D., Dr. Michael Baden, M.D., and Dr. Leroy Riddick, M.D**., have determined that Stites was actually murdered before midnight on April 22, 1996, (not at 3:00 a.m. on April 23,) and her body was dumped by the side of the road at least four hours after the murder. Exhibits 2, 3, 4. Three renowned experts conclude that this longer post-mortem interval, coupled with the dumping of her body at least four hours after death, makes the State's theory of Reed's guilt medically and scientifically impossible.

This new scientific evidence directly implicates Fennell because it shows that Stites was killed at the very time Fennell and Stites were together in their apartment, as he testified at trial. *Compare Ex parte Reed,* 271 S.W.3d 698, 703

(Tex. Crim. App. 2008). These conclusions are supplemented by **Retired NYPD Homicide Detective Sergeant Kevin Gannon's** findings that the crime scenes appear to have been staged. Exhibit 5.

Despite years of state court litigation, the State has never contradicted this affirmative scientific evidence of Reed's innocence, and Dr. Bayardo's retraction of his trial testimony that was previously doubted by this Court has now been joined by the agencies that employed the remaining experts who offered opinions connecting Reed's DNA to the murder. Exhibit 6 (Bayardo Declaration); Exhibit 7 (DPS Crime Lab Letter); Exhibit 8 (Cellmark Correction Report); Exhibit 9 (Purnima Bokka Aff.).

- **New Credible Witnesses to Reed and Stites's Affair**

Several witnesses who have no connection to Reed have provided information confirming the relationship between Reed and Stites. These witnesses include:

- o **Calvin "Buddy" Horton**, Stites's cousin, saw Reed and Stites together at a Dairy Queen in late 1995. Exhibit 10.

- o **Alicia Slater**, a co-worker of Stites at the Bastrop H-E-B, recounted a breakroom conversation in which Stites confided she was "sleeping with a black guy named Rodney," that she had to "be careful," and "didn't know what her fiancé would do if he found out." Exhibit 11.

- o **Rebecca Peoples** a co-worker of Stites at the Bastrop H-E-B, recounted conversations in which Stites told Peoples she was afraid of her fiancé. Stites also confided that she was having an affair with

a black man.  Exhibit 12.

o **Lee Roy Ybarra**, another co-worker at the H-E-B, saw Reed and Stites together at the store and believed they were "together." Exhibit 13.  He also described that Stites would become nervous and sometimes hide from Fennell when he came into the store.  *Id.*

o **Charles Wayne Fletcher**, a Bastrop County Sheriff's Officer and good friend of Fennell and Stites at the time of the murder, recounted a conversation in which Fennell told him that Fennell believed Stites was "fucking a nigger."  Exhibit 14.  Fennell's knowledge of the affair and his expressed racism also provide motive for Fennell to have murdered Stites.

- **New Witnesses Implicating Fennell**

New witnesses have also been discovered who confirm that law enforcement's initial suspicion of Fennell as the murderer was justified:

o **Arthur J. Snow, Jr.**, a former prisoner in TDCJ and member of the Aryan Brotherhood who served prison time with Fennell, states that Fennell told him that his "fiancé had been sleeping around with a black man behind his back," and quoting Fennell: "I had to kill my nigger-loving fiancé."  Exhibit 22.

o **Curtis Davis**, a Bastrop Sheriff's Officer and best friend of Fennell in 1996, testified that Fennell gave an inconsistent statement about his whereabouts and activities on the night of April 22, 1996—the time Stites was murdered.  Exhibit 15.  When confronted with this inconsistent statement, Fennell invoked the Fifth Amendment. Exhibit 16.

o **An insurance salesperson**[3] who sold Fennell and Stites life insurance heard Fennell threatened Stites, saying "If I ever catch you messing around on me, I will kill you and no one will know it was me."  Exhibit 17.

---

[3] The witness has expressed safety concerns in light of Fennell's recent release from prison, and identifying information is accordingly redacted. The State has interviewed this witness and unredacted copies of identifying documents will be filed under seal at the Court's request.

- o **Brent Sappington** visited his father William Sappington, who resided directly below Fennell and Stites. Brent heard arguing and fighting upstairs. Exhibit 18. Brent and his wife **Vicky Sappington** recount that William told them he regularly heard Fennell argue with Stites and suspected physical abuse as well. Exhibits 18, 19. After the murder, William Sappington told police about the abuse, but was told that Fennell was not involved in the murder. *Id.*

- o **Jim Clampit**, a retired Lee County Sheriff's Officer, was shocked when Fennell muttered at Stites's body at her funeral that "you got what you deserved." Exhibit 20.

- o **Richard Derleth**, a Bastrop County Sheriff's Office Deputy, learned that Stites would hide from Fennell when he came to H-E-B to avoid him starting a fight. Exhibit 21.

Reed's evidence of third-party guilt in his prior habeas petition reflected doubts at that time as to the identity of Stites's murderer. *See Reed v. Thaler*, 2012 WL 2254217, at *13 (W.D. Tex. June 15, 2012) (discussing David Lawhon). The new forensic evidence that Stites was murdered hours before her body was transported in Fennell's truck and dumped by the roadside is conclusive proof of Fennell's guilt based on his own timeline. That critical discovery alters the chronology of Stites's death and yields a consistent understanding of Reed's innocence and Fennell's guilt.[4] This evidence of a consensual relationship coupled with scientific evidence disproving the State's forensic case is powerfully

---

[4] Prosecutors may again question how Fennell returned home after abandoning his truck in Bastrop, but basic investigative missteps lost important evidence, such as Fennell's phone records, which were never subpoenaed even though investigator notes reflect their importance. Exhibit 23 (letter from DA Goertz). As a policeman, Fennell was familiar with the area and likely had people available to provide transportation.

exculpatory.[5]

Armed with this extensive new evidence of actual innocence of the Stites murder, all of which post-dates his initial federal habeas proceedings, Reed raises new constitutional factual innocence, *Brady*, Due Process, and Ineffective Assistance of Counsel claims, which claims could not have been raised earlier with reasonable diligence. Accordingly, this Court should authorize a second federal habeas petition pursuant to 28 U.S.C. § 2244(b)(2)(B)(ii) because the facts underlying these claims, when viewed in light of the evidence as a whole, prove by clear and convincing contemporaneous evidence that, but for constitutional error, no reasonable factfinder would have found Reed guilty of the underlying offense.

## I.     Statement of Facts

### A.     Crime and Forensic Investigation

Stacey Stites was last seen by her mother Carol Stites around 8:00 p.m. on April 22, 1996, when Stites and Fennell went upstairs to the apartment they shared.[6] Stites was supposed to be at work the next morning at 3:30 a.m. at the Bastrop H-E-B, about 30 miles from her home. At 6:45 a.m., her mother received a call reporting that Stites was not at work.

---

[5] *Thaler*, 2012 WL 2254217, at 14 n.8 ("[P]ersuasive evidence that Reed and Stites had consensual sex days before the murder would have clearly undermined the State's evidence. Further, given the evidence that Fennell was racially prejudiced, evidence of an interracial affair between Stites and Reed would also have provided a credible motive for Fennell to kill Stites.").

[6] Exhibit 24 (Statement of Carol Stites, March 5, 1997).

Fennell's pickup truck was spotted parked in the Bastrop High School Parking Lot at 5:23 a.m.[7]   Stites's body was found before 3 p.m. beside a gravel road in rural Bastrop County.[8]

Fennell's truck was locked, its keys were missing, and on the ground near the driver's door were a portion of a woven leather belt and carbon copies from Fennell's checkbook.[9]   The driver's seat was reclined and the seatbelt  fastened. Fingerprints were collected from the truck and items contained therein; all prints that were identified belonged to Fennell and Stites.[10]   No physical evidence linked Reed to the truck.[11]

The photographs below depict the truck, the scene where Stites's body was found, and the condition of her body:

---

[7] Exhibit 25.
[8] TT Vol. 44:18-2, Exhibit 26 (images of Stites's body).
[9] Exhibit 27 (image of car).
[10] TT Vol. 47:39.
[11] *Id*. at 43.







