## **Index of Exhibits**

Exhibit 01:  CCA Opinion, June 26, 2019
Exhibit 02:  Affidavit of Werner Spitz, M.D.
Exhibit 03:  Affidavit of Michael Baden, M.D.
Exhibit 04:  Affidavit of Leroy Riddick, M.D.
Exhibit 05:  Affidavit of Kevin Gannon
Exhibit 06:  Declaration of Robert Bayardo
Exhibit 07:  Letter from DPS Crime Lab
Exhibit 08:  Cellmark Correction Report
Exhibit 09:  Affidavit of Purnima Bokka
Exhibit 10:  Affidavit of Buddy Horton
Exhibit 11:  Affidavit of Alicia Slater
Exhibit 12:  Affidavit of Rebecca Peoples
Exhibit 13:  Affidavit of Lee Roy Ybarra
Exhibit 14:  Affidavit of Charles Fletcher
Exhibit 15:  Curtis Davis CNN Transcript
Exhibit 16:  Fennell Invocation of Fifth Amendment
Exhibit 17:  Affidavit of Insurance Salesperson
Exhibit 18:  Brent Sappington Declaration
Exhibit 19:  Vicky Sappington Declaration
Exhibit 20:  Affidavit of Jim Clampit
Exhibit 21:  Affidavit of Richard Derleth
Exhibit 22:  Affidavit of Arthur Snow
Exhibit 23:  Letter from DA Goertz
Exhibit 24:  Carol Stites Statement
Exhibit 25:  Paul Alexander Report
Exhibit 26:  Image of Stacey Stites' Body
Exhibit 27:  Image of Car
Exhibit 28:  Karen Blakely Report
Exhibit 29:  Travis County Medical Examiner's Report

Exhibit 30:  Tami Hannath Police Report

Exhibit 31:  Affidavit of Ronnie Reveal

Exhibit 32:  Handwritten Note

Exhibit 33:  Jimmy Fennell Bank Documents

Exhibit 34:  Jimmy Fennell Statement re Truck

Exhibit 35:  Affidavit of Merrill Lewen, M.D.

Exhibit 36:  Carol Stites Statement

Exhibit 37:  Carmack Polygraph Report

Exhibit 38:  Moore Polygraph Report

Exhibit 39:  Affidavit of Jimmie Brown

Exhibit 40:  Sandra Reed Bond Hearing Testimony

Exhibit 41:  Affidavit of Rodney Reed

Exhibit 42:  BCSO Discipline Report

Exhibit 43:  Affidavit of Pamela Duncan

Exhibit 44:  Aida Fennell Police Report

Exhibit 45:  Fennell Arrest Warrant

Exhibit 46:  Williamson County Supp. Report, March 12, 2007

Exhibit 47:  Travis County Report, June 9, 2004

Exhibit 48:  Williamson County Supp. Report, August 11, 2007

Exhibit 49:  Williamson County Supp. Report, Feb. 19, 2008

Exhibit 50:  Giddings Civil Rights Complaint

Exhibit 51:  Funeral Register

# Exhibit 1



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. WR-50,961-08, WR-50,961-09

### EX PARTE RODNEY REED, Applicant

### ON APPLICATIONS FOR POST-CONVICTION WRIT OF HABEAS CORPUS
### FROM CAUSE NO. 8701 IN THE 21ST JUDICIAL DISTRICT COURT
### OF BASTROP COUNTY

*Per curiam*.  **Newell, J., not participating.**

## O R D E R

We have before us subsequent applications for writs of habeas corpus filed

pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071 § 5.[1]  In

May of 1998, a jury convicted Rodney Reed (applicant) of the capital murder of Stacey

Stites.  The jury answered the special issues submitted pursuant to Article 37.071, and the

trial court, accordingly, set applicant's punishment at death.  This Court affirmed

---

[1]  Unless otherwise indicated all references to articles refer to the Code of Criminal
Procedure.

Reed - 2

applicant's conviction and sentence on direct appeal. *Reed v. State*, No. AP-73,135 (Tex. Crim. App. Dec. 6, 2000) (not designated for publication).

In 1999, applicant filed his initial post-conviction application for writ of habeas corpus in the convicting court. In 2001, applicant filed his "Supplemental Claim for Relief on Application for Writ of Habeas Corpus" in the convicting court.[2] This Court subsequently denied applicant relief on his initial application and dismissed the subsequent application pursuant to Article 11.071 § 5. *Id*. Applicant filed his second subsequent habeas application in the convicting court on March 29, 2005. This Court dismissed some of the claims in that application as an abuse of the writ under Article 11.071 § 5, but remanded the case to the trial court for the development of two of applicant's claims. *Ex parte Reed*, No. WR-50,961-03 (Tex. Crim. App. Oct. 19, 2005) (not designated for publication). After the convicting court returned the case to this Court, we issued an opinion denying relief. *Ex parte Reed*, 271 S.W.3d 698, 751 (Tex. Crim. App. 2008).

Applicant filed three more subsequent writ applications, none of which satisfied the requirements of Article 11.071 § 5, and this Court dismissed each of them as an abuse of the writ. *Ex parte Reed*, Nos. WR-50,961-04 & WR-50,961-05 (Tex. Crim. App. Jan. 14, 2009) (not designated for publication) and *Ex parte Reed*, No. WR-50,961-06 (Tex.

---

[2] The Court construed applicant's "Supplemental Claim" as a subsequent application. *Ex parte Reed*, Nos. WR-50,961-01 and WR-50,961-02 (Tex. Crim. App. Feb. 13, 2002) (not designated for publication).

Reed - 3

Crim. App. July 1, 2009) (not designated for publication).

Applicant filed his sixth subsequent application (No. WR-50,961-07) in the trial

court on February 13, 2015, and he filed a document titled "Supplemental Application for

Writ of Habeas Corpus" (No. WR-50,961-08) on June 9, 2016.  In his -07 application,

applicant asserted that he had newly discovered evidence that supported his claim that he

is actually innocent and that new scientific evidence entitled him to a new trial pursuant to

Article 11.073.  Applicant also argued that the State presented false, misleading, and

scientifically invalid expert testimony in violation of his right to due process.  *See Ex*

*parte Chabot*, 300 S.W.3d 768, 770-71 (Tex. Crim. App. 2009).  In a fourth allegation,

applicant asserted that we should reconsider his previous writ applications in light of this

new evidence.  In his -08 application, applicant asserted that he had newly discovered

evidence that supported his claim that he is actually innocent, that the State's failure to

disclose this newly discovered evidence violated his due process rights under *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and that this newly discovered evidence showed that the

State presented false and misleading testimony, which violated his right to due process.

*See Chabot*, 300 S.W.3d at 770-71.

In 2015, we ordered that applicant's execution be stayed pending further order of

the Court.  *Ex parte Reed*, No. WR-50,961-07 (Tex. Crim. App. February 23, 2015) (not

designated for publication).  On May 17, 2017, this Court found that applicant's -07

application failed to satisfy any of the exceptions provided in Article 11.071 § 5, and

Reed - 4

failed to make the requisite showing under Article 11.073.  *Ex parte Reed*, Nos.

WR-50,961-07 & WR-50,961-08, slip op. at 3 (Tex. Crim. App. May 17, 2017) (not

designated for publication).  We dismissed the -07 application as an abuse of the writ

without reviewing the merits of the claims and refused to reconsider applicant's prior writ

applications.  *Id*.

Also in the May 2017 order, we found that applicant failed to make a *prima facie*

showing of actual innocence in his -08 application.  *Id*.  However, we found that

applicant's *Brady* and false testimony claims (his second and third grounds for relief in

his -08 application) satisfied the requirements of Article 11.071 § 5.  *Id*.  These claims

were based on statements made to a CNN interviewer by Curtis Davis, a law enforcement

officer and close friend of Stacey Stites's fiancé, Jimmy Fennell.  Davis told the

interviewer about statements that Fennell allegedly made to him in 1996 on the morning

after the murder about Fennell's activities and whereabouts the previous evening.  These

statements appeared to be inconsistent with Fennell's trial testimony.

The trial court held an evidentiary hearing in October 2017.  Applicant called five

witnesses to the stand, including Davis.  The State called five witnesses, including

Stites's mother.  At the hearing, Davis conceded that many of his answers to the

interviewer's questions had been based on assumptions and he had trouble remembering

some of Fennell's statements.  Stites's mother also gave testimony inconsistent with

applicant's claims.  The trial judge signed findings of fact and conclusions of law on

Reed - 5

January 5, 2018, recommending that applicant's grounds two and three be denied.

We have reviewed the evidence in the writ record, the testimony at the writ

hearing, the habeas court's findings of fact and conclusions of law, and relevant portions

of the direct appeal record.  Based on our review of the record, with regard to the

remanded grounds in applicant's -08 subsequent application, we deny the relief sought.

We dismiss any other grounds applicant raised in his -08 application as an abuse of the

writ for failure to satisfy Article 11.071 § 5.

In June 2018, applicant filed another document titled "Supplemental Application

for Writ of Habeas Corpus."  This 2018 application constitutes applicant's eighth

subsequent application (No. WR-50,961-09) pursuant to Article 11.071 § 5(a).  In this -09

application, applicant asserts that the scientific experts' opinions that the State relied on

to convict him were "false when given and have since been changed."  In support,

applicant cites Article 11.073, due process principles, and actual innocence law.

Applicant has not shown that his "current claims and issues" in his 2018 application were

not or could not have been presented in a previous application because the factual or legal

basis for the claim was unavailable on the date he filed the previous application.  *See*

Article 11.071 § 5(a)(1).  In fact, applicant previously presented one of his current

exhibits, a 2012 declaration authored by the State's medical examiner, Dr. Roberto

Bayardo, as a basis for a substantially similar false evidence ground raised in his -07 writ

application.  Nor has applicant shown "by a preponderance of the evidence, [that] but for

Reed - 6

a violation of the United States Constitution no rational juror could have found [him]

guilty beyond a reasonable doubt." *Id*. at § 5(a)(2).  Consequently, we dismiss applicant's

-09 application as an abuse of the writ for failure to satisfy Article 11.071 § 5.

IT IS SO ORDERED THIS THE 26TH DAY OF JUNE, 2019.

Do Not Publish

# Exhibit 2

### <u>AFFIDAVIT OF WERNER U. SPITZ, MD</u>

STATE OF MICHIGAN    )
                           ) ss
COUNTY OF MACOMB   )

     I, Werner U. Spitz, M.D., having been duly sworn and having personal knowledge

of the matters set forth in this affidavit, hereby states:

I am a medical doctor licensed to practice medicine. I graduated from medical school in 1953 and have undertaken residency in pathology followed by fellowship in forensic pathology. I am certified by the American Board of Pathology in anatomic pathology (1961) and forensic pathology (1965). I have spent my entire professional life (62 years) in the practice of forensic pathology. My curriculum vitae is attached.

1.  My review of the autopsy report, autopsy photos, crime scene photos, crime scene video, and report of crime scene investigation leads me to conclude that Stacey Stites was murdered prior to midnight on April 22, 1996 (the night before her body was found). And further that she laid in a different position for about 4-5 hours before she was moved to the location where the body was found.

2.  The lividity (livor mortis, red purple discoloration due to pooling of blood after death) on Stites's face, shoulder, and arm, scientifically proves that she was dead in a position different from that which she was found for a period of at least 4- 5 hours. This pattern of lividity seen on the anterior arm, chest, shoulder, and face would develop if Stites was lying face down with one arm lower than the rest of the body for 4-5 hours, before she was moved to the position in which she was found. It is impossible that this lividity occurred at the scene in the position the body was found because Stites's body was found on her back. I have reviewed investigation reports indicating that mucus-like fluid was found near the passenger floor board of the truck belonging to Stites's fiancé. The presence of this fluid in combination with the lividity on the arm, shoulder and face is consistent with Stites being killed at a different location and later placed into the pick-up truck, resting with her face and arm lower than the rest of the body. This would explain both the mucus-like fluid near the passenger floor of truck and the blanching (areas where blood is pressed out of the skin) on the fingers as if pressed into something after death.

3.  The presence of lividity in these non-dependent areas makes it medically and scientifically impossible that Stites was killed between 3- 5 a.m. on the date in question. Stites could not have been both murdered *and* dumped between the hours of 3-5 a.m. on April 23, 1996 and remained undisturbed in that spot until her body was discovered at around 3 p.m. because the lividity observed in the non-dependent areas

would have taken at least 4-5 hours to develop. It is impossible that Stites was murdered and left at the scene in the two-hour time frame asserted by the State at trial. I have reviewed the trial transcripts of the pathologist Roberto Bayardo M.D. and the Crime Scene Investigator Karen Blakely. The medico-scientific analysis of the lividity I discuss was never addressed.

4.    Dr. Bayardo describes "slight residual" rigor at autopsy conducted at 1:30 p.m. on April 24, 1996, after the body was refrigerated since approximately 11 p.m. on April 23rd. Rigor is seen on the crime scene video, but the arms are easily placed down from above Stites's head as she is put into a body bag before sundown on April 23,1996. This movement of the arms shows passing rigor. Likewise, "slight residual rigor" after refrigeration at the ME's office is consistent with passing rigor, at the time the body is filmed in the video.

5.    Rigor is markedly temperature-dependent. In warm weather rigor mortis progresses faster, in cool weather it progresses more slowly. The average temperature on April 23rd was in the mid-60s. Taking this temperature into consideration, passing rigor, as depicted in the video, is consistent with death of about 20-24 hours prior to the video—a period of 15 hours as estimated by Dr. Bayardo would not allow for such movement, without having broken the rigidity.

6.    Very few sperm were found on autopsy smears, and the crime scene investigator found only 3 intact spermatozoa. If the victim was sexually assaulted between 3-5 a.m., there would be more sperm found on slides. A normal sperm count is considered to be 15 million spermatozoa per milliliter. The amount of sperm found on the slides is more consistent with a longer interval between intercourse and the time the sample was collected. As I explain in my book, intact spermatozoa can be found in the vagina up to 72 hours after coitus.

7.    My review shows evidence of decomposition that is not consistent with a time of death at 3 a.m. on April 23, 1996. The body is described as having green discoloration, which can be seen in the video. The appearance of the breasts after the bra is removed shows gas formation. The abdomen does not appear flat. There is skin slippage in several places. What is described at autopsy as post mortem burns in the face, breasts, and other areas is also likely skin slippage, in which the top layer of skin has dried. What has been described as petechiae in the scalp are none other than small torn blood vessels in the process of reflection of the scalp. Brown fluid running from the mouth and nose, across the right cheek is decomposition fluid and is not described in the autopsy report. Internal organs also show evidence of decomposition—what Dr. Bayardo describes as congestion in lungs is actually decomposition. The heart is flabby and the blood is liquid after liquefaction which is part of the decomposition process.

Brain swelling is also part of decomposition. This amount of decomposition supports a post-mortem interval of about 20 to 24 hours before the film and photographs.

8.    The distended anus seen in photos and described at autopsy is normal, in consideration of the absence of rigidity. It is a common mistake for death investigators to misinterpret natural relaxation of the sphincter, as evidence of anal penetration. There are no apparent lacerations in the photographs of the anus. If lacerations were present, they would be visible. Abrasions described at autopsy are not evidence of anal assault, and are equally consistent with hard bowel movements. I am aware that there was a weak DNA result consistent with Rodney Reed on the sperm fraction of the rectal swab taken from Stites. The presence of a small amount of sperm in the rectum is not surprising and does not contradict my conclusion that there is no evidence of anal penetration in this case. When semen is present in a body, it can drain from the vagina into the dilated anus. I have seen this happen in a number of cases. Contamination of the rectal swab by vaginal contents is also a concern, especially in cases where vaginal swabs are collected prior to the taking of the rectal specimens.

9.    The examination of the body at the scene was inappropriate. None of the investigation should have been done by the crime scene investigator. The body should have been placed in a body bag, preserving all trace evidence, and then taken to a controlled environment where it could be examined by a forensic pathologist. But despite these errors, the photographs and video provide enough evidence to estimate the post-mortem interval. These observable factors include: lividity, rigor, amount of residual sperm in the genital tract, and evidence of decomposition. When all of these factors are considered together, it becomes indisputable that the time of death was considerably earlier than 3:00 am on April 23rd as estimated by Dr. Bayardo. All findings point to a post-mortem interval of about 20-24 hours prior to the time the body was filmed.

10.    My textbook, *MEDICOLEGAL INVESTIGATION OF DEATH*, 4th edition, published by Charles C. Thomas, Springfield, Illinois, 2006 discusses many of the issues in this affidavit in greater detail.

