UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RODNEY REED, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CIVIL NO. A-19-CV-0794-LY |
| | § | |
| BRYAN GOERTZ, | § | * CAPITAL CASE * |
| BASTROP COUNTY DISTRICT | § | |
| ATTORNEY, | § | |
| | § | |
| DEFENDANT. | § | |

## ORDER DISMISSING COMPLAINT

Plaintiff Rodney Reed, a Texas death-row inmate, is scheduled to be executed on November 20, 2019. On August 8, 2019, Reed filed a civil-rights complaint arguing that the denial of his motion for DNA testing in state court denied him, among other things, the right to due process of law and access to the courts. *See* 42 U.S.C. § 1983 ("Section 1983"). Reed later amended his complaint and filed a motion for stay of execution.[1] (Doc. #11). Defendant Goertz opposes both of these requests.

Currently pending before the court are Reed's Amended Complaint[2] (Doc. #10), Goertz's Motion to Dismiss (Doc. #22), and Reed's Opposition to the Motion to Dismiss (Doc. #25), as well as Reed's Motion to Stay Execution (Doc. #11), Goertz's opposition (Doc. #23), and Reed's reply (Doc. #27). Also before the court are Goertz's Motion to Stay Discovery (Doc. #24) and Reed's opposition (Doc. #26). For the reasons discussed below, Goertz's Motion to Dismiss will

---

[1] Reed filed his initial complaint against the Director of the Texas Department of Public Safety, as well as the District Attorney, District Clerk, and Sheriff of Bastrop County, Texas. Following motions to dismiss filed by all Defendants, however, Reed amended his complaint and named only Bryan Goertz, the District Attorney of Bastrop County, as a defendant.

[2] For simplicity, Reed's Amended Complaint will hereinafter be referred to as the complaint.

be granted and Reed's complaint will be dismissed for failing to state a claim upon which relief may be granted. In addition, Reed's motion to stay the execution will be denied and Goertz's motion to stay discovery dismissed.

## I. Background

### A. The Crime, Investigation, and Trial

Reed was convicted and sentenced to death for the 1996 abduction, rape, and murder of Stacey Lee Stites. The evidence introduced during Reed's capital-murder trial has been summarized in great detail by numerous courts, most comprehensively by the Texas Court of Criminal Appeals ("CCA") in an opinion following Reed's third state *habeas corpus* proceeding. *Ex parte Reed*, 271 S.W.3d 698, 702-12 (Tex. Crim. App. 2008). For purposes of this proceeding, however, the most relevant summary of the facts is from the CCA's 2017 opinion affirming the denial of Reed's DNA motion:

> [] Stacey Lee Stites's partially clothed body was found on the side of a back country road in Bastrop County on April 23, 1996. She was wearing only a black bra, underwear, undone blue jeans, socks, and a single tennis shoe, and her H.E.B. name tag was found in the crook of her knee. A white t-shirt, a piece of a brown woven belt without a buckle, and two beer cans were found nearby. Before Stites's murder, she was engaged to Jimmy Fennell, a Giddings police officer at the time, and the two shared Fennell's red pick-up truck. Stites worked the early-morning shift at H.E.B. and typically drove the truck to work. The truck was discovered in the Bastrop High School parking lot after Stites's disappearance. Among other things inside the truck, authorities found Stites's other shoe and broken pieces of a green plastic cup. Outside the truck, police found a piece of a brown woven belt with the buckle attached.
>
> Department of Public Safety (DPS) crime scene investigators Karen Blakley, Wilson Young, and Terry Sandifer processed Stites's body, the truck, and the scene where Stites was found. Blakley testified at trial that the murder weapon was the belt "[b]ecause it matched the pattern that was on [Stites's] neck." Blakley also concluded that the two belt pieces matched and were torn, not cut. Because Stites was found partially clothed and with her pants ripped open, Blakley presumed a sexual assault preceded the murder. At the scene, Blakley further observed Stites's underwear was wet in the crotch and bunched around her hips, so she tested the crotch of the underwear for semen. Getting a positive result, Blakley collected DNA samples from Stites's vagina and breasts.