DPS Crime Lab Technician Karen Blakely conducted an irregular examination of Stites's body at the scene, including vaginal swabs, and both the scene and examination were captured on video.[12]   At the crime lab later that night, Blakely examined a slide from the vaginal swabs and identified three intact spermatozoa.[13]

In his autopsy report, Medical Examiner Dr. Roberto Bayardo provided his opinion that Stites died "as a result of asphyxia due to ligature strangulation associated with sexual assault."[14]   Dr. Bayardo took vaginal smears and reported finding "very few" spermatozoa, heads and tails. He reported seeing abrasions in

---

[12] Exhibit 28, Blakely Report.
[13] *Id.*
[14] Exhibit 29, Autopsy Report.

the distended rectum, but rectal swabs were negative for spermatozoa.[15]

### B.     Fact Investigation by Law Enforcement Focused on Fennell

Stites's relationship with Fennell at the time of the murder was described in law enforcement documents as strained. Friends close to Stites described Fennell as controlling, impulsive, and prone to possessive outbursts.[16] Indeed, an interview note in the investigative file indicates that the couple argued the night of the murder and that Fennell was "Jealous of Everyone."[17]

"Even after Fennell provided a blood sample, which excluded him as the donor of semen found in and on Stites's body, the authorities continued to pursue him as a suspect."[18] He was aggressively interrogated by both Bastrop County Sheriff's Officers and the Texas Rangers concerning his involvement in the murder, but the interviews were not recorded.[19]

Fennell gave inconsistent accounts of the events leading up to Stites's murder, and his actions immediately following her disappearance were suspicious. Before Stites' body was even found, Fennell withdrew all of the money in his bank account.[20] He also gave a false statement about his truck that

---

[15] *Id.*
[16] Exhibit 30 Tammy Hannah Aff.; Exhibit 31 Ronnie Reveal Aff.
[17] Exhibit 32, Note "Jealous of Everyone."
[18] *Thaler*, 2012 WL 2254217, at *2.
[19] TT Vol. 45:110; TT Vol. 46:125.
[20] Exhibit 33.

same morning, telling police that he filled the truck with gas the night before.[21]

Days later, when police discovered that the truck's gas tank was only 1/8 to 1/4

full, Fennell changed his account.[22]   Fennell also gave a false explanation for

why he and Stites had not recently had sex, implausibly claiming that her birth

control prescription warned against a higher risk of pregnancy at certain times.[23]

Fennell's descriptions of the couples' plan for the day of April 23, 1996

also varied.  In a sworn statement, Carol Stites recounted that Fennell insisted on

the afternoon of April 22 that he would drive Stacey to work on April 23 and

keep his truck for a court appearance the next day.[24]   Fennell was inconsistent: he

first claimed that Carol asked him to drive Stites to work, but then admitted that

it was his suggestion.[25]   To explain his presence at home alone the next morning,

Fennell claimed that, despite insisting to Carol that he would drive Stites to work,

the couple later decided that Stites would drive herself.[26]

Fennell failed two polygraph examinations during the investigation.[27]   In

the October 1996 examination, the examiner reported that Fennell gave deceptive

responses to questions concerning whether he strangled Stites or had sex with

---

[21] Exhibit 34.

[22] *Id.*

[23] Exhibit 35.

[24] Exhibit 36 ("I was under the impression that Jimmy was taking Stacey to work the next morning.")

[25] TT Vol. 45:81.

[26] TT Vol. 45:83.

[27] TT Vol. 52:10, 15; *id.* at 150, 155.

Stites on April 23, 1996.[28]  In his second examination two months later, Fennell gave deceptive answers to questions concerning whether he strangled Stites and whether he deposited her body.[29]  After learning that the polygraph again indicated deception, Fennell invoked his privilege against self-incrimination and stopped cooperating with the investigation.

Suspicion of Fennell ended, however, when DNA testing of evidence collected in an unrelated investigation (where no charges were ever filed) matched Reed's DNA profile to the profile obtained from Stites's vaginal swabs. Reed, arrested on unrelated drug charges when confronted about Stites's murder, was surprised by this questioning and initially denied knowing her.[30]

## C.    Reed's Relationship with Stites

Reed immediately told his retained lawyer, Jimmie Brown, about his relationship with Stites.  Brown located multiple witnesses that corroborated Reed's relationship with Stites.[31]  Brown presented testimony about the Reed-Stites relationship at a bond hearing.[32]  Although Reed declined to testify at trial on the advice of counsel, his attorneys told the jury there was an affair, and presented two witnesses that confirmed it.[33]

---

[28] Exhibit 37.

[29] TT Vol. 52:10; Exhibit 38.

[30] TT St. Exhibit 91(a).

[31] Exhibit 39.

[32] Exhibit 40 (Testimony of Sandra Reed, 9/5/97).

[33] *See Stephens*, 739 F.3d at 772.

Reed has since given a full account of his relationship with Stites in an affidavit in a state court DNA testing action.  Reed's affidavit explains that he met Stites in October or November of 1995, and that the two saw each other from time to time thereafter.  He also states that Fennell became aware that Reed and Stites were seeing each other, and that Fennell threatened Reed just before Stites's murder.[34]  Reed described the last time he saw Stites:

> The last time I saw Stacey was either very late Sunday night on April 21st or very early Monday morning on April 22nd. Stacey came by the community center by my mom's house where I often hung out. She picked me up and drove to the Bastrop State Park. We had sex at the park, and then Stacey dropped me off around 3am at the corner of Linden and Main Street in Bastrop before she went to work.[35]

### D.     The State's Case at Trial Relied on Flawed Forensic Testimony

At trial, the State relied upon forensic testimony to convince the jury that Reed killed Stites.  The State's theory was that Reed abducted, raped, and killed Stites driving to work at about 3 a.m., using flawed forensic testimony and Fennell's account that he and Stites were together the night before and that she had driven herself to work that early morning.

In order to connect Reed to the crime, the State relied on expert testimony that Stites was murdered during a sexually assault.  First, the State claimed that spermatozoa can only remain morphologically intact for twenty-four hours.  The

---

[34] Exhibit 41.
[35] *Id.*

State's medical examiner, Dr. Bayardo, testified that the spermatozoa he found was placed in the victim's body "very recently."[36]  State witness Karen Blakely specified "that 26 hours is the outside length of time" that intact spermatozoa can be found.[37]  The State's retained DNA expert Meghan Clement echoed this opinion.[38]  The State further emphasized this point in its closing argument.[39]

The prosecution also relied upon Dr. Bayardo's assertion of anal tearing as conclusive proof that Stites was raped at the time of her murder.   Dr. Bayardo testified at trial, inconsistent with his autopsy report, that he found lacerations in the anus, and that the dilation of the anus was consistent with penetration at or near the time of death.[40]  In conjunction with the fact that spermatozoa fragments were recovered from rectal swabs, the State argued in closing that this was conclusive proof that the victim had been sexually assaulted before she died: "that's the piece of evidence, if nothing else does, that's going to hammer him."[41] Unprepared to defend essentially every aspect of the case, Reed's trial counsel did not meaningfully contradict any of the State's forensic evidence.

The jury convicted Reed of capital murder.   The CCA upheld the sufficiency of the evidence, citing only the State's forensic evidence:

---

[36] TT Vol. 48:122.
[37] TT Vol. 45:16.
[38] TT Vol. 51:56.
[39] TT Vol. 56:33-34.
[40] TT Vol. 48:126.
[41] TT Vol. 56:47-48.

> Given the strength of the DNA evidence connecting appellant to
> the sexual assault on Stites and the forensic evidence indicating
> that the person who sexually assaulted Stites was the person who
> killed her, a reasonable jury could find that the appellant is guilty
> of the offense of capital murder.[42]

As shown below, the State's forensic evidence—the backbone of its case against Reed—was medically and scientifically lacking.

### E.     The Forensic Evidence Relied Upon by the State at Trial has been Recanted and Disproven

Since Reed's last federal habeas petition, the forensic evidence presented against him has been recanted by those who offered it, and also been affirmatively disproven by three of the nation's most experienced, renowned forensic pathologists.

This Court is aware of the recantation by Dr. Roberto Bayardo contradicting his trial testimony that Reed sexually assaulted Stites. Dr. Bayardo now admits that the forensic evidence suggests consensual intercourse between Reed and Stites *more* than 24 hours before her death, which is consistent with Reed's account of his last meeting with Stites and inconsistent with Jimmy Fennell's testimony.[43] Dr. Bayardo now states that the deposit of Reed's semen was not "quite recent" to her death—as he testified at trial[44]—but was

---

[42] *Reed v. State*, No. 73,135 at 9 (Tex. Crim. App. December 6, 2000).
[43] Exhibit 6 ¶4.
[44] At trial, Bayardo testified that he determined the deposit of Reed's semen in Stites occurred "quite recently" in proximity to the time of her death.  TT Vol. 48:122.

approximately a day before her death:

> "…the fact that I found "very few" (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was *not deposited less than 24 hours before Ms. Stites's death.*"[45]

Although the credibility of Dr. Bayardo's recantation was questioned in 2014, it is supported now with the new statements of Texas DPS Crime Lab Director Brady Mills and LabCorp scientists correcting the erroneous trial testimony of their lab employees connecting Reed's DNA to a supposed sexual assault and murder. Exhibits 7, 8, 9.