3

11.    All my opinions expressed in the above paragraphs 1-10 are based on my education, training and experience and are rendered to a reasonable degree of medical certainty.

Werner U. Spitz, M.D.

Sworn to and subscribed before me on February 4th, 2015

Diane L. Lucke, Notary Public, State of Michigan
Monroe County,  Acting in Macomb County
My commission expires:  October 20, 2017

4

Exhibit 3

# Michael M. Baden, M.D.

15 West 53rd Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732

Facsimile: (212) 397-2754
E-mail: MBaden@mac.com

10 February 2015

*Via e-mail to bbenjet@innocenceproject.com*

Bryce Benjet
Staff Attorney, Innocence Project
40 Worth Street, Suite 701
New York, New York 10013

     *Re:   Stacey Stites, deceased*

Dear Mr. Benjet:

    1.    I am a physician, licensed to practice medicine in the State of New York and Board-Certified in Anatomic, Clinical and Forensic Pathology. I am a former Chief Medical Examiner of New York City and the former Chief Forensic Pathologist for the New York State Police. I have held professorial appointments at Albert Einstein Medical School, Albany Medical College, New York Law School and John Jay College of Criminal Justice. I served as Chairman of the Forensic Pathology Panels of the United States Congress Select Committee on Assassinations that reinvestigated the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr. (1970s). I have been a forensic pathology consultant to the Federal Bureau of Investigation,

Case: 19-51044     Document: 00515196870     Page: 17     Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 17 of 115

Baden/Stites
10 February 2015
Page 2

the Veterans Administration, the U.S. Department of Justice and the U.S. Drug Enforcement Agency. Attached hereto is a copy of my *curriculum vitae*.

2.      I have reviewed the autopsy report and other medical examiner office documents, scene and autopsy and clothing photographs, a scene videotape, police reports, laboratory reports and a statement by Mrs. Carol Stites relative to the death of Stacey Stites, 19 years old.

3.      According to Mrs. Stites, her daughter returned from work as usual about 1:30 p.m. on April 22, 1996. She went upstairs to the apartment she and her fiancé Jimmy Fennel, a police officer, shared, changed out of her work clothes and came back down. She stayed with her mother until about 8:00 p.m. when Mr. Fennel returned from baseball practice and they both went upstairs. That was the last time Mrs. Stites saw her daughter alive.

4.      Mr. Fennel told police that Ms. Stites left their apartment to drive to work in his pickup truck by herself about 3:00 a.m. on April 23, 1996. The unoccupied truck was seen parked in the Bastrop High School parking lot by a patrol officer less than 2-1/2 hours later, at 5:23 a.m. The officer also noticed a six to eight inch length of part of a leather belt with a square chrome buckle on the ground in front of the driver's door.

5.      Ms. Stites' partially clothed body was found lying face-up in brush a number of yards from an unpaved road about 3:00 p.m. the same day. Prominent

lividity was noted on the front non-dependent parts of her body by responding sheriff's department officers. This inappropriate lividity is clearly documented in scene photographs. A homicidal ligature mark was present around her neck and the ligature, the remainder of the belt portion seen near the truck, was nearby.

6.    Lividity develops by the gravitational settling of red blood cells while still in blood vessels in the lower dependent portions of the body after death causing a maroon-type discoloration of the skin. The intensity and extent of the lividity present on Ms. Stites' body demonstrates that she would have lain face down after she was dead for more than four or five hours in order for this lividity to remain after she was turned over when she was placed on her back in the brush. This lividity demonstrates that Ms. Stites was dead before midnight on April 22nd when she was alone with Mr. Fennel.

7.    Examination of the truck showed that the driver's seat was reclined back and the passenger seat was in a slightly forward position. "Some type of viscous fluid" was found on the passenger-side floorboard. This is not pulmonary edema fluid from Ms. Stites as interpreted by the prosecution. Pulmonary edema fluid is thin and frothy and would also have been present in and around her mouth and nose, and was not. Pulmonary edema fluid is not viscous. This is typical post-mortem purge fluid that flowed from her nose and mouth as her body began to decompose and showed other decomposition changes, such as skin slippage and

Baden/Stites
10 February 2015
Page 4

green discoloration of skin, which were also described at the scene and autopsy. It would have taken more than four hours after her death for this purge fluid to develop. It could not have developed in less than 2-1/2 hours if she were alive at 3:00 a.m. when she got into the truck. This finding also demonstrates that she had been dead for a number of hours, before midnight, when she was placed in the passenger seat.

8.      The testimony at trial that no intact sperm remains in the vagina after 24 hours is not correct. It is my experience, and the experience of other forensic pathologists as reported in the forensic science literature, that sperm may remain intact for more than 72 hours after intercourse. The few sperm seen are entirely consistent with consensual intercourse that Mr. Reed said occurred between midnight and 3:00 a.m. on April 22, 1996.

9.      The autopsy photographs show dilatation of Ms. Stites' anus that normally occurs after death when the anal sphincter muscles relax. No lacerations, no blood, no semen were present in or around the anus in the photographs and which finding was also confirmed in Dr. Bayardo's autopsy report. There is no evidence of anal penetration. There is no forensic evidence that Ms. Stites was sexually assaulted in any manner.

10.     In my opinion removing the clothing and performing vaginal swabs at the scene where the body was found rather than at the properly equipped medical

examiner's office is contrary to proper forensic practice. Such procedure can cause loss of trace evidence at the scene and contamination of evidence that is removed and evidence that remains, including contamination of rectal swabs with vaginal contents.

11.    It is my opinion, to a reasonable degree of medical and scientific certainty, based on my education, training and more than fifty years' experience as a forensic pathologist, that the distribution and intensity of Mrs. Stites' lividity shows that she was murdered before midnight of April 22, more than four hours before she was brought to where her body was found; that she was already dead with signs of decomposition and development of purge fluids when she was placed in the truck; that intact sperm could be present two or three days after consensual vaginal intercourse; and that there is no evidence of anal intercourse or of sexual assault. It is further my opinion beyond a reasonable degree of medical certainty that, based on all of the forensic evidence, Mr. Reed is scheduled to be executed for a crime that he did not commit.

Very truly yours,

Michael M. Baden

Michael M. Baden, M.D.
Former Chief Medical Examiner,
  City of New York
Former Chief Forensic Pathologist,
  New York State Police

Baden/Stites
10 February 2015
Page 6

MMB:ph

# Exhibit 4

County of Mobile    )

                    )

State of Alabama    )

### Affidavit of LeRoy Riddick

LeRoy Riddick, M.D., being duly sworn, deposes and says upon penalty of perjury thereof:

1.    My name is LeRoy Riddick and I am a medical doctor licensed to practice in the State of Alabama.  I am board certified in anatomic and forensic pathology.  I served as an adjunct professor in the pathology department at the University of South Alabama College of Medicine until I retired from that position in 2013.  I retired from employment with the State of Alabama in 2006.  Before my retirement, I was employed as a State Medical Examiner by the Alabama Department of Forensic Services, an agency of the State of Alabama.  In addition, I served as the County Medical Examiner for the County of Mobile, Alabama and Laboratory Director for the Region IV Full Service Forensic Science Laboratory for the Alabama Department of Forensic Sciences.  I was employed both as a State Medical Examiner and as County Medical Examiner for over 25 years.  I currently consult privately on issues of forensic pathology.  I was deputy medical examiner in Washington D.C. from 1974 until I moved to Alabama in 1979.

2.    Over my career with the State of Alabama, my responsibilities extended to virtually every aspect of forensic investigation.  I have attended over 75 homicide scenes and conducted thousands of autopsies.  In my capacity as the administrative director of the Region IV Full Service Forensic Laboratory in the State of Alabama, I also worked with scientists and analysts in drug chemistry, firearms and toolmarks, forensic biology (DNA), toxicology, and latent fingerprint examination.

3.    I have testified as a qualified expert witness in more than 500 court appearances in a number of jurisdictions including the federal courts in Alabama, the District of Columbia and Louisiana, and in state courts in Alabama and Mississippi.  I have testified for the prosecution and the defense.  In most of the cases in which I have testified as an expert witness, I have done so on behalf of the prosecution in state court and the federal government in federal court.  My curriculum vitae is attached to this Affidavit as Exhibit 1.

4.  I examined the following items from *State of Texas v. Rodney Reed*:

    a.  Medical Examiner's Report of the autopsy of Stacey Stites performed by Robert J. Bayardo, M.D.;

    b.  Photographs of: Ms. Stites' body at the scene where it was recovered; Ms. Stites' clothing; and Ms. Stites' body at the autopsy;

    c.  The videotape showing where Ms. Stites' body was recovered and evidence collection;

    d.  The trial testimony of Robert J. Bayardo, M.D., Meghan Clement, and Elizabeth Johnson and the trial and state habeas corpus hearing testimony of Karen Blakely;

    e.  Reports from the Texas Department of Public Safety Crime Laboratory;

    f.  Crime scene reports from various law enforcement agencies; and

    g.  Police reports of witness interviews and the Affidavit of Rodney Reed.

I have also conferred with other experts regarding this case and reviewed written statements by Ronald Singer, M.S., Roberto Bayardo, M.D., and Joseph Warren, Ph.D. Based upon my review of the documents listed above, and based upon my knowledge, training, experience and education, I have reached several conclusions and opinions which are expressed in this affidavit. These conclusions and opinions are based upon a reasonable degree of medical certainty.

5.  I was initially retained over 10 years ago to assist attorneys representing Rodney Reed in evaluating the forensic evidence in the case. I have previously provided written opinions in 2003, 2006, and in 2010. I was contacted again in the fall of 2014 to re-examine the case and to supplement the opinions that I have previously offered in this case if I discovered anything new in this re-examination. I was asked specifically to look at the crime scene video, crime scene and autopsy photographs, and other documents to see if they contained evidence that would assist in determining the post mortem interval. As part of my re-evaluation of the case, I have also conferred with other experts in

2

forensic investigation. In conducting this re-evaluation of the case, I have noticed additional forensic evidence which has allowed me to address the post-mortem interval with greater accuracy than I have in my prior statements.

**Post Mortem Interval**

6.      The post mortem interval (the time between the victim's death and the time when the body is discovered) is one of the most difficult tasks of the death investigator with the most experienced and qualified forensic investigator being the medical examiner, forensic pathologist. Currently in forensic practice, there is no scientific means of determining that interval with precision. The investigator is left with making an estimation based on the circumstances surrounding the body and the post mortem changes in the body, which generally progress in a regular manner. These changes are rigor mortis (stiffening of the muscles to chemical alterations in the cells), livor mortis (pink to red discoloration of the skin due to blood settling in the vessels and later seeping into the skin), and algor mortis (cooling of the body.) Examination of the chemical composition of the vitreous humor, the fluid in the eye can also be employed. All of the modalities with the exception of analysis of the vitreous humor need to be systematically determined at the scene by the medical examiner, the scientist with the most experience in making these determinations. In this case, the medical examiner did not attend the scene and none of the investigators, including the law enforcement officers and forensic technicians, systematically examined the body for rigor, livor, and temperature. The vitreous was never analyzed.

7.      Despite the absence of a systematic investigation of these key elements, much can be derived from a review of the existing record, especially the videotape of the crime scene investigation, which is attached as Exhibit 2 to this Affidavit. The first officers at the scene from the Bastrop Police Department made no scene report. Lt. David Campos Jr. from the Bastrop Sheriff's Office, who arrived at the scene some time (not specified) after 3:11 p.m. on April 23, 1996, made the recorded observation in a typewritten report that "The body had marked lividity and rigor mortis had set in." He did not specify any muscle groups or the intensity of the stiffness, which would have indicated whether the rigor was beginning, reached its peak, or waning. He did not test the lividity to ascertain if it blanched, that is, whether the color dissipated with pressure and did not return, indicating in general that the body has been in that position for several hours. The relevant portion of Lt. Campos's report is attached as Exhibit 3. Texas Ranger L.R. Wardlow, who entered the scene at 5:43 p.m. made observations about the position and clothing on the body but nothing about livor, rigor, or temperature. However, Wardlow

observed a "greenish discoloration" in parts of the body, including under each breast. The relevant portion of Ranger Wardlow's report is attached as Exhibit 4.

8.    A time stamp on the video reads 16:19, which would indicate filming began at 4:19 p.m. However, a report by Texas Ranger Rocky Wardlow states that the filming began at 5:16 p.m. The video is not continuous and ends some time after dark. A time stamp at the end of the video shows 20:22 (8:22 p.m.) A note from DPS crime scene investigator Karen Blakely to the Medical Examiner's Office discussing the completed collection of evidence gives the time of 8:15 p.m. A copy of this note is attached as Exhibit 5. Ranger Wardlow indicates that the scene was released at 8:55 p.m. The Travis County Medical Examiner's Office records indicate that the body was received at 10:00 p.m. Based on this information, it appears that the video documents the condition of the body over a 3-4 hour period.

9.    Dr. Bayardo, the medical examiner, at the time of the autopsy at 1:50 p.m. on April 24, 1996 and after the body had been examined at the scene, transported to the morgue, and refrigerated observed "slight residual rigor mortis" and "post mortem dependent lividity." Such observations made many hours after the body was found and subjected to movement and stored in a cooler at the morgue are open to critique and of little relevance to the determination of the post-mortem interval. In his trial testimony, Dr. Bayardo, without specifying anything other than "Based on the changes that occur after death in the body" opined that "an estimation of the time of death being around 3:00 a.m. on April 23, 1996," "Give or take one or two hours", making it between 1:00 and 5:00 a.m. An excerpt of the relevant portions of Dr. Bayardo's testimony is attached as Exhibit 6. It is impossible to evaluate Dr. Bayardo's conclusion because he was not asked and did not offer the basis for his time of death estimate. This testimony conformed to the State's theory of the case that the victim left home for work around 3:30 a.m. and was murdered between 3:30 a.m. and the time the truck she was driving was seen in a parking lot in Bastrop at 5:23 a.m. Assuming the victim left her home in Giddings according to her usual schedule at 3:30 a.m. and was abducted 30 miles away in Bastrop as alleged at trial, the post mortem interval from when the victim was first described and filmed around 5:15 p.m. would have been around thirteen (13) hours.

**Rigor Mortis**

10.    If the post mortem interval had been roughly thirteen hours as estimated by Dr. Bayardo at the trial, rigor should have been intense and progressing to completion. The crime scene video contradicts this finding and indicates a much longer post-mortem interval. A body in complete rigor (which is generally achieved at roughly 12 hours

4

under normal conditions and will be essentially unchanged at 13 hours) is stiff.
Manipulation of an arm, a leg, or the head is difficult and will also result in moving the
torso. The manipulation of the body demonstrated in the crime scene video, however,
indicates that the limbs can be moved independently, thus indicating that rigor was no
longer at its height and was passing. For example, a crime scene investigator can be seen
lifting the left arm easily without the left side of the torso being lifted as it would have
been with completed rigor. *See* Exhibit 2 at 19:10-19:20. The arm also flops back down
when released. At frame 21:00 of the crime scene video, the left leg is moved without
the body turning as it would have in advance rigor. In a subsequent frame, 23:26, the
examiner easily turns the head to the left without having to move the stiff body and then
allows the head to easily roll back to the right. At frame 23:46 to 23:50 of the video, the
head, when moved by investigators, returns easily to its original position in a manner that
is not consistent with the level of rigor I would expect if the victim had been killed at
around 4:00 a.m. that morning. When the funeral directors move the body to a bag, they
easily position the arms across the chest; a manipulation difficult to complete in a body
stiff with complete rigor. This is depicted in Exhibit 2 at 27:15-27:50. In short, during
the examination of the body between 5:15 p.m. and around 8:22 p.m. when the crime
scene video ends, the body appears in many instances to be easily manipulated and at
times the arms appear limp indicating that rigor has waned. Based on the lessening of
rigor demonstrated in the crime scene video, I estimate that the post mortem interval is
significantly longer than the 13 hours estimated at trial. The level of rigor demonstrated
in the crime scene video is more consistent with a post-mortem interval of 16-20 hours
from the first documentation of the body at 5:15 p.m.