2

Blakley did not collect samples from Stites's rectum because rigor mortis had already set in. Blakley also observed scratches on Stites's arms and abdomen, a cigarette burn on her arm, and what appeared to be fire ant bites on her wrists. To preserve any DNA evidence under her fingernails, DPS investigators put plastic bags over Stites's hands.

Dr. Robert Bayardo, the Travis County Medical Examiner, conducted Stites's autopsy the day after her body was found. He determined that Stites died around 3:00 a.m. on April 23rd. He also concluded that the belt was the murder weapon and that Stites died of asphyxiation by strangulation. Like Blakley, Bayardo presumed Stites was sexually assaulted, took vaginal swabs, and found sperm with both heads and tails intact. He also took rectal swabs but found only sperm heads with no tails. He noted that her anus was dilated with superficial lacerations. Dr. Bayardo thought the presence of sperm in the anus was indicative of penile penetration, but noted that it may have been attributed to seepage from the vagina. He concluded that Stites's anal injuries occurred at or around the time of death and therefore were not acts of consensual sexual activity.

When Young and Sandifer processed the truck for evidence, neither found fingerprints, blood, or semen identifying the perpetrator. However, they and Ranger L.T. Wardlow, the lead investigator on the case, noted the driver's seat position was reclined with the seatbelt fastened as if someone was pulled out of the seat while buckled in. Young, who stood six feet, two inches, also noticed that when he sat in the reclined driver's seat, he had a clear view out of the back window in the rearview mirror. Based on this, they concluded that someone who was six-foot-two or of similar height must have driven the truck.

Five days after Stites's body was found, a citizen reported finding some items they believed were connected to Stites's murder. The report, written by Officer Scoggins, stated that the citizen reported that a part of a shirt, two condoms, and part of a knife handle were found. At trial, Ranger Wardlow testified that he did not have personal knowledge about who brought in the condoms. However, he testified that he saw the condoms a short while after they were brought in and confirmed that the condoms "appeared to be old and cracked and worn out." These items were not tested for DNA evidence before trial.

Police investigated Stites's murder over the course of eleven months. During that time, police obtained twenty-eight biological samples from twenty-eight males. None of them matched the biological evidence found in and on Stites's body. After following several theories and lines of investigation—ruling out people Stites knew personally—police learned information about Reed that could make him a suspect. Reed was about the same height as Young, lived near the Bastrop High School, and frequently walked the area late at night. Police learned from DPS that Reed had an existing DNA sample on file and had DPS test it against the vaginal swabs taken by Blakley. Two different DNA tests of the samples concluded that Reed could not be excluded as a donor of the semen. Looking for more conclusive results, DPS forwarded the samples to LabCorp for

3

additional testing. Again, the results could not exclude Reed and determined that the samples matched Reed's genetic profile. The LabCorp technician, as well as Blakley, testified that intact sperm did not live more than twenty-four hours after commission of a vaginal-sexual assault and sperm breaks down faster in the rectal area than in the vaginal vault.

*Reed v. State*, 541 S.W.3d 759, 762-63 (Tex. Crim. App. 2017).

Following the discovery that Reed's DNA matched the DNA recovered from Stites's body, police provided Reed with *Miranda*[3] warnings and interviewed him. Reed denied knowing Stites. In May 1997, Reed was charged with capital murder. At trial the following year, prosecutors presented the evidence discovered during the murder investigation, as well as the testimony of Dr. Bayardo, Blakley, and DNA analyst Meghan Clement. In response, Reed's defense team mounted a two-pronged challenge to the State's evidence. First, the defense attempted to show that someone else, possibly Stites's fiancé Jimmy Fennell, had committed the offense. Second, to explain the presence of Reed's semen in Stites's body, the defense attempted to establish that Reed had an ongoing romantic relationship with Stites and that the semen was the result of consensual intercourse. After weighing the evidence, the jury ultimately rejected Reed's defense and found him guilty of capital murder. Reed was sentenced to death after a separate punishment hearing, where the jury heard evidence that Reed had committed numerous other sexual assaults.