### 1. DPS Crime Lab Director repudiates Karen Blakely's trial testimony concerning significance of intact spermatozoa.

DPS Crime Lab Technician Karen Blakely collected vaginal swabs from Stites's body and reported that a vaginal swab slide contained three intact sperm.[46] Blakely falsely testified at trial that she was able to determine sexual intercourse was very recent because she saw intact sperm on the evening of April 23, 1996 and "26 hours was the outside length of time that tails will remain on a sperm head inside the vaginal tract of a female."[47]

On April 30, 2018, DPS Laboratory Director Brady Mills sent a letter to

---

[45] Exhibit 6 ¶4 (emphasis added).
[46] TT Vol. 44, 132.
[47] TT Vol. 45, 16.

undersigned counsel correcting this error.[48]  Director Mills concedes "potential limitations" in Blakely's testimony and admits that Blakely's scientific source actually reports *72 hours as the longest time for intact spermatozoa to be found in the vagina.*[49]

### 2. LabCorp error correction report repudiates Meghan Clement's trial testimony concerning significance of intact spermatozoa.

At trial, the State's retained expert Clement echoed Bayardo and Blakely, claiming that her experience of examining thousands of rape kits never yielded intact spermatozoa after 20-24 hours.[50]  Just as with Blakely, Clement's testimony left a clear and false impression with the jury that intact spermatozoa cannot exist in the vaginal tract after 24 hours.

In a January 11, 2018 letter, Bode Cellmark Forensics Technical Leader Stephanie Sivak described Clement's testimony as an "error" and "unsatisfactory."[51]  Sivak characterized the error in Clement's testimony as follows:

> The DNA/Forensic Biology Analyst cites the number of cases and/or samples worked in the lab as a predictive value to bolster the conclusion that the DNA profile belongs to a specific individual or…otherwise testifies beyond the scope of his/her

---

[48] Exhibit 7.
[49] *Id.*
[50] TT Vol. 51, 53, 56.
[51] Exhibit 8.

expertise.[52]

Purnima Bokka, M.S., a LabCorp forensic serologist, also corrects Clement's testimony by stating that intact spermatozoa may be found in the vaginal cavity up to 144 hours after intercourse, well beyond the timeframe to which Clement and Blakely testified.[53]

### 3.    Declaration of Dr. Bayardo recants his prior testimony.

Dr. Bayardo's expert opinion has changed in essentially every respect. In a sworn declaration, he has disputed any link between Reed's DNA and a vaginal or anal sexual assault, and has likewise confirmed that his time of death estimate should not have been relied upon as definitive. Exhibit 6 at 2-3 ("If the prosecuting attorneys had advised me that they intended to use my time of death estimate as a scientifically reliable opinion of when Ms. Stites died, I would have advised them not to do so.").

### F.    New Evidence Shows that Proper Interpretation of the Forensic Evidence Renders the State's Theory of Reed's Guilt Impossible

The recantations of the State's trial experts are supplemented by three of the nation's leading forensic pathologists, (Werner Spitz, M.D.; Michael Baden, M.D.; and LeRoy Riddick, M.D.), who unanimously agree that Reed did not sexually assault Stites. After Reed's initial habeas proceedings were denied, the

---

[52] *Id.*
[53] Exhibit 9.

case was independently reexamined by retired NYPD Homicide Detective Sergeant Gannon. Gannon made an important discovery regarding Stites's time of death that fundamentally transformed the case record. Gannon contacted undersigned counsel and explained that his observations of non-dependent lividity and other decompositional changes demonstrate that Stites died well before her body was transported and dumped. Exhibit 5.

Gannon's observations were presented to three of the nation's leading forensic pathologists, who each confirmed Gannon's findings and unanimously concluded that Stites was murdered *before midnight* on April 22, 1996 and placed in the location and position where she was eventually found at least four hours *after* the murder. Exhibits 2, 3, 4. This longer post-mortem interval, coupled with the fact that the body was moved at least four hours after death, makes the State's theory of Reed's guilt impossible. These experts likewise agree that there is *no* evidence of a sexual assault contemporaneous with death, a fact found essential to the sufficiency of the evidence supporting the verdict against Reed.[54] Thus, because Stites was murdered at a time that Fennell testified she was at home with him, and there is no evidence that Stites was sexually assaulted, it becomes clear that Fennell, and not Reed, murdered Stites.

The forensic experts rely primarily on three key elements to fix the post-

---

[54] *See Reed v. State*, No. 73, 135 at 9.

mortem interval: rigor mortis, livor mortis, and signs of decomposition.[55]  None of these customary time of death indicators were discussed in relation to the postmortem interval at Reed's trial.

### 1. Patterns of Postmortem Lividity Indicate that the Body was Moved Not Less Than 4 to 6 Hours After Death.

Drs. Spitz, Baden and Riddick explain that lividity on Stites's right shoulder, arm, and part of her face shows that Stites was left in a position in which these areas were lower than the rest of her body (dependent) for at least four hours prior to the body being left in the position it was found—in simple terms, she lay with her head and right arm downward for hours immediately following her death.[56]  Areas of lividity often contain patches of white called "blanching" where compression of the skin has prevented the blood from pooling.[57]  The photograph of Stites below shows lividity on her right arm, right shoulder and chest, and the side of her face—areas that are not dependent in the position she was found:

---

[55] *See Spitz and Fisher*, Medicolegal Investigation of Death 94 (4th Ed. 2006) (livor, rigor, and decomposition included in most common protocols used in postmortem timing).

[56] Exhibit 2, Spitz Aff. ¶¶2-3; Exhibit 3, Baden Aff. ¶6; Exhibit 4, Riddick Aff. ¶¶12-14.

[57] Exhibit 4 ¶14.



*(Note red discoloration on face, upper chest, and arm with blanching on elbow-area.)*

Areas of blanching can be seen on Stites's elbow. Dr. Spitz explains the relevance of this non-dependent lividity:

> The presence of lividity in these non-dependent areas makes it medically and scientifically impossible that Stites was killed between 3- 5 a.m. on the date in question. Stites could not have been both murdered *and* dumped between the hours of 3-5 a.m. on April 23, 1996 and remained undisturbed in that spot until her body was discovered at around 3 p.m. because the lividity observed in the non-dependent areas would have taken at least 4-5 hours to develop. It is impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial.[58]

Dr. Baden reached the same conclusion:

> This lividity demonstrates that Ms. Stites was dead before midnight on April 22nd when she was alone with Mr.

---

[58] Exhibit 2 ¶3.

Fennel[l]."[59]

### 2.    Rigor Mortis Indicates Longer Post-Mortem Interval.

The doctors also focus on the level of rigor mortis seen in the crime scene

video, which shows a longer postmortem interval. Dr. Riddick explains:

> If the post mortem interval had been roughly thirteen hours as
> estimated by Dr. Bayardo at the trial, rigor should have been
> intense and progressing to completion. The crime scene video
> contradicts this finding and indicates a much longer post-mortem
> interval.[60]

This observation was also shared by Dr. Spitz, who noted that the manipulation

of Stites's body in the crime scene video demonstrates "passing" rigor consistent

with a longer post-mortem interval.[61]

### 3.    Evidence of Decomposition Demonstrates a Longer Postmortem Interval and that Stites's Body was Moved.

Dr. Spitz points out evidence of decomposition that is inconsistent with the

time of death advanced by the State at trial:

> My review shows evidence of decomposition that is not
> consistent with a time of death at 3 a.m. on April 23, 1996. The
> body is described as having green discoloration, which can be
> seen in the video. The appearance of the breasts after the bra is
> removed shows gas formation. The abdomen does not appear
> flat. There is skin slippage in several places. What is described
> at autopsy as post mortem burns in the face, breasts, and other
> areas is also likely skin slippage, in which the top layer of skin

---

[59] Exhibit 3 ¶6; Exhibit 4 ¶14 (body in different position for at least 4-6 hours).
[60] Exhibit 4 ¶¶10-11.
[61] Exhibit 2 ¶¶4-5.

> has dried.…  This amount of decomposition supports a post-
> mortem interval of about 20 to 24 hours before the film and
> photographs.[62]

Dr. Baden also explains the importance of the viscous fluid on the floor of

Fennell's truck in determining the time of death:

> Examination of the truck showed…"[s]ome type of viscous fluid"
> was found on the passenger-side floorboard. . . .  This is typical
> post- mortem purge fluid that flowed from her nose and mouth as
> her body began to decompose and showed other decomposition
> changes, such as skin slippage and green discoloration of skin,
> which were also described at the scene and autopsy.  It would
> have taken more than four hours after her death for this purge
> fluid to develop.  It could not have developed in less than 2-1/2
> hours if she were alive at 3:00 a.m. when she got into the truck.
> This finding also demonstrates that she had been dead for a
> number of hours, before midnight, when she was placed in the
> passenger seat.[63]

### 4.    The State's Evidence that Reed's Sperm was Associated with a Sexual Assault is Scientifically Invalid.

Drs. Spitz, Baden and Riddick all conclude that there is no evidence of a

sexual assault or anal penetration, and that the State's evidence to that effect was

scientifically invalid.  As discussed *supra*, the doctors refute the trial testimony

that intact sperm would not be found more than 24-26 hours and state that the

small number of intact spermatozoa corroborates Reed's statement that he and

---

[62] Exhibit 2. ¶7 The photography and video were taken between approximately 5:15 and 8:15 p.m.  Exhibit 4 ¶8

[63] Exhibit 3 ¶7.