11.    My estimate of the post-mortem interval takes into account environmental factors
that can affect the speed at which rigor develops. According to the National Weather
Service, the temperature in the neighboring city of Elgin ranged from a low of 50 to a
high of 75 degrees Fahrenheit on April 23, 1996. Although the National Weather Service
indicated sixteen hundredths (.16) of an inch of precipitation on that day in Elgin, the
videotape shows dry conditions at the crime scene.[1] Further, the body appears to be
shaded by small trees and brush. These are normal conditions, which would not affect
the routine progress of rigor. It is an accepted fact, proven through my career
investigating death in southern Alabama, that the progress of rigor is accelerated in hot

---

[1] A note written by Karen Blakely to the Medical Examiner's Office, attached as Exhibit 5, indicates that
the victim's underwear and pants were wet. However, none of the other evidence such as the victim's
bra and socks were described as wet, and it is common that a deceased person's pants and underwear
become wet due to the post-mortem release of urine. This would not affect the development of rigor.

and humid conditions. Although there is evidence in the video of post mortem superficial burns on the left side of the victim's face, the lower portions of the breasts, the right leg, and the left forearm, the heat source that caused these superficial burns would not have been enough to affect temperature of the body as to accelerate the development and passing of rigor in the victim. I would expect to see significantly larger or more severe burns if the victim had come in contact with a source of heat sufficient to affect the progress of rigor.

**Livor Mortis**

12.     Another significant factor in my opinion as to the post-mortem interval is my observation of the location and level of livor in the body. As discussed above, livor mortis (or lividity) is the pooling of the blood to the lowest part of the body, described by clinicians as a dependant area. Lividity that exceeds faint patches of discoloration generally develops after at least 2 hours, and takes several more hours to become fixed. Lividity is fixed when the blood congeals in the capillaries or diffuses into the extravascular tissues. Once lividity is fixed, it will not be displaced by compression and will not shift if the body is moved. If lividity is not fixed, the blood that has pooled in one area will shift to a new area once the body has been moved. The figure attached as Exhibit 7 describes this phenomena with an approximation of the time required.[2] Observation of lividity is a key tool in determining whether a body has been moved after death and for how long the body was in a certain position. Lividity found on a non-dependant area of a body is evidence that the body was moved. A photograph from a forensic pathology text attached as Exhibit 8 shows fixed lividity in a non-dependent area, which is evidence that the body had been moved after having been in a different position for several hours.[3]

13.     Photographs and the crime scene video show lividity on the back and other dependant areas in the position in which the victim was found. This lividity is depicted in the photograph attached as Exhibit 9. Absent documentation of blanching, however, I cannot state with precision how long the body was in the position in which it was discovered other than that it would take at least 4-6 hours for such complete lividity to form.

---

[2] Burkhard Madea, *Handbook of Forensic Medicine* 80, figure 7.8 (Wiley 2014) (complete shifting of lividity expected if body turned within 6 hours of death) (Exhibit 7).

[3] J. Prahlow, R.W. Bayard, *Atlas of Forensic Pathology* 153 figure 8.13 ("After several hours, lividity becomes fixed," such that movement of a body from one position to another may become evident because the lividity pattern is inappropriate for the current body position) (Exhibit 8).

14.     There is also lividity in the non-dependent areas of the victim's right shoulder and right arm. This lividity can be seen as the red coloration of the arm and portions of the shoulder in the photos attached as Exhibit 10. Just as is shown in the textbook photograph in Exhibit 8, this discoloration in the victim is identified as lividity based on the presence of white areas on the fingertips and near the elbow which show blanching through compression of the skin at the time the lividity developed. These blanched areas are circled in Exhibit 11. Because the lividity remains complete in the non-dependant areas of the right arm and shoulder and did not shift to the dependant areas of the body, this indicates that the victim's body was in a different position in which the right arm and shoulder were dependent for at least 4-6 hours.

15.     In summary the observable evidence of rigor mortis and livor mortis discussed above do not support the conclusion offered at Reed's trial that the time of death was at 3:00 a.m. on April 23, 1996, even with a standard of error of two hours. Rather, the available forensic evidence indicates a post mortem interval of 16-20 hours from the time the body was first documented in the video with the body having been in a different position for a period of 4-6 hours.

**<u>Time Since Intercourse</u>**

16.     At trial, Dr. Bayardo testified that he found intact sperm in his examination of a sample collected at autopsy and that the sperm he found was placed in the victim's vagina "quite recently." I have also reviewed similar trial testimony by crime scene investigator Karen Blakely and DNA analyst Meghan Clement. Ms. Blakely testified that spermatozoa will remain intact no longer than 26 hours in the female vaginal tract, and Ms. Clement testified that an intact spermatozoa would not be found on a rape kit more than 24 hours after a sexual encounter.

17.     Both Ms. Blakely and Ms. Clement are incorrect regarding the length of time a morphologically intact sperm survives in the vagina. As a forensic pathologist, I am familiar with a host of medical literature that, simply put, absolutely refutes those witnesses' conclusions that a sperm cannot remain intact beyond 24 or 26 hours, and even refutes Dr. Bayardo's conclusion that the semen was introduced into the vagina a day or two before his autopsy exam. Reliable scientific studies, many of which I understand have been cited by Mr. Reed in his pleadings in this case, have found morphologically intact sperm in the human vagina after two, four, five, six, seven, and even 10 days. As a general rule, morphologically intact sperm can be expected to be seen up to 72 hours after intercourse.

**No Reliable Evidence of Anal Rape**

18.    The evidence of forced anal intercourse – whether pre- or post-mortem – is not conclusive in this case.  Dr. Bayardo testified that he believed that the victim was raped anally.  He based this conclusion on his testimony that he found lacerations on the anus, that that anus was dilated, and that he observed what may have been sperm heads in a rectal smear.  Dr. Bayardo's opinion offered at trial is not supported by the available evidence.

19.    First, no sperm was actually visualized on the rectal smears.[4]  The small amount of sperm which was detected through DNA testing could have come from post-mortem cross contamination.  The body was left at the scene on its back and remained in this position during the crime scene investigation, transportation to the morgue, and while stored at the morgue.  Especially where the anus was dilated as depicted in the autopsy photo, sperm could have leaked from the vagina unto the anus.  The videotape of the scene where the body was recovered also shows Karen Blakely taking pubic hair tape lifts in a manner that would transfer semen from the labia to the rectum.  Additionally, the videotape shows that Ms. Blakely and others at the scene rolled Ms. Stites' body from its right side over onto its left side.  This rolling was sufficient to cause sperm to be expelled from the vagina and to leak into the anus.  The body was moved into a body bag, then moved onto a stretcher and then loaded for transport to the Office of the Travis County Medical Examiner, where it was moved to a refrigerated unit and then moved to an autopsy table.  Thus, there were several opportunities for leakage by the time that Dr. Bayardo took the rectal swabs.  It is also possible that the small amount of sperm detected by DNA testing was transferred through an error in collection such as touching the swab against an external area of the body that may have had sperm on it.

20.    Second, the observation of dilation of the anus at the time of Dr. Bayardo's autopsy does not indicate anal sexual assault.  The anus was not examined at the time that Ms. Stites' body was recovered.  By the time Dr. Bayardo examined the body at 1:50 p.m. on April 24, 1996, Ms. Stites had been dead for more than 36 hours.  Rigor mortis would be passing at this time, as reflected by Dr. Bayardo's observation of only "slight residual rigor mortis."  With passing rigor mortis, sphincters, including the anus, dilate, and with manipulation from swabs can expand even more.  The misinterpretation of postmortem dilation of the anus as sexual assault or sodomy is listed as one of the most

---

[4]  The Medical Examiner's Report submitted by Dr. Bayardo states, "[r]ectal smears are negative for spermatozoa."

common errors by forensic pathologists in the forensic pathology text *Spitz and Fisher's Medicolegal Investigation of Death*.[5]

21.    Third, it cannot be concluded with any degree of scientific certainty that Ms. Stites' anus was lacerated and that those lacerations occurred around the time of death. The autopsy report describes "longitudinal linear abrasions." Abrasions are scrapes which are not necessarily associated with anal intercourse and can be caused by a hard bowel movement. Lacerations, by contrast, are tears in the skin. A trained forensic pathologist should not confuse these two terms. The photograph taken at the autopsy does not show breaks in the skin, a sign of a laceration. Blood would also be expected if the tear to the anus was sustained while the victim was alive. By contrast, it is possible that minor abrasions would be present that would not be seen on the photograph. To determine whether these were in fact lacerations, a microscopic section of this area should have been performed.

22.    Additionally, Dr. Bayardo very clearly stated in both his testimony and the autopsy report that Ms. Stites' rectum was "intact and free of injury." The rectum is the lower 10-15 centimeters of the gastrointestinal tract. It is highly improbable that sperm heads could be found in the rectum as a result of forced anal intercourse without the existence of some noticeable trauma to the rectum. The fact that the rectum was intact and free of injury indicates that no forced anal intercourse occurred.

Further affiant sayeth naught.

*LeRoy Riddick*

LeRoy Riddick

Sworn and subscribed to before me, this ___10___ day of January, 2015.

*Kryptel Vivian Giles*

NOTARY PUBLIC

My commission expires: ___September 16 2015___.

---

[5] *Spitz and Fisher's Medicolegal Investigation of Death* at 120.

# Exhibit 5

County of *Snohomish*

State of Washington

## AFFIDAVIT OF KEVIN GANNON

My name is Kevin Gannon, I am over the age of 18 and otherwise competent to give this affidavit.

1.     I am a founder of Nationwide Investigations, an agency that provides pro bono consulting and investigative services in missing persons and homicide cases. I retired from the New York City police department (NYPD) in 2001 after 20 years of service. Since my retirement, I have provided pro bono service evaluating suspicious deaths for families who have lost loved ones and I have also written a forensics textbook ("Case Studies in Drowning Forensics") with my partners Dr. D. Lee Gilbertson and NYPD Detective Anthony Duarte. In addition to my work with Nationwide Investigations, I have consulted and appeared on television programs dealing with criminal investigation.

2.     I retired from the NYPD at the rank of Sergeant in the Detective Bureau. At the time of my retirement, I worked as a supervisor in the Homicide Taskforce/Nightwatch. Prior to my work on the Homicide Taskforce, I was a supervisor in the Rape Taskforce and the Missing Persons Squad. I have been awarded numerous commendations over my career including two medals for valor.

3.     In my work on television, I recently participated in a Dick Wolf (Executive Producer of "Law and Order" and other television shows) true crime television show called "Dead Again" for the A&E network. In "Dead Again", myself and two other experienced police officers (Ret. Miami P.D. Det. Sgt. Joe Schillaci and active Chicago P.D. Det. Michelle Wood) were asked to re-investigate old criminal cases without prior knowledge of the ultimate outcome of the case. In conducting reinvestigations on the show, we have sometimes agreed with the outcome of the trial and other times we disagreed with the conclusions of the law enforcement investigation and the outcome of the trial.

4.     While working on "Dead Again", I was given the autopsy and toxicology reports, crime scene photographs, and police reports relating to the investigation of the murder of Stacey Lee Stites. I was also provided with the Texas Department of Public Safety video that was recorded while they processed the body at the crime scene on April 23, 1996. I was given these materials on Tuesday, October 21, 2014. Upon review of these materials, I found that the evidence pointed to a murder that happened much earlier in the evening than what was described in the

1

police reports. This was apparent from the color of the body in the photographs. I also noticed lividity on the arm, shoulder and face that indicated that the body had been left in another position for several hours before she was left at the scene where she was found. When I reviewed the crime scene video, my conclusions regarding an earlier time of death were confirmed through the observable passing of rigor mortis. These forensic findings will be discussed in greater detail later in this affidavit.

5.      I immediately contacted my partners Dr. D. Lee Gilbertson and NYPD Detective Anthony Duarte, who concurred with my assessment. I also discussed this evidence with Det. Schillaci and Det. Wood who also agreed that Stites could not have been murdered between 3 and 5 a.m. as reflected in the law enforcement documents. I then brought this information to the producer of the A&E show (Michael Sheridan), and we subsequently contacted Bryce Benjet, the Innocence Project attorney, and scheduled a meeting. At the office of attorney Bryce Benjet in New York City, I presented my analysis to him. This information was subsequently forwarded to Forensic Pathologist Dr. LeRoy Riddick who also concurred with our assessment. We (Benjet, Gilbertson, Duarte, and Gannon) had a telephone conference call with Dr. Riddick (November 5, 2014) and discussed all the specifics of the postmortem artifact evidence that we uncovered.

6.      The forensic pathologist who testified at Reed's trial estimated the time of death to be about 3:00 a.m. The State's argument at trial was that Stacey Stites was abducted on her way to work, sexually assaulted, and murdered between 3:00 a.m. and 05:00 a.m. on April 23, 1996. In my professional opinion based on years of homicide investigation and law enforcement forensic training, as well as the consultation with other forensic experts including a forensic pathologist, the physical evidence at the crime scene and as described in written reports clearly demonstrate that the postmortem interval--relative to Stacey's time of death--is not consistent with the State's assertions regarding the timeline of events.

7.      The factors relating to my conclusion were the presence of livor mortis, rigor mortis, and decompositional changes to the color of Stacey's body as viewed in the video and as described in the written reports. Livor Mortis (lividity) was observed both on the anterior and posterior portions of Stacey's body, which means that she was lying face down for a period exceeding 4 hours before being moved to the site where her body was eventually discovered. Rigor Mortis (rigidity): was starting to relent (leaving the body.) If Stacey was murdered at 3 a.m., she would be at the peak of rigor when the crime scene video was taken. Instead, the video shows some rigor, but that her head and arms are easily manipulated. Where the average temperature on April 23, 1996 was in the 60s (ranging from the low 50s to the high 70s), rigor would not be relenting at the time of the video tape unless

Stacey was killed well before midnight on April 22, 1996. Color changes on the body related to the decomposition process were evident in the video and described by Texas DPS reports as being green in color on Stacey's body. The color green first develops in the abdomen's Right Lower Quadrant within approximately 12 hours after death and spreads to the entire body within approximately 24 hours. Green coloration was evident on Stacey's upper torso her face as well as her lower extremities. This further supports my conclusion that she had been deceased longer than the timeframe proposed at Reed's trial and in the police reports. It is my professional opinion that she was murdered hours earlier-- sometime between 7:00 p.m. and 11:00 p.m. on April 22, 1996.

8.       When investigating a murder, the last place the victim was seen should always be searched. This was not done here. The failure of law enforcement officers to take this basic step in the investigation of missing persons was especially devastating because the forensic evidence now indicates that the murder took place not long after Jimmy and Stacey were seen going up to their apartment.

9.       In addition to the forensic evidence which indicates that the murder took place while Jimmy and Stacey were at home together, a number of other factors raise suspicion that Jimmy Fennell was the murderer:

- The seatbelt of the truck was fastened as if the last driver had been sitting on top of the seat belt. It is common for police officers to sit on top of a fastened seat belt in their vehicle. Officers do this because they are often called upon to quickly exit their vehicles in an emergency. A seatbelt can impede a fast exit, so it is buckled to keep it out of the way and stop warning signal in the car. My experience is confirmed by statistics released by the California Commission on Police Officer Standards and Training indicating that roughly half of all police officers do not wear seatbelts.

- Stacey's fingernails are closely cut in a manner that I would not expect from a nineteen year old woman only a few weeks before her wedding. Strangulation involves a close struggle that provides the victim an opportunity to scratch her attacker and leave his DNA under her fingernails. In 1996, a police officer would be familiar with the fact that fingernail scrapings are taken during autopsy, and it is unlikely that a lay person would know to cut the fingernails of a victim to avoid detection.

- Certain aspects of the crime scene appear to have been staged in a manner that does not conform to a kidnapping/murder by a stranger. First, the placement of Stacey's name tag between her legs is direct evidence of a staged crime scene. The location of the two halves of Stacey's belt also

3

does not comport with a kidnapping murder by a stranger seeking to evade detection. It is unlikely if not impossible that Stacey's woven leather belt broke while it was used as a ligature. The force necessary to break a leather belt would have caused greater injury to her neck than was reported at autopsy. It is far more likely in my opinion that the belt was separated after the murder. One half of the belt was left at the side of the road in a position pointing towards the body. Especially where it was alleged that the murderer used the victim's shirt to wipe fingerprints from the truck at the scene, it is not plausible that the same person would have left the belt in this location unless he wanted the body to be quickly found. The same is true for the portion of the belt left outside the truck at the Bastrop High School. A murderer who had the forethought to wipe his fingerprints and lock the door of the truck would not leave such obvious evidence in plain view accidentally.

Further affiant sayeth naught.

*Kevin Gannon*

Kevin Gannon

Sworn and subscribed to before me, this ___11th___ day of February, 2015.