**B.     Reed's Post-Conviction Proceedings**

Reed appealed his conviction on several grounds, including that the evidence was factually insufficient to support his conviction for capital murder. On December 6, 2000, the CCA rejected these claims, holding that "the strength of the DNA evidence connecting [Reed] to the sexual assault on [Stites] and the forensic evidence indicating that the person who sexually assaulted [her] was the person who killed her, a reasonable jury could find that [Reed] is guilty

---

[3]     *Miranda v. Arizona*, 384 U. S. 436 (1966).

of the offense of capital murder." *Reed v. State*, No. AP-73,135 (Tex. Crim. App.) (unpublished).

Since then, Reed has repeatedly challenged the constitutionality of his conviction and sentence in state court, having filed ten *habeas corpus* applications raising numerous allegations for relief. Each of the applications by Reed includes claims that newly-discovered evidence supports his assertion that he is actually innocent and that the State's failure to disclose this evidence violated his due-process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). On these issues alone, Reed has, over a lengthy period of time, provided the state courts with a variety of evidence to support his allegations and has received no less than three evidentiary hearings on the matters. To date, each of these applications has either been dismissed or denied, with neither the trial court nor the CCA ever seriously questioning the integrity of his conviction. *See, e.g., Ex parte Reed*, Nos. WR-50,961-08, WR-50,961-09, 2019 WL 2607452, at *1-3 (Tex. Crim. App. June 26, 2019).[4]

Reed has also challenged the constitutionality of his conviction and sentence in federal court, having sought federal *habeas corpus* relief from this court following the CCA's rejection of his first and second state *habeas corpus* applications. *See Reed v. Thaler*, No. 1:02-cv-142-LY (W.D. Tex). After permitting limited discovery and depositions, this court stayed Reed's federal proceedings to allow him to return to state court to exhaust claims that had not been presented to the state court in his previous state *habeas corpus* proceedings. Upon his return to federal court some six years later, Reed filed an amended petition raising, among other claims, a freestanding claim of actual innocence and a gateway claim of actual innocence to help overcome the procedural default of certain allegations. The State moved for summary judgment,

---

[4] Reed's tenth state *habeas corpus* application, filed November 11, 2019, is currently pending in the CCA.

and on June 15, 2012, a magistrate judge issued a comprehensive report and recommendation listing each of Reed's allegations and recommending their denial. A few months later, this court issued an order largely adopting the magistrate judge's recommendations and, relative to Reed's claims of actual innocence, finding there was no credible evidence to support the conclusions that Reed had a consensual relationship with Stites or that someone other than Reed murdered her. The decision was affirmed by the Fifth Circuit Court of Appeals in January 2014. *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014).

### C.  Reed's Post-Conviction Motion for DNA Testing

In April 2014, the State moved the state trial court to set an execution date for Reed. At a July 2014 hearing on the matter, Reed moved the trial court, pursuant to Chapter 64 of the Texas Code of Criminal Procedure, Tex. Code Crim. Proc. § 64 ("Chapter 64"), to have post-conviction DNA testing performed on a large number of items, including: (1) items recovered from Stites's body or her clothing, (2) items found in or near Fennell's truck, and (3) items located near the site where Stites's body was found. The trial court held a hearing on the motion, at which Reed expanded his request for testing to include numerous additional items found near the crime scene. Reed also presented the testimony of John Paulucci, an expert in crime-scene investigation, and Deanna Lankford, an expert in DNA testing. The State presented the testimony of three witnesses: Sergeant Gerald Clough, an investigator with the Office of the Attorney General; Etta Wiley, a Bastrop County Deputy Clerk; and Lisa Tanner, the lead prosecutor at Reed's trial.

The trial court denied Reed's DNA motion and issued findings of fact and conclusions of law on the matter. On appeal, the CCA remanded the case for additional findings, which the trial court rendered. On subsequent appeal, the CCA affirmed the trial court's denial of DNA testing

6

in an opinion delivered April 12, 2017. *Reed*, 541 S.W.3d at 759. Citing the requirements set forth by Chapter 64, both the trial court and the CCA found that Reed failed to demonstrate: (1) the evidence had been subjected to a chain of custody sufficient to establish it had not been substituted, tampered with, replaced, or altered in any material respect; (2) he would not have been convicted if exculpatory results had been obtained through DNA testing; and (3) his DNA motion was not made to unreasonably delay the execution of his sentence. *Id.* at 769-79; *see* Tex. Code Crim. Proc. Article 64.03(a). Reed appealed the CCA's decision to the United States Supreme Court, which denied certiorari. *Reed v. Texas*, __ U.S. __, 138 S. Ct. 2675 (2018).