Stites had sex before her shift on April 22, the day before her disappearance.[64]

The doctors also rebut the State's evidence of anal rape:

> The distended anus seen in photos and described at autopsy is
> normal. . . . It is a common mistake for death investigators to
> misinterpret natural relaxation of the sphincter, as evidence of
> anal penetration. There are no apparent lacerations in the
> photographs of the anus. If lacerations were present, they would
> be visible.[65]

### G.    Fennell's Inconsistent Statement and Second Invocation of His Fifth Amendment Privilege.

Fennell initially cooperated with the murder investigation and told police,

consistent with his trial testimony, that he was with Stites on the night of April 22,

1996.  In a secret conversation the morning of April 23, 1996, however, Fennell

told his best friend, Bastrop Sheriff's Officer Curtis Davis, that Fennell was out

late drinking the night of April 22, 1996.

At an October 2017 state habeas hearing, Officer Davis testified at length

regarding his April 23, 1996 conversation with Fennell, a conversation that first

came to light when Davis gave a 2016 CNN interview.  Officer Davis confirmed

the accuracy of the transcript of his interview with CNN and adopted the

transcript as his testimony.[66]

Officer Davis had already undergone training as a peace officer in April

---

[64] Exhibit 2 ¶6; *Spitz and Fisher* at 1262; *see also* Exhibit 3 ¶8; Exhibit 4 ¶17.
[65] Exhibit 2 ¶8; *see also* Exhibit 4 ¶18-21.
[66] TR Vol. 2: 58, 70-71; Exhibit 15, CNN Transcript.

1996 and was hired on in that capacity at the Bastrop County Sheriff's Office in June of 1996, almost two years before Reed's trial.[67]  The Bastrop County Sheriff's Office was the lead investigative agency working on the investigation along with Texas Ranger Rocky Wardlow.  Officer Davis testified that he spoke about the investigation with Wardlow[68] and met with prosecutors Charles Penick and Forest Sanderson.[69]  The Bastrop County Sheriff's Office believed that Officer Davis had responsibilities to the murder investigation, as proved by its disciplinary suspension of Officer Davis without pay for failing to file a report about his CNN interview about the case.[70]

The importance of these factual allegations is not in the specific details provided by Fennell to his best friend, but in the undeniable fact that Fennell's morning-after conversation with Officer Davis is irreconcilable with Fennell's testimony at trial. Reed proved at the October 2017 state hearing that Fennell's account to Officer Davis was entirely inconsistent with his trial testimony:

- Fennell told Officer Davis he planned to drive Stites to work, but he testified at trial that the two decided he would sleep in.[71]

- Fennell told Officer Davis he went out drinking with another officer, but he testified at trial that he stayed in that evening with Stites.[72]

- Fennell told Officer Davis that he intentionally stayed out late so as not

---

[67] TR Vol. 2: 101, 112.
[68] TR Vol. 2:73-74.
[69] TR Vol. 2:172-74.
[70] Exhibit 42, BCSO Discipline Report.
[71] *Compare* Exhibit 15 at 32; TT Vol. 45:81.
[72] *Compare* Exhibit 15 at 30-31; TT Vol. 45:82.

to disturb Ms. Stites, but he testified at trial he was at home all evening.[73]

- Fennell told Officer Davis that he didn't wake up in the morning to drive Stites to work because he had been drinking, but testified at trial that he never intended to wake up in the morning based on an agreement with Stites.[74]

Fennell's inability to give a consistent account of where he was and what he did on the night of April 22, 1996 is particularly important because this is the exact point in time when the forensic evidence establishes that Stites was murdered.[75] These inconsistencies are classic evidence of consciousness of guilt.[76] Indeed, much of the State's entire case rested upon Fennell's credibility:  it was his account of Stites's whereabouts in the hours leading up to her body's discovery that drove the theory of Reed's prosecution.[77]

When Fennell was subpoenaed to a hearing at which he would be confronted with his statement to Officer Davis, Fennell refused to testify and invoked the Fifth Amendment.  Fennell's refusal to answer questions was filed and read into the record.  Exhibit 16.

### H.    New Witnesses Implicate Fennell in Stites's Murder

Fennell has a long history of controlling, abusing, and threatening to harm

---

[73] *Compare* Exhibit 15 at 31; TT Vol. 45:82-83.

[74] *Compare* Exhibit 15 at 32; TT Vol. 45:81.

[75] TR Vol. 2:46-47.

[76] *See Lozano v. State,* 359 S.W.3d 790, 814 (Tex. App. Fort Worth 2012, pet. ref'd) (police officer's inconsistent statements were evidence of guilt in murdering wife and staging crime scene); *see also United States v. Richardson,* 848 F.2d 509, 513 (5th Cir. 1988).

[77] TT Vol. 53:34 (Sheriff Investigator Campos testifying that information about Stites's whereabouts "came from Jimmy Fennell").

or kill his romantic partners and other women he has encountered.[78]  The CCA held prior evidence raised a "healthy suspicion" that Fennell, not Reed, committed the murder.[79]  Fennell's character as a violent sexual predator was conclusively established with his conviction for kidnapping and raping a woman while on duty as a Georgetown Police Officer.[80]  That prosecution uncovered a pattern of rape and other on-duty sexual misconduct by Fennell.  Exhibit 46 (March 12, 2007 on-duty rape by Fennell during vehicle stop); Exhibit 47 (June 9, 2004 attempted on-duty sexual assault by Fennell during vehicle stop); Exhibit 48 (August 11, 2007 on-duty attempted sexual assault by Fennell); Exhibit 49.  Additionally, in his short time as a Giddings Police Officer prior to Reed's trial, Fennell had already triggered civil rights complaints alleging racism and violence.  One incident occurred just two months before Stites's murder: Fennell was accused of chasing down, beating, and putting a gun to the head of a young Hispanic man, and hiding it with a false report.  Exhibit 50 (Complaint).

Witnesses who knew Fennell and Stites or investigated the murder have recently come forward with new information that meaningfully inculpates Fennell in the murder.  These witnesses have come forward since the CCA denied Reed's most recent state habeas petition on June 26, 2019 as well as since

---

[78] Exhibit 43, Pamela Duncan Aff.; *see also* Exhibit 44, Police Report re: Aida Fennell.
[79] *See Ex parte Reed*, 271 S.W.3d at 747.
[80] Exhibit 45, Fennell arrest warrant.

the setting of his November 20, 2019 execution date.

### 1. Fennell confessed that he murdered Stites to an Aryan Brotherhood gang member in prison.

Recently, yet another witness has come forward providing evidence of Fennell's knowledge of Stites's affair with Reed, and Fennell's actual admission to killing her in retaliation for that affair. Arthur J. Snow, Jr., a former Aryan Brotherhood member at the Stevenson Unit prison in Dewitt County, Texas where both Fennell and Snow were housed[81] recalls Fennell boasted of murdering Stites:

> Jimmy said his fiancé had been sleeping around with a black man behind his back. By the way Jimmy spoke about this experience, I could tell that it deeply angered him. Toward the end of the conversation Jimmy said confidently, "I had to kill my nigger-loving fiancé."[82]

Snow came forward because he recently saw a newspaper article about Fennell in the context of Reed's case. Fennell's confession "weighed on his conscience."[83] He felt compelled to share the confession Fennell made to him to killing Stites.

### 2. Insurance salesperson heard Fennell threaten to kill Stites.

A local Texas insurance salesperson familiar with Fennell witnessed him threaten to kill Stites.[84] The salesperson describes how Fennell and Stites applied

---

[81] Undersigned counsel have confirmed that Fennell and Snow were together at the Stevenson Unit in 2010, and that Snow's statement regarding his transfer to the Connolly Unit is corroborated by TDCJ records.

[82] Exhibit 22 at 2.

[83] *Id.*

[84] Exhibit 17.

for life insurance together in November 1995, a transaction confirmed by the insurer's records.

In describing the interaction, the salesperson recounted that Stites remarked "I really don't know why I need life insurance since I am so young."[85] Fennell then replied, "If I ever catch you messing around on me, I will kill you and no one will ever know it was me that killed you."[86] The salesperson describes Fennell's tone as serious and harsh.[87]

In light of other evidence implicating Fennell in the murder, this specific threat to kill Stites provides strong evidence of motive: that Fennell murdered Stites because she was, in fact, "messing around" on him.

### 3. Downstairs Neighbor Reported Concerns of Abuse.

William Sappington lived directly below the apartment shared by Fennell and Stites. He frequently heard loud arguments and fighting upstairs, and suspected Fennell was physically abusive to Stites. Exhibits 18, 19. William's son Brent, and Brent's wife Vicky Sappington, each recount that William Sappington told police about the abuse after Stites was killed, but was told that Fennell was not involved in the murder.[88]

---

[85] *Id*. at 2.
[86] *Id*.
[87] *Id*.
[88] Exhibits 18, 19.