*Alexander Walker*

NOTARY PUBLIC

My commission expires: ___December___, 20__17__.

> Notary Public
> State of Washington
> ALEXANDER WALKER
> My Appointment Expires Dec 25, 2017

4

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **RODNEY REED,** | § | |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. A-02-CA-142** |
| | § | |
| **DOUG DRETKE, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| **Respondent** | § | |

<u>**DECLARATION OF ROBERTO J. BAYARDO, M.D.**</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

1.     My name is Roberto J. Bayardo, M.D.  I am over the age of 18 years and fully competent in all respects to make this Declaration.  All the facts recited herein are within my personal knowledge and are true and correct.  All of the opinions recited herein are expressed within a reasonable degree of medical and/or scientific probability, except where noted.

2.     I am a forensic pathologist, and the former Travis County Medical Examiner. I performed the autopsy on Stacy Stites, and testified at the trial of Rodney Reed.  I have recently reviewed the following materials:

  a.  The autopsy report on Ms. Stites;

  b.  My trial testimony;

  c.  Excerpts from the trial testimony of Karen Blakely and Meghan Clement; and

  d.  The April 14, 2006 affidavit and June 16, 2010 declaration of Leroy Riddick, M.D.

I am also personally aware that Jimmy Fennell, who was a Giddings police officer at the time of Ms. Stites's death, and was a suspect in her murder, has been convicted of sexual assault while

serving as police officer in Georgetown, Texas and is in prison. Based on the materials identified above, the information concerning Mr. Fennell, and my expertise as a forensic pathologist, I have the following opinions and clarifications.

3.     <u>Time of Death</u>.     At trial, I testified that I estimated the time of death as 3:00 a.m. on April 23, 1996.  Estimates regarding time of death are just that – estimates – and the accuracy of the estimate is subject to various factors, as outlined by Dr. Riddick in paragraphs 10-13 of his April 14, 2006 affidavit.  My estimate of time of death, again, was only an estimate, and should not have been used at trial as an accurate statement of when Ms. Stites died.  (As I testified, I am unaware of how long it was between the time of death and the time her body was brought to the Travis County Medical Examiner's office.)  If the prosecuting attorneys had advised me that they intended to use my time of death estimate as a scientifically reliable opinion of when Ms. Stites died, I would have advised them not to do so.  In my professional opinion, pinpointing a precise time of exactly when Ms. Stites died would have been, and remains, impossible.

4.     <u>Survival of Sperm</u>.     At trial, I testified that the very few spermatozoa I found in Ms. Stites's vaginal cavity had been deposited there "quite recently."  Ms. Blakely testified that spermatozoa can remain intact in the vaginal cavity for no more than 26 hours; and Ms. Clement testified that spermatozoa can remain intact for no more than 24 hours.  I question the qualifications of these witnesses to offer this testimony, and in any event, they are incorrect. I am personally aware of medical literature finding that spermatozoa can remain intact in the vaginal cavity for days after death. Accordingly, in my professional opinion, the spermatozoa I found in Ms. Stites's vaginal cavity could have been deposited days before her death.  Further, the fact that I found "very few" (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the spermatozoa was not deposited less than 24 hours before Ms. Stites's

2

death. If the prosecuting attorneys had advised me that they intended to present testimony that spermatozoa cannot remain intact in the vaginal cavity for more than 26 hours, and argue that Ms. Stites died within 24 hours of the spermatozoa being deposited, I would have advised them that neither the testimony nor the argument was medically or scientifically supported.

5.     Sperm Not Found in Rectum. I reported in the autopsy report and testified at trial that rectal smears taken of Ms. Stites were negative for spermatozoa and seminal fluid. Upon direct examination, I did testify that under a microscope, the rectal smears showed what appeared to be the heads of spermatozoa. However, the smears were insufficient to conclude that spermatozoa were present in the rectum. Accordingly, I reported the smears as negative on the autopsy report. My trial testimony should not have been construed as suggesting that spermatozoa were indeed found in Ms. Stites's rectal cavity. Had the prosecuting attorneys advised me that they intended to present my testimony as evidence that spermatozoa was found in Ms. Stites's rectal cavity, I would have informed them that that was incorrect. An autopsy report is the result of scientifically valid, forensic pathology methods. Trial testimony is given in response to the questions asked. Had I been asked at trial if spermatozoa and/or seminal fluid had been found in Ms. Stites's rectal cavity, I would have said that it had not, consistent with the autopsy report.

6.     Sexual Assault. I found on autopsy that Ms. Stites was sexually assaulted, and testified consistently at trial. However, the presence of spermatozoa in Ms. Stites's vaginal cavity was not evidence of sexual assault. There was no indication that the spermatozoa in Ms. Stites's vaginal cavity was placed there in any fashion other than consensually. Also, because there was no spermatozoa found in Ms. Stites's rectal cavity, there is no evidence that any spermatozoa was deposited in the rectal cavity as a result of the sexual assault. In my

professional opinion, Ms. Stites was sexually assaulted in her anal cavity, and that assault did not result in the deposit of any spermatozoa.   The injuries to Ms. Stites's anus are certainly consistent with penile penetration, as I testified, but if there was penile penetration, there was no ejaculation. I understand that the sexual assault for which Mr. Fennell was convicted did not involve ejaculation.  This is consistent with the sexual assault on Ms. Stites.  Further, the injuries to Ms. Stites's anus are more consistent with penetration by a rod-like instrument, such as a police baton.

7.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13, 2012.

Roberto J. Bayardo, M.D.

# Exhibit 7

# TEXAS DEPARTMENT OF PUBLIC SAFETY

**5805 N LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001**
**512/424-2000**
**www.dps.texas.gov**



STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
SKYLOR HEARN
DEPUTY DIRECTORS



COMMISSION
STEVEN P. MACH, CHAIRMAN
MANNY FLORES
A. CYNTHIA LEON
JASON K. PULLIAM
RANDY WATSON

April 30, 2018

Bryce Benjet
Senior·Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY  10013

Dear Mr. Benjet:

I have reviewed your correspondence entitled "Request for Correction, L-246937" dated July 11, 2017. I do not believe that Ms. Blakely's testimony constitutes professional negligence or professional misconduct and thus do not see a basis for the Crime Lab to report this matter to the Texas Forensic Science Commission pursuant to Article 38.01, Sec. 4, Texas Code of Criminal Procedure. The issues raised in your letter have been extensively litigated in this case. We do not see a duty to correct in this matter; however, during our review of the testimony by Ms. Blakely we noted some potential limitations in the paper she cited during testimony: Spermatozoa -- Their Persistence After Sexual Intercourse, GM Willott and JE Allard, Forensic Science International, 19 (1982) pp 135-154.

The Willott paper cited by Ms. Blakely during her testimony concerned a study that was undertaken to determine the amount of time spermatozoa could remain in the body after intercourse. Data for this study was collected from living victims and relied on the victim to correctly estimate the time since the offense (intercourse) occurred. The paper acknowledged that reliance on the victim to estimate the time since the offense occurred was a potential limitation to the research. The paper also included a table comparing the results of similar studies. In this table, a study by Davies and Wilson was referenced that reported 72 hours as the longest time for intact spermatozoa to be found in the vagina. The Davies and Wilson study, in contrast to the Willott study, relied on laboratory volunteers to collect samples at pre-established time points. The difference in collection method is a possible explanation for the difference in result. As seen in the table in the Willott paper, the literature varied greatly in the time given for finding spermatozoa (intact and otherwise) in the female reproductive tract.

Your letter indicates that you have sent your Request for Correction to the Texas Forensic Science Commission. We would fully cooperate with the Commission or the Courts regarding any hearings or reviews they may choose to conduct.

Sincerely,

Brady W. Mills
Assistant Division Director
Crime Laboratory Service
Law Enforcement Service Division

cc: Lynn Garcia, Texas Forensic Science Commission

BWM:cg

# Exhibit 8



**Bode Cellmark**
**FORENSICS**
LabCorp Specialty Testing Group

10430 Furnace Road, Suite 107
Lorton, VA 22079
Phone: 703-646-9740

## Forensic DNA/Biology Analysis Testimony
### Result of Review
### January 11, 2018

**To:**
Bryce Benjet
Staff Attorney
Innocence Project
40 Worth Street, Suite 701
New York, NY 10013

**Cellmark Case #: F9801744**

## List of Documents Evaluated from Innocence Project received on July 11, 2017:

Transcript for Case F9801744

## CONCLUSIONS:

Bode Cellmark has completed its review of the testimony transcript [and/or stipulation] for the case referenced above and found it to contain:

___ Satisfactory Statements          X Unsatisfactory Statements

If Unsatisfactory: Bode Cellmark has completed its review of the testimony transcript [and/or stipulation] for the case referenced above and found it to contain:

___ **Error Type 1:** The DNA Analyst stated an inclusion associated with a specific individual to the exclusion of all others when 1) source attribution threshold was not met (applicable only to cases reported before September 19, 2015) or 2) after Bode Cellmark discontinued the practice of applying source attribution (September 19, 2015).
___ **Error Type 2:** The DNA Analyst provided an incorrect statistical value during testimony or incorrectly explained the meaning of the statistical value(s).
X **Error Type 3:** The DNA/Forensic Biology Analyst cites the number of cases and/or samples worked in the lab as a predictive value to bolster the conclusion that the DNA profile belongs to a specific individual or the DNA/Forensic Biology Analyst otherwise testifies beyond the scope of his/her expertise.

See enclosed Testimony Review Evaluation Form.

Report submitted by,

Stephane Sivak, MS
Technical Leader

**Correction Review Evaluation Form**

| Case Information: | |
|---|---|
| Case Number: | F9801744 |
| Defendant(s): | Rodney Reed |
| Date of Review: | 11/22/2017 |

| Review of Testimony: | |
|---|---|
| Date of Testimony: | 5/11/1998 |
| Testifying Analyst: | Meghan Clement |
| Name of Prosecutor: | Mr. Charles Penick, Mr. Forrest Sanderson, & Ms. Lisa Tanner |
| Name of Defense: | Mr. Calvin Garvie & Ms. Lydia Clay-Jackson |

Testimony Results (mark as appropriate):

Unsatisfactory Statements:    Yes  ☒          No  ☐

If testimony contained Unsatisfactory Statements, cite each by Error type, page(s), and line number(s):

| | |
|---|---|
| Page 55, lines 13-21 | With spermatozoa, the tails are very fragile and tend to break off, so after a short period of time they start losing their tails and then what you find is only the spermatozoa heads, from sexual assault cases. So that can be an indicator of how long the spermatozoa has been in a particular place before it is actually collected and detected. |
| Page 56, lines 8-16 | In serology work, typically, sexual assault kits weren't even collected more than 24 hours after an encounter because the chances of finding sperm is so rare. Generally, finding intact sperm at more than probably about 20 hours, 20 to 24 hours, I don't ever recall finding intact sperm more than that, from the time of the sexual assault and from the time the collection was made. |
| Page 56, line 18, after asked to clarify above response: "And that was in over thousands of rape kits?" | Yes. |

Approved By: _____                          Date: 1/11/2018

Document: Correction Review Evaluation Form
Revision: 1
Effective: 1/3/2018 4:22:11 PM
Issuing Authority: Quality Assurance Manager

# Exhibit 9

### AFFIDAVIT OF PURNIMA BOKKA

I, Purnima Bokka, declare, under penalty of perjury, that the following is true and correct:

1.  My name is Purnima Bokka, I am over the age of 18 and otherwise fully competent to provide this affidavit. I am a Forensic Biology/DNA Analyst II at Bode Cellmark Forensics in Lorton, Virginia. I have a Bachelor's Degree from Anna University, India and a Master's in Forensic Science Degree from The George Washington University. I began working at Bode Cellmark in 2014 and in addition to my casework responsibilities; I also train new analysts and perform quality control on serological reagents used at Bode Cellmark. I have also previously testified in court as an expert in forensic biology.

2.  Bode Cellmark Forensics is a private ASCLD/LAB accredited forensic DNA laboratory and regularly performs forensic biology and DNA testing of evidence from many law enforcement agencies, prosecutor's offices, crime labs, defense attorneys, Innocence Projects and public defender's offices across the country. The accreditation is based on ISO/IEC 17025:2005 standards and the FBI Quality Assurance Standards for Forensic DNA Testing and DNA Databasing Laboratories.

3.  Bode Cellmark Forensics is one of the largest private DNA laboratories in the United States and routinely processes greater than 1,000 forensic cases per month, with approximately 3,000 to 5,000 items tested each month. Bode Cellmark has worked with several law enforcement agencies to help clear sexual assault kit backlogs which also included serological testing for spermatozoa.

4.  Due to the physical morphology and structure, spermatozoa are more resilient than other cell types to regular body processes and externally induced processes such as washing. This results in longer survival times of spermatozoa within internal body cavities than other cell types. It is also observed that the recovery of intact sperm cells (head and tail) is typically low due to the nature of the sperm tails being fragile and susceptible to degradation, unlike the sperm heads.

5.  Several studies have been conducted to study the persistence of spermatozoa in body cavities. The time frames for intact spermatozoa (with tail attached), that have been observed in living individuals, are up to 26 hours after intercourse in the vaginal cavity and up to 6 hours in the rectal and oral cavity [1-5]. Some studies have shown that intact sperm are less commonly seen as late as 72 to 144 hours in the vaginal cavity [3, 5]. Sperm heads (without tails) have been observed in living individuals up to 7 days after intercourse in the vaginal cavity, 2-3 days in the rectal cavity and 24 hours in the oral cavity [1-5]. These estimates are for internal body cavities and will be different for the persistence of spermatozoa on clothing items. The presence of spermatozoa in a sample depends on several factors including, but not limited to, the time of collection after intercourse and the number of sperm present in the ejaculate.

6.  In my role as Forensic Biology/DNA Analyst II, I have processed over 500 cases that involved examination of spermatozoa. In my experience with microscopic examination of spermatozoa, I have not encountered intact sperm in forensic casework due to the processes involved in preparing a sample for microscopic examination. The chemicals used typically break down the tails resulting in only sperm heads being observed. Also, most samples in forensic casework are not collected or processed immediately after the sexual assault for intact sperm cells to still be present, which can result in the loss of tails even before collection.

References:

1) Greenfield, A., & Sloan, M. A. (2003). Identification of biological fluids and stains. Forensic Science: an Introduction to Scientific and Investigative Techniques, 261-271.

2) Gaensslen, R. E. (1983). Identification of Semen and Vaginal Secretions. Sourcebook in forensic serology, immunology, and biochemistry (pp. 149-154). US Department of Justice, National Institute of Justice.

3) Baechtel, F. S. (1988). The identification and individualization of semen stains. Forensic science handbook, 2, 347-392.

4) Morrison, A. I. (1972). Persistence of spermatozoa in the vagina and cervix. British Journal of Venereal Diseases, 48(2), 141.

5) Davies, A., & Wilson, E. (1974). The persistence of seminal constituents in the human vagina. Forensic science, 3, 45-55.

Purnima Bokka

Sworn to before me this 20th day of June 2018.

Notary Public

Karen Hope Bennett
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7512687
My Commission Expires
May 31, 2019

# Exhibit 10

## AFFIDAVIT OF CALVIN "BUDDY" HORTON

THE STATE OF TEXAS            §
                              §
COUNTY OF BASTROP             §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Calvin "Buddy" Horton, known to me to be the person whose name is subscribed to this Affidavit, and who, being duly sworn on his oath, deposed and said:

1.      My name is Calvin "Buddy" Horton. I am over twenty-one years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and they are true and correct. Currently, I live in Red Rock, Texas.

2.      When my cousin Stacey Stites ("Stacey") was 16 years old, she and her mother moved in with my parents, Janice and Ray Horton, in Rosanky, Texas—less than a mile from where I lived with my wife Camille Horton and our three young children, Jaymi, Whitford and Steven, at the time. I traveled to Corpus Christi around this time to help Stacey and her mother Carol move their belongings into a storage facility in the Bastrop area.

3.      I understood from speaking with my parents that Stacey's mother was concerned that Stacey had begun dating and associating with men at an early age— including black men—that Stacey had gotten pregnant, and that her mother decided to move after Stacey's pregnancy. My father told me that Carol was concerned about the influences in Stacey's environment in Corpus Christi and wanted to leave.