### D.    Reed's Civil-Rights Complaint

On July 23, 2019, the trial court scheduled Reed to be executed on November 20, 2019. Two weeks later, Reed filed this civil-rights action challenging the constitutionality of Chapter 64 "both on its face and as interpreted, construed, and applied" by the CCA. Specifically, Reed asserts a due-process violation resulted from the CCA's imposition of "arbitrary" conditions on Chapter 64, which effectively precludes DNA testing in most cases and eviscerates the relief Chapter 64 was designed to provide. He also contends the CCA's interpretation of Chapter 64 has unconstitutionally deprived him of his rights under both the United States Constitution and the Texas Constitution to access the courts, to be free from cruel and unusual punishment, and to establish his innocence. Reed requests declaratory relief from this court stating that Chapter 64, as construed by the CCA, violates the First, Fifth, Eighth, and Fourteenth Amendments. *See* U.S. CONST. amend. I, V, VIII, and XIV. He also asks this court to stay his upcoming execution pending a resolution of this action.

## II. Jurisdiction

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a federal court must dismiss a case for lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc., v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Reed has filed a Section 1983 complaint challenging the constitutionality of the Texas DNA statute—Chapter 64—as authoritatively construed by the state court. The Supreme Court has found that such challenges may be brought in a Section 1983 action. *See Skinner v. Switzer*, 562 U.S. 521, 525 (2011) (holding "postconviction claim for DNA testing is properly pursued in a [Section] 1983 action."). This is so because success in this civil-rights action, unlike a petition for *habeas corpus* relief, would not "necessarily imply" the invalidity of Reed's conviction. *Id.* at 534 (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005)). In fact, DNA testing could potentially prove inconclusive or may even further incriminate Reed. Because Reed's complaint would not "necessarily spell speedier release," his suit is properly brought under Section 1983. *Young v. Gutierrez*, 895 F.3d 829, 831 (5th Cir. 2018) (citing *Skinner*, 562 U.S. at 534).

Nevertheless, Goertz requests dismissal of Reed's complaint under Rule 12(b)(1), arguing first that this court lacks subject-matter jurisdiction over the complaint under what is known as the *Rooker-Feldman* doctrine.[5] The doctrine is a jurisdictional rule that precludes the lower federal courts from reviewing state-court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005). The Supreme Court is the only federal court vested with authority to review a state court's judgment. *Id.*; *see* 28 U.S.C. § 1257(a) (providing, in relevant part, that "[f]inal judgments or decrees rendered by the highest court of a State in which

---

[5] The *Rooker-Feldman* doctrine derives from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

8

a decision could be had, may be reviewed by the Supreme Court by writ of certiorari" if they involve an issue of federal law). Given the "narrow ground" the doctrine occupies, however, the Supreme Court confined *Rooker-Feldman* "to cases . . . brought by state-court losers . . . inviting district court review and rejection of [a state court's] judgments." *Id.* at 283-84.

Reed's case does not fall within this narrow ground. Although it is true a state-court decision is not reviewable by a lower federal court under the *Rooker-Feldman* doctrine, the Supreme Court has clarified that "a statute or rule governing the decision may be challenged in a federal action." *Skinner*, 562 U.S. at 532 (citing *Exxon*, 544 U.S. at 284). Here, Reed's complaint specifically asserts that Reed is challenging "the constitutionality of [Chapter] 64 both on its face and as interpreted, construed, and applied" by the CCA. Because Reed is not challenging the adverse state-court decisions themselves but rather the validity of the Texas DNA statute they authoritatively construe, the *Rooker-Feldman* doctrine is inapplicable. *Skinner*, 562 U.S. at 530 (holding district court had jurisdiction to consider prisoner's Section 1983 case seeking DNA testing of evidence because case challenged "Texas' post-conviction DNA statute 'as construed' by the Texas courts" rather than challenging prior decisions denying requests for DNA testing through state-law procedures).