### 4. Officer heard Fennell make vindictive comments towards Stites's body at her funeral.

Jim Clampit, a former Texas Game Warden, worked for the Lee County Sheriff's Office as a deputy at the time of Stites's murder. Clampit has recently come forward with evidence that Fennell made an inculpatory statement at Stites's funeral.[89] Clampit's name appears on the funeral attendance register.[90] At the funeral, Officer Clampit observed Fennell looking down at Stites's body and saying words to the effect: "'You got what you deserved.'"[91] He observed Fennell being suspiciously cold and emotionless.[92] Clampit was shocked by this comment. While this comment has haunted Clampit over the years,[93] he only recently contacted undersigned counsel to report what he observed.

### 5. Shortly Before the Murder, Fennell angrily told his friend Officer Charles Wayne Fletcher that Stites was "fucking a nigger."

Charles Wayne Fletcher, a former colleague of Fennell's at the Bastrop County Sheriff's Office and a social friend of both Fennell and Stites, recently revealed that, shortly before Stites was killed, Fennell suspected her of having an affair with a black man. In March 1996, Officer Fletcher heard Fennell say in

---

[89] Exhibit 20, Jim Clampit Aff.
[90] Exhibit 51, Funeral Guest Register.
[91] Exhibit 20 at 2.
[92] *Id*.
[93] *Id*. at 3.

conversation that he believed Stites was "fucking a nigger."[94]  Officer Fletcher was visiting at their apartment when Fennell privately made this disclosure to him.  Fletcher also observed Fennell and Stites being short with each other, and it appeared their relationship was "not in a good place."[95]

Like Officer Clampit, Officer Fletcher noticed Fennell's odd, emotionless behavior at Stites's funeral and questioned whether he was involved in the murder.[96]

### 6.    Bastrop County Sheriff's Deputy reports Stites hiding from Fennell at work to avoid a fight.

Richard Derleth, a Bastrop County Sheriff's Deputy at the time of Stites's murder, recalled H-E-B employees stating that they frequently warned Stites when they spotted Fennell enter the grocery store to give her an opportunity to hide from Fennell and avoid him starting a fight.[97]

### I.    New Witnesses Provide Evidence of Reed's Relationship with Stites

In addition to the dispositive new forensic evidence and witnesses further implicating Fennell, new credible witnesses have come forward with evidence that Stites and Reed were romantically involved.  Unlike the witnesses discounted

---

[94] Exhibit 14, at 2.
[95] *Id*. at 1.
[96] *Id*. at 2.
[97] Exhibit 21.

previously, these witnesses have no relationship to Reed, and their connection to Stites through work or family ties are undisputed.

### 1.    Alicia Slater[98]

Alicia Slater contacted Reed's defense team because "she felt morally compelled to tell someone" that she was aware of a relationship between her former co-worker Stites and Reed – and that Stites told her specifically that the relationship was *sexual* in nature.[99] Slater was employed time by H-E-B in 1995-96, was friends with Stites, and would lunch together:

> On one occasion when Stacey and I were eating together in the break room, she talked to me about her relationship with her fiancé. She was talking about her engagement ring and that she was not excited about getting married. She told me that she was sleeping with a black guy named Rodney and that she didn't know what her fiancé would do if he found out. She commented that she had to be careful.[100]

### 2.    Lee Roy Ybarra

Lee Roy Ybarra worked at H-E-B in Bastrop with Stites in 1996; on numerous occasions he saw Stites and "a young black man" he later identified as Reed from news articles after her death.[101] He remembers Reed's face well because "sometimes they were close enough that [Ybarra] got a very good look at

---

[98] Exhibit 11.
[99] *Id.*
[100] Exhibit 11 ¶5.
[101] Exhibit 13 ¶3.

him."[102]

Ybarra's direct observations of numerous instances of Reed and Stites together confirm their intimate, positive relationship. Ybarra noticed her "demeanor would change" when Reed came around and she was "happy to see him and would be in a good mood."[103] The nature of Reed's and Stites's encounters was happy and romantic.[104]

### 3.    Rebecca Peoples

Another H-E-B employee, Rebecca Peoples, recently recounted conversations in which Stites told Peoples that she was afraid of her fiancé and also having an affair with a black man.[105]

### 4.    Calvin "Buddy" Horton

Calvin "Buddy" Horton, Stites's cousin, saw her leave a Dairy Queen with a black man in late 1995. Horton called out, but the two ignored him.

After Stites's death, Horton saw pictures of Reed in the media. After seeing these pictures, he identified Reed as the man accompanying Stites. Horton's statement establishes that the State's assertion that Reed and Stites did not know each other and had not been together prior to her death was false.

Rodney Reed is the same man I saw with Stacey at the Dairy Queen in 1995...I would have testified to my experience at the

---

[102] *Id.* ¶4.
[103] *Id.* ¶3.
[104] *Id.*
[105] Exhibit 12.

Dairy Queen in 1995 at trial, but no one ever approached me to do so.[106]

### 5.    Charles Wayne Fletcher

Officer Fletcher was a law enforcement officer and friends with both Stites and Fennell.  He recounts that Fennell told him that he believed Stites was "fucking a nigger."[107]  He was initially reluctant to get involved, and he has no reason to fabricate this damning account.

These statements from Stites's cousin, former H-E-B employees who knew Stites, and Officer Fletcher stand apart from the statements of friends and family of Reed who were found not to be credible.[108]  Slater, Ybarra, Peoples, Horton and Fletcher stand nothing to gain from involving themselves in this case.  As noted by Federal Magistrate Andrew W. Austin, such independent evidence of a consensual relationship coupled with scientific evidence disproving the State's forensic case is powerfully exculpatory:

> . . . the DNA evidence and evidence suggesting rape was plainly the primary evidence relied on by the State to prove Reed's guilt. Thus, persuasive evidence that Reed and Stites had consensual sex days before the murder would have clearly undermined the State's evidence. Further, given the evidence that Fennell was racially prejudiced, evidence of an interracial affair between Stites and Reed would also have provided a credible motive for

---

[106] Exhibit 10 ¶8.

[107] Exhibit 14.

[108] *Compare Ex Parte Reed*, 271 S.W.3d at 735-37 (discussing lack of credibility of witnesses affirming relationship between Stites and Reed).

Fennell to kill Stites.[109]

Based upon the foregoing newly-discovered evidence, Reed's proposed

petition seeks authorization to file the following claims:

1. Mr. Reed is actually innocent and therefore his confinement and death sentence violate the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment of the Constitution.

2. In violation of *Brady v. Maryland*, the State withheld material, exculpatory evidence by not disclosing information known to Officers Davis, Clampit, Derleth and Fletcher.

3. In violation of Due Process, the State sponsored scientifically invalid expert testimony.

4. In violation of *Strickland v. Washington*, Reed's counsel did not challenge the critical invalid scientific testimony and failed to establish that Reed's guilt was "medically and scientifically impossible."

5. In violation of *Strickland v. Washington*, Reed's counsel did not investigate witnesses who would establish Reed's relationship with Stites.

## **ARGUMENT**

## **II.    MR. REED MEETS THE STANDARD TO PROCEED IN DISTRICT COURT ON SUCCESSIVE HABEAS CLAIMS PURSUANT TO 28 U.S.C. § 2244**

As a threshold matter, 28 U.S.C. § 2244(b)(1) requires any claim that has

been presented in a prior habeas petition must be dismissed in determining

authorization to file a successive habeas petition.[110] While Reed did previously

---

[109] *Thaler*, 2012 WL 2254217, at 14 n.8.

[110] 28 U.S.C. § 2244(b)(1); *Gonzalez v. Crosby*, 545 U.S. 524, 529-30 (2005); *see also In re Pruett*, 711 F. App'x 732, 735 (5th Cir. 2017).

raised constitutional errors related to Actual Innocence, *Brady* and *Strickland* violations, the factual bases for his claims in the instant petition are newly discovered and distinct from those litigated previously, and, therefore, are properly presented here.

Under 28 U.S.C. § 2244(b)(2)(B), a new claim may proceed if the movant shows that "(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and that (ii): "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." This provision is a "modified" version of the *Schlup* miscarriage of justice exception:

> Congress thus required second-or-successive habeas petitioners attempting to benefit from the miscarriage of justice exception to meet a higher level of proof ("clear and convincing evidence") and to satisfy a diligence requirement that did not exist prior to AEDPA's passage.

*McQuiggin v. Perkins*, 569 U.S. 383, 396 (2013). Accordingly, there are two inquiries:

- The Court must apply the traditional *Schlup* assessment of all of the evidence in the case "as a whole" to determine if there is clear and convincing evidence that no reasonable factfinder would convict.

- The Court determines whether the factual basis underlying the claims for relief could not have been discovered through the exercise of reasonable diligence.