4.      Stacey and Carol lived with my parents for approximately two months, but within that time, my mom and father informed me that some of Stacey's traits from Corpus Christi resurfaced. According to them, she would continue to see men, was disobedient and would leave the house at-will. Because of this, my dad asked my mom and wife to seek out more suitable housing for them. Eventually, my wife and my mother found a home in Smithville for Carol and Stacey to live. As I had done before, I helped Stacey and her mother move. This time I moved their belongings from the storage facility to the Smithville home, where they stayed until they moved to Bastrop.

5.      One Sunday evening, around five, or six o'clock in 1995, two of my young children, Jaymi and Whitford, and I went to the Dairy Queen in Bastrop to get some ice cream. I remember they were young at the time—both were under the age of ten. I also remember it was a warm day, but the weather was not hot or humid as is typical in Texas summers. I believe it was sometime between October and November. At that time in my life I worked as a carpenter and did not get Saturdays off. The only day I would have been able to take them for ice cream would have been on a Sunday.

6.      As I pulled into the Dairy Queen in the Ford pickup I was driving at the time, with my children inside, I remember seeing Stacey coming out of the Dairy Queen

with a black man. I hollered her name to get her attention as I drove in, but she did not respond. I know they heard me because both Stacey and the black man looked directly at me, but neither came toward me. I have a rather loud voice; I easily project and rarely have a difficult time being heard.

7.     Seeing Stacey with a black man did not surprise me because I remembered what my parents told me about her dating and associating with black men. Stacey, however, was shocked; she seemed embarrassed when she saw us and she quickly left with the black man without introducing me. Stacey and the black man got into a darker colored car that Stacey was driving, and they drove off without speaking to me or my children. I told my father of this incident, but to me it was not a big deal at the time because I had been told that Stacey associated with black men.

8.     Sometime after Stacey's death I remember seeing pictures of Rodney Reed on the news and in the newspaper after he became a suspect in the death of my cousin. Rodney Reed is the same man I saw with Stacey at the Dairy Queen in 1995. I understand that the appeals courts have previously said that there were no credible witnesses that would testify as to having seen Rodney and Stacey together. I would have testified to my experience at the Dairy Queen in 1995 at trial, but no one ever approached me to do so. Since then, I have told other members of my family and would have told law enforcement and prosecutors the same had they interviewed me or shown any interest.

9.     Because of this information, and Stacey's behavior at this time in her life, I have always believed Mr. Reed's story that he had a relationship with my cousin Stacey —despite the unfortunate pain it brings upon my aunt Carol. I do not wish to cause her, or my family, any more pain. I simply want to bring this truth to light.

Further Affiant sayeth not.

_____
Calvin "Buddy" Horton

Subscribed and sworn to before me this ___ day of March, 2015, to certify which witness my hand and official seal.

Rhonda Jean Garcia
Notary Public, State of Texas
My Commission Expires
August 6, 2016

_____
Notary Public in and for
the State of Texas

2

# Exhibit 11

County of Alameda)

)

State of California )

## AFFIDAVIT OF ALICIA SLATER

Alicia Slater, of lawful age, being duly deposed and sworn states that:

1. My name is Alicia Slater, I am a resident of Alameda County, California, I am over the age of 18 and otherwise competent to give this affidavit. I am originally from Cedar Creek, Texas and my maiden name is Alicia Griesemer.

2. In 1995 and 1996, I was employed part-time at the HEB in Bastrop while I went to high school. I worked as a bagger and would collect shopping carts from the parking lot. I worked at the HEB until I graduated Bastrop High School May of 1996. I moved to Austin almost immediately after I graduated and never returned to Bastrop County to live. I moved to California permanently in 2003 and had lived there for a year in the late 1990's.

3. In the summer of 1995, I was working in the HEB parking lot collecting shopping carts. I was approached by a man in his thirties who asked me for my phone number. When I refused, he grabbed my arm and tried to pull me towards his blue Chevy Suburban. I knocked his hand away, screamed and ran to the front of the parking lot. A co-worker named Chuck heard me scream and ran after the truck. The truck ran the red light at the intersection and drove off. No one was able to get the license plate because it was blacked out. I reported the incident to the store manager, and I eventually was interviewed by the Bastrop Police. Sometime after Stacey's murder, but before I left Bastrop, I was interviewed again about the incident in the parking lot. I don't remember who interviewed me, but I understood it to be related to the investigation of the murder of Stacey Stites. Since that time, I have seen photographs of Rodney Reed on the internet. I am certain that the man who tried to abduct me was not Rodney Reed. I have been provided with a copy of the police report from this incident which is attached to this Affidavit. The attached report contains my statement given to the police at the time and accurately describes the incident.

1

4. I met Stacey Stites when she came to work at the Bastrop HEB. She was very friendly and close to my age. Sometimes, when we were working at the same time, we would eat lunch together in the break room.

5. On one occasion when Stacey and I were eating together in the break room, she talked to me about her relationship with her fiancé. She was talking about her engagement ring and that she was not excited about getting married. She told me that she was sleeping with a black guy named Rodney and that she didn't know what her fiancé would do if he found out. She commented that she had to be careful. I was taken aback by this because I didn't know Stacey that well and was surprised that she would confide in me. I cannot remember when this conversation took place, but it was within a few months of Stacey's murder and could have been only a few weeks before. I did not know Jimmy Fennell or Rodney Reed at the time, and have never met either of them since.

6. I remember that some people at the HEB thought that Stacey's fiancé Jimmy Fennell committed the murder. I didn't tell the police what Stacey had told me because I did not want to get involved. I knew Jimmy Fennell was a cop and didn't trust the police in Bastrop. After I graduated high school, I wanted to get out of town. If I said something to accuse a police officer, I was afraid there would be repercussions for my family.

7. Although I had heard that Rodney Reed was convicted of the murder, I didn't really follow the case. I don't remember telling anyone about the information that Stacey shared with me. However, I recently mentioned this to my childhood friend Velma Gonzalez who remembered me telling her about it soon after Stacey murder. She recalled that I told her that Stacey informed me that she was having an affair with a black dude. I thought that the relationship between Rodney Reed and Stacey was common knowledge, that everyone knew. I remember that in 2003, a friend from Bastrop brought up the case and said that she heard I knew Stacey. I did not tell her anything about what I knew. I kept this to myself because, at the time, I had just moved to California, had just gotten married, and had started a new job. I thought that if I said something, that I would have to come back to testify in Bastrop.

2

8. On November 22, 2014, I read a Facebook post about the Reed case from KXAN and found out that he was scheduled to be executed. The first thing I did was called KXAN and other news media that covered the case to find out who I could talk to provide the information I knew. I also called the Bastrop County DA's office but don't recall leaving a message. I also sent an email to a person named Gayle Wilhelm at Bastrop County explaining what Stacey told me and providing additional information about the case that I had since read on the internet. I got no response to my e-mail. Ultimately, my friend Heather Pritchard, who has been following the case, gave me the name of Bryce Benjet, Rodney Reed's lawyer at the Innocence Project and a filmmaker Ryan Polomski, who did a film about the case. I contacted both of them and told them what I knew.

9. When I saw in the Facebook post that Rodney Reed had an execution date, I realized that it was now or never. I didn't track the case before and didn't realize the importance of what Stacey had told me. When I read about the case on the internet, I learned that an important issue has been whether Stacey and Rodney were in a consensual relationship. Based on this, it became clear that what Stacey told me in the break room at the HEB needed to be made public. I felt morally compelled to tell someone that Stacey herself told me that she was sleeping with Rodney. I felt that it would be terrible if the wrong person was executed for Stacey's murder and I had never come forward with this information.

10. I declare under penalty of perjury that my statements in the above numbered paragraphs 1-9 are true and correct.


Further affiant sayeth naught.

_Alicia Slater_

Alicia Slater

Dated: December _15_, 2014


Subscribed and sworn to, before me, a Notary Public, this ___day of December 2014, by Alicia Slater who is personally known to me or has shown adequate identification:

3

_____

Notary Public

**PROOF OF EXECUTION BY A SUBSCRIBING WITNESS**

State of California                    )
                                       )
County of San Francisco                )

On December 15, 2014, before me, the undersigned, a notary public for the
            Date

State of California, personally appeared ____Hannah Gilson____, personally
                                              credible witness's name

known to me and providing satisfactory evidence, who is known to be the person whose

name is subscribed to the within instrument, as a witness thereto, who, being by me duly

sworn, deposed and said that he/she was present and saw/heard acknowledged

Alicia Slater_____ , the same person described in and whose name
name of principal

is subscribed to the within and annexed instrument in his authorized capacity as a party

thereto, execute the same, and that said affiant subscribed his/her name to the within

instrument as a witness at the request of ____Alicia Slater___ .
                                              name of principal

WITNESS my hand and official seal.



_____
NOTARY PUBLIC SIGNATURE

M. DAVIS
COMM. #1927115
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Mar. 9, 2015

# Exhibit 12

## DECLARATION OF REBECCA PEOPLES

THE STATE OF TEXAS          §
                            §
COUNTY OF BASTROP           §

I, REBECCA PEOPLES, declare as follows:

1.      My name is Rebecca Peoples. I am over twenty-one years of age and am fully competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration, and they are true and correct.

2.      I worked at the H-E-B in Bastrop, Texas, for many years. In fact, I retired from H-E-B after 25 years of service. I also worked at the store during the time that Stacey Stites was employed there. She was very nice, very pretty, and very strong. Sometimes we worked together in the morning when very few other employees were there and because of that, we got a chance to talk. Our conversations were usually casual but sometimes we shared personal details.

3.      A number of times she spoke about the fact that she was engaged to be married, but she said she was afraid of her fiancé. She never elaborated on why she was afraid. I was more than twenty years her senior and had been in bad relationships in the past myself, so I could understand and empathize with her. I think we bonded a bit over our shared experiences. I don't remember that she ever told me her fiancé's name. She either mentioned, or I came to learn on my own, that he was a police officer.

4.      Stacey also mentioned that she was having an affair with a black man. She never told me who he was or mentioned his name, but I remember on one occasion when we

*RP*

talked there in the store about our lives she shared this detail. I am not sure why she told

me this, except that maybe she felt comfortable with me.

5.      I did not share this information with anyone before the trial of Rodney Reed

because I did not realize that it was important and no one ever approached me.

I have read and reviewed this declaration. I declare under penalty of perjury under the

laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and

that this declaration was executed on the ___10___ th day of November, 2019.

Rebecca Peoples

Rebecca Peoples

# Exhibit 13

STATE OF TEXAS

COUNTY OF BASTROP

### AFFIDAVIT

LEE ROY YBARRA, being first duly sworn, appeared before the undersigned authority duly designated to administer oaths and states as follows:

1.    My name is Lee Roy Ybarra. I am a resident of Bastrop, Texas. I am over the age of 18 years and do hereby declare that I am competent to give this affidavit. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future. This affidavit is based on my personal knowledge and the following facts are true and correct to the best of my knowledge:

2.    I was employed at the HEB grocery store located at 104 N. Hasler in Bastrop, Texas in 1996. During the course of my employment I met Stacey Stites, a nice personable young lady who also worked at the store as a checker and then moved to the fruits and vegetables department.

3.    There were several times that I would see Stacey talking with a young black man inside the store. I did not know his name but I would notice that her demeanor changed whenever he came around. She seemed happy to see him and would be in a good mood.

4.    I remember this man because some times they were close enough that I got a very good look at him. I remember him because I used to think that this was not a very attractive black man and she on the other hand was a very pretty young lady with a good personality. I couldn't understand what she saw in him but I guessed that if he made her happy, nothing else mattered.

5.    I knew that Stacey was engaged to a police officer at the same time that she was seeing this same black man and I recall that the few times that Stacy's fiancee entered the store to visit her, she would become a nervous wreck. I know that there were times that Stacey would deliberately hide so that she didn't have to talk to him. I just thought that it was a strange relationship.

6.    I left my employment with HEB about two weeks before the murder of Stacey Stites. I took a short vacation and when I returned I found out about Stacey's death. Much later I read a newspaper article about Stacey's death and saw the photograph of the black man who was accused of her murder. I quickly said to myself that this is the same black man who used to visit her at the store. It was then that I found out that the man's name was Rodney Reed.

7.    I did not read anymore news articles about the death of Stacey Stites because I have rarely taken the time to read newspapers or to watch the news. I don't know what happened

between the two of them but I thought that it was a sad thing because they looked pretty happy when they were together. I just thought that it was a terrible tragedy.

8.     At the time of Rodney Reed's trial or prior to his trial no one from the prosecution or defense team contacted me. If anyone had asked, I would have gladly told them what I knew about Stacey Stites and Rodney Reed. I was recently interviewed by a television crew about my knowledge of Stacey Stites and Rodney Reed. As in this affidavit, everything that I told the television crew is true to the best of my recollection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.


_Veekay yBana_
Signature

COUNTY OF BASTROP
STATE OF TEXAS

Subscribed and SWORN before me in the jurisdiction aforesaid, this 15ᵀᴴ day of JANUARY 2015.


_Richard Reyna_
Notary Public's Signature
My commission expires: August 22, 2018

RICHARD REYNA
My Commission Expires
August 22, 2018

# Exhibit 14

## AFFIDAVIT OF CHARLES WAYNE FLETCHER

THE STATE OF TEXAS            §
                                           §
COUNTY OF GUADALUPE       §

BEFORE ME, the undersigned authority, personally appeared Charles Wayne Fletcher, who, being duly sworn upon his oath according to law, said as follows:

1.      My name is Charles Wayne Fletcher. I am over twenty-one years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and they are true and correct.

2.      I worked at the Bastrop County Sheriff's Office from 1992-1996, and I went by the name Wayne Fletcher. I handled several duties while at the Sheriff's Office. I was a jailer and also handled inmate transport. I was also a reserve patrolman with my peace officers' license. During some of my time with the agency, I worked directly with Jimmy Fennell ("Jimmy"). Jimmy and I were colleagues and friends and socialized together off the job sometimes.

3.      I also knew Stacey Stites. I was friends with both she and Jimmy.

4.      When they started dating in 1995, I spent some time with them. He and Stacey and my wife Etta (at the time), and I would go out to eat and bowl together occasionally. I believe that Stacey and Jimmy considered me to be a friend.  They called me Fletch or Fletcher, for short.

5.      After Jimmy and Stacey moved to Giddings, I saw them less. I noticed, however, that their relationship seemed to deteriorate. I remember visiting them once in March of 1996 in an apartment at Rolling Oaks Apartments on the west side of Giddings. I am almost certain it was March because the weather was nice. Jimmy and Stacey were short with each other and raised their voices in communicating when they spoke. Generally, I got the impression that they were not in a good place with their relationship because of how they talked to each other.

1

6.     During that visit, Stacey said she was going to the pool at the complex. After Stacey left, I remember clearly that Jimmy said that he believed Stacey was "fucking a nigger." We were outside of the apartment building by the barbeque pit on the ground level preparing barbeque when he said it. He did not elaborate. He did not say specifically how he knew that or what made him believe it, but I remember he said those words because I was disturbed by them. I did not ask him about it. I did not know how to respond and did not want to pry into it. Although I have not shared this with many people, I have never forgotten his words.

7.     I attended Stacey's funeral service. Before the funeral service, I remember Jimmy looked cold, empty, and emotionless to me. He could be quiet and stern anyway, but his behavior was so odd I could tell that something was definitely off. He behaved the same way at the funeral service.  I believe others noticed it too, whether they said anything or not.

8.     Jimmy and I drove together to Corpus Christi for the burial services, along with Jimmy's parents. During the drive and at the burial services, Jimmy's odd, emotionless behavior continued. I think I even asked his mother whether he was on medication.  I was so disturbed by his behavior that it caused me to question whether he was involved in Stacey's death.  I also chose to have no further interaction or communication with him.

9.     In 1996, I left the Sheriff's Office. I changed careers and later left the area. I have never returned to law enforcement. I have not been outspoken about my experiences with Jimmy and Stacey because I still have family in the Bastrop area, and I do not want any negative action to come to them if it is perceived that I am going against local law enforcement.

10.     I met my current wife, Dana, in 2009. Sometime after, I opened up to her about my experiences with Jimmy and Stacey, about the time when they lived in Bastrop, about their

relationship deteriorating when they lived in Giddings, about Jimmy saying he believed Stacey was 'fucking a nigger,' and about his behavior at the funeral and burial services.

11.    She has encouraged me to share my experiences even though there could be some negative reaction.

Further Affiant sayeth not.

_____
Charles Wayne Fletcher

Subscribed and sworn to before me this 11 th day of October, 2019, to certify which witness my hand and official seal.