Goertz also asserts that dismissal of Reed's complaint is warranted under Rule 12(b)(1) because this court lacks subject-matter jurisdiction under the Eleventh Amendment. The Eleventh Amendment generally provides immunity to a State defendant against suits in federal court by a citizen of the State against the State or a state agency or department. U.S. CONST. amend. XI; *Saahir v. Estelle*, 47 F.3d 758, 760-61 (5th Cir. 1995) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-99 (1984)). When only state officials have been sued, the suit is barred if "the [S]tate is the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101.

Goertz argues that, as an agent of the State of Texas, the Eleventh Amendment provides him immunity from this suit because the State is the real party here.

However, there is a narrow exception to Eleventh Amendment immunity when a plaintiff sues state officials for an allegedly ongoing violation of federal law and seeks prospective, declaratory, or injunctive relief. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908). The Supreme Court has held that enforcement of an unconstitutional law is not an official act, because a state cannot confer authority on its officers to violate the Constitution or federal law. *Pennhurst*, 465 U.S. at 102-03 (finding suit challenging constitutionality of state official's action is not one against the State and thus is not barred by Eleventh Amendment); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (same) (citation omitted). To determine whether *Ex parte Young* applies, the court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted). Because Reed alleges a violation of federal law by an individual acting in an official capacity as an agent of the State and seeks prospective declaratory relief in this lawsuit, his claims are not barred by sovereign immunity. *Aguilar*, 160 F.3d at 1054. Contrary to Goertz's assertions, therefore, the court does not lack subject-matter jurisdiction.

### III. Standard of Review

Goertz also requests a dismissal of Reed's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A prisoner's civil-rights complaint should be dismissed if it is frivolous, malicious, or fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1); Fed. R. Civ. P. 12(b)(6). Although a complaint does not need detailed factual

allegations, a plaintiff must allege sufficient facts to show more than a speculative right to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Conclusory allegations and a formulaic recitation of the elements of a cause of action will not suffice to prevent dismissal for failure to state a claim. *Id.* To withstand dismissal for failure to state a claim, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678-79. This plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a district court's dismissal of a complaint for failing to state a claim will be upheld if, "taking the plaintiff's allegations as true, it appears that no relief could be granted based on the plaintiff's alleged facts." *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009).

## IV. Analysis

### A. The Due-Process Claim

Goertz moves to dismiss Reed's Section 1983 claims for failing to state a claim upon which relief may be granted. To state a claim under Section 1983, a plaintiff must prove that: (1) the conduct in question was committed by a person acting under the color of state law, and (2) the conduct deprived the claimant of a constitutional right. *Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010). In his complaint, Reed contends that the Texas DNA statute, as construed by the CCA, violates procedural due process because it imposes "arbitrary" and extra-statutory

11

conditions upon individuals seeking DNA testing.[6] While there is no freestanding right for a convicted defendant to obtain evidence for post-conviction DNA testing, Texas has created such a right, and, as a result, the state-provided procedures must be adequate to protect the substantive rights provided. *Skinner v. Switzer*, 562 U.S. 521, 525 (2011); *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009). In order for the procedures to be unconstitutional, the court would have to determine that the procedures are inadequate to protect Reed's right to seek post-conviction DNA testing and offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Skinner*, 562 U.S. at 525; *Osborne*, 557 U.S. at 69.