Pursuant to 28 U.S.C. § 2244(b)(3)(C), Reed's burden at this initial juncture is merely to present a *prima facie* showing, *i.e.*, "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court."[111]

Because Section 2244(b)(2)(B) incorporates the *Schlup* miscarriage of justice standard, the Court's consideration of the evidence "as a whole" pursuant to 28 U.S.C. § 2244(b)(2)(B)(ii) requires consideration of all evidence "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'"[112] Based on this broad assessment of the evidence as a whole, the Court must make a "holistic judgment" whether reasonable jurors would have reasonable doubt.[113] Then, focusing on the smaller subset of the facts directly underlying Reed's new claims, the Court should determine whether those facts could have been discovered previously through the exercise of reasonable diligence.[114] Application of these standards here demonstrates that a successive habeas petition is warranted here.

---

[111] *In re Campbell*, 750 F.3d 523, 530 (5th Cir. 2014).

[112] *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted).

[113] *Id.* at 539.

[114] *McQuiggin*, 569 U.S. at 396.

## A.    Reed Has Made the Necessary *Prima Facie* Showing

As discussed *supra*, the new evidence in this case (1) disproves the State's expert-based case against Reed, (2) corroborates Reed's account of his relationship with Stites, and (3) directly implicates Fennell in the murder. This is a comprehensive showing of actual innocence that both meets the "modified" miscarriage of justice standard under section 2244(b) and establishes a free-standing constitutional violation discussed but not recognized in *Herrera v. Collins*.[115] Mr. Reed's initial federal habeas petition did not include claims based upon the newly-discovered evidence discussed above, nor could it, as none of the new witnesses had come forward, been identified by the State, or otherwise been made known to Mr. Reed or his counsel.

### 1.    The new scientific evidence alone is dispositive.

Although the scientific evidence considered in 2014 was discounted for raising only a "possibility" that Reed's semen was from consensual sex,[116] the new scientific evidence from Drs. Spitz, Baden and Riddick (which has never been contradicted by the State) is qualitatively different. The new scientific evidence renders the prosecution's entire theory of Reed's guilt impossible.[117]

Because this scientific evidence conclusively disproves the State's theory of a simultaneous rape and murder, the Court's discussion of the condition of

---

[115] 506 U.S. 390 (1993).

[116] *Stephens*, 739 F.3d at 771.

[117] Exhibit 2 ¶3 (Spitz); Exhibit 3 ¶5 (Baden); Exhibit 4 ¶14 (Riddick).

Stites's body as evidence of Reed's guilt must also be revisited.  It is undisputed that Stites was strangled violently and later dragged into the brush, accounting for the bruises and other injuries noted by the Court.[118]  However, the patterns of non-dependent lividity and other decompositional changes—coupled with viscous purge fluid in the truck—demonstrate that Stites was murdered at least four hours before being moved in the truck and left beside the road.[119]  This conclusively disproves the State's central allegation that Stites was abducted, raped, murdered, and left at the scene between 3:00 and 5:00 a.m.  And while Stites's body was found with her shirt off, photographs show that Stites's bra was fastened and in place, and her pants and underwear were pulled up.[120]  Knowing that Stites was murdered elsewhere hours earlier also explains the damage to Stites's zipper as resulting from Fennell's movement of Stites's body to the truck and the dump site.  In fact, Detective Sergeant Gannon—drawing upon 30-years-experience in homicide and sex crimes investigation—identified signs that the crime scenes were staged, including the careful placement of Stites's nametag between her legs and the use of her belt sections to point to the truck and her body.  Exhibit 5 (evidence "does not comport with a kidnapping murder by a stranger seeking to evade detection.").[121]

---

[118] *See Stephens*, 739 F.3d at 771.
[119] Exhibit 3 ¶7; Exhibit 2 ¶4-5; Exhibit 4 ¶8.
[120] Exhibit 26.
[121] An earlier time of death also explains the presence of Reed's DNA on Stites's body.  Reed

The new scientific evidence also directly implicates Fennell because the time that Stites was murdered is the same time that Fennell testified he and Stites were together in their apartment[122] *and* the same time for which Fennell gave an inconsistent statement to Officer Davis, further demonstrating Fennell's consciousness of guilt.[123]  When confronted with this new scientific evidence and his inconsistent statements to Officer Davis, Fennell opted to again hide behind the Fifth Amendment.

### 2.    Credible Witnesses Were Aware of the Reed-Stites Relationship.

In 2014, this Court noted that Reed's witnesses at trial to his relationship with Stites did not include "a friend, family member, or associate of Stacey Stites who claimed to have been aware of a relationship."[124]  That gap in the record is now filled with new witnesses with such knowledge: three H-E-B co-workers (Slater, Peoples and Ybarra), Stites's cousin Buddy Horton, and Jimmy Fennell himself, who spoke of it to a friend and Bastrop Sheriff's Officer Charles Wayne Fletcher.  Exhibits 11-14.  Again, this evidence is qualitatively different from that

---

and Stites last had sex prior to her 3:30 a.m. shift on April 22, 1996.  Stites's whereabouts are generally accounted for by her mother after she returned home from work on April 22, and there is no mention of a shower.  Fennell testified at trial that, after he and Stites retired to their apartment, the two showered together.  This self-serving testimony is undoubtedly false, but it also demonstrates that even the trial prosecutors understood that Stites had not showered during the day, and that Reed's DNA from consensual sex the night before would have remained on her body when Fennell killed her.

[122] Exhibit 2 ¶¶2-3; Exhibit 3 ¶6; Exhibit 4 ¶12-14.

[123] Because this scientific evidence conclusively disproves the State's theory of a rape-murder, the Court's discussion of the condition of Stites's body must also be revisited.

[124] *Stephens*, 739 F.3d at 772.

presented in prior proceedings.

### 3.     Evidence Implicating Fennell.

Finally, a host of new evidence that confirms the suspicions of Bastrop County Sheriff's Officers who initially pursued Fennell as a suspect. This includes: (1) Fennell's inconsistent statements to his best friend and Bastrop Sheriff's Officer Curtis Davis and subsequent refusal to testify when confronted; (2) his threat to murder Stites when buying insurance; (3) his statement at Stites's funeral along the lines of "you got what you deserved;" (4) his statement to Officer Fletcher that Stites was "fucking a nigger;" (5) Stites's practice of hiding from Fennell at the H-E-B to avoid fighting with Fennell; (6) the account of the downstairs neighbor who heard loud arguments and suspected physical abuse from their apartment; and (7) Fennell's confession to Aryan Brotherhood gang member Arthur Snow while the two were serving time in prison that Stites "had been sleeping around with a black man behind his back" and that "I had to kill my nigger loving fiancé."

Considering the evidence as a whole, Reed has easily met the *prima facie* gatekeeping standard for authorization to file a successive habeas petition. And while this Court has not yet recognized a free-standing constitutional claim of actual innocence, Reed's showing would meet any constitutional standard established by the United States Supreme Court.

### III.  Mr. Reed's *Prima Facie* Showings In Support Of His Claims for Relief.

#### A.  The State's failure to disclose Fennell's inconsistent statement to Bastrop Sheriff's Officer Curtis Davis violated Due Process under *Brady v. Maryland*

Reed's state habeas *Brady* claim relating to Fennell's inconsistent statements to Officer Davis was the subject of an evidentiary hearing and was adjudicated on the merits by the CCA.  The CCA provided little explanation; it reviewed, but did not adopt, the trial judge's findings and conclusions, and denied relief with the following brief commentary:

> At the hearing, Davis conceded that many of his answers to the interviewer's questions had been based on assumptions and he had trouble remembering some of Fennell's statements.  Stites's mother also gave testimony inconsistent with applicant's claims.[125]

*Ex parte Reed*, 2019 WL 2607452, at *2 (Tex. Crim. App. June 26, 2019).  The CCA's lack of materiality finding is both an unreasonable application of the law and an unreasonable determination of the factual record.

The CCA's apparent focus on the precision with which Officer Davis recalled Fennell's inconsistent statement is unreasonable because the details of the statement have little effect on its impact at trial.  Officer Davis was careful to

---

[125] The CCA's lack of specificity makes it difficult to respond to this reasoning.  Carol Stites testified at the hearing that she last saw Stites go into her apartment with Fennell on the evening of April 22nd.  TR Vol.5:20.  In a sworn affidavit from 1997, Carol told police she spent the night of April 22nd watching TV until 1:30 a.m., but drifted off for about a half hour during that time.  Exhibit 36 at 2.  After 1:30 a.m., she then went to sleep in a back bedroom and did not wake until receiving a phone call in the morning.  TR Vol 5:26-27.

distinguish his assumptions from statements made by Fennell.[126]  Even so, there is no reasonable reading of the CNN interview transcript Officer Davis adopted or his hearing testimony that reconciles Fennell's trial testimony with what he told Officer Davis.[127]  The weight of this evidence is amplified by the new scientific evidence showing that the time when Stites was killed is precisely the same time for which Fennell cannot provide a consistent account.[128]

The greatest measure of materiality here is demonstrated by the effects of Fennell's testimony to the jury at Reed's trial.  When confronted with his inconsistent statement, Fennell refused to answer questions, asserting the Fifth Amendment privilege that he had waived at Reed's trial.  Exhibit 16.  Because Reed was thus unable to confront this key trial witness, a proper materiality analysis must consider the verdict without Fennell's trial testimony: there would be no witness accounting for Stites's whereabouts for the entire evening of April 22nd, and Fennell, who was an initial murder suspect, would have no alibi.  In its place would be scientific evidence[129] showing the time period when Stites died is the same period when Stites and Fennell are unaccounted for.[130]  It was an unreasonable application of the *Brady* materiality standard for the CCA to simply

---

[126] *See, e.g.*, TR Vol.2:127 (Officer Davis stating Fennell did not tell him exact time he returned home); *compare* TR Vol.2:30; TR. Vol. 2: 126-27; TR Vol.2:128-29.