_____
Notary Public in and for the State of Texas

DEBBIE BURT
My Notary ID # 129385627
Expires April 12, 2021

3

# Exhibit 15

DRS PRODUCTIONS

"DEATH ROW STORIES"

INTERVIEW WITH CURTIS DAVIS

MEDIA ID: THS_62415_09.OGG

TC_16_25_11_20160414_DAVIS_1,

TC_16_58_18_20160414_DAVIS_2

### MALE #1:

16:25:36:00    Tell me your name and what your title is?

### CURTIS:

16:25:41:00    My name is Curtis Davis. I work at the
               Bastrop County Sherriff's office as a
               Criminal Investigator.

### MALE #1:

16:26:18:00    So take me back with you to the mid nineties
               and tell me what Bastrop was like.

### CURTIS:

16:26:25:00    Bastrop back there in the mid nineties was
               very uh, a rural type of setting. Uh, we
               were basically the-the room and board for
               Travis County. Uh, people came and lived
               there and then worked in Travis County, for
               the most part Austin. And uh, so there
               wasn't a lot to even do. Matter of fact the
               only restaurant that was open 24 hours there
               in Bastrop at the time was the Water Burger.
               And uh, the Pig Grill and uh, so uh, those
               are the only two things that you had a
               choice of if you were working nights in

Case: 19-51044   Document: 00515196870   Page: 71   Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 71 of 115

Page **2** of **63**

Bastrop County because those were the only
two things open.

CURTIS:

16:27:05:00    All the other convenience stores and
everything closed down overnight.  So uh, to
kind of give you a setting of the idea
that's behind what was a available back
there it was large ranching, farming
community, rural type living, rural type
subdivisions and uh, that was pretty much
the makeup of the 1990s of Bastrop.

MALE #1:

16:27:28:00    Do you know what the- I mean they call it
the Lost Pines Region and I, uh- This is a
test.  I'm just curious if you know what uh,
Lost Pines are?

CURTIS:

16:27:37:00    Lost Pines would be that you're driving on
the highway and all of a sudden there's a
bunch of lo-lost pines.  There's a bunch of
trees that just kind of seemed like they
didn't quite belong and it would be the-the
pine trees of that area.  And uh, so that's
pretty much where the Lost Pines came from.

MALE #1:

16:27:54:00    Hmm.  So when did you get involved in uh,
the police force.  I mean you were in

Case: 19-51044    Document: 00515196870    Page: 72    Date Filed: 11/13/2019
Case 1:19-cv-00794-LY    Document 29-2    Filed 11/14/19    Page 72 of 115

Page **29** of **63**

                        CURTIS:
16:59:53:00    Sheriff's office.


                        MALE #1:
16:59:54:00    Sheriff's office.


                        CURTIS:
16:59:54:00    Mm-hmm.


                        MALE #1:
16:59:55:00    Um, did he tell you anything about the night
               before what he was doing?


                        CURTIS:
17:00:04:00    Not then.  When-when Jimmy-when Jimmy talked
               to me about the night before and some of the
               things that had-had let up to her leaving
               that morning to go to work, um, that was
               pretty much after the fact.  It was after we
               were trying, and when I say after the fact,
               I'm talking about once we'd gone and seen
               the truck.  Um, he was basically excused.
               He was told, "Look.  You need to go wait.
               We're-we're gonna be looking.  We're gonna
               be searching for her.  We will find her."
               And we're police officers.  We know that's
               what they're gonna tell us.  We knew that's
               what they wanted us to do and we knew not to
               check their authority.


                        CURTIS:

17:00:45:00      So pretty much we did.  We went back to-to
                 Giddings, and uh-uh, went back to his
                 apartment, and at that point is when he
                 started talking about some of the things
                 that had happened the night before.  Um, he…
                 It's the first time I really sensed that he
                 was having some kind of blame.  He blamed
                 himself for allowing her to drive to work
                 that morning because he had said that he had
                 actually been driving her to work; that way
                 he can keep the truck.  He can go pick her
                 up later.  Whatever their little arrangement
                 was, but I remember him making comments
                 about he should have got up out of bed and
                 drove her to tr- drove her to work that
                 morning.  He said otherwise she wouldn't be
                 missing.


                         MALE #1:

17:01:33:00      So why didn't he?


                         CURTIS:

17:01:36:00      The night before, based on what he told me,
                 uh, they- him and a couple of the other
                 police officers, I believe, that were part
                 of a little league coaching group uh, had
                 consumed a little bit of alcohol.  Uh, I
                 won't say they were drunk 'cause that's not
                 what he said, but they had drank a few beers
                 after practice and uh, those beers were
                 consumed in and around his vehicle, and uh,
                 that uh, brought the truck back home that

Case: 19-51044    Document: 00515196870    Page: 74    Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 74 of 115

Page **32** of **63**

this.  Their-their sleeping arrangements
were based on uh, his job being shift work
and now her job being shift work of an early
hours and stuff.  So they were kind of
passing in the wind sometimes, you know,
because of the way that they were working,
but yet, um, for him to get up in the
morning, that was mentioned to me that he
was driving her to work so that he could
have the truck, but every day I can't answer
that 'cause I don't know for a fact that's
true.


                    MALE #1:

17:03:40:00    Yeah, I don't mean to uh… It's not- it's
               more of what happened that morning.


                    CURTIS:

17:03:44:00    Yeah.


                    MALE #1:

17:03:44:00    You had told me when I talked to you on the
               phone.


                    CURTIS:

17:03:45:00    Yeah.


                    MALE #1:

17:03:47:00    That he said, uh, that he didn't wake up
               when she left because he had had a few
               beers.

Case: 19-51044    Document: 00515196870    Page: 75    Date Filed: 11/13/2019
Case 1:19-cv-00794-LY    Document 29-2    Filed 11/14/19    Page 75 of 115

Page **31** of **63**

night.  Um, I don't know how- what time.  I
mean uh, if somebody was to ask me a direct
question about what time they got home that
night, I couldn't answer that 'cause I don't
know that I was ever told.  But it was later
that night after practice.

CURTIS:

17:02:18:00    So um, I would assume definitely 10:00'ish,
11:00 maybe at night.  You know, after he
powed around with the guys a little bit.
Plus his whole reasoning for necessarily not
coming straight back home was Stacey was
asleep.  She would go to bed at 9:00, 8:00.
9:00 at night in order to get ready for the
shift the next morning.  So he didn't want
to disturb her.  That was kind of their
sleeping arrangement.  You know, didn't want
to just come in and disturb her.  And so
that was part of the other reason why he
said he didn't come home, you know, uh,
earlier than he did.  So…

MALE #1:

17:02:54:00    And uh, did he normally wake up when she
left for work?  And if he didn't that
morning, why not?

CURTIS:

17:03:01:00    Well, and to ask me if-if uh, they- he
normally woke up to take her to work, uh, I
guess the question would be answered like

Case: 19-51044     Document: 00515196870     Page: 76     Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 76 of 115

Page **33** of **63**

CURTIS:

17:03:51:00     Yeah, he'd had a few beers.


MALE #1:

17:03:52:00     That's all.  So just do me a favor and tell
                me that.


CURTIS:

17:03:55:00     Yeah, uh, and basically the reason why he
                didn't get up the next morning whether it
                was because of uh, her wanting to allow him
                to sleep further because she knew that he'd
                had a few beers the night before or he slept
                in because he had a few beers the night
                before.  Whatever the decision was made,
                ultimately she drove herself to work that
                morning.


MALE #1:

17:04:13:00     And, uh, describe to me the scene where you
                were with Jimmy uh, when you found out that
                her body had been found.  [CLEARS THROAT]


CURTIS:

17:04:42:00     When we discovered that her body had been
                found, that Stacey had been found, um, me
                and Jimmy were actually upstairs in his
                apartment.  Um, he was basically laying on a
                beanbag on the floor, on the big bean bags,
                and I was sitting on a chair, and we were
                just talking about police stuff.  Trying to-
                trying to think about something else for

Case: 19-51044     Document: 00515196870     Page: 77     Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 77 of 115

Page **34** of **63**

right now, and I kept telling him every time
he'd go back to the topic of her, "They're
gonna find her. She's gonna be okay, and
we'll deal with whatever has happened to
her. We'll deal with it." And I just kept
telling him that and reassuring him that.
And this went on for a little while. I
don't remember how long.

CURTIS:

17:05:27:00     We were actually in the-the room together,
but uh, there was a knock at the door. I
answered the door and, if I recall right, it
was the chief deputy for Lee County; a guy
by the name of Rodney Meyer, who is now the
sheriff. Looked down and I could see that
there was other police officers in the
grassy area of the apartment, and there was
cop cars from Bastrop. There was
investigators from Bastrop. The Texas
ranger was there. Rocky Wardlow. Uh, there
was another deputy there from Lee County,
and we walked downstairs, and we got
downstairs. I believe it was uh,
Investigator Connor who walked up and told
Jimmy, "We found her, and she's deceased."

MALE #1:

17:06:24:00     And how did he react? Do you remember?

CURTIS:

# Exhibit 16

**REPORTER'S RECORD**

VOLUME 2 OF 6 VOLUMES

WR-50,961-08

TRIAL COURT CAUSE NO. 8701


THE STATE OF TEXAS          ) IN THE DISTRICT COURT

vs.                         ) BASTROP COUNTY, TEXAS

RODNEY REED                 ) 21ST JUDICIAL DISTRICT

---

**WRIT OF HABEAS CORPUS**

---

On the 10th day of October, 2017, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Doug Shaver, Judge Presiding, held in Bastrop, Bastrop County, Texas.

Proceedings reported by computerized stenotype machine.

1    MR. PHILLIPS: Your Honor, if I may, as
2    his lawyer --
3    THE COURT: Well, introduce yourself for
4    the record.
5    MR. PHILLIPS: My name is Robert
6    Phillips, counsel for Jimmy Fennell. Mr. Fennell tends
7    to stand on the truthful testimony he gave 20 years ago
8    and will be declining to testify further, on advice of
9    counsel under the rights afforded him by the
10    Constitution of the United States and particularly the
11    Fifth Amendment.
12    THE COURT: All right, sir.
13    MR. PHILLIPS: I've made that known to
14    both sides. We have an affidavit to file, in lieu of
15    his testimony, which I think is acceptable to both
16    counsel.
17    THE COURT: Do you agree?
18    MR. BENJET: I haven't -- I want to just take
19    a look at it, but, if it's as represented, we would go
20    on his affidavit that's presented today. You know,
21    obviously, we can't make him talk.
22    THE COURT: You need to see the
23    affidavit?
24    MR. BENJET: If you wouldn't mind, yeah.
25    THE COURT: Yeah. Go ahead.

1    *MR. OTTOWAY:* I'd like to see a copy,

2    too, Your Honor.

3           *THE COURT:* All right.

4           *MR. OTTOWAY:* But, again, Your Honor, I am

5    reiterating here, we shouldn't get to Jimmy Fennell

6    because the undisclosed evidence is not what Jimmy

7    Fennell said, it's what Curtis Davis said that Jimmy

8    Fennell said. That's the entire basis of the writ. So

9    having an invocation here, we might not even get to this

10   particular witness. I think we should hear Curtis Davis

11   first, before we take up this particular issue. If you

12   don't believe Curtis Davis or you don't believe    he

13   says that, you know, Jimmy Fennell didn't tell him this

14   alternative timeline, then we don't go further.

15          *THE COURT:* I understand. We're still

16   talking about Mr. Fennell at this time.

17          *MR. OTTOWAY:* Thank you, Your Honor.

18          *MR. BENJET:* This affidavit is acceptable

19   to us to memorialize the invocation of the rights.

20          *THE COURT:* Do we have something in the

21   file?

22           *MR. BENJET:* We don't.

23          *MR. PHILLIPS:* I have the original.

24          *THE COURT:* If you would have it filed

25   over there with the clerk so that --

Case: 19-51044    Document: 00515196870    Page: 82    Date Filed: 11/13/2019
Case 1:19-cv-00794-LY   Document 29-2   Filed 11/14/19   Page 82 of 115
*WRIT OF HABEAS CORPUS*
*10/10/17*

44

1                *MR. PHILLIPS:* Thank you.

2                *MR. BENJET:* And if I can just read it

3  aloud for the record. To the paragraph 1:

4                "My *name is Jimmy Lewis Fennell, Jr. I am over*

5                *the age of 18 and fully competent to make this*

6                *affidavit. I currently reside at the TDCJ Sanders*

7                *Estes Unit in Johnson County, Texas.*

8                Paragraph 2:

9                "*I am aware that a bench warrant for my*

10               *appearance and testimony in Bastrop County District*

11               *Court has been issued in Ex Parte Reed,*

12               *No. WR-50,961. A copy of a bench warrant is*

13               *attached as Exhibit I. I have discussed this matter*

14               *with my attorney prior to executing this affidavit.*

15               Paragraph 3:

16               "*If I am called to testify and asked any*

17               *questions regarding the subject matter of* (A), *the*

18               *murder of Stacey Stites; (B), any statements I may*

19               *have made regarding my activities and whereabouts on*

20               *April 22nd-23rd, 1996; (C), the investigation of the*

21               *murder of Stacey Stites, or (D) the prosecution and*

22               *trial of Rodney Reed for the murder of Stacey*

23               *Stites, I will not answer the questions. Instead, I*

24               *will respond to each question regarding the subjects*

25               *by stating that, 'On advice of counsel, I am*

1      *declining to answer the question based on my Fifth*

2      *Amendment right not to testify.'"*

3                Paragraph 4:

4          *"If I am called to testify and asked any*

5      *questions regarding any allegation against me of*

6      *criminal conduct while I was working as a police*

7      *officer, I will not answer the questions. Instead,*

8      *I will respond to each question regarding these*

9      *subjects by stating that, 'On advice of counsel, I*

10     *am declining to answer the question based on my*

11     *Fifth Amendment right not to testify.'"*

12               Signed on October 7, 2017. There is a

13  notarized signature affirming that it's Jimmy Fennell,

14  and then attached is the bench warrant. And, Your

15  Honor, if you would like a copy, we can provide you

16  one    or you have it right there.

17               *THE COURT:* That'll be accepted. And he

18  will not testify?

19               *MR. PHILLIPS:* He will not testify.

20               *THE COURT:* If he will not testify,

21  you're free to go.

22               *MR. PHILLIPS:* I'm going to stay for a

23  while, if I may.

24               *THE COURT:* You can stay. And if he's

25  here -- I don't know if he's here or not -- he can be

# Exhibit 17

## AFFIDAVIT OF

THE STATE OF TEXAS

WILLIAMSON COUNTY

BEFORE ME, the undersigned authority, personally appeared ▇▇▇▇▇▇▇▇ who, being duly sworn upon his oath according to law, said as follows:

1.    I, ▇▇▇▇▇▇▇, am over the age of twenty-one and am competent to make this Affidavit. I have never been convicted of a felony or a crime involving moral turpitude. I have personal knowledge of the facts set forth in this Affidavit, and those facts are true and correct.

2.    For the last 34 years, I have been a salesperson for ▇▇▇▇, a fraternal life insurance company based in ▇▇▇▇▇▇. In addition to selling and providing insurance, we provide opportunities for our policy holders, whom we call members, to engage in cultural, social, educational, and civic activities. For example, we have lodge halls at locations all over the State of Texas, where we encourage members to come for social events, including dances and other gatherings.

3.    In 1995, I was officer of the ▇▇▇▇▇▇▇▇▇, located (at the time) at ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ where we frequently held functions. At that time I went by the name ▇▇▇▇▇▇. As part of my responsibilities, I would open the hall, make sure we had enough workers for whatever event we had planned, set up the ticket sales, and perform other tasks. We would hire outside security officers to ensure safety at the event, and I would interact with the security, if there were ever problems or just to visit.

4.    A frequent member of our security team was a man named Jim Fennell ("Jim"), who would come to the lodge hall and work security. I understood that he was a law enforcement officer, or involved in law enforcement in some way, and did this on the side—a practice that

1

was not uncommon for law enforcement officers who wanted to make a little extra money. I knew Jim because of this; and I can easily recognize him.

5.     On one occasion, Jim introduced me to his girlfriend at the time, a young lady named Stacey Stites ("Stacey"). After that introduction, I remember seeing her at the lodge hall accompanying Jim on a few other occasions that he worked.

6.     In November 1995, I struck up a conversation with Stacey at the lodge hall and asked her if she would be interested in applying for a life insurance policy. She agreed to fill out an application, and being in the insurance business, I always had an application nearby. When she was filling out the application she made the remark, "I really don't know why I need life insurance since I am so young."