Chapter 64 permits a convicted defendant to move in the convicting court for post-conviction DNA testing of evidence. But Chapter 64 only allows the convicting state court to order testing if it finds that: (1) the evidence still exists and is in a condition that makes DNA testing possible; (2) the evidence has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; (3) identity was or is an issue in the case; (4) the convicted person establishes by a preponderance of the evidence that he would not have been convicted if DNA testing provided exculpatory results; and (5) the motion is not made to unreasonably delay the execution of a sentence. Tex. Code Crim. Proc. art. 64.03(a). The CCA affirmed the denial of Reed's DNA motion because Reed could not establish the chain-of-custody requirement or prove "by a preponderance of the

---

[6] According to Reed, the CCA's interpretation of Chapter 64 violates fundamental fairness in several ways, including: (1) imposing a flawed chain-of-custody requirement; (2) improperly limiting the definition of "exculpatory" only to results excluding the convicted person as the donor of the material; (3) failing to consider post-trial factual developments in determining whether he would have been convicted in light of presumed exculpatory DNA results; and (4) erroneously finding "unreasonable delay" in bringing his DNA motion even though the "touch DNA" testing he requested did not become available under the statute until 2014.

evidence that, in light of presumed exculpatory DNA results, he would not have been convicted." *Reed*, 541 S.W.3d at 774-78. The court also found that Reed failed to show that his motion was not made to unreasonably delay the execution of his sentence or the administration of justice. *Id.*

There is nothing so egregious in Chapter 64 that rises to the level of a procedural due-process violation. Reed has not met the heavy burden of showing that the procedures established by Chapter 64, as construed by the CCA, are inadequate to protect a defendant's right to post-conviction DNA testing. Considering Reed fully utilized the process enacted by the Texas Legislature to obtain DNA testing, all Reed has shown is that he disagrees with the state court's construction of Texas law. That is not enough.

After careful consideration, this court is unable to find any failure of the state's procedures that "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or that "transgress[es] any recognized principle of fundamental fairness in operation." *Moon v. City of El Paso*, 906 F.3d 352, 359 (5th Cir. 2018) (citing *Osborne*, 557 U.S. at 69). Indeed, there is simply "nothing inadequate about the procedures [Texas] has provided to vindicate its state right to postconviction relief in general," or anything "inadequate about how those procedures apply to those who seek access to DNA evidence." *Osborne*, 557 U.S at 70; *see also Pruett v. Choate*, 711 F. App'x 203, 206-07 (5th Cir. 2017) (unpublished) (finding plaintiff's assertions regarding CCA's interpretation of Chapter 64 "boil down to the bare claim that the CCA misapplied Texas law" and not a due-process violation).[7] In other words, Reed fails to establish that Chapter 64, as construed by the CCA, denies him procedural due process. *Skinner*, 562 U.S. at 525.

---

[7] "An unpublished opinion issued after January 1, 1996 is not controlling precedent, but may be persuasive authority. 5th Cir. R. 47.5.4." *Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006).

13

**B.     Access to Courts**

Reed next contends that the CCA's interpretation of Chapter 64 prevents him from gaining access to potentially exculpatory information that could demonstrate his innocence. According to Reed, this lack of information interferes with his First and Fourteenth Amendment rights of access to the courts, as it prevents him from collecting evidence to support either a successive *habeas corpus* petition or an application for clemency. U.S. CONST. amend. I, XIV. This claim fails to state a claim upon which relief may be granted.

It is well established that prisoners have a constitutional right of access to the courts that is "adequate, effective, and meaningful." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (quoting *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). That being said, "[o]ne is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation." *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017) (quoting *Whitaker v. Livingston*, 732 F.3d 465, 467 (5th Cir. 2013)). Rather, a plaintiff must show an actual injury and an actual legal claim to establish a valid access-to-courts claim. *Lewis v. Casey*, 518 U.S. 343, 350-52 (1996); *see also Turner v. Epps*, 460 F. App'x. 322, 328 (5th Cir. 2012) (explaining that "an inmate who brings a § 1983 claim based upon his right of access to the courts must be able to show that the infringing act somehow defeated his ability to pursue a legal claim."). This requirement reflects the fact that "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002).

In addition to Reed's access-to-courts claim, Reed's civil-rights action alleges that Chapter 64—on its face and as construed by the CCA—violates his due-process rights, the Eighth Amendment, the Texas Constitution, and his right to establish his innocence. But Reed

14

has presented nothing which permits this court to conclude that his rights under the United States Constitution or Texas Constitution are violated by Chapter 64. Reed thus cannot establish the necessary prerequisite of an "actual injury" to support his access-to-courts claim when he has no colorable claim to present to the court in the first place. "Plaintiffs must plead sufficient facts to state a cognizable legal claim." *Whitaker*, 732 F.3d at 467. Because Reed has not met the pleadings standards for the claims he raises, any access-to-the-courts theory fails as well.