[127] *See supra* fn. 101-104.

[128] Exhibit 3 ¶7; Exhibit 2 ¶4-5; Exhibit 4 ¶8.

[129] Exhibits 2-4.

[130] TR Vol. 3:168-69 (defense counsel testifying she would have retained a forensic pathologist to investigate time of death if Fennell's statement had been disclosed).

ignore the profound role of Fennell's timeline of events at trial and the impact on the jury of removing that testimony from the record. *See Kyles v. Whitley*, 514 U.S. 419, 453 (1995) (focus of materiality is effect of exculpatory on confidence in the jury's verdict).

Even if Fennell's testimony is not entirely disregarded, his presentation to the jury would have been entirely different had his inconsistent statement been disclosed. First, one must assume that, when confronted with his inconsistent statement, Fennell would either invoke privilege before the jury or otherwise refuse to answer questions. This alone would be devastating to Fennell's credibility and raise suspicion that he was the murderer. Had Fennell elected to testify, Reed's trial counsel would have engaged in a scathing interrogation focused on Fennell's suspicious statements and actions at the time of the murder.[131] Reed's counsel would also have investigated and presented forensic evidence like that offered by Drs. Spitz, Baden and Riddick, so the jury would have heard testimony showing that Reed's guilt was impossible. Based on all of this evidence, the Court cannot have confidence in the jury's verdict.

## B.    Other Undisclosed *Brady* Evidence Implicating Fennell.

Other law enforcement knew information clearly implicating Fennell that was never disclosed to the defense.

---

[131] *See* TR Vol. 3:149-167 (defense counsel Lydia Clay-Jackson testifying that the "gloves would have been off" if Fennell's statements to Officer Davis had been disclosed).

Bastrop Sheriff's Officer Charles Wayne Fletcher was a friend of Stites and Fennell and describes an occasion in early 1996 in which Fennell told him that he believed Stites was "fucking a nigger." Officer Fletcher also observed that Fennell and Stites "were not in a good place in their relationship" before her murder and described Fennell's odd demeanor both at Stites's funeral service and while he drove with Fennell to the burial in Corpus Christi.[132] Despite his employment as a peace officer, reserve patrolman, and jailer with the lead investigative agency, Officer Fletcher did not report what Fennell told him.[133] Fennell's statement and actions are clearly exculpatory because they (1) corroborate Reed's affair with Stites and (2) provide motive for Fennell to have committed the murder. Because Officer Fletcher served as a patrolman for the lead investigating agency, his knowledge is imputed to the State.

Lee County Sheriff's Officer Jim Clampit likewise heard Fennell make an inculpatory statement that was never disclosed. Officer Clampit was at Stites's funeral and overheard Fennell make a statement directed towards Stites's body along the lines of "you got what you deserved."[134] Officer Clampit also confirmed that the Lee County Sheriff's Office assisted in the investigation, thus imputing his

---

[132] Exhibit 14.
[133] *Id.*
[134] Exhibit 20.

knowledge to the State.  Indeed, Lee County officers delivered the news of the location of Stites's body to Fennell and Carol Stites on April 23, 1996.[135]

Richard Derleth, a Bastrop County Sheriff's Office Deputy at the time of Stites's murder, recalled employees of H-E-B informing him that they frequently warned Stites when they spotted Officer Fennell enter the grocery store to give her an opportunity to hide from Fennell and avoid confrontation:

> …if they saw Jimmy coming into the store, they would tell Stacey and she would run and hide from Jimmy. They told me they were concerned that if they did not alert Stacey to Jimmy's presence in the store before he found her, he would start a fight with her.
> When I received this information, I shared it with a few members of the Sheriff's Office… I am not sure what the members of the Sheriff's Office I told this to ever did with it.[136]

Officer Derleth's information was reported to investigating officers at the Bastrop Sheriff, but it was never disclosed to Reed's defense counsel until Derleth recently came forward.  Accordingly, this exculpatory evidence was suppressed by the State.

The materiality of suppressed exculpatory evidence must be determined cumulatively.  *See Kyles*, 514 U.S. at 437-38.  Accordingly the dramatic impact that Fennell's inconsistent statement would have on the trial must be supplemented by additional law enforcement witnesses who would (1) confirm Reed's relationship with Stites through his belief that Stites was "fucking a nigger,"

---

[135] Exhibit 15, CNN Transcript ("I answered the door and, if I recall right, it was the chief deputy for Lee County; a guy by the name of Rodney Meyer, who is now the sheriff.").

[136] Exhibit 21 ¶¶5-6.

(2) provide motive for Fennell based on the descriptions of problems in the relationship and his belief Stites was cheating on him with a black man, and (3) describe suspicious behavior and statements by Fennell in the wake of the murder. These were friends and colleagues of Fennell, whose credibility in reporting information implicating Fennell would not have been questioned. Had a jury heard all of the suppressed exculpatory evidence detailed above, there is a reasonable likelihood that the outcome would have been different. And finally, because this undisclosed exculpatory information was known to law enforcement charged with investigating the Stites murder, Reed has shown that this information was not available through the exercise of reasonable diligence.

### C.   Mr. Reed Can Make A *Prima Facie* Showing That The State's Use of Invalid Scientific Testimony Violates His Due Process Rights.

The State relied upon invalid forensic evidence to connect Reed's sperm to a sexual assault. Although this category of unreliable evidence does not fit neatly within typical "false testimony" jurisprudence under *Napue v. People of Illinois*,[137] federal courts and the United States Department of Justice have agreed that the use of scientifically invalid forensic evidence is material if there is a "reasonable likelihood" that it could have affected the jury's verdict.[138] In the alternative, the

---

[137] 360 U.S. 264 (1959); *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997).

[138] *United States v. Ausby*, 916 F.3d 1089, 1090 (D.C. Cir. 2019) (FBI and Department of Justice determined false scientific testimony amounted to *Napue* violation and procedural barriers should thus be waived); *see Jones v. United States*, 202 A.3d 1154, 1162 (D.C. 2019); *United*

State's reliance of invalid scientific testimony in Reed's case constitutes a
deprivation of fundamental fairness in violation of Due Process. *See Han Tak Lee
v. Glunt*, 667 F.3d 397 (3d Cir. 2012).

The primary evidence against Reed was the testimony of the State's
experts connecting Reed's sperm to a sexual assault said to have occurred
directly before the murder. This connection was cited by the CCA as the central
evidence sufficient to sustain the conviction.[139] However, Reed has now shown
that the testimony relied on by the State to establish this vital connection was
scientifically invalid. Willfully or not, the State's witnesses misled the jury by
claiming that intact semen cannot be found on a rape kit more than 24-26 hours
after intercourse. This testimony was wrong as a matter of science.[140] Dr.
Bayardo now admits that intact sperm can remain "for days," recanting his trial
testimony as false and misleading.[141] Similarly, the DPS Correction Letter states
that Blakely's testimony that 26 hours is the outside length of time intact sperm
can survive is incorrect and left a false impression on the jury.[142] Additionally,
Technical Leader Sivak recognizes Clement's testimony claiming intact
spermatozoa does not persist in the vaginal tract for more than 24 hours as an

---

*States v. Butler*, 278 F. Supp. 3d 461, 476 (D.D.C. 2017).

[139] *See Reed v. State*, No. 73, 135 at 9.

[140] *See Spitz and Fisher*: Medicolegal Investigation of Death at 1262; Exhibits. 2-4.

[141] Exhibit 6 ¶4, *compare* TT Vol. 48:144.

[142] Exhibit 7.