7.     In response to that comment, Jim, in my presence, told her "If I ever catch you messing around on me, I will kill you and no one will ever know it was me that killed you." I remember it well because of the tone of voice that he used. It was not presented as a joke. That concerned me and still concerns me today, because I took it as a threat on her life. I found it harsh and abrasive, and I have never forgotten it.   Although I do not recall Jim applying for insurance or filling out an application, records with the insurance company indicate that he did as well. I have attached as **Exhibit 1** of this Affidavit a copy of the insurance company's receipt of applications for Jimmy Lewis Fennell, Jr., and Stacey Lee Stites, dated November 29, 1995.

8.     Months later, at a function Jim was not scheduled for security duty, I remember he came to the lodge hall shortly before closing time. I remember looking at my watch. He entered through the kitchen door. He was familiar with all entrances and exits since he was frequently one of our security. He came around to the front of the bar. I observed him and noticed he was red-faced and his face seemed to be puffy, as though he had been drinking. I

2

remember thinking that he looked upset or like he had high blood pressure. It just did not seem like the Jim Fennell I was used to seeing. I did not speak to him, as I had duties and proceeded to do them since it was almost closing time. I did not have a reason to talk to him. A few days later, I learned that Stacey had been murdered.

9.      Although I do not know Rodney Reed ("Mr. Reed"), sometime in the early 2000s I tried to contact an attorney of his to let his legal team know about Jim's threat to Stacey. I got the name Bryce Benjet from a newspaper article, and I called a phone number in Austin. I was not sure that I was calling the right place, but there was a recording asking that messages be left, and I left my name and a brief message relating to my call. I have since learned that Mr. Benjet had moved to New York. I did not try to reach him again. I did not come forward earlier because I thought Mr. Reed was going to be exonerated.

10.      In 2015, after all of the coverage about Mr. Reed's case and with the possibility of his execution, I wrote and mailed two letters describing these events, one to Texas Attorney General Ken Paxton, and the other to Governor Greg Abbott. I wrote the letters because I thought at the time, and continue to believe, it is important that I share my experience witnessing Jim's threat to kill Stacey if he found out she was cheating on him. I have attached copies of those letters to this Affidavit, as **Exhibits 2** and **3**. I never heard back from either the Attorney General or the Governor based on these letters.

11.      In July of this year, I learned from television media that Mr. Reed was scheduled for execution. I again wrote a letter, this time to Judge Shaver, the judge who presided over Mr. Reed's last hearing, to share my experience. I sent copies of that letter to Governor Abbott, Bastrop County District Attorney Bryan Goertz, and to Texas Attorney General Ken Paxton. I have attached a copy of that letter as **Exhibit 4** to this Affidavit. Despite the passage of time

3

between my 2015 and 2019 letters, my description of the interaction I had with Stacey in November 1995, and my recollection of the words Jim used to threaten to kill her, are the same.

12.     I am coming forward now, again, because it is important that law enforcement and people in positions of authority in this State know and consider Jim's threat to kill Stacey, which I understand occurred shortly before her death.

13.     I fear that Texas may soon execute someone who I do not believe committed this crime.

Further Affiant sayeth not.



Subscribed and sworn to before me this 5th day of September, 2019, to certify which witness my hand and official seal.

LEE E ROBERTS
Notary ID # 7481138
My Commission Expires
April 5, 2020

Notary Public in and for the State of Texas



November 29, 1995



Dear ███ ,

This acknowledges the receipt of non-medical and / or medical applications and benefits as applied for:

| Name(s) | Class | Amount | DI | PW | PY | OR |
|---|---|---|---|---|---|---|
| JIMMY LEWIS FENNELL, JR. | | | | | | |
| STACEY LEE STITES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

for membership to ███

Please check the information listed above carefully. If any change(s) is required, call us immediately so that we may incorporate the change prior to issuing the certificate.

Thank you,

Cynthia
Insurance Department

███ ,

Please call me as soon as possible regarding these applications.

Cynthia



**EXHIBIT**

1

February 16, 2015

Honorable Greg Abbott
Governor of Texas
State Capital
Austin, Texas 78701

Re: Rodney Reed

Dear Governor Abbott:

As I watch the news from day to day and week to week and see the continued execution of Rodney Reed, it saddens me to know that the young man doesn't seem to be getting the opportunity to be found not guilty. I can't imagine any judge or attorney not allowing an piece of evidence to be submitted to save a life.

I am in the life insurance business and knew both Jim Fennell and Stacy Stites. Stacy was in my presence filling out an application for insurance as Jim Fennell stood near. Stacy made the comment that, "I am so young I don't know why I would need insurance."  Jim Fennell then made the statement that if he ever found out she was cheating on him, he would kill her and no one would ever know he did it.

I have read and heard others make similar reports, but no one seems to take these treats of Jim's serious. What in the world or why wouldn't a judge take every little bitty piece of evidence into consideration before taking the life of anyone not much less an innocent Rodney Reed.

With all of the supporters and demonstrations and asking for help; I too decided to write my Governor and request some help for this innocent Rodney Reed.  Please please help this innocent person and allow his lawyers the opportunity to prove his innocence.

Recently, a man went through this same type of conviction in Williamson County and after serving 25 years was finally found not guilty and was released. What a terrible tragic thing to convict an individual by not allowing all evidence to be submitted for evidence.

Thank you for your utmost consideration!

Please do not allow our state to become known for killing innocent people.

In God we Trust!!!!!!

With a deep plea for help I am,





EXHIBIT
2

February 19, 2015

Honorable Ken Paxton
Attorney General of Texas
State Capital
Austin, Texas 78701

Re: Rodney Reed currently on death roll.

Dear Mr. Paxton:

As I watch the news from day to day and week to week and see the continued execution of Rodney Reed, it saddens me to know that the young man doesn't seem to be getting the opportunity to be found not guilty. I can't imagine any judge or attorney not allowing an piece of evidence to be submitted to save a life.

I am in the life insurance business and knew both Jim Fennell and Stacy Stites. Stacy was in my presence filling out an application for insurance as Jim Fennell stood near. Stacy made the comment that, "I am so young I don't know why I would need insurance." Jim Fennell then made the statement that if he ever found out she was cheating on him, he would kill her and no one would ever know he did it.

I have read and heard others make similar reports, but no one seems to take these treats of Jim's serious. What in the world or why wouldn't a judge take every little bitty piece of evidence into consideration before taking the life of anyone not much less an innocent Rodney Reed.

With all of the supporters and demonstrations and asking for help; I too decided to write you and the Governor and request some help for this innocent Rodney Reed. Please please help this innocent person and allow his lawyers the opportunity to prove his innocence.

Recently, a man went through this same type of conviction in Williamson County and after serving 25 years was finally found not guilty and was released. What a terrible tragic thing to convict an individual by not allowing all evidence to be submitted for evidence.

Thank you for your utmost consideration!

Please do not allow our state to become known for killing innocent people.

In God we Trust!!!!!!

With a deep plea for help I am,





EXHIBIT

3

July 25, 2019

Honorable Judge Doug Shaver
Bastrop County Court House
804 Pecan Street
Bastrop, Texas 78602

Re: Rodney Reed

Your Honor:

I have made several attempts to contact or notify various parties to express concern in the Rodney Reed case. Each time this has come up it concerns me that all possible evidence would not be allowed to save a human life. How could you possibly live knowing that you didn't allow this to happen?

I do not know Rodney Reed, but I did know Stacy and I also knew Jim Fennel. I am in the insurance business and sold Stacy a life insurance policy. When she was filling out the application she made this remark, "I really don't know why I need life insurance since I am so young". Jim Fennel (in my presence) told her, "If I ever catch you messing around on me, I will kill you and no one will ever know it was me that killed you".

That concerned me that day and it still concerns me today. That is why I feel I have to let this be known. That's a threat!

You obviously have made up your mind that Rodney Reed is guilty, but I am asking you to reconsider and hear all evidence even the evidence that was previously presented and later admitted being wrong. What kind of justice is that?

For God sake give the man a fair trial. Hear all the facts regarding the Rodney Reed case. Could you live with yourself if he was falsely put to death. I am not black and consider myself to be an honorable respectable individual in and around my community. But could not live with myself if I didn't share this information with you. I believe you are a fair individual and will do the right thing. Thank you for your consideration.

cc: Honorable Greg Abbott
cc: Honorable Bryan Goetz
cc: Honorable Ken Paxton




EXHIBIT
4

# Exhibit 18

## DECLARATION OF BRENT SAPPINGTON

THE STATE OF TEXAS      §
                         §
COUNTY OF PARKER      §

I, BRENT SAPPINGTON, declare as follows:

1.      My name is Brent Sappington. I am over twenty-one years of age and am fully competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration, and they are true and correct.

2.      In early 1996, my wife, Vicki, and our two children lived in Giddings, Texas, close to my father, William Frederick Sappington. He lived at the Rolling Oaks Apartment Complex, and we lived not far from him, closer into town.

3.      I spent a lot of time at Daddy's apartment with him and my family.

4.      One time in the earlier part of 1996, I don't recall if it was day or night, I was over Daddy's apartment and I heard a lot of loud noises and banging above his apartment. It startled me because it sounded like loud arguing and fighting. I asked Daddy what that was, and I remember him telling me that it was Jimmy yelling and screaming and "getting into it" with Stacey. I remember either saying, or thinking to myself, that they were making a lot of racket.

5.      It was not a surprise to me because Daddy had told us before that he was concerned about the way the neighbor above him, a man named Jimmy, treated a young lady named Stacey. He told us that he would hear Jimmy yelling at Stacey at night. He said it was always Jimmy's voice that he heard and that Jimmy's language was abusive toward Stacey. Daddy lived in Apartment 501 at Rolling Oaks at that time.

6.      At this time in my life I was in my early 30s and weighed about 185 pounds. I am 6-feet-1. I consistently wore a mustache and had what you would call either light, or sandy brown, colored hair.

1

7.    I have reviewed the information and statements in my wife Vicki Sappington's declaration and all of the information and statements therein are true and correct according to my recollection.

I have read and reviewed this declaration. I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this declaration was executed on the ⎿0 th day of November, 2019.

Brent Sappington

Exhibit 19

## DECLARATION OF VICKI SAPPINGTON

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF PARKER | § |

I, VICKI SAPPINGTON, declare as follows:

1.    My name is Vicki Sappington. I am over twenty-one years of age and am fully competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration, and they are true and correct.

2.    Around 1992, my husband, our two children and I moved from Ledbetter, Texas to Giddings, Texas. At that time, my father-in-law, William Frederick Sappington, lived with us, and he made the move from Ledbetter to Giddings with us. Later, he moved into his own apartment at Rolling Oaks Apartment Complex in Giddings. I was close to my father-in-law and called him "Daddy."

3.    Daddy was very helpful to us while we were in Giddings. Our children enjoyed spending time with him, as did my husband and I. We went to church together and did just about everything else together with Daddy. He was very much a part of our family.

4.    In early 1996, Daddy lived in Apartment 501 at the complex.

5.    Daddy was very social and enjoyed getting to know people around him. At some point, he told my husband and I that the man who lived above him in apartment 502 was a police officer named Jimmy Fennell ("Jimmy"). He also told us a young lady spent time with Jimmy in his apartment. He told us her name was Stacey and that she was engaged to be married to Jimmy.

6.    Daddy told us that he was very concerned about the way Jimmy treated Stacey, however. He told us that he would hear loud noises and thumping sounds at all times of the night from arguments above him. He said it was always Jimmy's voice that he heard and that Jimmy's language was abusive, aggressive, and angry toward Stacey. He would yell and scream at her.

1

Daddy mentioned that this happened often and he often relayed these stories to us. He told us specifically that he was concerned for Stacey because the aggression seemed to be directed at her in these arguments—not the other way around. Based on the loud noises and thumping, and Jimmy's tone, Daddy told us he believed Jimmy was also physically abusive to Stacey.

7.     Regrettably, I remember discouraging Daddy from getting involved or speaking out while she was alive. I told him that he could not be sure what was going on and probably should just stay out of it.

8.     When Stacey was killed, Daddy was devastated, and he told us that he contacted law enforcement to tell them what he knew about Jimmy's abuse but was told that Jimmy would not do that type of thing and was not involved in Stacey's death. He told me he could not understand why investigators were not more interested in speaking to him since Jimmy and Stacey were directly above his apartment.

9.     Because of what he heard and experienced at that apartment complex, daddy never believed that anyone other than Jimmy Fennell could be responsible for Stacey's murder. Daddy was very sharp until the day he died and never had memory or cognitive issues.

I have read and reviewed this declaration. I declare under penalty of perjury under the laws of the state of Texas that the foregoing is true and correct to the best of my knowledge and that this declaration was executed on the 10th day of November, 2019.

_____
Vicki Sappington

Exhibit 20

## AFFIDAVIT OF JIM CLAMPIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF LEE | § |

BEFORE ME, the undersigned authority, personally appeared Jim Clampit, who, being duly sworn upon his oath according to law, said as follows:

1. My name is Jim Clampit. I was born in Lufkin, Texas. My date of birth is 7/15/1940. I reside at 1321 Nails Creek Rd., Giddings, Texas, 78942. I am over the age of 21 and competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and they are true and correct.

2. In about 1968, I graduated from the Texas A&M Game Warden Academy. After graduation, I accepted a position as the Lee County Game Warden. The position was based in Giddings, Texas. I moved to Giddings for this job. I met my wife in Giddings and have lived here ever since. I served as the Game Warden for about 15 years, until about 1984. At this time, the region was experiencing an oil boom, and so I became an oil field worker. I worked in the oil fields for about 3 years.

3. In 1988, I accepted a position as a deputy at the Lee County Sheriff's Office. As a deputy in a small Sheriff's office, I had a lot of responsibilities. For example, I worked patrol, traffic, and investigations. I investigated offenses including burglaries, assaults, and homicides.

4. In 1996, I was working as a deputy at the Lee County Sheriff's Office when Stacey Stites ("Ms. Stites") was murdered.

5. Though I did not know Ms. Stites personally, I knew her fiancé at the time, Jimmy Fennell ("Jimmy"). Jimmy was an officer at the Giddings Police Department. I knew Jimmy from around town, and because we were both local law enforcement officers. The Lee County Sheriff's Office often assisted the Giddings Police Department on calls. I recall Jimmy being present at several of the calls I provided support on. In this way, I became familiar with Jimmy.

6. I and many other law enforcement officers paid our respects to Ms. Stites and her family by attending her funeral. I have been shown a copy of a 33-page document entitled "Register of Friends and Relatives." It is a registry in which people who attended the visitation services for Ms. Stites signed their names. I have identified my signature on the last line of page 9. I signed this registry at the funeral home on the day I attended the services for Ms. Stites.

1 of 2

7. I recall that at the viewing services, Ms. Stites's body was inside of a casket in a small viewing room. Her body was dressed in a white dress which looked like a wedding dress. I distinctly remember standing in the doorway to the viewing room next to Jimmy Fennell. Jimmy was looking at Ms. Stites. At that moment, Jimmy said something that I will never forget. Jimmy said something along the lines of, "You got what you deserved." Jimmy was directing his comment at Ms. Stites's body. I was completely shocked and floored by what Jimmy said. It did not strike me as something a grieving partner would say to their murdered fiancé.

8. Over the years, I have often thought about what Jimmy said at Ms. Stites's services. I am still shocked by it. Recently, after reading about Rodney Reed's case in the newspaper, I started thinking about what Jimmy said more and more. I told a couple friends and my wife about what I heard Jimmy say. The more I thought about it, the more I knew that I would not be able to live with myself if I did not come forward.

9. I know that Rodney Meyer and Rocky Wardlow would be good sources of information about the Stacey Stites murder investigation. I know both personally. The Lee County Sheriff's Office assisted on the investigation. Rodney Meyer was the chief deputy at the Lee County Sheriff's Office. Rocky was a DPS Ranger. Both Rocky and Rodney assisted with the Stites murder investigation.

I have read and reviewed this 2-page affidavit. After reading each page, I initialed the bottom of each page.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the _3_ day of October, 2019 in Giddings, Texas.

_Jim Clampit_
Jim Clampit

Sworn to and subscribed before me on the _3_ day of October, 2019, by Jim Clampit.