Furthermore, although Reed argues the denial of his DNA motion impedes access to evidence he needs in order to pursue another actual-innocence claim in state court, the right of access to the courts does not encompass the ability "to *discover* grievances, and to *litigate effectively* once in court." *Lewis*, 518 U.S. at 354 (emphasis in original). Reed points to no actual claim that he was prevented from lodging in a court of law. Although Reed sought DNA testing to support a potential actual-innocence claim, his request was evaluated by the state trial court pursuant to the statutory process set forth in Chapter 64. *State v. Reed*, No. 8701 (21st Dist. Ct., Bastrop Cnty., Tex. Sept. 9, 2016) (Findings of Fact and Conclusions of Law). Reed also took advantage of the right to appeal the state trial court's decision to the CCA as set forth in the statute. *See* Tex. Code Crim. Proc. Article 64.05. Considering Reed fully utilized the processes of Chapter 64, he has shown only that his state-court motion was denied. That is not enough to establish an "actual injury" to support a claim that his right of access to the courts was obstructed. Reed's claim therefore fails.

C.     **The Eighth Amendment**

Reed argues that Chapter 64 violates the Eighth Amendment's prohibition on cruel-and-unusual punishment because the CCA has interpreted Chapter 64 to allow the denial of DNA testing even under circumstances where such testing has the capacity to prove innocence. *See*

U.S. CONST. amend. VIII. Without the opportunity to establish his innocence with potentially exculpatory DNA results, Reed contends, his execution will constitute cruel-and-unusual punishment. Reed provides no argument to support this assertion, nor is the court aware of any precedent indicating the denial of DNA testing constitutes an Eighth Amendment violation. Indeed, Reed's argument essentially seeks to constitutionalize a right to DNA testing under the Eighth Amendment whenever such testing "has the capacity to prove innocence," a notion the Supreme Court unambiguously rejected in *Osborne*. 557 U.S. at 72 (rejecting invitation to recognize "a freestanding right to DNA evidence" and concluding there is no substantive due-process post-conviction right to obtain evidence for DNA testing purposes). As such, Reed fails to state a viable Eighth Amendment claim.

**D.      Actual Innocence**

In a related allegation, Reed refers to an asserted constitutional right to prove his "actual innocence." The State's refusal to allow DNA testing, Reed argues, deprives him of "the opportunity to make a conclusive showing that he is actually innocent . . . in violation of the Eighth Amendment, the right to access to courts, the right to a remedy, and the Due Process Clause of the Fourteenth Amendment[.]" But whether such a federal right exists is "an open question." *Osborne*, 557 U.S. at 71. Reed fails to provide this court with authority establishing such a right and does not state a claim upon which relief may be granted.

Further, like the previous Eighth Amendment claim, Reed's attempt to establish a right to demonstrate his actual innocence through DNA testing fails under *Osborne*. "One of the main reasons underlying the decision in *Osborne* is that it should be primarily up to the state and federal legislatures to fashion procedures that balance the powerful exonerating potential of DNA evidence with the need for maintaining the existing criminal justice framework and the

finality of convictions and sentences." *See Alvarez v. Attorney Gen. for Fla.*, 679 F.3d 1257, 1265 (11th Cir. 2012) (citing *Osborne*, 557 U.S. at 62-63, 72-74). Although Reed asks this court to establish a *right* to DNA testing under the Eighth Amendment, such a holding would squarely conflict with the Supreme Court's explicit rejection of the invitation "[t]o suddenly constitutionalize this area." *Osborne*, 557 U.S. at 73 ("We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for handling DNA."). Only the Supreme Court may expand the existing parameters set forth in *Osborne*.