"error" and "unsatisfactory."[143]    This repudiation is further supported by the affidavit from LabCorp Forensic Serologist Bokka, which acknowledges that intact sperm are found in the vaginal cavity 72 to 144 hours after intercourse.[144]

This invalid 24-hour time frame for the survival of intact sperm had a significant impact on the outcome of the case because it rendered Reed's defense impossible.    Stites's whereabouts were accounted for within twenty-four hours of the collection of the sample.    And for this very reason, the false testimony regarding the length of time intact sperm remains in the body was mentioned three times during closing argument.[145]

Further, the State presented scientifically invalid (and therefore misleading) testimony that Stites was sexually assaulted by Reed, as evidenced by alleged injury to her anus and the presence of trace amounts of Reed's semen. Dr. Bayardo testified the rectum does not dilate until "very late in the stages of body decomposition, and that usually occurs after 4 or 5 days."[146]    This allowed the State to show conclusively (but incorrectly) that Reed's DNA had to have come from a rape contemporaneous with the murder.

> …We know from the credible evidence that that tells you that that semen got in that girl's body within 24 hours….Which is when?

---

[143] Exhibit 8.
[144] Exhibit 9.
[145] TT Vol. 56:34; TT Vol. 56:139; TT Vol. 56:140.
[146] TT Vol. 48:142.

On her way to work.[147]

During deliberations, the jury specifically asked that Dr. Bayardo's testimony regarding the connection between anal dilation and sexual assault be read back.[148]

Bayardo, however, has now retracted any connection between Reed's semen and a sexual assault, and his testimony relating to this alleged assault is scientifically invalid. Drs. Spitz, Baden, and Riddick all confirm that the dilation of Stites's anus depicted in the autopsy photographs is consistent with normal flaccidity as part of the decompositional process, and not penetration.[149] Reliance upon this false evidence was a clear violation of Reed's right to Due Process.[150]

The State also relied upon scientifically invalid testimony to argue to the jury that Stites was murdered on her way to work around 3 a.m. on April 23. Based on Fennell's testimony and the now-recanted testimony of Dr. Bayardo, the State argued that Stites was murdered on her way to work between 3 a.m. and 5:30 a.m. Dr. Bayardo has retracted his trial testimony regarding time of death:

> If the prosecuting attorneys had advised me that they intended to
> use my time of death estimate as a scientifically reliable opinion

---

[147] TT Vol. 56:33-34.

[148] TT Vol. 56:154.

[149] *See, e.g.*, Ex, 3 ¶9.

[150] This Court has held that that defendant's due process rights were violated when the prosecution relied at trial upon a scientifically invalid serology report prepared by the Government's expert. *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008). Although there was no finding that the prosecutor was aware of the falsity, knowledge was imputed and this Court held the prosecutor's reliance on the report violated defendant's due process rights.

of when Ms. Stites died, I would have advised them not to do so.[151]

Drs. Spitz, Baden and Riddick all demonstrate in their reports that Stites died before midnight on April 22, hours before she was scheduled to leave for work, and when Fennell claimed the two were home in bed. Dr. Spitz explained that the time of death presented by the State at trial is scientifically impossible:

> The presence of lividity in these non-dependent areas makes it … **impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial.**[152]

The State's reliance on Bayardo's scientifically invalid testimony regarding time of death both renders the trial fundamentally unfair and certainly could have affected the outcome under the more lenient *Napue* standard.

Because this claim relies on admissions by the State's experts in 2018 that their testimony was scientifically invalid, Reed has established reasonable diligence in presenting his claims.[153]

### D.    Original Trial Counsel's Ineffective Assistance[154]

In prior proceedings, Reed presented evidence that the trial in his case was rushed and that the forensic and factual investigation of the case was incomplete. *See Reed v. Thaler*, 2012 WL 2254217, at *38. Although this deficient

---

[151] Exhibit 6 ¶3.
[152] Exhibits 2-4.
[153] *See supra* fn. 187.
[154] To the extent these claims rely on invalid scientific evidence or evidence alleged to have been suppressed in violation of Due Process, Reed's Ineffective Assistance of Counsel claims are plead in the alternative.

performance resulted more from the rush to trial than bad faith or lack of effort by trial counsel, the effect was the same—the jury did not hear dispositive evidence that exculpates Reed and inculpates Fennell.

The "reasonable probability" test of *Strickland v. Washington* requires a showing that an attorney's deficient performance "more likely than not altered the outcome of the case."[155]  Reed's counsel's deficient performance in entirely failing to challenge the false scientific testimony offered against him at trial altered the outcome of his case, and but for this ineffectiveness, no reasonable factfinder would have found him guilty.  Because Mr. Reed's ineffective assistance of counsel claims in his petition are based upon newly-discovered evidence, they are distinct from the claims in his initial federal habeas petition and are properly presented here.

### 1.     Failure to investigate time of death

The errors in Dr. Bayardo's testimony and the scientific proof that Stites was murdered at a time Fennell testified he was alone with her, is discussed at length *supra*, and incorporated herein.  Reed's trial counsel testified in 2017 that the disclosure of Fennell's suppressed inconsistent statements about the night of April 22nd would have put them on notice to investigate time of death.  This claim is pled in the alternative.

---

[155] 466 U.S. 668, 693 (1984); *see Trottie v. Stephens*, 720 F.3d 231, 244 (5th Cir. 2013).

Competent investigation, including the presentation of a forensic pathologist at trial, would reveal that there was no scientific basis for Dr. Bayardo's conclusion as to time of death. Rather, three of the nation's leading pathologists, when consulted by undersigned counsel, all concluded that Stites was actually murdered before midnight on April 22, 1996 and that she was placed in the location and position where she was found at least four hours after the murder, thus making the State's theory of Reed's guilt impossible.

Here, because of trial counsel's unpreparedness, evidence which rendered the State's theory of Reed's guilt impossible was unpresented. This failure prejudiced Reed under *Strickland* because it undermines confidence in the verdict.[156]

### 2.    Failure to investigate survival of intact sperm

The facts and import of the evidence regarding the survival of intact sperm are discussed at length *supra* and incorporated herein.

Because the State presented this scientifically invalid evidence that has since been discredited and retracted, Reed believes that the evidence is best considered as a component of his Due Process claims. In the alternative, competent investigation, would have revealed scientific invalidity of this evidence, and it would have been excluded. *See Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App.

---

[156] 466 U.S. at 694.

1992) (adopting *Daubert* gatekeeping standard). Had defense counsel presented the testimony of an independent forensic pathologist, the jury could have heard evidence directly undermining the State's theory, which was dependent upon a scientifically invalid time of death in the early morning hours of April 23, 1996 and the invalid serology testimony linking Reed's sperm to a contemporaneous rape and murder.

### 3.     Failure to investigate relationship witnesses

Trial counsel's inadequate preparation also prevented them from effectively explaining to the jury the presence of Reed's semen in Stites's body.[157] Defense counsel stated in opening that the defense would show that Reed and Stites were involved in a "secret affair."[158] At trial, however, the defense presented little proof of what was promised, and all relevant witnesses to their relationship were impeached. Defense counsel had inadequate time to prepare for trial and had been denied a motion for continuance, requested for the purpose of investigating witnesses to this relationship.[159]

Had defense counsel adequately investigated Stites's co-workers and friends, they would have been able locate and present unbiased witnesses—Slater, Ybarra,

---

[157] There is some evidence that the inability of the defense to locate relationship witnesses was due to State intimidation. Exhibit 39. To the extent this Court finds that witnesses' reluctance to come forward defeats a showing of deficient performance, that State intimidation deprived Reed of fundamental fairness in violation of Due Process.

[158] TT Vol. 42: 69.

[159] TR Vol. 4:133.

Peoples, Horton and Officer Fletcher—to testify to the ongoing relationship between Reed and Stites. These witnesses had no ties to or motivation to assist Reed. Here, because of trial counsel's admitted unpreparedness, evidence which was directly inconsistent with the State's theory of Reed's guilt went unpresented. This failure prejudiced Reed.

## **CONCLUSION**

Reed has duly shown by a *prima facie* standard that he is entitled to have the district court hear his newly presented evidence to determine whether he is entitled to a new trial. He respectfully requests that his motion for authorization to file a successive writ of habeas corpus be GRANTED.

DATED:  November 12, 2019

Respectfully submitted,

 /s/ *Bryce Benjet*
BRYCE BENJET
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth St. Suite. 701
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)

ANDREW F. MACRAE
State Bar No. 00784510
LEVATINO|PACE PLLC
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8563
(512) 637-1583 (fax)


*Counsel for Movant Rodney Reed*

## CERTIFICATE OF COMPLIANCE

I certify that (1) this Motion was prepared in 14-point Times New Roman font using Microsoft Word software, (2) this Motion is 12,942, excluding those exempted by the rules of court, and (3) this Motion has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Andrew MacRae*
Andrew MacRae

## CERTIFICATE OF CONFERENCE

I hereby certify that on November 12, 2019, I conferred with Matthew Ottoway, counsel for Respondent, who stated that Respondent opposes this Motion for Authorization.

*/s/ Andrew MacRae*
Andrew MacRae

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2019, I electronically filed the foregoing Motion with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I have also sent a copy via email to counsel for the Respondent, Matthew Ottoway.

*/s/ Andrew MacRae*
Andrew MacRae