_Rachel C Manning_

RACHEL C. MANNING
Notary Public, State of Texas
Comm. Expires 01-31-2022
Notary ID 131431128

Notary Public, State of Texas

Register of Friends
and Relatives

Lynetta Letimer
Norm & Alice Hochdorf
Maria T Ramos
Cindy Gonzales
Wayne Fletcher
Linda Kellar
Karen Hausler
Sidi Lisikar
Pamela Dunk
Susan Schultz
Herschel W. & Brenda Knittle   with all our love always
Maria Bryant   Joe Bryant
Rhonda Bennett   Rest in peace God be with you!
Jackie Miles
Sally Shieperbeck   BCSO
J M. Vellme   BCSO
Jim Hoet   BCSO
Adam Gonzales   Lee Co. SO
Jim Clampit   Lee Co. SO   Jim Elphit
10.3.19

# Exhibit 21

## AFFIDAVIT OF RICHARD DERLETH

THE STATE OF TEXAS     §
                         §
COUNTY OF BASTROP     §

BEFORE ME, the undersigned authority, personally appeared Richard Derleth, who, being duly sworn upon his oath according to law, said as follows:

1.    My name is Richard Derleth. I am over twenty-one years of age and am fully competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and they are true and correct.

2.    I started working at the Bastrop County Sheriff's Office during the time that Fred Hoskins was Sheriff, and stayed until 2002. I began as a jailer and then became a deputy. In April of 1996, I was a deputy.

3.    While at the Sheriff's Office I got to know Jimmy Fennell and would see him at work during the time that he worked there. We had a professional relationship. I vaguely knew Stacey Stites from her job at the H-E-B grocery store. I went to the store frequently, probably two or three times a week, to get items or food or a quick snack. I remember seeing her on occasion and greeting her once or twice. I did not get to know her any better.

4.    I did get to know the check-out staff at the store, and I spoke to them more often. In fact, I would see and speak to them on the way in and out of the store. They seemed friendly and happy to speak with me. We would talk casually, sometimes about things going on in their lives and sometimes about things going on in the store.

5.    On at least one occasion, probably in early 1996 before Stacey died as I recall, I remember a member of the check-out staff telling me something concerning about Stacey Stites and Jimmy Fennell. Specifically, they told me that members of the staff would keep a look-out for Jimmy Fennell to see if he would come into the store. They told me that if they saw Jimmy

1

coming into the store, they would tell Stacey and she would run and hide from Jimmy. They told me they were concerned that if they did not alert Stacey to Jimmy's presence in the store before he found her, he would start a verbal fight with her.

6.      When I received this information, I shared it with a few members of the Sheriff's Office, but mostly kept it to myself because I tried to avoid creating a problem for the employees at H-E-B who shared this with me. I am not sure what the members of the Sheriff's Office I told this to ever did with it.

Further Affiant sayeth not.

Richard Derleth
Richard Derleth

Subscribed and sworn to before me this 9 th day of November, 2019, to certify which witness my hand and official seal.

Notary Public in and for the State of Texas

MATTHEW ORESON
My Notary ID # 131587996
Expires May 31, 2022

# Exhibit 22

## AFFIDAVIT OF ARTHUR SNOW

THE STATE OF TEXAS        §
                                        §

COUNTY OF HAYS           §

BEFORE ME, the undersigned authority, personally appeared Arthur Snow, who, being duly sworn upon his oath according to law, said as follows:

1. My name is Arthur J. Snow, Jr. My date of birth is ██████████. My address is ██ ████████████████████. I am over the age of 21 and competent to make this Affidavit. I have personal knowledge of the facts set forth in this Affidavit, and they are true and correct.

2. I have been in and out of jails and prisons for much of my life. From about December 2010 until about September 2011, I was an inmate at the Stevenson Unit in Cuero, Texas. At the time, I was serving time for forgery. My TDCJ number is #01534438.

3. Prison can be a dangerous, chaotic, and violent place. It is common for inmates to join or form allegiances with gangs for protection, or to feel like they belong to part of a group. Often, prison gangs form along racial divides.

4. I was brought up to be prejudiced against black people. As a kid, I remember my grandparents using the word "nigger" to describe black people. They used the term so casually. As a result of my upbringing, I adopted the same values and beliefs I was taught. I didn't know any other way to be, and so when I went to prison, I joined the Aryan Brotherhood. The Aryan Brotherhood is a whites-only prison gang.

5. The Aryan Brotherhood has a hierarchical structure. Eventually, I became a respected member of the gang, and was seen by other inmates as sort-of a leader. As a result, new white inmates would sometimes approach me for services. For example, inmates could pay the Aryan Brotherhood to offer them protection from people or groups within the prison.

6. In about 2010, a white man named Jimmy Fennell ("Jimmy") approached me at the Stevenson Unit wanting the protection of the Aryan Brotherhood. Jimmy said he needed protection from the blacks and Mexicans at the prison. At the time, I didn't know anything about Jimmy. All I knew was that I had seen Jimmy around the prison and observed that he seemed out of his element. So, I cut a deal with Jimmy that he would pay the Aryan Brotherhood out of his commissary, and in exchange we would keep the blacks and Mexicans off of him and protect him from violence.



1

7. Jimmy and I were never really friends, but we occasionally made conversation. One conversation stands out very clearly in my mind. Jimmy and I were in the rec yard at the Stevenson Unit walking around the track and talking. He was talking about his ex-fiancé with a lot of hatred and resentment. Jimmy said his fiancé had been sleeping around with a black man behind his back. By the way Jimmy spoke about this experience, I could tell that it deeply angered him. Toward the end of the conversation Jimmy said confidently, "I had to kill my nigger-loving fiancé." My impression was that Jimmy felt safe, even proud, sharing this information with me because I was a member of the Aryan Brotherhood. I think Jimmy assumed that his confession would impress me and earn him credibility with the Aryan Brotherhood.

8. As I recall, people didn't really bother Jimmy anymore once they knew he was under our protection. However, one day a new inmate came onto the unit who said he knew Jimmy from time he spent in Williamson County. I do not recall this man's name, but the new inmate said that Jimmy was a former cop who had been convicted of raping a woman in his custody. I wanted to verify this, so I asked a guard at the prison to look Jimmy up and tell me who he was and what he was in for. After looking Jimmy up, the guard confirmed Jimmy's history.

9. After the news spread around the prison that Jimmy was a cop, and that he was a rapist, the Aryan Brotherhood couldn't protect Jimmy anymore. Then, Jimmy accused the Aryan Brotherhood of extorting him. Because the guards saw me as one of the leaders of the gang, Jimmy's accusations landed on me. As a result, I was ultimately moved to the Connally Unit where they send a lot of gang members.

10. A few years ago, I was in the Hays County Jail. While there I saw Jimmy's picture in the newspaper. His picture was juxtaposed next to a picture of a black man named Rodney Reed. This was the first time I had heard about Rodney Reed or his case. The article said that Rodney Reed had been convicted of murdering Jimmy Fennell's fiancé. That's when everything came together for me. I recalled my conversation in the rec yard with Jimmy. I realized that Rodney Reed was sitting in prison for a murder that Jimmy Fennell had confessed to me that he had committed. I had planned to come forward back then, but never did. At the time, I still had a heavy gang-mentality and decided that it was none of my business. On top of it all, I worried that even though Jimmy was a cop, I would be labeled a snitch.

11. In the years since I saw that newspaper article, though I was not a young man then, I finally started to grow up. I had grandkids. I started to look at the world differently. I let go of some of my prejudices. I looked at the situation differently and tried to put myself in Rodney Reed's shoes. When I did, it weighed on my conscience. Recently, after having again landed myself in the Hays County Jail, I saw another newspaper article about Jimmy Fennell and Rodney Reed. I knew I couldn't ignore this memory anymore. I decided that I had to come forward and tell someone what I knew.



2

I have read and reviewed this 3-page affidavit. After reading each page, I initialed the bottom of each page.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge and that this affidavit was executed on the 29 day of October, 2019 in San Marcos, Texas.

_____
Arthur J. Snow Jr.

Sworn to and subscribed before me on the 29TH day of October, 2019, by Arthur Snow.

_____
Notary Public, State of Texas

RHIANNON HAMAM
Notary Public, State of Texas
Comm. Expires 12-16-2019
Notary ID 130483993

# Exhibit 23



**BRYAN GOERTZ**
CRIMINAL DISTRICT ATTORNEY
PHONE (512) 581-7125

804 Pecan Street
Bastrop, Texas 78602
FAX (512) 581-7133

## *Office of the Criminal District Attorney*
### *Bastrop County, Texas*

September 23, 2019

Andrew MacRae
Levatino | Pace PLLC
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746

Re:    Letter of August 12, 2019

Dear Mr. MacRae,

I am in receipt of you letter dated August 12, 2019, requesting the disclosure of two items you allege I possess: (1) phone records for Jimmy Fennell and Stacey Stites, and (2) a database generated from those records.

After receiving your letter, a review of the trial file was conducted, and it disclosed no such items. We have verified that Carol Stites's phone records were provided by consent via a copy of her phone bill and, thus, no subpoena was issued to obtain these records. We have also reviewed the district clerk's records for subpoenas applied for or issued from April 23, 1996 (Stacey Stites's murder), to May 29, 1998 (date of Rodney Reed's sentencing), and could find none for the phone records of Jimmy Fennell and/or Stacey Stites. An inquiry was also made with the Rangers Division of the Department of Public Safety and they could find no such items either.

In sum, it appears that no phone records were requested or received regarding Jimmy Fennell and/or Stacey Stites and no database was generated therefrom. The note you reference on the discovery provided before trial, Bates-numbered page 0000512, appears to have been made in error. Ultimately, because I do not possess either item that you have requested, I cannot provide them to you.

Regards,

Bryan Goertz
Criminal District Attorney
Bastrop County, Texas

# Exhibit 24

## TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGER DIVISION

### VOLUNTARY STATEMENT (NOT UNDER ARREST)

THE STATE OF TEXAS

COUNTY OF NUECES

Before me the undersigned authority in and for said County and State, on this day, Wednesday, March 05, 1997, personally appeared, CAROL JEAN STITES, address is 2514 ASHLOCK ST CORPUS CHRISTI, TEXAS 78418, phone number is 512-937-3265, who, after being by me duly sworn, deposes and says:

My name is Carol Stites, I am 55 years of age. My date of birth is 12-27-41. I am the mother of Stacey Stites. On Monday 4/22/96, I was in my apartment at the Rolling Oaks Apartment in Giddings. I think it was apartment 503. I lived in the apartment below and to the right of Stacey. She lived upstairs with her fiancee, Jimmy Fennell.

Stacey had first seen Jimmy at the Smithville Jamboree. Stacey and I were living in Smithville at the time. Stacey and Jimmy began dating steady about the time she graduated from Smithville High School. Stacey and I moved to Bastrop just before she graduated. We lived at 420 Vista West at that time in a duplex. Jimmy and Fletcher helped us move in. They were both working at the sheriff office in Bastrop. Jimmy was in cadet school. Stacey was working at Covert Chevrolet at this time. Before that, she had worked at Owl's western wear in Bastrop for about a week. Prior to all this when we lived in Smithville, Stacey worked at Brookshire Brothers grocery there in Smithville.

Stacey and Jimmy became very close while we were in Bastrop. Jimmy moved in with us in October. Jimmy got a job in Giddings as a police officer. In December, Jimmy got an apartment in Giddings. Jimmy asked her to marry him but he was talked out of it by his mother. Stacey and I moved into the same apartment complex the first of January 1996. Jimmy gave Stacey a ring and she moved in with him in February. They were planning a March wedding, but his mother talked him out of that so they were planning a wedding on May 11, 1996.

On Monday 4-22-96, I was at my apartment when Stacey came in from work at about 1:30. She was driving Jimmy's truck. Jimmy was at work. Stacey came directly into my apartment and we talked for a few minutes. Stacey left and went upstairs to change out of her work clothes. She was wearing her blue pants and white shirt. I'm thinking she had the red work shirt in her hand. She wasn't gone very long, just long enough to change, and then she came back downstairs. Stacey fixed herself a meatloaf sandwich and ate. She wrapped up in a throw I had and laid down on the couch and went to sleep.

About 2:30, Jimmy came in from work. He came to the front door and I woke Stacey up and told him he was there. Jimmy came in and Stacey told him he would have to fix his own meal. They kinda laughed at each other, and Jimmy fixed a sandwich. I was taking care of Jennifer Dale, she is the 5 year old daughter of Janice Dale. Stacey and Jimmy played with her and watched TV with me until about 4:30.

Jimmy got ready to go upstairs to change clothes for baseball practice. Jimmy took my car keys out of his pants pocket and laid them on the entertainment center. To my knowledge there is only two sets of keys to my car. One set is on my keyring and the other set was used by Stacey or Jimmy. The second set is not on anybody's keyring, and I have them now.

COPY

Statement of Carol Stites (continued)

Statement of Carol Stites (continued)                                              page 2 of 3

Jimmy was still wearing his uniform at the time. Jimmy said he was going to take Stacey to work the next morning because he wanted his truck. He said he was scheduled for court and needed his truck, that he didn't want to drive my car. Jimmy was supposed to go with Stacey when she got off to get insurance on her so she could drive drive his truck. Stacey and I both got on him because it was stupid for him to get up, drive her to work, drive back home, then drive back to Bastrop to pick her up. Jimmy just walked out of the apartment and Stacey said she would talk to me later and she left to go upstairs. I was under the impression that Jimmy was taking Stacey to work the next morning.

Jimmy left just before 5:30 or so to go to baseball practice. He coached a little league team with David Hall, another Giddings police officer. I don't think David went that day because it seemed like something came up. I'm not sure whether David went or not. He may have ridden with Jimmy, I just know Jimmy left in his truck.

David Hall lived in a trailer behind the apartments with his wife Carla. They had 3 kids. From what Stacey and Jim told me, I believe David and Carla were having marital problems. Stacey and Jimmy used to go over to the Hall's and visit, but not a great deal.

Stacey came back down to my apartment about 7:30. I was crying and Stacey asked me what was wrong. I told her I was stressed out over the wedding, that things weren't going the way we thought they were. I told Stacey she should think twice about this marriage. I told her she needed to really make up her mind about whether she wanted a mother in law messing in her business. Jimmy's mother wouldn't call me about anything, she would go through Jimmy which was creating problems between Jimmy and Stacey. Stacey told me she loved both me and Jimmy and I was just going to have to learn how to get along with Jimmy.  _mm 7_

I saw Jimmy through the window walking around the end of the building. Stacey asked me if I had seen Jimmy and I told her yeah, that he had just walked around the end of the building. I assumed he was going to David's because that's the direction he was going. Stacey went out the apartment and around the end of the building where he had gone. Stacey came back running and was laughing like she had pulled something on him. He was chasing her, and he was laughing. They ran upstairs. It was probably a little after 8 o'clock. That was the last time I saw her.

I stayed in my apartment the entire evening and watched TV. I stayed up until about 1:30 AM Tuesday morning. I never heard anything unusual. I drifted off to sleep one time, for about 30 minutes. I got up and went to bed. I woke up out of a sleep about 5:15 that morning. I had the feeling somebody was telling me I had done a good job of raising Stacey. I remember thinking my job wasn't over yet.

I don't remember anything else until the phone rang and they told me Stacey wasn't at work. I looked outside and saw the truck wasn't there. I told them the truck was gone, so I would call Jim. I hung up the phone and called Jimmy. I said Stacey didn't make it to HEB. He said OK. I don't remember what he may have said. He didn't question me about it. I called the Police Department in Bastrop and the HEB. I told HEB Jimmy was going to look for Stacey.

I went outside and Jimmy was coming downstairs. He had his jeans and shoes on and was putting on his T shirt. I had picked up the keys to my car where he had left them the day before. I had them in my hand when he came down the stairs. I gave him the keys, because I knew the truck was gone. He said he had talked to Bastrop and was going to meet someone at the county line to backtrack to Bastrop.

Statement of Carol Stites (continued)                                          page 3 of 3

I waited in my apartment and Janice Dale showed up to drop off Jennifer. When she found out Stacey was missing, she decided to stay. Janice made some calls. We called the police several times to see if anybody knew anything.

Sometime after 9 AM Jimmy returned. He said they hadn't found anything and he was going up to Giddings PD. Jimmy left and wasn't gone very long before I was called and they said they found the truck. They said it was locked and they needed the keys. They needed Jimmy to bring a set of keys. I called Giddings PD and talked to the dispatcher. She said Jimmy knew the truck had been found and he was on his way over there.

Jimmy came back but I don't remember the time. Jimmy's Mom and Dad showed sometime after lunch. I know Jimmy was there when they showed up.

_____
Witness

_____
Witness


_____
Signature

Date:   03/05/97    Time:  8:03 PM