### E.    Claims Under the Texas Constitution

The dismissal of the above allegations leaves Reed's corresponding claim that his rights under the Texas Constitution were also violated. The Supreme Court has cautioned federal courts to avoid "[n]eedless decisions of state law" when, in situations such as this, the corresponding federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). And the general rule in the Fifth Circuit "is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Enochs v. Lampasas Cty.*, 641 F.3d 155, 161 (5th Cir. 2011) (citing *Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992)); *Brookshire Bros. Holding Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) (noting that "the general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial"). For these reasons, the court declines to exercise pendant jurisdiction over Reed's state-law claims.

## V. <u>Motion to Stay Execution</u>

Reed asks this court to stay his upcoming execution to allow for more time to review the claims raised in his complaint. A federal court has inherent discretion when deciding whether to stay an execution. *See* 28 U.S.C. § 2251(a)(1); *Nken v. Holder*, 556 U.S. 418, 434 (2009). However, "a stay of execution is an equitable remedy, and an inmate is not entitled to a stay of execution as a matter of course." *Hill v. McDonough*, 547 U.S. 573, 583-84 (2006); *Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019). In deciding whether to grant a stay of execution, a court must consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other party interested in the proceeding; and (4) where the public interest lies. *Nken*, 556 U.S. at 425-26.

The *Nken* factors support denying Reed's Motion to Stay Execution.[8] In particular, Reed fails to show a likelihood of success on the merits. Reed requests a stay of execution so that the court may consider the issues raised in his complaint: namely, whether Chapter 64, as interpreted by the state trial court and CCA, violates Reed's constitutional rights under both the United States and Texas Constitutions. Because the court rejects Reed's claims, he cannot demonstrate a likelihood of success on the merits. *See Diaz v. Stephens*, 731 F.3d 370, 379 (5th Cir. 2013) (affirming denial of stay when movant fails to establish likelihood of success on the merits).

Furthermore, equitable considerations weigh against granting Reed's Motion to Stay Execution. This court applies "a strong equitable presumption against the grant of a stay where a

---

[8] The second *Nken* factor—the possibility of irreparable injury—"weighs heavily in the movant's favor." *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (per curiam). But an applicant is not entitled to a stay "[as] a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 427 (internal quotation marks omitted).

18

claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Murphy*, 919 F.3d at 915 (citing *Hill*, 547 U.S. at 584). Here, Reed waited until the trial court held a hearing on the State's motion to set an execution date before seeking DNA testing under Chapter 64, despite the fact (1) he was convicted nearly 16 years previously, and (2) Chapter 64 had existed with only slight variations for over 13 years at the time Reed filed his motion. The CCA found that "there does not appear to be any factual or legal impediments that prevented Reed from availing himself of post-conviction DNA testing earlier." *Reed*, 541 S.W.3d at 779. Reed did not file this action until the state trial court scheduled his current execution date. Reed contends his state DNA proceedings "were marred by striking irregularities and delays requested by the State." But this does not explain the delay in filing this action over two years *after* the conclusion of Reed's state DNA proceedings. The court will deny the request for stay.

## VI. Conclusion and Order

Contrary to arguments made by Goertz, neither the *Rooker-Feldman* doctrine nor the Eleventh Amendment divest this court of subject-matter jurisdiction over Reed's claims for relief. However, Reed's complaint fails to state a claim upon which relief may be granted because there is nothing inadequate about how Chapter 64's procedures apply to those who seek access to DNA evidence. *See* 28 U.S.C. § 1915A(b)(1); Fed. R. Civ. P. 12(b)(6).

It is therefore **ORDERED** that Goertz's Motion to Dismiss, filed October 15, 2019 (Doc. #22), is hereby **GRANTED**.

It is further **ORDERED** that Reed's Amended Complaint (Doc. #10) seeking declaratory relief is **DISMISSED WITH PREJUDICE** for failing to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1); Fed. R. Civ. P. 12(b)(6).

It is further **ORDERED** that Reed's Motion to Stay Execution, filed October 1, 2019 (Doc. #11), is **DENIED**.

Finally, it is **ORDERED** that Goertz's Motion to Stay Discovery, filed October 15, 2019 (Doc. #24), is **DISMISSED**.

**SIGNED** this the 15th day of November, 2019.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE